**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

RECEIVED

JUL 1 4 2008 *alw*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.                    )
                                                    )
    TONY ANDERSON B-16044                           )
(Full name and prison number)                       )
(Include name under which convicted)                )
                                                    )
PETITIONER                                          )
                                                    )        08CV3979
        vs.                                         )        JUDGE BUCKLO
                                                    )        MAG. JUDGE NOLAN
    TERRY L. McCANN, Warden                         )
(Warden, Superintendent, or authorized              )
person having custody of petitioner)                )
                                                    )
RESPONDENT, and                                     )
                                                    )
(Fill in the following blank **only if judgment**   )
**attacked imposes a sentence to commence**         )
**in the future)**                                  )
                                                    )
                                                    )
ATTORNEY GENERAL OF THE STATE OF·                   )        Case Number of State Court Conviction:
                                                    )
    ILLINOIS                                         )        90 CR 11984 (02)
(State where judgment entered)                      )

**PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY**

1.  Name and location of court where conviction entered: Circuit Court of Cook County, Illinois

_____

2.  Date of judgment of conviction: May 9, 1991

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

Attempt First Degree Murder, Armed Robbery, and Armed Violence

4.  Sentence(s) imposed: (25)-years on Each Count

5.  What was your plea?  (Check one)      (A) Not guilty       ( XX )
                                          (B) Guilty           (   )
                                          (C) Nolo contendere  (   )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

## PART I -- TRIAL AND DIRECT REVIEW

1.  Kind of trial:  (Check one):         Jury ( )              Judge only (XX)

2.  Did you testify at trial?    YES ( XX         NO      ( )  (Note" AT SUPPRESSION HEARING)

3.  Did you appeal from the conviction or the sentence imposed? YES (X ) NO ( )

    (A)  If you appealed, give the

        (1) Name of court:  __First District, Appellate Court of Illinois__

        (2) Result:  __Affirmed__

        (3) Date of ruling:  __December 22, 2006__

        (4) Issues raised:  Violation of Due Process when coerced into  giving a false
    confession due to torture and abuse, Trial Counsel was ineffective by failing
    to investigate police torture, Denied his Fifth and Sixth Amendment right
    to counsel, and the State violated Due process by withholding evidence.

    (B)  If you did not appeal, explain briefly why not:

    _____

    _____

4.  Did you appeal, or seek leave to appeal, to the highest state court?  YES ( X)        NO ( )

    (A)  If yes, give the

        (1) Result  Denied Leave to Appeal to Illinois Supreme Court

        (2) Date of ruling:  May 31, 2007

        (3) Issues raised: Violation of Due Process when coerced into giving a false
    confession due to torture and abuse, Trial Counsel was ineffective by failing
    to investigate police torture, Denied his Fifth and Sixth Amendment right
    to counsel, and the State violated Due Process by withholding evidence.

    (B)  If no, why not: _____

5.  Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )    No ( X)

    If yes, give (A) date of petition: _____  (B) date *certiorari* was denied:  _____

2

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)  NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.  Name of court: <u>Cook County Circuit Court</u> / <u>Cook County Circuit Court</u>

    B.  Date of filing: <u>June 9, 2000</u> / <u>February 9, 2005 (Successive P.C.)</u>

    C.  Issues raised: <u>Unknown</u> / <u>Confession obtained as a result of Police Torture and abuse/ Trial Counsel ineffective for failing to investigate torture/ Denied right to counsel/State deliberately withholding evidence.</u>

    D.  Did you receive an evidentiary hearing on your petition? YES ( )  NO (X)

    E.  What was the court's ruling? <u>Summarily Dismissed</u>

    F.  Date of court's ruling: <u>February 16, 2005</u>

    G.  Did you appeal from the ruling on your petition?  YES (X)  NO ( )

    H.  (a) If yes,  (1) what was the result? <u>Affirmed</u>

               (2) date of decision: <u>December 22, 2006</u>

        (b) If no, explain briefly why not: _____

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES (X) NO ( )

        (a) If yes,  (1) what was the result? <u>Leave to Appeal Denied</u>

               (2) date of decision: <u>May 31, 2007, Mandate Issued July 6, 2007</u>

        (b) If no, explain briefly why not: _____

2.  With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )        NO (X)

    A.  If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.  Nature of proceeding     _____

        2.  Date petition filed     _____

        3.  Ruling on the petition     _____

        3.  Date of ruling     _____

        4.  If you appealed, what was the ruling on appeal?     _____

        5.  Date of ruling on appeal     _____

        6.  If there was a further appeal, what was the ruling ?     _____

        7.  Date of ruling on appeal     _____

3.  With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (x)

    A.  If yes, give name of court, case title and case number: _____

_____

    B.  Did the court rule on your petition? If so, state

        (1)  Ruling: _____

        (2)  Date: _____

**4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?**

**YES ( )    NO ( X)**

If yes, explain: _____

_____



## PART III — PETITIONER'S CLAIMS

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one  DENIED DUE PROCESS UNDER THE 5th, 6th, 8th & 14th Amendments.
Supporting facts (tell your story briefly without citing cases or law): of the U.S. Constitution.

Petitioner's Due Process rights were violated when he was 'coerced'

into giving a false confession to offenses he did not commit due to

the "Torture" and "Abuse" by Detective's at Area 2 violent crimes.

· (SEE ATTACHED MEMORANDUM OF LAW FOR ADDITIONAL SPECIFIC FACTS)

(B) Ground two  DENIED EFFECTIVE REPRESENTATION UNDER THE 5th, 6th & 14th
Supporting facts:  AMENDMENTS OF THE U.S. Constitution.
Petitioner's right to effective Representation was violated when his

trial counsel failed to investigate defendant's claims of Police "Torture"

and "Abuse" to coerce a confession and that there was a "systematic

Patter" by these names specific Detectives of Wrongdoing, Torture and

Abuse. (See: ATTACHED MEMORANDUM OF LAW FOR ADDITIONAL FACTS)

(C) **Ground three** DENIED HIS RIGHT TO COUNSEL PURSUANT TO THE 5th, 6th & 14th
**Supporting facts:** AMENDMENT OF THE U.S. CONSTITUTION.
Petitioner was denied his right to counsel because he was questioned and
tortured by Police, even after he requested counsel after arrest, and
requested to remain silent until an attorney was provided and present
prior to and during interrogations. (SEE: ATTACHED MEMORANDUM OF LAW
FOR ADDIRTIONAL FACTS)

(D) **Ground four** DENIED DUE PROCESS PURSUANT to the 8th and 14th AMENDMENTS OF
**Supporting facts:** THE U.S. CONSTITUTION.
Petitioner's Due Process rights were violated, by the State's failure
to disclose 'known' 'exculpatory evidence' to the defense pursuant to
BRADY V. MARYLAND, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963),
and 'cuntinue' to withhold and fail to disclose exculpatory Newly
Discovered Evidence.(SEE: ATTACHED MEMORANDUM OF LAW FOR ADDITIONAL
FACTS).

2    Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES (X)    NO ( )

3.    If you answered "NO" to question (16), state priefly who ........as were not so presented and why not:



PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _____

(B) At arraignment and plea _____

(C) At trial _____

(D) At sentencing _____

(E) On appeal  BRIAN A. McNEIL (Assistant Appellate Defender), 203 North
LaSalle Street, 24th Floor, Chicago, Illinois 60601

(F) In any post-conviction proceeding _____

(G) Other (state): _____


## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( X ). NO ( )

Name and location of the court which imposed the sentence:  COOK COUNTY, Chicago Illinois

Date and length of sentence to be served in the future _____ Sentences in case Numbers 90 CR 11985,
and a Multitude of other cases stemming from the indictment of over
100-Charges

   WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: June 1, 08
        (Date)

_____
Signature of attorney (if any)


I declare under penalty of perjury that the foregoing is true and correct.

_Tony Anthony_
(Signature of petitioner)
B-16044
(I.D. Number)
P.O. Box 112, Joliet, Ill. 60434
(Address)

7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA ex rel,]
                                 ]
TONY ANDERSON B-16044,           ]
                                 ]
        Petitioner,              ]
                                 ]
-Vs-                             ]  CASE NO:_____
                                 ]         (Supplied by Clerk of Court)
TERRY L. McCANN, Warden,         ]
                                 ]  The Honorable:_____
        Respondent.              ]  Judge Presiding.

---

MEMORANDUM OF LAW IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS.

---

NOW COMES the Petitioner, TONY ANDERSON, Pro se, and files this "Memorandum of Law in Support of Petition for Writ of Habeas Corpus", as follows:

## I. INTRODUCTION

"Democracy defends itself from anarchy by a degree it exalts process over passion.  Certainly this is the very reason why Justice Scalia has reminded us that "the more - - - - - - - - - - - - - - - - - reprehensible the charge, the more the defendant is in need of all constitutionally guaranteed protection for his defense." Danner v. Kentucky, 525 U.S. 1010, 119 S.Ct. 529. 530 (1998)(Scalia, J, dissenting from denial of certiorari).

Thus, while the circumstances of a capital case "excite a strong suspicion [] for which public clamor demands a victim" Jumpster v. People, 21 Ill. 375, 412 (1859), Like the surrounding 100-charges posed against the defendant herein, including multible murder counts, it is

-1-

nevertheless "the duty of the judiciary calmly to poise the scales of justice [] undisturbed by the clamor of the multitude." In re McDonald, 16 Fed.Cas. 17, 19 (E.D. Mo. 1861)(Treat, J.).

> [C]apital cases present the situation in which the clash in the State Courts between parochial interests and emotions on the one hand and national law and liberties on the other is most likely to favor the former and threaten the latter--precisely the situation in which the Framers saw a need for a federal appellate check on "a local spirit" and on a State judicial system "too little independent" of that spirit "to be relied upon for the inflexible execution of the national laws."

Federal Habeas Corpus Practice and Procedure, Leibman & Hertz, Lexis Law Publishing, Third Ed. at 101-102 (1998)(citations omitted).

Here, the "Local Spirit" of the Police and the Prosecution combined to deny the petitioner his Federal Constitutional rights. Serious constitutional questions have been raised in the "Petitiion for Writ of Habeas Corpus" that warrant a hearing, Discovery, and thereafter, the grant of the writ. While any one of these Constitutional violations warrant the grant of the Writ, these errors cumulatively denied the Petitioner his Constitutional rights to a fair trial

## II. HABEAS CORPUS REVIEW

### A.) Introduction

Habeas corpus is a remedy whose "most basic traditions and purposes" are to "avoid a grievous wrong--holding a person 'in custody in violation of the Constitution [][or laws or treaties] of the United States'" --and "thereby both [to] protect [] individuals from unconstitutional convictions and [to] help [] to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." O'Neal v. McAninch, 513 U.S. 432, 442, 115 S.Ct. 992, 997 (1995). Further, it is a remedy that "has been for centuries esteemed the best and only sufficient defense of

personal freedom" which, if withdrawn, "risk[s] injury to an important interest in human liberty." <u>Lonchar v. Thomas</u>, 517 U.S. 314, 116 S.Ct. 1293, 1299 (1996), quoting, <u>Ex parte Yerger</u>, 75 U.S. (8Wall.) 85, 95 (1869).

While there is a responsibility not to interfere with the sovereign power of the State, it is also the right and the duty of the Federal Courts to conduct its judicial work in a manner that reflects the seriousness of inflicting severe penalty upon a human being. In fact, the Federal Court's "duty to search for constitutional error with painstaking care is never more exacting than when the Court is aware of the multitude of cases involving the "Torture and Abuse" by the same Police Officers named by the Petitioner, and the 'known' failure of the Prosecution to disclose exculpatory evidence of that Torture and Abuse as presented in this case.

### B.) History of the "Great Writ"

Anglo-American habeas corpus jurisprudence was founded on an early recognition that the "right of personal liberty" is an "absolute right" established on the firmest basis by the provisions of "Magna Carta" and a long succession of statutes enacted under Edward III. <u>Blackstone's Commentaries</u>, Book III, Ch. 8, Secs 119, 128-129 at 1115, 1126, Lewis' Ed., Reese, Welsh & Company (1897). Further:

> [w]e know -it is a maxim- that this right of liberty must have had a remedy, and, if none was known, one must have been invented after 1215; and that one was invented before 1640 or 1679 [] The great writ must have been contrived in that interim. <u>Hallam, Const. Hist.</u> <u>617</u> narrates that in the case of a freeman detained in prison on a criminal charge 'it was always', that is before 1679, in his power to demand of the King's Bench a writ of habeas corpus[.]

<u>Habeas Corpus: A Protean Writ and Remedy</u>, George F. Longsdorf, 8 F.R.D. 179 (1949)

This <u>remedy</u> that was "invented" was, in fact, the "great and efficacious writ in all manner of illegal confinement [] Habeas corpus ad subjiciendum; [it was] directed to the person detaining another, [] commanding him to produce the body of the petitioner [] to do, submit to, and receive, whatever the Judge or court awarding such writ shall consider in that behalf." <u>Blackstone Commentaries</u>, Book III, Ch. 8, Sec. 131 at 1127, Lewis' Ed., Reese, Welsh & Company (1897).

Originally, the "Writ of Habeas Corpus" was simply a judicial mechanism by which the sheriff or other  custodian was commanded  to "have the body" of the incarcerated person before the Court. Notwith-standing its early purposes and functions, its use as a means of correction is well illustrated by cases decided in the latter part of the fourteenth Century.  Then in 1629, "<u>Chamber's Case</u>" confirmed that the writ of habeas corpus had assumed a new role. [] The questioning of the validity of commitments, previously an incidental effect of the writ, now became the major object.  It was at this point, then, that the writ of habeas corpus embarked upon its journey as "the highest remedy in law, for any man that is imprisoned." <u>The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame</u>, William F. Ducker, 53 N.Y.U. Law Review 983, 1035 (1978).  "The writ is particularly significant because it goes much further than demanding the presentment of the prisoner's body together with the cause of his taking and detention, in that it includes an explicit statement of the Court's intention upon examination: 'in order that the King might give order for his delivery according to right and the law and custom of the realm." <u>Ducker</u>, <u>Supra</u>. at 1009.

Yet, abuse of the writ by English Courts was common. Not only was the writ often ignored, but the Chancery Courts used the writ to defeat

the jurisdiction of lower Courts and the Courts of Common Law used the
writ to extend their jurisdiction. Ducker, supra. at 1009-1010.  These
abuses led to Legislation that culminated in the passage of the "Habeas
Corpus Act of 1679."  The Act formalized certain provisions of the
habeas corpus law, for example, the new Act included penalties for
evasion of the writ. but, "all other cases of unjust imprisonment [were]
left to the Habeas Corpus at common law." Blackstone Commentaries, Book
III, Ch. 8, Sec. 137 at 1133, Lewis' Ed., Reese, Welsh & Company (1897).
"It should be noticed that the [Act of 1679] did not grant anything new;
that it did not make habeas corpus, but merely made efficient a writ, which
was recognized as already existing." Habeas Corpus in the Colonies,  A.H.
Carpenter, 8 Am.Hist.Rev. 18, 19 (1902).

    "Habeas Corpus came to America and became part of the common and
Statute laws of the several States and of the United States." Longsdorf,
supra at 181. Habeas corpus was "claimed as among the immemorial rights
descended to [the Colonists] from the ancestors." Ex parte Yerger, 75
U.S. 85, 96 (1868). "[T]he habeas corpus, brought by our ancestors as
their birthright, to this country, was the common law habeas corpus; that
great embodiment of a free principle, which [was] born with the sturdy
Roman [and] preserved by the free Saxon." In re McDonald, 16 Fed.Cas. 17,
31 (E.D. Mo. 1861)(Treat, J.).

    The writ "was  a common law writ and remedy. [] It was therefore
common law in the Colonies and the several States." The Federal Habeas
Corpus Acts: Original and Amended, George F. Longsdorf, 13  F.R.D, 407
(1953). "[T]he right of the colonists as regards the writ of habeas
corpus rested upon the common law with the exception of South Carolina,
which re-enacted the English statute.  The lack of Statute did not mean
that the Colonists had no protection for their personal rights, for the
want was supplied by the Common Law, and also by placing of habeas

corpus provisions in their Court laws." Carpenter, supra at 26.

Federal Court jurisdiction in habeas corpus cases was limited, though. Pursuant to the "Judiciary Act of 1789", (1 Stat. 81), the United States Supreme Court "disclaim[ed] all jurisdiction not given by the constitution or by the laws of the United States." Ex parte Bollman, 8 U.S. 75, 94 (1807). The "restriction is interposed by the proviso to the fourteenth section of the act. [] It is in these words: 'Provided, that writs of habeas corpus shall in no case extend to prisoners in jail, unless they are in custody under or by color of the authority of the United States." The object of the proviso "was to prevent any possible conflict between the Federal and State tribunals. [] The provisi simply inhibits [the Federal Courts] from sending the writ to persons in legal custody in jail, unless their under the authority of the United States." Ex parte Des Roches, 7 Fed.Cas. 537, 539 (C.C. Cal. 1856); See also: In re McDonald, supra at 22. Unquestionably though, the Federal Courts had the power to grant the writ in all other cases it would reach at common law. Des Roches, at 538.

The decisions of the federal courts refusing to grant habeas corpus relief because of the lack of "jurisdiction", though, in no way diminished the historical fact that habeas corpus lay to "test any restraint contrary to fundamental law." The Framers, as well as every Colonist, clearly expected that the States would fully and fairly make available the Great Writ as it was known at common law and in the Court rules of the various Colonies. Moreover, the Federal Constitution's Suspension Clause guaranteed that the writ would not be suspended except in extraordinary circumstances. This provision thus insured that if the States failed in their responsibilities, the United States Constitution would authorize federal intervention, since habeas corpus is a right of national

-6-

citizenship protected by the Privileges and Immunities Clause. <u>See</u>:
<u>Slaughter House Cases</u>, 83 U.S. (16 Wall) 36, 114-115 (1872)(Bradley,
J. dissenting).

As the Union aged, Congress found it necessary to amend the habeas
corpus jurisdictional statutes from time to time because of the failings
of the States.  The experiences of history taught, and the National
Congress was quick to recognize, that the States were not always true to
the purpose of the Great Writ. Thus, Congress determined that federal
Courts must have jurisdiction to enforce the fundamental purposes of
the writ of habeas corpus to prevent <u>de facto</u> suspension the Great Writ.
(That certainly must have been the intention of the Habeas Corpus Act
of 1867 coupled with the 1866 proposal and the 1868 ratification of the
Fourteenth Amendment). Congress thus used, "[t]he habeas corpus
jurisdictional statute [to] implement [] the constitutional command that
the writ of habeas corpus be made available." <u>See</u>: <u>Jones v. Cunningham</u>,
371 U.S. 236, 238, 83 S.Ct. 373 (1963).

As the Supreme Court has noted:

> All the significant statutory changes in the fedreal writ have
> been prompted by grave political crises.  The first modification []
> was made [] March 2, 1833 [] in response to South Carolina's
> nullification ordinance.  The Act provided that federal Courts
> and Judges could release from State custody persons who had been
> acting under federal authority.  The Act of August 29, 1842 []
> which extended federal habeas to foreign nationals acting under
> authority of a foreign State, was prompted by British diplomatic
> protest following the trial of a Canadian soldier by a New York
> Court. [] The Act of February 5, 1867 [] which extended federal
> habeas to State prisoners generally, was passed in anticipation of
> possible Southern recalcitrance toward Reconstruction Legislation.

<u>Fay v. Noia</u>, 372 U.S. 391, 83 S.Ct. 822, 828, fn. 9 (1963). In fact,
"the developement of habeas corpus can largely be attributed to the
Unconscious forces of constitutional law. [] The writ became a viable
bulwark between the powers of government and the rights of the people [.]"
<u>Ducker</u>, <u>supra</u> at 1054.

-7-

"[T]he general spirit and genius of our institutions has tended to the widening and enlarging of the "habeas corpus" jurisdiction of the Courts and Judges of the United States." Ex parte Yerger, 75 U.S. 85, 102 (1868). In 1867, Congress sought to provide a federal forum for State prisoners having constitutional defenses by extending the habeas corpus powers of the federal Courts to their constitutional maximum. Fay v. Noia,, supra at 842. The Legislation was "of the most comprehensive character. It br[ought] within the 'habeas corpus' jurisdiction of every Court and of every Judge every possible case of privation of liberty contrary to the National Constitution, treaties, or laws. It [was] impossible to widen the jurisdiction." Exparte McCardle, 73 U.S. 318, 325-326 (1867).

"[W]hen the 1867 Congress provided that persons restrained of their liberty in violation of the Constitution could obtain a writ of habeas corpus from the federal Court, it undoubtedly intended [] to incorporate the common law uses and functions of this remedy." Legal History in the High Court-Habeas Corpus, Dallin oaks, 64 Mich. Law Review 451, 452 (1966). In fact, "the Act of 1867 [] restored rather than extended the common-law powers of the habeas Judge." Fay v.Noia, supra. at 868, fn. 27. And, even though the appellate jurisdiction of the Supreme Court was rescinded by the Act of March 27, 1868, (14 Stat. 44), See: Lindh, 96 F.3d at 868, final action in habeas cases rested with the District snd Circuit Judges. The Supreme Court in United States History, Charles Warren, Vol. II at 687, Little, Brown & Company (1935). Thus, since 1867, the full and complete common law usages of the Writ of Habeas Corpus have come within the "jurisdiction" of the Federal Courts.

Today, the United States Supreme Court consistently adheres to

the principle that habeas corpus is, "at its core, an equitable remedy".
Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 863 (1995). Statutes, Rules,
Precedents and Practices control the Writs exercise. Within Constitutional
Constraints, they reflect the balancing of sometimes controversial
objectives which are normally for Congress to make, but which Courts
will make when Congress has not resolved the question. Lonchar v. Thomas,
517 U.S. 314, 116 S.Ct. 1293, 1298 (1996).

Simply put, the "history of the Writ indicates that it constitutes
a prompt avenue of redress for grievances second to none." United
States ex rel. Norris v. Norman, 296 F.Supp. 1270, 1272-1273 (N.D. Ill.
1969)(Parsons, J.). And, even the passage of the AEDPA has not undermined
the "vital role" that the "Writ of Habeas Corpus [] plays in protecting
Constitutional rights." Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595,
1603 (2000).


### C.) Nature and Procedure of a Habeas Corpus Action

Habeas Corpus, technically speaking, is a civil proceeding. O'Neal
v. McAninch, 513 U.S. 432, 115 S.Ct. 992, 996 (1995). "[T]he traditional
characterization of the writ of habeas corpus as an original [] civil
remedy for the enforcement of the right of personal liberty, rather
than a stage of the State criminal proceedings or as an appeal therefrom,
emphasizes the independence of the Federal Habeas Proceedings from what
has gone before." Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 841 (1963).

As the Supreme Court has noted:

"Habeas Corpus is not an appellate proceeding, but rather an
original Civil action in a Federal Court.(cites) [I]t is a new
suit brought by [the petitioner] to enforce a civil right. (cite)
Any possible doubt about this point has been removed by the Statutory
procedure Congress has  provided for the disposition of habeas corpus
petitions, a procedure including such non-appellate functions as the
allegation of facts [] the taking of depositions and propounding of

interrogatories [] the intriduction of documentary evidence [] and, of course, the determination of facts at evidentiary hearing.

To be sure, habeas corpus has its own peculiar set of hurdles a petitioner must clear before his claim is properly presented to the district court. The petitioner must, in general, exhaust available State remedies (cite), avoid procedural default (cite), not abuse the writ (cite) and not seek retroactive application of a new rule of law. (cite) [] But once they [the hurdles] have been surmounted − once the claim is properly before the district court −a habeas corpus petitioner, like any civil litigant, has a right to a hearing where one is necessary to prove the facts supporting his claim. (cites)."

Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct 1715, 1722 (1992).

Additionally, the Supreme Court has repeatedly noted the interplay between statutory language and judicially managed equitable considerations in the developement of habeas corpus jurisprudence. Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 863 fn. 35 (1995).

"As the writ has evolved into an instrument that now demands not only conviction by a Court of competent jurisdiction (cite) but also application of basic constitutional doctrines of fairness (cite), Congress, the Rule writers, and the courts have developed more complex procedural principles that regularize and thereby narrow the discretion that individual judges can freely exercise. Those principles seek to maintain the Courts' freedom to issue the writ, aptly described as the "highest safeguard of liberty," (cite), while at the same time avoiding serious, improper delay, expense, complexity, and interference with a State's interest in the "finality" of its own legal process. (cites) These legal principles are embodied in statutes, rules, precedents, and practices that control the writ's exercise."

Lonchar v. Thomas, 517 U.S. 314, 116 S.Ct. 1293, 1298 (1996).

Simply put, "[W]hen a federal district court reviews a habeas corpus petition pursuant to 28 U.S.C.  § 2254, it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'  The court does not review a judgment, but the lawfulness of the petitioner's custody simpliciter."  Coleman v. Thompson, 501 U.S. 730, 111 S.Ct. 2546, 2554 (1991)(citations omitted).


## 1.) Applicable Procedural Principles


Federal Habeas relief is available only after a petitioner has (a)

given the State Courts a full and fair opportunity to review a claim ("fair presentment" leading to "exhaustion"); (b) has shown "cause and prejudice" for the failure to raise the claim in State Court, or (c) when enforcing a default would lead to a "fundamental miscarriage of justice." Franklin v. Gilmore, 188 F.3d 877, 881-882 (7th Cir. 1999). The standard for reviewing alleged procedurally defaulted claims has not been altered by the general provisions of the AEDPA. See: Weeks v. Angelone, 4 F.Supp.2d 497, 509-510 (E.D. Va. 1998). And, careful consideration must be given to the procedural status of each claim as "the rules for procedural default in habeas corpus cases have become Byzantine in their complexity." Howard v. O'Sullivan, 185 F.3d 721, 724 (7th Cir. 1999).

### a.) "Fair Presentment" (The Sine Qua Non of "Exhaustion")

Generally, a Federal Court cannot address the merits of a habeas petition unless the State Courts have first had a full and fair opportunity to review the petitioner's claims. Picard v. Connor, 404 U.S. 270, 275-76, 92 S.Ct. 509 (1971); Farrell v. Lane, 939 F.2d 409, 410 (7th Cir.), cert. denied sub nom., Farrell v. McGinnis, 502 U.S. 944, 112 S.Ct. 387 (1991). The Seventh Circuit announced the guidelines for determining whether State Courts have had a fair opportunity to consider a federal claim in verdin v. O'Leary, 972 F.2d 1467, 1472-73 (7th Cir. 1992). The Court noted that:

> If the petitioner's argument to the State court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on State cases applying constitutional analysis to a similar fact situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the State Courts to

-11-

have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the Court must consider the specific facts of each case.

A federal constitutional claim is "fairly presented" to a State Court when both the operative facts and the controlling legal principles are submitted to that court. Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995); Verdin, 972 F.2d at 1474. The claim must be presented in such a way as to "fairly alert the State Court to any applicable [Federal] constitutional grounds for the claim." Green v. Peters, 36 F.3d 602, 605 (7th Cir. 1994), cert denied, 115 S.Ct. 1703 (1995)(quoting United States ex rel. Sullivan v. Fairman, 731 F.2d 450, 453 (7th Cir. 1984)). By doing so, a State Court is afforded the opportunity to resolve the constitutional issue on federal grounds in accordance with Federal rights. Verdin, 972 F.2d at 1473-76.

A habeas petitioner must only "fairly alert" the State Court of the federal constitutional grounds for his claims. The claims presented in State and Federal Courts need not be exact replicas of each other to satisfy the fair presentment requirement. Howard v. O'Sullivan, 185 F.3d 721, 726 (7th Cir. 1999). What is important is that the substance of the federal claim be presented fairly. Porter v. Gramley, 112 F.3d 1308, 1315 (7th Cir. 1997), citing, Verdin. And, federal courts must take care to "avoid hypertechnicality" in determining whether a claim is fairly presented. Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995). In fact, a "mere variation" of a previously presented claim will be considered. See: Wilks v. Isreal, 627 F.2d 32, 38 (7th Cir. 1980).

The United States Supreme Court has not implied that claims have to be raised "only by citing book and verse of the Federal constitution." Picard v. Connor, 404 U.S. 270, 277-78, 92 S.Ct. 509 (1971); Verdin,

-12-

972 F.2d at 1474.  A Petitioner may alert the State Court that a
Federal Constitutional claim is at issue by relying on Federal or State
cases employing Federal constitutional analysis, See e.g., Williams v.
Lord, 996 F.2d 1481, 1483 (2nd Cir. 1993), cert denied, 510 U.S. 1120
(1994); Whipple v. Duckworth, 957 F.2d 418, 420-21 (7th Cir.), cert.
denied, 506 U.S. 876 (1992), or by alleging the claim using "magic words"
that call to mind a specific federal constitutional right. See e.g.,
Ford v. Georgia, 498 U.S. 411, 419, 111 S.Ct. 850 (1981); Beam v. Paskett,
3 F.3d 1301, 1305 (9th Cir.), cert. denied, 511 U.S. 1060 (1993)(State
court challange to death penalty statute as "unconstitutionally
arbitrary" alerted State Court that Eighth Amendment claim was at issue);
McNulty v. Olim, 652 F.2d 1369, 1370 (9th Cir. 1981)(use of words
"ineffective assistance" exhausted Sixth Amendment claim). Additionally,
allegations of a pattern of facts that is well within the mainstream
of constitutional litigation, United States ex rel. Sullivan v. Fairman,
731 F.2d 450, 454 n.8 (7th Cir. 1984), is sufficient to fairly present
a federal constitutional claim so as to avoid procedural default.

It suffices that the substantial equivalent of a petitioner's
federal habeas claim has been argued in the State proceedings.  The
question really is "whether any of the petitioner's claims is so clearly
distinct from the claims he has already presented to the State Courts
that it may fairly be said that the State Courts have had no opportunity
to pass on the claim. Humphrey v. Cady, 405 U.S. 504, 516 n.18, 92 S.Ct.
1048 (1972);accord, e.g., Vasquez v. Hillery, 474 U.S. 254, 260, 106
S.Ct. 617 (1986)("supplemental evidence [] did not fundamentally alter
the [] claim [] considered by the State courts"); Sanders v. United
States, 373 U.S. 1, 16, 83 S.Ct. 1068 (1963)("identical grounds [for
exhaustion purposes] may often be proved by different factual allegations.

-13-

So also, identical grounds may often be supported by different legal
arguments, [] or be couched in different language, [] or vary in
immaterial respects."); Wells v. Maass, 28 F.3d 1005, 1008-09 & n.1 (9th
Cir. 1994)(although petitioner's claim was presented in somewhat different
terms in State Supreme Court, claim was adequately preserved under State
law because brief was sufficient "to put the Oregon Supreme Court on
notice" of central legal and factual elements of claim).

    And, a habeas petitioner may formulate somewhat the claims made in
State Court.  Exhaustion requires only that the substance of the
Federal claim be fairly presented. Carter v. Bell, 218 F.3d 581, 606-607
(6th Cir. 2000). "New factual allegations do not render a claim
unexhausted unless they "fundamentally alter the legal claim already
considered by the State Court." Chacon v. Wood, 36 F.3d 1459, 1468 (9th
Cir. 1994), citing, Vasquez v. Hillery, 474 U.S. 254, 260, 106 S.Ct. 617,
622 (1986). At bottom, "[o]bviously there are instances in which 'the
ultimate question for disposition' [] will be the same despite variations
in legal theory or factual allegations urged in its support." Picard,
Id. at 277.


### i.) State Court Review of a Defaulted Claim Authorizes
### Later Federal Review

    It is important to note also where the State court proceeds to
decide an allegedly defaulted claim on the merits, the federal court
may also consider that claim. Robertson v. Hanks, 140 F.3d 707, 709
(7th Cir.), cert. Denied, 119 S.Ct. 189 (1998); See also: Harris v.
Reed, 489 U.S. 255, 262-63, 109 S.Ct. 1038, 1043 (1989); See also:
Williams v. Parke, 133 F.3d 971, 973 (7th Cir. 1997), Citing, Coleman
v. Thompson, 501 U.S. 722, 735, 111 S.Ct. 2546 (1991). It is true that

-14-

if a state court refused to hear a federal claim because it was not
properly presented to the State Courts, and the refusal was based on
adequate and independent state grounds, the Federal Courts are barred
from reviewing the claim. Hogan v. McBride, 74 F.3d 144, 146 (7th Cir.),
modified, 79 F.3d 578 (7th Cir. 1996). However:

> Federal Courts have not always been able to discern from the face
> of a State Court opinion whether the Court actually relied upon a
> State procedural bar or whether the Court reached the merits of the
> federal claim. (Cites)  Reluctant to entangle the federal judiciary
> unnecessarily in deciphering state law claims, the Supreme Court
> has placed the burden on state courts to make clear on what  grounds,
> State or Federal, they base their decision.  "In habeas, if  the
> [State Court decision] appeared to rest primarily on resolution of
> those claims, or to be interwoven with those claims, and did not
> clearly and expressly rely on an independent and adequate state
> ground, a federal court may address the petition." Coleman v.
> Thompson, 501 U.S. 722, 735 [.]

Swofford v. DeTella, 101 F.3d 1218, 1222 (7th Cir. 1996).

Thus, for a State ground to be considered independent and adequate,
the State Court must "clearly and expressly" rely on that ground, and
a federal court will presume that no such ground exists if it is not
clear from the face of the opinion." United States ex rel Armstrong
v. Burris, 48 F.Supp.2d 1084, 1086 (N.D. Ill. 1999), citing, Coleman,
501 U.S. at 735, 111 S.Ct. at 2546; See also: Jenkins v. Nelson, 157
F.3d 485, 491 (7th Cir. 1998), cert. denied, 119 S.Ct. 2402 (1999)(Where
the state court decision does not include an express statement detailing
its reliance on procedural default, habeas court concluded the claim
was not procedurally barred).

### ii.) State Procedural bars Must be based on Adequate and Independent Grounds to Preclude Federal Review.

Moreover, a State Court's failure to follow firmly established
and regularly followed State rules in finding a claim to be procedurally

-15-

defaulted will preclude the State from relying on "default" to bar federal review. See: <u>Johnson v. Mississippi</u>, 486 U.S. 578, 588-89, 108 S.Ct. 1981, 1988 (1988); <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S.Ct. 850, 857 (1991).  State Court decisions are not adequate to bar federal review unless they rest upon firmly established and regularly followed state practice. <u>Franklin v. Gilmore</u>, 188 F.3d 877, 882 (7th Cir. 1999). Thus, a state court's default rules are not "adequate" if they are inconsistently applied. <u>See</u>: e.g., <u>Moran v. McDaniel</u>, 80 F.3d 1261, 1269 (9th Cir. 1996).

To be "adequate", the State rule must be "firmly established and regularly followed". <u>Franklin</u>, <u>Id</u>. at 882; <u>Rosa v. Peters</u>, 36 F.3d 625, 633 (7th Cir. 1994). A basis of decision applied infrequently, unexpectedly or freakishly may be inadequate, for the lack of notice and consistency may show that the State is discriminating against the federal rights asserted. <u>Tredway v. Farley</u>, 35 F.3d 288, 295 (7th Cir. 1994). In fact, this lack of notice or consistency in ruling by a state court will not constitute an independent and adequate state ground. <u>Lilly v. Gilmore</u>, 988 F.2d 783, 785 (7th Cir. 1993), <u>citing</u>, <u>Prihoda v. McCaughtry</u>, 910 F.2d 1379, 1383 (7th Cir. 1990).

The proper time for determining whether a procedural rule was firmly established and regularly followed is the time of the purported procedural default. For example, a petitioner cannot be expected to comply with a procedural rule that does not exist at the time, and should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has passed. <u>Walker v. Ward</u>, 167 F.3d 1339, 1344-1345 (10th Cir. 1999), <u>cert</u>. <u>denied</u>, sub nom, <u>Walker v. Edmondson</u>, 120 S.Ct. 449 (1999).

Finally, although "forfeiture" is a question involving a State's
internal law and procedures, resolving whether a petitioner has fairly
presented his claim to the state court, thus permitting federal review,
is an intrinsically federal issue which must be determined by the
Federal Court. See: Wydles v. Hundley, 69 F.3d 247, 251 (8th Cir. 1995);
Harris v. Champion, 15 F.3d 1538, 1556 (10th Cir. 1994).


### b.) "Cause and Prejudice"


A federal court may address the merits of a procedurally defaulted
claim if the petitioner can demonstrate "Cause" sufficient to excuse
the procedural default and "actual prejudice" resulting from a failure
to obtain review of the merits. Wainwright v. Sykes, 433 U.S. 72, 87, 97
S.Ct. 2497, 2506 (1997); Lemons v. O'Sullivan, 54 F.3d 357, 360 (7th Cir),
Cert. Denied, 116 S.Ct. 528 (1995).

For a petitioner to demonstrate sufficient "Cause", there must
generally be some external impediment that prevented the petitioner from
raising the claim. Edwards v. Carpenter, 529 U.S. 446, 120 S.Ct. 1587,
1591 (2000); Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645
1986). Yet, the United States Supreme Court has not attempted to
establish conclusively the contours of the "cause" and "prejudice"
standards. Amadeo v. Zant, 486 U.S. 214, 221, 108 S.Ct. 1771 (1988).

While "cause" for procedural default generally involves "some
objective factor exterior to the defense [that] impedes counsel's
efforts to comply with the State's procedural rule", Murray, Id. at
488, the overall fairness of the entire proceeding may fall within the
rubic of "cause" excusing procedural default. See: Wainwright v. Sykes,
433 U.S. 72, 95-96, 97 S.Ct. 2497 (1977).

The concepts of "objective factor" and "external impediment" have broad application. For instance, the concepts encompass situations in which the factual or legal basis for a claim was not reasonably available [to counsel or petitioner] or in which the Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment [which the Supreme Court has designated an 'objective factor external to the defense' in that it 'must be imputed to the State.']. See: Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2566-67 (1991); Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986). Interference by the State, Amedeo v. Zant, 486 U.S. 214, 222, 108 S.Ct. 1771 (1991), Counsel's conflicts of interest, Jennings v. Purkett, 7 F.3d 779, 782 (8th Cir. 1993), and legal novelty of a claim or failure to present a legal claim for which the factual basis is not readily available, Reed v. Ross, 468 U.S. 1, 13-14, 104 S.Ct. 2901 (1984), may constitute "cause". Additionally, it is conceivable that the denial of access to the courts may constitute "cause". Lamp v. State of Iowa,  122 F.3d 1100, 1105 (8th Cir. 1997).

Ineffective assistance of counsel can be "cause" for a petitioner's default. See: e.g., United States ex rel Barnard v. Lane, 819 F.2d 798 (7th Cir. 1987); See also: Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2566 (1991).  This includes situations where counsel fails to raise a claim reasonably known to him. See: e.g., Amedeo v. Zant, 486 U.S. 214, 222, 108 S.Ct. 1771 (1991) or where counsel is unaware  of the facts and the law. See: e.g., Wainwright v. Sykes, 433 U.S. 72, 98-99, 97 S.Ct. 2497 (1977); Estelle v. Williams, 425 U.S. 501, 515, 96 S.Ct. 1691 (1976).

Additionally, in certain situations, ineffective assistance of post-conviction counsel should constitute "cause" to excuse procedural

-18-

default.  This is so because, while there may be no independent  Sixth
Amendment right under the Federal Constitution, there is a Statutory
right to counsel in Illinois Post-Conviction proceedings.  725 ILCS
5/122-2.1(a)(1).  And, where representation by counsel is provided for,
it is the effective assistance of counsel that is mandated. See:
Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 847 (1993).  The
right to counsel would be a futile gesture unless it comprehended the
right to the effective assistance of counsel. Evitts v. Lucey, 469 U.S.
387, 105 S.Ct. 830, 837 (1985).  To deprive any petitioner  of the
effective assistance of counsel that is statutorily provided would
raise a due process and equal protection violation.  This is so because
where a State provides a right, it cannot discriminate in the exercise
of that right. See: e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct.
585, 590 (1956). That is, "when a State opts to act in a field where its
action has significant discretionary elements, it must [] act in accord
with the dictates of the Constitution--and, in particular, in accord
with the Due Process Clause." Evitts v. Lucey, Id. at 839. Moreover, the
purpose of the Equal Protection Clause is to secure every person within
a State's jurisdiction against intentional and arbitrary discrimination,
Whether occasioned by the express terms of a statute or by its improper
execution through duly constituted agents. Village of Willowbrook v.
Olech, 528 U.S. 562, 120 S.Ct. 1073, 1075 (2000)

An argument that the United States Supreme Court's holding in
Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546 (1991) precludes
representation by competent counsel on collateral review is erroneous.
Moreover, that argument is in direct conflict with the exceedingly high
standards demanded of counsel pursuant to Keeney v. Tamayo-Reyes, 504
U.S. 1, 112 S.Ct. 1715 (1992) and McCleskey v. Zant, 499 U.S. 467, 111

-19-

S.Ct. 1454 (1991).  The Courts, on one hand, cannot demand flawless performance of counsel in the representation of issues on collateral review to preserve them for habeas consideration and then, on the other hand, maintain that counsel need not be effective during those collateral proceedings.

While a criminal defendant is not constitutionally entitled  to the effective assistance of counsel in State habeas proceedings after a constitutional claim has been exhausted on direct appellate review, See: Williams v. Turpin, 87 F.3d 1204 (11th Cir. 1996), citing, Finley, 481 U.S. at 555, 107 S.Ct. at 1993, the question has not been squarely addressed in a "right to counsel" case whether a defendant is entitled to the effective assistance of counsel on collateral review where the constitutional issue has not been exhausted on direct review and a State mandates effective representation in the State Courts.  The Seventh Circuit has recognized, though, that "[o]ne can imagine scenarios where egregious attorney misconduct in a State post-conviction proceeding would make it unjust to hold a federal habeas petitioner to any resulting default." Morrison v. Duckworth, 898 F.2d 1298, 1301 (7th Cir. 1990); See: Williams v. Duckworth, 724 F.2d 1439, 1441 (7th Cir. 1984); Henderson v. Sargent, 926 F.2d 706, 709 (8th Cir. 1991)(ineffectiveness of counsel in a State collateral proceeding can constitute cause).

To deny a Petitioner competent counsel on collateral review is tantamount to telling the government that they can use trickery, deceit and any means of illegality to gain a conviction and then preclude a Petitioner from having any means of countering or attacking the illegality of the conviction on collateral review. Simply put, it is exactly what has occurred in this case.  A petitioner must have a means to counter the

-20-

unconstitutionality of his conviction where the first place to attack
that conviction is on collateral review, especially in light of the
fact that the State 'knew' of the torture and abuse occurring with
the same officers involved in the petitioners case, and the "State"
was aware of the "Numerous" similar complaints' filed against these
Officers for the same or similar misconduct, however, the State made
a decision 'deliberately' not to disclose this evidence to the defense
until after all procedural deadlines had surpassed, and then which
would allow the State to argue "procedural default" and "avoid" addressing
the merits of the allegations.

An indigent has a right to the effective assistance of counsl for
his one and only appeal that he has as a matter of right. Douglas v.
California, 372 U.S. 353, 83 S.Ct. 814 (1963). It follows that an
indigent has a right to the effective assistance of counsel at the one
and only proceeding where he can raise constitutional claims for the
first time. See: McFarland v. Scott, 512 U.S. 849, 114 S.Ct. 2568 (1994)
(Indigent entitled to appointment of effective counsel on collateral
review). To  hold otherwise would result, in certain cases, in a
defandant being totally deprived of constitutionally mandated effective
representation.  One of the "scenarios" imagined by the Seventh Circuit
surely must have been the situation where trial counsel is ineffective,
that ineffectiveness could only be proved by matters outside the record
(and would, therefore, not be considered on direct review), and, when
combined with the fact that the State 'withholds' exculpatory evidence,
post-conviction counsel, in his incompetence, totally fails to raise
the Sixth Amendment right to competent counsel claim, and Eighth and
Fourteenth Amendment Due Process claims. In this situation, a defendant
has been denied his constitutional rights.  There must be a remedy for

-21-

this type of wrong.

Just as the Supreme Court has not established conclusively the contours of "cause", neither has the court established conclusively the contours of the "Prejudice" standard. Amadeo v. Zant, 486 U.S. 214, 221, 108 S.Ct. 1771 (1988). Prejudice requires more than a mere possibility of prejudice and the error must have "worked to [the Petitioner's] actual and substantial disadvantage." United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584 (1982). Probably the most appropriate standard for determining whether prejudice has occurred is to determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 506 U.S. 619, 113 S.Ct. 1710 (1993). (The actual standard to be employed, post-AEDPA, in assessing whether a constitutional error is harmless is an open question. Pre-AEDPA, Brecht, supra, was the Standard. The Seventh Circuit has not addressed if Brecht applies post-AEDPA. Whitehead v. Cowan, F.3d 708, 726 fn. 3, (7th Cir. 2001). And, when the "matter is so evenly balanced that [the Federal Judge] feels himself in virtual equipoise as to the harmlessness of the error," the Court should find the error is not harmless and grant relief on behalf of the petitioner. O'Neal v. McAninch, 513 U.S. 432, 435, 115 S.ct. 992 (1995).

Finally, procedural default will be excused in cases of "Newly Discovered Evidence". Reed v. Ross, 468 U.S. 1, 104 S.Ct. 2901 (1984). Presentation of that newly discovered evidence provides the means for a Federal Court to review otherwise defaulted claims. See: Herrera v. Collins, 506 U.S. 390, 404-05, 113 S.Ct. 853 (1993); See also: Milone v. Camp, 22 F.3d 693. 701 (7th Cir. 1994).

-22-

### c.) "Miscarriage of Justice"

Additionally, if failure to consider claims will result in a "fundamental miscarriage of justice," procedural default will be excused. Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995); Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 2518 (1992); Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2565 (1991); McClesky v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 1470 (1991); Engle v. Isaac, 456 U.S. 107, 135, 102 S.Ct. 1558 (1982); Wainwright v. Sykes, 433 U.S. 72, 91, 97 S.Ct. 2497 (1977). The "miscarriage of justice" exception is concernined with actual as compared to legal innocence. Sawyer, Id. at 339.  If a petitioner asserts his "actual" innocence, as here, of the underlying crime, he must show it is "more likely than not that no reasonable juror would have convicted him" in light of the new evidence presented in the habeas petition. Schlup, Id. at 324. On the other hand, if a petitioner challenges the validity of his sentence. he must show "by clear and convincing evidence" that no reasonable juror would have imposed such a sentence. A claim of "actual" innocence is a "gateway" through which a habeas  petitioner must pass to have his otherwise barred constitutional claim considered on the merits. Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853 (1993).

A Court must determine if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1956 (1999), quoting, Kyles v. Whitley, 514 U.S. 419.  A "significant possibility" that the undisclosed evidence would place the actual result of the proceeding in question should be sufficient to warrant overturning a conviction or sentence. Strickler, Id. at 1957.

Simply put, the "very nature of the writ demands that it be

-23-

administered with the initiative and flexibility essential to insure
that miscarriages of justice within reach are surfaced and corrected,"
Harris v. Nelson, 394 U.S. 286, 291, 89 S.Ct. 1082 (1969), and that
preclusive doctrines and formalities "yield to the imperative of
correcting [] fundamentally unjust incarceration." Engle v. Isaac, 456
U.S. 107, 135, 102 S.Ct. 1558 (1982).

### d.) Right to an Evidentiary Hearing

Ever since 1867, Federal Courts have had the authority and the
responsibility to "hear and determine the facts, and dispose of the
matter as law and justice require." See Act of February 5, 1867, Ch. 28,
Sec. 1; 14 Stat. 385-386; currently codified at 28 U.S.C. § 2243 (1996).
Thus, whenever "there is a reasonable likelihood that the production of
evidence will make the answer to the [constitutional] questions clearer,"
Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 213, 55 S.Ct. 187
(1934)(Cardozo, J. concurring), the "essential facts should be determined
before passing upon grave constitutional questions [.]" Polk Co. v.
Glover, 305 U.S. 5, 10, 59 S.Ct. 15 (1938).

Generally, an evidentiary hearing is mandatory id (1) the merits
of the federal dispute were not resolved in a State hearing; (2) The
State factual determination is not fairly supported by the record as
a whole, (3) the fact-finding procedure employed by the State Court
was not adequate to afford a full and fair hearing; (4) there is a
substantial allegation of "Newly Discovered Evidence"; (5) the material
facts were not adequately developed at the State Court Hearing; or (6)
for any reason it appears that the State trier of fact did not afford
the habeas applicant a full and fair fact hearing. Townsend v. Sain, 372

U.S. 293, 313, 83 S.Ct. 745 (1963).

More importantly, though, a Federal District Court always has the discretion to hold an evidentiary hearing. Townsend, Id. at 318; See also: e.g., Lonchar v. Thomas, 517 U.S. 314, 326, 116 S.Ct. 1293 (1996)("district Court is afforded a degree of discretion in determining whether to hold an evidentiary hearing.", citing Rule 8(a) of the Rules governing Section 2254 Cases; Keeney v. Tamayo-Reyes, 504 U.S. at 11-12; Townsend v. Sain, 372 U.S. at 318). Moreover, the standards announced in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1963), including the requirements that a hearing is mandatory when a habeas petitioner has alleged facts that, if proven, would entitle him to relief, are still applicable even after the amendments made by the AEDPA. See: e.g., Porter v. Gramley, 112 F.3d 1308, 1314 (7th Cir. 1997).

While the AEDPA does impose express limitations on the grant of an evidentiary hearing and reduces considerably the degree of a district court's discretion in granting a hearing, the District Court may still proceed to consider whether a hearing is appropriate or required under Townsend, if the applicant has not failed to develope the facts in State court. Burris v. Parke, 116 F.3d 256, 258 (7th Cir. 1997); Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); See also: Turner v. Duncan, 158 F.3d 449, 458 (9th Cir. 1998)(when a habeas petitioner alleges facts which, if proven, would entitle him to relief, and he did not receive a full and fair hearing by a State Court which found the relevant facts, then he is entitled to an evidentiary hearing in the District Court).

In short, a Federal Court is obligated to hold its own evidentiary hearing on habeas corpus is, amongst other factors, the factfinding procedures employed by the State were not adequate to afford a full and

-25-

and fair hearing, the material facts were not adequately developed at
the State Court hearing, the applicant did not receive a full, fair and
adequate hearing in the State court proceeding, Hamilton v. Texas, 497
U.S. 1016, 110 S.Ct. 3262, 3264 (1990); Townsend v. Sain, 372 U.S. 293,
83 S.Ct. 745, (1963), or the State Court trier of fact has not reliably
found the relevant facts. Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir.
1997).    These Standards announced in Townsend are still applicable even
after the amendments made by the AEDPA. See: e.g., Fisher v. Lee, 215
F.3d 438 (4th Cir. 2000); Trotter v. Bunnell, 163 F.3d 607 (9th Cir.
1998). And, in fact, District Court's still have general  discretion to
afford evidentiary hearings under Townsend. See: United States ex rel.
Maxwell v.  gilmore, 37 F.Supp.2d 1078, 1090 (N.D. Ill. 1999). With all
these beforementioned principle's in mind, this Honorable Court should
grant relief on the claims contained herein for the following reasons:


## STATEMENT OF FACTS


Chicago Police Department in April 1990 through it's Detective's
went on a "fishing expedition" and without any legitimate probable
cause falsely detained the petitioner under the 'guise' that he was
driving a "Stolen Vehicle", which the Detective's knew to be false in
order to detain petitioner for 'questioning' on a multitude of other
unsolved crimes. Upon arrest petitioner exercised his right to counsel
by 'requesting' an attorney, however, that request was ignored by
police authorities, After the alleged 'stolen vehicle' allegations
were dropped when the owner of the vehicle verified that petitioner

-26-

had consent and authority to operate the vehicle, the officer relayed
to the petitioner that he still was not free to go as they had
'allegedly' discovered a 'gun' in the vehicle that the owner of the
vehicle claimed he knew nothing about, and that Area 2 Detective's
were in route to question the petitioner about a 'homicide' that  they
believed this alleged gun was involved in. At this point, again the
petitioner exercised his right to counsel and right to remain silent
by requesting that he be provided with a lawyer after being advised
of the seriousness of these allegations and advised the officers  that
the Detective's could ask questions through his lawyer. and denied
having any knowledge of any such crimes.

     In his Successive post-conviction petition (APPENDIX "A") which
is incorporated herein and made a part hereof, Petitioner alleged  (1)
that Area 2 Detectives coerced his confession through 'torture and
abuse' which led to his conviction for attempt murder, Armed Robbery
and Armed violence following his bench trial on May 9th, 1991, and
alleged that (2) trial counsel was ineffective in failing to investigate
and discover that a 'pattern' of torture and abuse existed at Area
2  prior to and when Petitioner's confession was coerced by these "same"
Detective's in a multitude of other cases, and alleged (3) that the
prosecution was aware of and participated, yet suppressed--the evidence
trial counsel should have investigated and discovered--the existence
and pattern and practice of torture and abuse at Area 2 by these  same
Detectives, and (4) that petitioner was denied his right to counsel
when officer's continued to question him, and ultimately coerce him
into a confession 'after' he invoked his right to counsel.  Petitioner
clearly stated the withheld and suppressed evidence was favorable to
the petitioner with respect to his coerced confession, and that the

-27-

disclosure and possession of this evidence (had it not been knowingly
suppressed) would have changed the outcome of his Suppression Hearing
and Trial in this case and a multitude of other cases. Finally, the
petition also alleged (5) that Petitioner's Appellate Counsel was
ineffective in failing to investigate, develope and present these claims
in the prior Appellate proceedings..

On February 15, 2005, the Circuit Court summarily dismissed petitioners
Successive-Post-Conviction Petition, attaching as an exhibit an internal
Police Complaint against Officer Robert Dwyer, but on March 24, 2005, the
Circuit Court denied the Motion to reconsider.

## PETITIONER'S CONFESSION

On April 18, 1990, Petitioner (Tony Anderson) and "Robert Allen"
were arrested by Officer's Gregory Sellers and Patrick Brosnan under
the 'guise' of a "Stolen Vehicle", after that charge was dropped,
Petitioner was questioned at —— the Auto Theft Section at 1121 South
State Street. After denying any knowledge of any crimes, Petitioner
was transported to Area 2 headquarters on 111th Street by Detectives
Michael McDermott and John Gallagher; at Area 2 Violent Crimes,
Petitioner was placed in an interview room on the second floor. Detectives
Tony Maslanka and John Paladino of Area 3 visited on April 19th to
question Petitioner because they had received word that petitioner
allegedly had knowledge of an Area 3 homicide.  Mr. Anderson after
hours of denial made a statement implicating himself in a number of
crimes with which was was charged, the substance of that alleged
statement was introduced at trial.

**Pre-Trial Motion to Suppress**

Prior to trial, Mr. Anderson's counsel [William Heenan] moved to suppress Petitioner's confession on the ground that it was coerced.  At a pre-trial hearing on the motion on May 1, 1991. Petitioner testified to having been abused and tortured at Area 2 Police headquarters  after he denied involvement in a multitude of crimes in which he was innocent, Specifically he stated that Detective McDermott placed a gun to his head and said he would "blow [his] damn brains out.", and that Detective Maslanka later jabbed Petitioner with a nightstick or billy club in the chest legs and back munerous times until he was overborne with fear of further pain and suffering.(See Proceedings).

**Petitioner's Trial for Attempt Murder, Armed Robbery, and Armed Violence.**

At a bench trial for Attempt Murder, Armed Robbery, and Armed Violence on May 9, 1991, Detective McDermott testified to the substance of Mr. Anderson's incriminating statement with regard to these offenses, and petitioner was convicted on all counts for Attempt Murder, Armed violence and Armed Robbery and the trial court sentenced petitioner to 25 years imprisonment on each count.

**Proceedings on Direct Appeal**

Mr. Anderson appealed the trial court's verdicts in People v. Anderson, No. 1-91-1867 (1994)(unpublished order under Supreme Court Rule 23), arguing that there was insufficient evidence to support a

conviction and that his conviction for Armed Violence violated the
one-act, one-crime rule. The Appellate Court rejected the former argument
but agreed with the latter and vacated  thy conviction for Armed violence.

## PETITIONER'S INITIAL PETITION FOR POST-CONVICTION RELIEF

On June 9, 2000, Petitioner filed his first petition for Post-
Conviction Relief. That petition was Summarily dismissed, and counsel
filed a Motion to withdraw as counsel pursuant to <u>Pennsylvania v. Finley</u>,
481 U.S. 551 (1987). The appellate Court granted counsel's motion and
affirmed the Summary dismissal in <u>People v. Anderson</u>, No. 1-00-3454
(Feb 16, 2002)(unpublished order Pursuant to Supreme Court Rule 23).

## The Instant Petition and Claims
## (SUCCESSIVE POST-CONVICTION PETITION)

On February 9th, 2005, Petitioner filed the Instant claims in
a "Successive Post-Conviction Petition" based on Newly Discovered
Evidence" (<u>See</u>: APPENDIX "A")  Those Claims enumerated therein are
the Claims and Factual allegations of this Habeas Corpus Petition.

In this Petition, Petitioner alleges that he made his alleged
incriminating Statement due to "torture" and "Abuse" inflicted upon
him by Area 2 Detectives and visiting Area 3 Detectives. Particularly,
Petitioner identified Detective's (Michael McDermott) and (Tony Maslanka)
as having coerced his confession. Petitioner asserted that Detective
McDermott held a gun to his head and threatened to "blow [his] brains
out" if he did not sign a confession. Later, Detective (Maslanka) 'jabbed'
and hit Petitioner repeatedly in the back and chest with a nightstick or

-30-

billy club. Following these events, Petitioner signed a statement
implicating himself in various crimes and resulting charges being
filed against him for attempt murder, armed robbery and armed violence,
the subject of these proceedings as well as numerous other charges.

The petition also alleges that petitioner explained to his trial
counsel, (William Heenan), that he had been coerced into confessing by
Detective McDermott and Maslanka's Abuse and Torture. However, despite
knowledge of this coercion, counsel failed to undertake and investigation
into these Detective's or other Area 2 personnel and their  Interrogation
tactic's. Had counsel done so, he would have discovered the existence
of a "systematic pattern of torture" in place at Area 2, and that a
multitude of complaints had previously been filed against these Detectives
for the same or similar conduct, and which continued to occur even
after the defendant's conviction to extract confessions from suspects;
this pattern tracked Petitioners allegations of coercion and would have
been favorable evidence to present at his suppression hearing and trial.
Further, such an investigation would have uncovered the involvement of
these particular Detectives in other torture incidents, Which would have
changed the outcome of both the Suppression Hearing and trial..

Further the prosecution was aware of the evidence supporting the
Petitioner's claims of police coercion at the time of his trial and
yet choose to not disclose this material to the defense in violation
of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).. These allegations identify
documentation of widespread contemporaneous police torture at Area
2 in general, and, more specifically, involving the same Detective's
petitioner accused of torturing him in this case, using the 'same'
torture tactic's and abuse as alleged by petitioner. Had the prosecution

-31-

disclosed this material, it would have increased the likelihood that
his confession would have been suppressed and changed the outcome of
his trial: "The evidence which the State failed to disclose would have
created a reasonable doubt that the petitioner committed the offenses
in question.".

In addition, It was alleged that following petitioner's arrest,
petitioner requested counsel, which was ignored, and even when Miranda
rights were read while at Area 2, Petitioner asserted his right to
remain silent and requested counsel. Nevertheless, he was tortured and
abused until he confessed to crimes he did not commit as described
above..


**Motions to Cite Additional Authority based on "Newly Discovered
Evidence" in State Court-(the Report of the Special State's Attorney)**


In (July 2006), "The Report of the Special State's Attorney (Torture
Report") was issued (Pursuant to a Federal Court Order).  This Torture
Report concluded that Detectives (Tony Maslanka) and (Michael McDermott)
had coerced a confession from (Alfonzo Pinex at area 2 in 1985. (Torture
Report at 286-290)(Attached: APPENDIX "D"). On August 17, 2006 the
Illinois Appellate Court granted the motion to cite the Torture Report,
                                   . It should be noted that since this
Report was published, further evidence of "Torture and Abuse" from
Area 2 Detectives have surfaced, in excess of over two-hundred cases,
many of which track the same or similar allegations of Torture and
Abuse as has been maintained by petitioner throughout the pendency of
his case. Some of those Reports however, are continuing to be
Suppressed from the petitioner herein even though petitioner has brought

-32-

to the States attention the known 'existence' of these Complaints,
Reports and Records

The Illinois Appellate Court affirmed the Summary dismissal of
petitioner's beforementioned claims at the first stage of the Post-
Conviction proceedings which "Conflicted" with a decision the same
Appellate Court made only (11)-days earlier. The Appellate Court's
decision in People v. Anderson, No. 1-05-1379 (December 22, 2006)
(Attached: APPENDIX "B") "Conflicts" with the opinion it issued less
than two weeks earlier in People v. Reyes ___ Ill.App.3d__ , 860 N.E.2d
488, 2006 Ill.App. LEXIS 1132, Nos. 1-04-1047 and 04-1150 (cons)(December
11, 2006). In Reyes, the appellate Court reaffirmed the principles
enunciated by the Illinois Supreme Court in People v. Edwards, 197
Ill.2d 239, 757 N.E.2d 442 (2001) and People v. Coleman), 183 Ill.2d
366, 388-89, 701 N.E.2d 1063 (1998), holding that, at the first stage
of the proceedings, a "post-conviction petition need not set forth a
claim in its entirety, and need only present a limited amount of detail."
Reyes, 2006 Ill.App. LEXIS at *30(quoting Edwards, 197 Ill.2d at 244).
The Reyes Court emphasized that "these principles apply with special
force where the petition is "pro se" and the petitioner is likely a
person of limited education." Id. at *31.  In addition, the Illinois
Court decision improperly applies the "cause and Prejudice" test to
the claims pursuant to People v. Pitsonbarger, 205 Ill.2d 444, 460 (2002)
despite the petitioner's presentation of Claims of "Actual Innocence".

Petitioner "incorporates his CLAIMS presented to the State Courts
in which "No" evidentiary hearings were held, and of which the Petitioner
was not given a full and fair opportunity in which to fully develope
his Claims and the factual predicates thereof in 'Any' of the State
Court Proceedings.

## CONCLUSION

For the reasons stated in this Pro-se Memorandum of Law the Petitioner would respectfully request that this Honorable Court Grant the Appointment of Counsel herein to further Develope Petitioner's Claims, Grant authority for additional Discovery regarding the matters of torture and abuse asserted herein, and grant Petitioner an Evidentiary Hearing and the Grant of the Writ of Habeas Corpus, and any further relief that the Court deems equitable and just.

Respectfully submitted,

TONY ANDERSON (Pro-se) B-16044
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

-34-

## INDEX

## OF APPENDIX

|  |  | PAGE |
|---|---|---|
| APPENDIX "A" | (Successive Post-Conviction Petition W/Exhibits) Filed: February 9th, 2005 | 36 |
| APPENDIX "B" | (First Judicial District-Appellate Court Opinion/Order) Filed: December 22, 2006. | 224 |
| APPENDIX "C" | (Conflicting Opinion of People v. Reyes) Decided December 11th, 2006. | 261 |
| APPENDIX "D" | (ALFONZO PINEX "Torture Report" p.275-292). | 284 |

## APPENDIX "A"

### (SUCCESSIVE POST-CONVICTION PETITION W/EXHIBITS)
### FILED: FEBRUARY 9, 2005



IN THE
CIRCUIT COURT OF COOK COUNTY
ILLINOIS, CRIMINAL DIVISION

People of The State of Illinois,       )
                          Respondent,  )
                                       )
vs.                                    )     Case No. 90 CR 11984
                                       )
Tony Anderson,                         )
                          Petitioner.  )

*Petitioner's Copy Please send back stamped file*

FILED
FEB 09 200
DOROTHY BROWN
CLERK OF CIRCUIT COURT

### Proof of Service

PLEASE TAKE NOTICE that on *January 24, 2004*, I, Tony Anderson,
Petitioner, swears that I mailed the required number of copies of the attached
Petition for Leave to File a Successive Post-Conviction Petition to the Party
listed below, by placing it in the U.S. Mail at the Stateville Correction Center,
together with the appropriate request to Prison Officials responsible to affix
fully prepare postage thereon, a copy of which is hereby served upon you.

TO  The Cook County State's Attorney's Office
    2650 S. California Ave.
    Chicago, IL 60608

                                        *Tony Anderson*
                                        Tony Anderson

### NOTICE OF FILING

PLEASE TAKE NOTICE that on *January 24, 2004*, I, Tony Anderson,
Petitioner, swears under the penalties in pursuant of 1-109 of the Code of Civil
Procedure, that I shall file with the Clerk of the above Court, Petitioner's
pro se Petition for Leave to File a Successive Post-Conviction Petition, and that
I have service all the required copies upon Interested Parties.

                                        *Tony Anderson*
                                        Tony Anderson
                                        Reg.# B-16044
                                        Stateville Corr. Ctr.
                                        Route 53, Box 112
                                        Joliet, IL 60434

RECEIVED
FEB 07 2005
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

IN THE
CIRCUIT COURT OF COOK COUNTY
ILLINOIS, CRIMINAL DIVISION

People of The State of Illinois,           )
                          Respondent,       )

vs                                          )        Case No. 90 CR ~~11111~~ 11984

                                            )

Tony Anderson,                              )
                          Petitioner.       )

## MOTION FOR APPOINTMENT OF COUNSEL

        NOW COMES, Tony Anderson, Petitioner, pro se, and respectfully requests that
he have an attorney appointed to represent him in this post-conviction proceeding, in
pursuant to 725 ILCS 5/122-1, et.,seq.   In support thereof, petitioner states as
follows:

    1.  That the petitioner is presently incarcerated in the Stateville Correctional
    Center.

    2.  That he is without income or assets with which to pay for the cost of this
    litigation or to procure counsel.

    3.  That he do not have the necessary education or skills to represent himself in
    this proceeding.

        WHEREFORE, petitioner prays that he be granted leave to file the above
captioned petiton for post-conviction relief, and to have counsel appointed to
represent him in this proceeding.

                                            Respectfully Submitted

                                            _Tony anderson_

                                            Tony Anderson


Subscribed and sworn to before me
this _24th_ day of _January_, 2004

_Crystal L. Mason_

NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

IN THE
CIRCUIT COURT OF COOK COUNTY
ILLINOIS, CRIMINAL DIVISION

FILED

FEB 09 2005

DOROTHY BROWN
CLERK OF CIRCUIT COURT

People of The State of Illinois,           )

              Respondent,           )

vs.                                        )   Case No. 90 CR 11984

Tony Anderson,                             )

              Petitioner.           )

## PETITION FOR LEAVE TO FILE A
## SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF

NOW COMES, Tony Anderson, Petitioner, pro se, in pursuant to 725 ILCS 5/122-1 et. seq., and respectfully requests that this Honorable Court grant leave to file the attached successive petition for post-conviction relief, and grant the requested relief therein.  In support thereof, the petitioner states as follows:

1.  On _____, the petitioner was arrested, cahrged and indicted with attempted murder, armed robbery and armed violence; and after waiving his right to a trial by jury, he was found guilty on all charges and sentenced to concurrent terms of 25 years on each conviction. (Case No. 90 CR 11984)

2.  Petitioner appealed his convictions to the Illinois Appellate Court, First District, and on July 12, 1994, the Court issued an opinion affirming in part and vacating in part petitioner's convictions. (Case No. 1-91-1867)

3.  On or around January 12, 1995, Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, and on June 23, 1995, the Court issued a mandate which "Denied" the petition for leave to appeal.

4.  Petitioner subsequently filed a pro se post-conviction petition, which was summarily dismissed, and he appealed the dismissal to the Illinois Appellate Court, first District.

5.  After petitioner's appointed counsel, the Cook County Public Defender; filed a motion for leave to withdraw as appellate counsel in pursuant of Pennsylvania vs. Finley, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987), stating, "that he has reviewed the trial record and concluded that there are no arguable bases for collateral relief," and after the petitioner responded to the motion, the court affirmed the judgment of the Circuit Court on February 26, 2002. (Case No. 1-00-3453)

6.  The issues raised in this successive post-conviction petition has not been previously raised or argued in any proceedings below, mainly in part based on the ineffective assistance of appellate counsel and trial counsel.

## STATEMENT OF FACTS

7. Petitioner was arrested on April 18, 1990, on the unrelated charges of Auto Theft, along with his wife and a friend, Robert Allen, and was trandsported to Police Headquarters on 11th and State Street in Chicago.

8. Later that night, Detectives Michael McDermott and John Gallagher came from and transported the petitioner and Robert Allen to Area 2 HQers to be questioned about a host of unsolved crimes.

9. At Area 2 HQers, petitioner repeated his request to remain silent, the same request he made to the Arresting Officers from 11th and State, Officers Gregory Sellers and Patrick Brosnan, and repeated his rights to have a lawyer and to make a telephone call.

10. While being held in an Area 2 interview room, Det. McDermott pulled out his gun and threatened to "blow out [the petitioner's] brains,' in an attempt to get the petitioner to sign a confession.

11. Later, Detectives Tony Maslanka and John Paladino traveled to Area 2 HQers from Area 3 HQers, where they were assigned, to interview the petitioner about more unsolved crimes. And when the petitioner explained that he had no knowledge of the crimes in question, Det. Maslanka began jabbing the petitioner in the back and chest with his night-stick, in an attempt to get him to sign a coerced confession to crimes he did not commit.

12. Because of the abuse and coercion , the petitioner eventually ended up signing the coerced confessions that the officers wanted him to sign.

13. Because of the coerced confession, in part, the petitioner was eventually charged with the crimes described above.

14. At the Hearing on the Motion to Suppress the Confession in the instant case, Detectives McDermott, Gallagher, Maslanka and Paladino had all testified that the petitioner had voluntarily confessed to the crimes , and that there were no abuse.

15. The court ruled after the Hearing was held:

> "We must base our decision on the totality of the evidence viewing all of
> it together and viewing all of that evidence [the Detectives' testimonies],
> we find number one, that Mr. Anderson was advised of his rights numerous
> times, at least two or three occasions.
> We further find that he was not in anyway threatened or abuse at any time
> during the period which is relevant to this motion at the very least and
> respectfully, although it is not really critical to the issues in this case,
> we find that the evidence we choose to accept the evidence, the testimony
> of the police officers indicating that he was at no time abused or physically
> threatened in anyway.

We find that his statement given at approximately 2:00 o'clock, I believe in the morning on April 19th, 1990, was given freely and voluntarily without coercion or threat or compulsion of any kind.
The motion to suppress the statement will be denied." (empasises added)

16.  Based on the ineffective assistance of counsel or based on counsel's strategy, which was not based on any investigation or interviews, Trial Counsel, William J. Heenan, failed to present facts which were readily available that would have buttressed the petitioner's claims of being coerced and abused.

17.  After the petitioner was found guilty by a jury the Court sentenced him to concurrent terms of 25 years in prison (and his co-defendant, Robert Allen was also found guilty and sentenced to concurrent terms of 55 years on each convictions).

## PETITIONER'S CONFESSION WAS NOT VOLUNTARILY MADE AND WAS THE RESULT OF COERCION AND THE INEFFECTIVE ASSISTANCE OF COUNSEL

18.  The petitioner explained to Counsel Heenan, before the Hearing to Suppress the Confession and before the jury trial, that he was abused and threatened during his interrogation by Detectives McDermott and Maslanka in particular, into signing coerced confessions, and a coerced confession in the instant case. (See Exhibit #1: Affidavit of Tony Anderson)

19.  Counsel Heenan failed to conduct an investigation of any kind of the Public Records and information readily available to him through the subpoena process.  Had counsel provided effective assistance to the petitioner, he would have discovered the available evidence that the officers involved in the instant case, Detectives McDermott and John Gallagher (along with Maslanka and Paladino), had used the same methods of torture and abuse on other suspects to obtain coerced confessions, while being detained at Area 2 and Area 3 Police HQers:

   a.  Marcus Wiggins, 13 years old was beat and tortured by these officers into confessing to a crime he did not commit, and was later exonerated.(See: Wiggins vs. Burge, 173 F.R.D. 226, (N.D. Ill. 1997) and, Wiggins v. Martin, 150 F. 3d 671 (7th Cir. 1998).

   b.  Cortez Brown was stopped for a traffic violation, and later tortured and abused by these officers on Septemeber 20, 1990.

   c.  Sylvester Green sworn in-court testimonies on March 4, 1983 and December 28, 1983, described in detail how he was tortured and beaten by these officers into allegedly making a confession.

   d.  Shadeed Mumin's sworn in-court testimony, who on October 30, 1985, was beaten and tortured by these officers into allegedly making a confession.

20. Counsel Heenan failure is not that he just failed to uncover those incidents. Rather, had counsel conducted even a basic investigation into allegations of police torture, he would have found evidence that these officers who tortured and abused Mr. Anderson had used the same techniques on other persons, and that the eviednce of these numerous instances of torture and abuse leads to the conclusion that these officers at Area 2 and later at Area 3 under the command of now fired Police Cmdr. Jon Burge, had engaged in a systematic pattern and practice of using torture to extract confessions from suspects.

21. This systematic pattern and practice of torture to extract confessions is the conclusion of many court findings and the Chicago Police Department's own Office of Professional Standards and Federal jury. (See: OPS Special Project Conclusion Report ((The Burge Investigation)), dated September 28, 1990, at 000006; and Wilson v. City of Chicago, 1989 WL 157667 (N.D. Ill. 1989).

22. The Office of Professional Standards concluded:

> "In the matter of alleged physical abuse, the preponderance of evidence is that abuse did occur and that it was systematic. The time span involved more than ten years. The type of abuse described was not limited to the usual beatings, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.
>
> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 officers are named as the location of the abuse."

23. As of the filing of this petition, there is a substantial body of evidence and numerous judicial findings that support the conclusion that for two decades, Burge and those who worked under him, including all the officers involved in the petitioner's interrogation in which he was abused, and others, had engaged in a pattern of torture and other unconscionable abuses of power:

> SEE: People v. Wilson, 116 Ill.2d 29 (1987); People v. Cannon, 293 Ill.App. 3d 634 (1997); People v. Banks, 192 Ill.App. 3d 986 (1989); People v. Bates, 267 Ill.App. 3d 503, (1994); Wilson v. City of Chicago, 6 F.3d 1233 (7th Cir 1993); In The Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, Feb. 11, 1993); Burge v. Police Board, No. 93 CH 2265 (Circuit Court of Cook County, Feb. 10, 1994); Burge, O'Hara, and Yucaitis v. Police Board, No. 1-94-999, 1-94-2462, 1-94-2475 (consolidated) (Ill. App. Ct., Dec. 15, 1995, unpublished); Wilson v. City of Chicago, 1995 WL 581352 (N.D. Ill. 1995); Wilson v. City of Chiago, 120 F. ed 681 (7th Cir. 1997); U.S. ex rel. Maxwell v. Gilmore, 1999 WL 130331 (N.D. Ill) at *14; People v. Patterson, 192 Ill. 2d 93 (2000); People v. King, 192

Ill. 2d 189 (2000); Wiggins v. Burge 173 F.R.D. 226, (N.D. Ill. 1997);
Wiggins v. Martin 150 F. 3d 671 (7th Cir. 1998); OPS Special Investigative
Report and Findings that Burge, O'Hara and Yucaitis tortured Andrew Wilson,
Oct. 26, 1990 (The Sanders Report); Gayle Shines, OPS Special Project
Conclusion Reports and Findings that there was systematic torture and abuse
at Area 2, Nov. 2, 1990 (The Goldston Report); OPS Summary Report and
Sustained Findings in the Re-Opened OPS Complaints of Phillip Adkins, CR#
142201; Darrell Cannon, CR# 134723; Gregory Banks CR# 188617; Stanley
Howard CR# 142017; Thomas Craft CR# 200390; OPS Memorandum, 12/21/94, RE:
Sustained Findings in Lee Holmes' Re-opened CR; Wilson v. City of Chicago,
Defendants' amended Answer, dated July 13, 1995, in which the City admits
that Andrew Wilson and Melvin Jones were tortured by Burge; Statement of
former Police Supt. Richard Brzeczek that there is "no doubt in my mind"
that Burge and his detectives tortured some suspects, Steve Mills and
Janna Hanna, Timing is Right For Torture Probe, Chog Tribune 4/29/02.

24.  On April 24, 2002, the Honorable Cook County Chief Judge of the Circuit Court
Criminal Division, Paul P. Biebel, Jr., appointed a Special Prosecutor to investigate
the crimes committed by Burge and his officers (which include the officers that abused
the petitioner) in connections relating to the allegations of torture and abuse. (See:
No. 2001 Misc. 4, Court Order, dated, April 24, 2001)

25.  The Special Prosecutor began investigating around 60 cases/complaints of
torture and abuse by Burge and his officers, and as of Oct. 1, 2004, his investigation,
according to the Special Prosecutor, "has found over 100" alleged torture victims.

26.  These alleged Torture Victims and the Petitioner share a common bond: they all
alleged that they were victims of torture, abuse, and other related misconduct by
Burge and his subordinates at Area 2 and Area 3 Police Hqers (which includes the
officers that tortured and abuse the petitioner).

27.  Had counsel investigated, developed, and offered the readily available evidence
at the Suppression Hearing and/or at trial, that other individuals who had suffered
extraordinarily similar types of torture to those of the petitioner had described,
at the hands of the same officers, this would have provided strong corroboration of
the petitioner's claims of being tortured and abuse into signing the coerced confession.

28.  At the petitioner's Suppression Hearing, it was his word against the word of
four sworn police officers who were cloaked with the credibility and respect
generally accorded their office. (See: ¶¶ 13-21 above)

29.  Evidence that these officers had engaged in systematic torture of other
detainees would have established the need for close scrutiny of the officers' testimony
and would have demonstrated that the petitioner claims were credible.

30.  Evidence that these officers had engaged in systematic torture of other detainees would have established the need for counsel to submit this corroborating evidence to buttress the petitioner's claims at the Suppression Hearing, but since counsel failed to investigate, develop, and offer the readily available evidence, the petitioner was denied the effective assistance of counsel.

31.  Had counsel investigated, developed, and offerd the readily available evidence at the Suppression Hearing, it would have given the Court reasons to believe the petitioner's claims of being tortured and abused to suppress the petitioner's coerced confession.

32.  The petitioner's coerced confession, obtained in violation of his constitutional rights, represents a significant piece of evidence used to obtain his conviction. And suppression of the confession would probably change the outcome of the trial, and accordingly, the petitioner was denied his 6th and 14th Amendment rights to the effective assistance of counsel, to a fair trial, and to due process of law, and his rights under the 5th Amendment of the U.S. Constitution, as well as his rights to due process of law and right to counsel under Article I, section 2 and 8 of the Illinois Constitution.

## RESULT OF COERCION
## AND TRIAL COUNSEL'S INEFFECTIVENESS

33.  Because of the Constitutional violations stated above concerning how the petitioner was coerced into signing a confession, and counsel's failure to investigate, develop, and offer the readily available evidence that these officers have a history of torturing and abusing detainees to obtain confessions, the court had no other choice than to believe the "allegedly more credible" officers than the petitioner, and allow the confession into evidence at the petitioner's trial.

34.  In fact, the claims of detainees alleging that they were tortured and abused by Officers working at Area 2 HQers was not new to the Cook County Public Defender's Office or to the trial counsel in particular were fully aware of the claims of torture and abuse by officers from Area 2 HQers - Counsel Heenan personally represented many defendant's suppression hearings and trials which the defendants claimed they were tortured and abused by officers from Area 2 HQers in the same manner the petitioner claimed.  (See: People v. Stanley Howard, 84 C 13134)

## THE STATE'S FAILURE TO PROVIDE ALL RELEVANT BRADY MATERIAL
## DENIED PETITIONER HIS RIGHT TO EVIDENCE
## TENDING TO NEGATE HIS GUILT

35. Counsel filed a motion for discovery which requested that the State product any and all material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefore.

36. The State responded by its Answer to Discovery, and notwithstanding this comprehensive request for discovery, the State failed to disclose to the defense that:

  a. The police detectives whom the petitioner accused of torturing and abusing him into making a statement had been accused by other defendants the State prosecuted, both before and after the petitioner claimed he was tortured and abused into signing a coerced confession. (See: ¶19)

  b. There were numerous instances of similar police torture and abuse by officers assigned to Area 2 and later at Area 3 under the command of fired Cmdr. Jon Burge, that indicated there existed at Area 2 and Area 3 a systematic pattern and practice of employing torture and abuse to obtain confessions from detainees. (See: ¶¶20-23)

37. As determined by the Police Department's Findings and many judicial findings as stated in ¶¶ 20-23 above, the State clearly had exculpatory evidence in its possession that was not disclosed to the defense.

38. In fact, not only did the State's Attorney's Office had this evidence in its possession, but the Assistant State's Attorney assigned to the Petitioner's cases, Kip Owen, was also very much familiar of the torture and abuse claims.

39. ASA Kip Owen worked for the State's Attorney's Office Felony Review unit between 9/85 thru 9/96, in which many complaints of torture and abuse was filed against the aforementioned officers; and was personally involved in the Aaron Patterson interrogation, in which Patterson had alleged he was tortured and abused to sign a coerced confession -- Patterson was later exonerated (April 30, 1986 and May 1, 1986); and Owen had personally prosecuted Ronald Kitchen who also claims to had been tortured into signing a coerced confession (July 25, 1988).

40. The claims of police torture and abuse had to had been known to the State, because of the numerous incidents were the subject of many diferent court testimonies. Moreover, the existence of a pattern of torture at Area 2 and Area 3 was and is demonstrated by the nature and huge volume of the internal investigations the Chgo Police Department had conducted by the time the petitioner's case was set for trial, and by the date in which the State filed its Answer to Discovery.

41.  The undiscovered evidence of torture would have tended to negate the petitioner's guilt, by increasing the likelihood that the most and only significant evidenc against him -- the coerced confession -- would be suppressed. For instance, the hidden evidence would have increased the plausibility of the petitioner's claims that the officers in question had tortured and abused him into "confessing." The evidence also would have tempered the natural skepticism of the Court about whether police officers are capable of such shocking conduct. The State's failure to disclose material exculpatory evidence as mandated by the U.S. Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963).

42.  Had defense counsel had the available evidence of this pattern and practice of police torture and abuse, proformed by the same officers with the same techniques, before and after the petitioner's torture and abuse, he would have had ample support for the petitioner's assertion that his confession was the product of police torture and abuse, and given him corroborating evidence to present at the Suppress Hearing and at trial. The evidence which the State failed to disclose would have created a reasonable doubt that the petitioner committed the offenses in question.

43.  The State's failure to provide the Brady evidence, denied the Petitioner his right to due process of law under the 5th and 14th Amendments to the U.S. Const., as well as his right to due process under Article I, Section 2 of the Illinois Const.

44.  Had the petitioner had the effective assistance of counsel, and/or had the State disclosed the above mentioned Brady material, the case would probably have had a different outcome.

## PETITIONER WAS DENIED HIS RIGHT TO COUNSEL WHEN HE WAS QUESTIONED BY POLICE OFFICERS AFTER HE HAD INVOKED HIS RIGHT TO COUNSEL

45.  The petitioner was arrested on April 18, 1990, and took to Police HQers on 11th and State St., in Chicago, and placed in an interrogation room.

46.  When he was read his Miranda rights, the petitioner said that he wanted an attorney and wanted to remain silent. (See: Motion to Suppress the Statement in Case No. 90 CR 11984, Testimony of Officers Patrick Brosnan and Gregory Sellers; and Exhibit #1; Affidavit of Tony Anderson)

47.  Subsequently, after being transported to Area 2 HQers, and after the petitioner again stated that he wish to remain silent and wanted an attorney to represent him, he was tortured and abused into making coerced confessions to many unsolved crimes, which he did not commit. (See: Affidavit of Tony Anderson)

48.  The petitioner explained this fact to his counsel, and the record supports

-46-



that his coerced confession was taken <u>after</u> the petitioner requested to remain
silent and requested an attorney to represent him, and therefore, his confession
was obtained in violation of his 5th Amendment right to counsel and to remain
silent and against self-incrimination.

### NEWLY DISCOVERED EVIDENCE DEMONSTRATES THAT PETITIONER
### WAS COERCED INTO CONFESSING AND THE CONFESSION WAS THE
### RESULT OF POLICE TORTURE AND ABUSE

49.  The petitioner was coerced into making the statement upon which he was
charged and indicted, and later found guilty of by a jury: crimes in which he did not
commit.

50.  Newly Discovered Evidence demonstrates that not only did the officers in
question tortured and abused the petitioner, but that these same officers had abused
and tortured other detainees before and after the petitioner's interrogation; and that
the petitioner was apart of a systematic pattern and practice of torture and abuse by
Area 2 and Area 3 police officers working under the command of fired Cmdr. Jon Burge.
(See: ¶ 19 and ¶¶ 20-23 above)

51.  In addition to the newly discovered evidence which demonstrates that there
have been numerous other reported instances of similar torture and abuse by these same
police officers in question and others, the State recently revealed more newly
discovered evidence that the State kept hid for over 20 years - evidence of a pattern
and practice of torture and abuse that existed before the petitioner was tortured and
abused into signing a coerced confession.

52.  In connections with the City of Chicago's respond to the Request for Discovery
in the four Federal Law Suits filed by four other Torture Victims, Aaron Patterson,
Madison Hobley, Leroy Orange, and Stanley Howard, who all were pardoned on the basis
of innocence by then-Governor George Ryan on January 10, 2003, it was proven that the
City of Chicago/The State illegally suppressed highly relevant documents from all
the Torture Victims who had claimed they were tortured and abused at Area 2 HQers,
evidence which would have substantiated their claims in their criminal cases.

53.  In November of 1984, the newly appointed Director of OPS, David Fogel,
ordered his superisors to conduct a search of allegations of electric shoch made to
the OPS, limited to the previous twelve month period.  This search revealed 14 cases.
Dir. Fogel notified Superintendent of Police, Fred Rice, in writing of his findings,
but no action was taken against any of the accused officers.

54.  The City/The State subsequently suppressed these highly relevant documents

from all Torture Victims who had claims of torture in their criminal cases, as well
as in numerous civil cases, despite documents requests which clearly covered their
production --- the City/The State suppressed these documents much like they have
failed to disclosed any of the torture and abuse documents for the petitioner's
use in his criminal proceedings -- which would have substantiated his claims.

55.  These files are now being called "The Fogel OPS Files," and they were just
released by the City/The State, August of 2004, nearly 20 years after they were
written and 15 years after they were first sought. (See: Exhibit #2, Patterson v.
Burge; et. al., Case No. 03 C 4433, U.S. District Court (N.D. Ill), Plaintiff's
Response...; at page 5, ¶5, and footnote #5)

56.  This newly discovered evidence, and the newly discovered evidence described
in ¶19 and ¶¶ 20-23 above, would change the result of these entire proceedings,
because it tends to show that the petitioner's confession was the result of coercion,
and help to prove that petitioner stands convicted of crimes he did not commit.

57.  This evidence is not cumulative of evidence presented to the Court, but
rather is material to the issue of whether the confession used to charge and indict
and convict the petitioner is the result of coercion, and whether the petitioner
is wrongfully convicted and sentenced for crimes he did not commit.

58.  Due to the existence of this newly discovered evidence, the petitioner
should be affored a new trial, because his convictions is not based on full
disclosure from the State - by the State intentional violation of Brady rights as
set forth by the U.S. Supreme Court.

### ADDITIONAL CLAIMS OF INEFFECTIVE
### ASSISTANCE OF TRIAL COUNSEL

59.  The petitioner asserts that trial counsel was also ineffective for not
presenting evidence which would have given the jury reasons to disbelieve the
officers' and the complaining witnesses identification testimonies, which probably
could have led the jury to come to a different outcome.

60.  After the petitioner was transported to Area 2 HQers, and forced to sign
a coerced confession in the instant case and many other unsolved crimes, the officers
continued their misconduct by having another man, Leo Hicks, arrested and identified
as being a co-defendant to the crimes committed by the petitioner and his other
co-defendant, Robert Allen. (See: Case No. 90 CR 11979, 80, 86, 90 and 91)

61.  Co-defendant Hicks was eventually released from custody after it was determined by a Cook County Circuit Court Judge that Hicks could not have been involved in the crimes, because he was on House Arrest/Home Monitoring when the crimes were committed.

62.  The petitioner asserts that this evidence should have been presented to the jury to establish a pattern of misconduct by the officers involved in his arrest, interrogation and wrongful identification.  Whereas if it was presented, it would have established that the same officers who were involved in the Hicks arrest, interrogation and wrongful identification where many witnesses indentified Hicks from line-ups -- line-ups conducted by the same officers, were also involved in the petitioner's arrest, interrogation and identification line-ups, and that it was a great possibility that the same misconduct was used to have the petitioner wrongfully identified.

EXAMPLE: (See: Police Report  RD# N-151-925, Page Five)

"On 27 Apr 90 at approx. 1915hrs all the victims on this case viewed a line-up at Area 2.  Each victim viewed the line-up seperately and each was then secluded from the rest of the witnesses.  Tony Anderson was positively identified by seven of the eight victims. Anita Ford-Gilliam made a tenative identification of Anderson.
A photo display was then shown to the victims.  All the victims made a positive identification of Leo Hicks as the second offender in this case."

The police report is signed by Det. M. McDermott and J. Boylan

63.  This evidence would have given the jury reasons to disbelieve the identification testimonies against the petitioner, because it would be almost impossible for all eight witnesses to wrongfully identify Loe Hicks without some kind of coercion or suggestiveness from the officers.

64.  This evidence would have given the jury reasons to believe the petitioner's testimony that he was also wrongfully arrested, tortured into signing the coerced confession and that he was also wrongfully identified by some form of coercion or suggestiveness by the officers involved.

65. The jury were never informed of this misconduct or the appearance thereof due to the ineffective assistance of his trial counsel, and had counsel presented this highly relevant evidence, it probably would have led to a different outcome of the trial.



**THE CUMULATIVE EFFECT OF COUNSEL'S FAILURES AND
INEFFECTIVENESS, AND THE STATE'S WITHHOLDING OF
EVIDENCE DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS
TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL**

66. The collective failures of counsel were so egregious as to substantially prejudice the petitioner and failed well below even the most minimal standards that govern effective assistance of counsel.

67. The cumulative effect of the constitutional deficiencies in counsel's proformance, as more fully described above, should compel this Court to grant the petitioner's request for a new trial.

68. The cumulative effect of the Sate's failure to disclose exculpatory evidence, combined with the fact that this failure to disclose came before the petitioner's trial, and in the midst of many other constitutional violations, should also compel this Court to grant the petitioner's request for a new trial.

69. Due to the errors listed above, combined with the errors raised on appeal, the petitioner was thereby deprived of his rights to effective assistance of counsel, to be free from self-incrimination, to a fair trial, and to due process of law under the U.S. and Illinois Constitutions.

**THE PETITIONER INCORPORATES, AS IF FULLY SET FORTH HERE, AND
ALL ISSUES RAISED ON APPEAL**

70. The petitioner incorporates, as if fully set forth here, all the issues he raised on appeal, to coincide with all the issues raised in this petition.

**APPELLATE COUNSELS WERE INEFFECTIVE
FOR NOT INVESTIGATING, DEVELOPING AND RAISING
THE ISSUES RAISED IN THIS PETITION**

71. The petitioner asserts that the Appellate Counsel that were appointed to represent him on Direct Appeal, and in his post-conviction proceedings were ineffective for not investigating, developing and raising the issues raised in this petition.

72. The petitioner believes that the Appellate Attorneys that were appointed to represent him on Direct Appeal, and in post-conviction proceedings should have investigated, developed and raised the issues raised in this petition, and by not doing so, they were ineffective, and therefore, the petitioner's Constitutional rights to effective assistance of counsel were violated.

REQUEST TO DISQUALIFY THE COOK COUNTY
STATE'S ATTORNEY'S OFFICE FROM
PROSECUTING THE PETITIONER'S CASE

73.  In April of 2002, the Chief Judge of the Cook County Circuit Court, criminal Division, held that the Cook County State's Attorney, Richard Devine, had a conflict of interest arising from his representation of Jon Burge, and a Special Prosecutor was appointed to investigate the allegations of torture at Area 2.  This Special Prosecutor is investigating all the officers who worked under Jon Burge's command, who were accused of torture and abuse from Area 2 and Area 3 Police HQers. (In Re Appointment of Special Prosecutor, Case No. 2001 Misc. 4; Court Order of April 23, 2002)

74.  Subsequently, the Chief Judge disqualified S.A. Richard Devine and the entire State's Attorney's Office from further prosecuting the cases of the Torture Victims who were alleging they were tortured and abused at Area 2 and Area 3 HQers by Jon Burge and/or Officers working under his command. (In Re: Appointment of Special Prosecutor, Case No. 2001 Misc. 4; Court Order of April 7, 2003)

75.  The petitioner believes that the Court Order of April 7, 2003, should also apply to his cases, and therefore, the Illinois Attorney General Office, that was assigned by the Chief Judge to replace S.A, Devine and the S.A.O., should be assist to hiscases.

76.  Because of the conflict of interest that was found by the Chief Judge, and the fact that the State's Attorney's Office violated their duty to disclose Brady material / exculpatory evidence concerning the petitioner's claims of torture and abuse by officers working under the command of jon Burge, the petitioner prays that this Honorable Court will grant this request to disqualify the Cook County State's Attorney's Office, and apponit the Illinois Attorney General Office as prosecutor.

### CONCLUSION

77.  The petitioner claims to be innocent, and his confession was the result of police torture and abuse, and that both his trial and appellate counsels were ineffective for not investigating, developing and presenting the issues raised in this petition, and that the State violated its discovery obligations, and that trial counsel was ineffective for not presenting the evidence of misconduct by the officers in question to buttress the petitioner's claims that he was wrongfully identified.

WHEREFORE, for all of the above stated reasons, the petitioner, Tony Anderson, pro se, respectfully requests that this Honorable Court grant him leave to file this successive petition for post-conviction relief, appoint counsel to amend the petition, issue an order vacating his conviction and sentence and grant him a new trial.

Dated: _January 24, 2005_

### VERIFICATION?CERTIFICATION

I, Tony Anderson, swears under the penalties provided by law in pursuant to Section 1-109 of the Code of Civil Procedure, that the Statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters, I certifies as aforesaid that I verily believes the same to be true.

The petitioner inadvertently stated he was tried by a jury, when in fact, he was tried before the bench.

E X H I B I T  # 1

State of Illinois   )

                    ) ss

County of Will      )


## AFFIDAVIT OF TONY ANDERSON

I, Tony Anderson, being duly sworn, does states as follows:

1. After trial counsel William Heenan was appointed to represent me in Case No. 90 CR 11984, I explained to him that I was abused and threatened during my interrogation by Detectives McDermott and Maslanka, in particular, into signing coerced confessions to crimes I did not commit - including the coerced confession involving the cases he was representing me on.

2. I asked Counsel Heenan numerous of times, before my Suppression Hearing, "[if he had talked with any of my witnesses, or if he had interviewed Officers Gregory Sellers or Patrick Brosnan about whether or not I had requested to remain silent and that I requested a lawyer?]" but he never investigated or interviewed any of my witnesses or the Officers.

3. When I arrived at Area 2 Police HQers, I was not read my rights, but I had told Detectives McDermott, Gallagher, Maslanka and Paladino, that I wanted a lawyer and that I did not want to answer any questions without an attorney.

4. After I had refused to answer any of their questions, I was beat and threatened with a gun into making the coerced confession in Case No. 90 CR 11984 and many other unsolved crimes.

Affiant further sayeth not:

_Tony Anderson_

Tony Anderson

Subscribed and sworn to before me

this ___24th___ day of ___January___, 2005.

_Crystal Z. Mason_

NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

-54-



**E X H I B I T   # 2**

SEP-24-2004  03:20PM  FROM-                                    T-828  P.008/023  F-738

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AARON PATTERSON,                              )
                                             )
    Plaintiff,                               )
                                             )     No. 03 C 4433
    vs.                                     )
                                             )     Judge Joan B. Gottschall
Former Chicago Police Lt. JON BURGE #338;    )     Magistrate Geraldine Soat Brown
RICHARD DEVINE; TERRY HILLARD;               )
LEROY MARTIN; GAYLE SHINES, THOMAS           )
NEEDHAM; and the CITY OF CHICAGO; et. al,    )
                                             )
    Defendants.                              )

### Plaintiff's Response to Defendants City of Chicago's and Richard Devine's Motion to Bar the Consolidated Depositions of Richard M. Daley, Defendant Richard Devine, Mara Georges, et. al., and Plaintiff's Cross Motion to Compel Said Depositions

    The Defendant City of Chicago and Richard Devine have moved to bar the depositions of Mayor Richard M. Daley, Defendant State's Attorney Richard Devine, former Corporation Counsel Kelly Welsh, Corporation Counsel Mara Georges, Mayoral Chief of Staff Sheila O'Grady, First Assistant Corporation Counsel Jeff Givens, and former Assistant Corporation counsel Sharon Baldwin, noticed on a consolidated basis in the *Patterson, Hobley, Orange* and *Howard* torture cases, essentially because they are "busy current or former public officials," some of whom who are or have been employed by the Corporation Counsel's Office.

    In this unique set of cases, where high public officials, including former police superintendents and the State's Attorney of Cook County are named both as policymakers and co-conspirator Defendants in a notorious thirty year pattern and practice of torture, cover-up, and code of silence, the public record, as well as the discovery obtained in this case, fully supports the depositions of these policymakers, as it demonstrates, at various times and in various ways, their active participation, ratification, condoning, acquiescence in, and actual knowledge of this continuing pattern and practice. The details of this involvement, which powerfully support questioning of these officials on these and related areas are set forth below.

1

### Facts

In January of 1981, Richard M. Daley took over as State's Attorney of Cook County, and he appointed Defendant Richard A. Devine as his First Assistant State's Attorney. William Kunkle, who later prosecuted Andrew Wilson, and was Jon Burge's chief defense counsel in several civil rights torture cases, was next in command as Chief Deputy State's Attorney. During Daley's tenure as State's Attorney, from 1981 to 1989, 55 persons, including Aaron Patterson, Leroy Orange, Madison Hobley and Stanley Howard, alleged that they were tortured and abused by Defendant Jon Burge and his men, while during Defendant Devine's tenure as First Assistant, which was from 1981 to 1983, 20 persons alleged that they were tortured and otherwise abused by Burge and his men. Summary of Known Area 2 and 3 Torture Victims, 1972-1991 (Exhibit A).[1] In most of these cases, statements were taken by assistant state's attorneys (ASAs) assigned to the Felony Review Unit and the criminal prosecutions were pursued by Felony trial ASAs.

On February 5, 1982, Melvin Jones was picked up as part of a murder investigation, brought to Area 2 and allegedly tortured with electric-shock by Burge and several of his men.[2] While Jones was still in custody, two Chicago police officers were murdered on the south side of Chicago. While searching for the killers, detectives and officers under Burge's command broke into houses, allegedly beat and tortured suspects and possible witnesses, causing widespread protest in the black community and numerous complaints to be filed with the Office of Professional Standards. *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993). These complaints were never investigated. *Id.* According to an anonymous police source, who apparently worked with Burge and later supplied a great deal of credible information to Andrew Wilson's civil rights lawyers, this complete failure to investigate was because Mayor Jane Byrne and States Attorney Daley ordered that numerous complaints filed against the police as a result of this abuse not be investigated. First Anonymous Letter to Flint Taylor, mailed on 2/2/89 (Exhibit

---

[1] Additionally, it has been revealed, in documents turned over last month by the City, that there were at least 14 additional alleged victims of electric shock, apparently unrelated to Area 2, who made OPS complaints from October of 1983 to March of 1987 alone. (Group Exhibit B).

[2] These detectives were Flood and McGuire, who are Defendants in the *Orange* case, and Detective McWeeny, who is a Defendant in *Patterson*, *Hobley* and *Orange*.

2

C).[3]

On February 10, 1982, Donald White was picked up by Area 2 detectives as a suspect in the police murders, and brought to Police Headquarters where he was allegedly tortured with a plastic bag placed over his head and beaten by Burge, and Area 2 detectives Fred Hill, John Yucaitis, and Patrick O'Hara. According to the anonymous police source, Police Superintendent Richard Brzeczek and the "State's Attorneys" were present during the alleged torture. Id. ASA supervisors Hyman and Angarola were, by Hyman's own admission, present at the 11th and State police headquarters that evening while White was in custody. Hyman Deposition in *Wilson v. City of Chicago*, 1/12/89, pp. 15-17.[4]

On February 14, 1982, Andrew Wilson was arrested after he was apprehended by Burge and his men on a police raid. ASA supervisors Hyman and Angarola reviewed the arrest warrant and ASA Paul Nealis, who had been serving as an advisor to Burge and his men at Area 2 for several days prior to the raid, and had been in repeated contact with "a Deputy State's Attorney" who he thought was Angarola, accompanied Burge on the raid. Id. at 18-20; Nealis Police Board Testimony, 2/28/92, pp. 2177-80.

Andrew Wilson was brought back to Area 2 and beaten and tortured during the morning and afternoon of February 14th by Burge and several other Area 2 detectives. Wilson Police Board Testimony, 2/10/92, pp. 77-146. Several Supervisory ASAs were present on the second floor of Area 2 while Andrew Wilson was interrogated and tortured. Nealis Police Board Testimony, 2/28/92, pp. 2180-82; Warnick Testimony, 2nd *Wilson* civil trial, 7/27/89, pp. 5587-624. Hyman also called the Chief ASA of the Municipal Division during the time that Wilson was interrogated, and discussed the progress of the interrogation. Ginex Police Board Testimony,

---

[3]This anonymous source first contacted Wilson's lawyers by letter in February of 1989, just as the first *Wilson* civil trial began. He or she subsequently sent three more letters and made one phone call during the trials. These anonymous letters, sent in CPD envelopes, and signed "Ty," identified Melvin Jones as another Burge victim, named Defendant John Byrne and a number of other Area two detectives as Burge's fellow torturers, and were instrumental in leading Wilson's lawyers to a wealth of evidence of systematic torture at Area 2.

[4]In order to keep the size of Plaintiff's Appendix somewhat manageable, we have not included as Exhibits some of the transcript excerpts cited. They are, of course, available if the Court wishes to review them.

3/16/92, pp. 3245-47. According to Wilson, he was screaming while he was being tortured, and at one point, was brought before Hyman. When he told Hyman that the detectives were torturing him, Wilson further testified that ASA Hyman said "get the jag-off out of here." Wilson Police Board Testimony, 2/10/92, pp. 114-15, 133-34.

After Andrew Wilson was admitted to Cook County Jail, he was examined by the head of Cermak Medical Services, Dr. John Raba, who then wrote to Superintendent Richard Brzeczek, informing him that Wilson complained of torture, had injuries which supported his claim, and requested an investigation. Raba Letter to Brzeczek, 2/17/82 (Exhibit D). Instead of opening a criminal investigation, Brzeczek wrote State's Attorney Daley, enclosed Raba's letter, and stated that he would not open a criminal investigation without Daley's authorization. Brzeczek Letter to Daley, 2/25/82 (Exhibit E). Neither Daley nor any of his subordinates ever responded, and no criminal investigation was ever opened. Brzeczek Deposition, *Wilson v. City of Chicago*, 12/21/88, pp. 123-24 (Exhibit F). According to the police source, "Mayor Byrne and State's Attorney Daley were aware of the actions of the detectives. ASA Angarola told both of them and condoned the actions." (Exhibit C).

The SAO charged Melvin Jones with unlawful use of weapons but not with murder. The same police source asserted that "the States Attorney knew that he [Jones] was complaining and that is why his [murder] charges were dropped. That decision was made at the highest levels at 26[th] and California." Third Anonymous Letter to Taylor, mailed 3/15/89 (Exhibit G).

In November of 1982, Deputy Chief of the Special Prosecutions Unit, ASA Frank DeBoni, was responsible for supervising the investigation and prosecution of excessive force by Chicago police. DeBoni Deposition in *Wilson v. City of Chicago*, 2/10/89, pp. 8-9. Deputy SA Kunkle and ASA Angarola informed him that Wilson had "raised" allegations of "excessive force" against "some police officers" in his motion to suppress testimony and that his lawyer might be in touch with him. Id. at 23-24. DeBoni further testified that Kunkle and Angarola did not inform him that the allegations included torture and that Wilson's lawyer never contacted him, so he did not obtain the transcripts of Wilson's motion to suppress, or make any attempt to investigate the allegations, despite his Unit's clear jurisdiction to investigate such matters. Id. at pp. 23-37. He also stated that he did not recall SA Richard Daley ever contacting him

4

concerning the Brzeczek and Raba letters. Id. at 38. Rather than investigating, on May 19, 1983, SA Daley honored Burge and four other Area 2 detectives for their work in the Wilson case. Chicago Tribune, 5/20/83 "Daley Hails 11 in Crime War" (Exhibit H).

In June of 1983, Defendant Devine left the State's Attorney's Office and returned to private practice. Kunkle took Devine's place as First Assistant, while Angarola became Chief of the Felony Trial Division. The pattern of torture and abuse at Area 2 continued.

In January of 1984, Leroy Orange and his co-defendant, Leonard Kidd, alleged that they were tortured at Area 2 with an electric shock box similar to that alleged by Jones and Wilson. In November of 1984, the newly appointed Director of the Office of Professional Standards (OPS), David Fogel, ordered his supervisors to conduct a search of allegations of electric shock made to the OPS, limited to the previous twelve month period. (Group Exhibit B). This search revealed fourteen cases, including four Burge cases from Area 2 - - - Orange, Kidd, Darrell Cannon, and Andrew Wilson. Id. Fogel notified Superintendent Fred Rice in writing of his findings, but there was no action was taken against any of the accused, and the City subsequently suppressed these highly relevant documents from all torture victims who had claims of torture in their criminal cases, including Plaintiffs Patterson, Orange, Howard and Hobley, as well as in numerous civil cases, despite document requests which clearly covered their production.[5]

In September of 1985, First ASA Kunkle left the SAO to join Phelan, Pope and John as a partner, and SA Daley appointed Angarola as First ASA. At about the same time, Defendant Devine joined Kunkle at Phelan, Pope and John as a partner. In April of 1986, Plaintiff was

---

[5] In a 1989 deposition in Wilson, Fogel revealed that he had an electric shock file, but said that it contained only six OPS cases, and omitted the crucial fact that he had informed the Superintendent of his findings. Fogel Dep., 6/27/89, pp. 48-52 (Exhibit I). Plaintiff's counsel immediately demanded that those documents be produced, but the City refused. Id. At the City Council Torture Hearings held in December of 1990, Mr. Taylor requested, without success, that the Committee obtain these documents, and they were unsuccessfully sought in several civil torture cases. City Council Hearing, 12/24/90, p. 36 (Exhibit J); Plaintiff's first Request to Produce, Wiggins v. Burge and City of Chicago, Requests 9, 11, and 18 (Exhibit K). They first appeared last month, nearly twenty years after they were written and fifteen years after they were first sought, in one of the endless boxes of documents produced by the City in this and the Hobley cases. The City marked the entirety of the documents as "confidential," which they clearly are not, but, in an abundance of caution, Plaintiff has redacted from the documents attached as Group Exhibit B the names of any victims or accused officers who have not been made public in prior proceedings.

allegedly tortured by Burge, Byrne and their detectives. He also made highly unusual allegations against ASA Defendant Troy - - that he participated in one of his beatings. *People v. Patterson*, Testimony of Aaron Patterson, 3/30/88, pp. 434, 443. Additionally, Defendant ASA William Lacy and an ASA supervisor also participated in Patterson's interrogation, (id.), and, at his first court appearance, Patterson stated in open court and in the presence of ASA Margaret Stanton-McBride that he had been tortured and beaten, and that ASA Troy had participated. *People v. Patterson*, Transcript of Bond Hearing, 5/2/86.

In April of 1987, the Illinois Supreme Court reversed Andrew Wilson's conviction, on the basis that the 15 injuries he had suffered occurred while he was in police custody and thereby tainted his confession. *Chicago Sun Times*, April 3, 1987, "Conviction Upset in Killing of 2 Cops." (Exhibit L). A spokesman for SA Daley stated that "we are disappointed in the decision and plan to retry him." Id. The SAO and Kunkle reached an agreement for Kunkle to act as a special ASA, paid hourly, to re-prosecute Andrew Wilson. Kunkle worked closely with Angarola, who was still First Assistant, as co-prosecutors, preparing for Andrew Wilson's re-trial, until Angarola was killed in an auto accident in October of 1987. Kunkle Time Sheets, 11/24/87 (Exhibit M). After a phone conversation between State's Attorney Daley and Kunkle, it was decided that ASA David Erickson, who was then a supervisor in the Special Prosecutions Unit, would take over Angarola's role. Kunkle Time Sheets, 12/29/87 (Exhibit N).

In August of 1988, the City, at the request of Jon Burge, and Defendant Superintendent Martin, hired Kunkle and his law firm, Phelan, Pope and John, to represent Burge and his co-defendants in Andrew Wilson's civil rights suit. Letters of 8/23/88 and 10/25/88 (Exhibits O and P). On December 30, 1988, approximately a month before the *Wilson* civil trial was to begin, Kunkle met with SA Daley to discuss the possibility of Daley testifying at the civil trial on Burge's behalf. Kunkle Monthly Time Sheets, 1/25/89 (Exhibit Q). That same day, Kunkle also discussed using Daley as a witness with at least one of his partners, and met with the Chief of the Civil Actions Bureau of the States Attorneys Office, apparently for the same reason. Id.

From Kunkle's and Defendant Devine's entry into the case until approximately a year later, a time period which featured extensive discovery and two six week trials, numerous lawyers and para-legals at Phelan, Pope and John worked on the *Wilson* civil case, billing the

6

City almost $600,000 for that year alone. Re-cap of Hours and Payments (Exhibits R and S).
Kunkle was lead counsel, and Devine billed for 24.5 hours during this time. Id. While most of
Devine's hours are not specifically documented, they appear to have been expended in office
strategy sessions,[*] and one entry shows a strategy and handling consultation at the very time that
the firm was dealing with explosive new evidence of a number of other torture allegations against
Burge which had just been uncovered by Wilson's lawyers and brought to the court's attention.
Kunkle Time Sheets, 6/22/89 (Exhibit T).[7]

In April of 1989, Richard Daley was elected Mayor. Among his duties as Mayor was to
appoint the Police Superintendent, the Police Board, and the Director of the OPS, and to sit as
President of the City Council. All of these officials and bodies are alleged, by the parties, to be
key policy makers in Plaintiffs' *Monell* claims.[8] In October of 1989, in response to community
pressure, the City Council held five days of hearings on police brutality, including allegations of
torture. In an unprecedented action, Mayor Daley appeared before the Committee as a witness,

---

[*]Devine's involvement is not further referenced beyond the "strategy and handling" entry
except for a consultation about a Court appearance. However, Kunkle's time sheets are replete with
references to "office strategy sessions" which do not designate participants, but given his role in the
case, status in the firm and prior history in the SAO, could well have included Devine as a participant
at other crucial stages of the litigation.

[7]On a day and during a month when almost all the other entries concern consultations with
Burge and the other defendants about the newly discovered torture victims, investigating the claims
of those victims, and how to avoid the admission of this evidence at the re-trial, the Devine 5/26/89
entry reads: "office conferences with JMR and RAD [Richard A. Devine] regarding handling and
strategy." (Exhibit T).

[8]In his *Monell* claim, Plaintiff alleges that "the actions of Defendants . . . were done pursuant to
one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago, its
Police Department, its Police Board, its Office of Professional Standards (OPS) and Internal Affairs
Division (IAD), its Personnel Division, and/or its Superintendents. (Plaintiff's Amended Comp., ¶ 76).
Similarly, when asked in an Interrogatory in *Hobley* who the City's chief policymakers were, the City
responded by asserting: "The City Council is the body with final policy making authority for all aspects
of the Chicago Police department. The Chicago Police Board has limited delegated authority to establish
more specific policies not in conflict with the policies set by the City Council. Furthermore Chicago
Police Department regulations forbid, among other things, violation of any law, disrespect or
maltreatment of any person, [or]engaging in an unjustified verbal or physical altercation with any person.
City's Answer to Interrogatory 13 in *Hobley* (Exhibit U).

7

and stated:

> Superintendent Leroy Martin was . . . reappointed by me. He has complete responsibility over the Chicago Police Department. I have full confidence in his administration. He has done an outstanding job.

City Council Hearing, 9/28/89, p. 4 (Exhibit V). Defendant Martin, OPS Director Fogel, and the Mayor's office monitored the entire hearing, and Martin and Fogel testified extensively before the Committee. Torture at Area 2 was presented through the testimony of Stanley Howard's mother. Hearing, 9/29/89, pp 172-215. Fogel was questioned about Burge, electric shock, and baggings at Area 2, Hearing, 10/6/89, pp. 187-96, (Exhibit W); Martin was also asked about Howard's torture, and he promised to look into it. Hearing, 10/10/89, pp. 392-400 (Exhibit X). In their testimony, Defendant Martin and OPS Director Fogel both admitted that there was a code of silence within the Department. Hearing, 10/10/89, pp. 285, 368-69. (Exhibit Y).

On Christmas Eve, 1990, a subcommittee of the Chicago City Council, chaired by Finance Committee Chairman Ed Burke, held a hearing on police torture at Area 2. At the hearing, evidence of a pattern and practice of Area 2 torture was presented, as was the evidence that SA Daley refused to investigate when requested to do so by Superintendent Brzeczek. *Chicago Tribune*, 12/25/90, "Hearing Examines Brutality Charges" (Exhibit Z); *Chicago Sun Times*, 12/25/90, "Davis Urges New Review of Police Brutality Cases" (Exhibit AA). Daley responded publicly, with his office stating that "Andrew Wilson refused to testify before the grand jury about the allegations." (Exhibit Z). In January of 1991, after Defendant Martin and Corporation Counsel Kelly Welsh had initiated proceedings before the Police Board to fire Burge, Yucaitis and O'Hara for torturing Andrew Wilson, Daley "defended his decision not to take action against the officers when he was state's attorney in 1982, explaining that . . [Wilson] refused to cooperate with his office at that time." *Chicago Tribune*, 11/26/91 "3 Cops Face Hearing in Torture Case " (Exhibit BB). On January 28, 1991, Amnesty International issued a Report calling for "a full inquiry into allegations that Chicago police systematically tortured criminal suspects from 1972 to 1984." *Chicago Sun Times*, 1/28/91, "Police Torture Probe Sought Here" (Exhibit CC). In response, the spokesman for Mayor Daley said she had "'no comment whatsoever.'" Id.

8

SEP-24-2004  03:24PM   FROM-                                              T-820   P.014/028   F-739

Later in 1991, the OPS completed an investigation into allegations of torture of suspects at Area 2. In a secret report which was approved by Defendant Shines and forwarded to Defendant Martin, [The Goldston Report], the OPS found that from 1973 to 1985 there was a practice of systematic abuse of suspects held in custody at Area 2 and that certain Area 2 command personnel were aware of such abuse and condoned it. OPS further found that this practice included psychological techniques and planned torture, and that Area 2 command personnel were aware of the systematic abuse and encouraged it either by actively participating in it or by failing to take any action to stop it. Command personnel at Area 2 during part or all of that time included Defendants Burge and Martin. The Report also found Defendants Burge and Byrne were "players" in this policy and practice. (Plaintiff's Amended Comp., ¶ 43).

Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, report, findings and conclusions set forth above, *inter alia*, by suppressing the findings that there was systematic abuse at Area 2 which implicated Defendants Martin, Burge, Byrne, and other Area 2 detectives until this report and findings were ordered produced by Federal Court order in February of 1992. (Id. at ¶¶ 44-45). During the time that the Report was suppressed, Corporation Counsel Kelly Welsh wrote at least two lengthy memos to Martin which discussed the then still secret Report. City Privilege Log, 5/17/04, pp. 14-15. (Exhibit DD).

This report was publicly released on February 7, 1992, and Mayor Daley and Defendant Martin angrily denounced its findings and defended Burge and the Police Department in public remarks which were carried on the front page of the Chicago *Tribune* and across the country in numerous newspapers. Daley was quoted as saying of the Report, "these are only allegations . . . not substantiated cases," as defending Martin's suppression of the report, stating: "it's allegations, rumors, stories, things like that" and of denying that the torture at Area 2 was "systematic." *Chicago Tribune*, 2/8/92, "13 Years of Cop Torture Alleged,"(Exhibit EE); *Los Angeles Times*, 2/8/92, "Chicago Police Used Torture Report Says,"(Exhibit FF); and articles included in Group Exhibit GG. In an editorial on February 13 1992, the *Chicago Tribune* criticized Daley and Martin's responses:

It was all too ordinary for Martin and Mayor Richard Daley to pooh-pooh the Report

9

produced e-mails, and the Welch/Martin documents over which they have improperly asserted privilege.

If the City has a good faith objection to any question put to these individuals, it may raise it at deposition. It is not proper, however, to prevent any inquiry whatsoever. Courts have broad discretion in resolving matters relating to discovery." *Leptanka v. Village of Franklin Park*, 2004 WL 626830 *1 (March 26, 2004, N.D. Ill.)(citations omitted). Plaintiff has shown that these witnesses have relevant, non-privileged information "reasonably calculated to lead to the discovery of admissible evidence." F.R.C.P. 26(b)(1). Accordingly, this Court should deny the City's motion with regard to these witnesses, and order that they be deposed on the all the areas discussed above.

**Conclusion**

It is clear from this powerful record, that the depositions of Mayor Daley, Defendant Devine, Corporation Counsel Mara Georges, former Corporation Counsel Kelly Welch, Mayoral Chief of Staff Sheila O'Grady, and Assistant Corporation Counsel Jeff Given and Sharon Baldwin should proceed forthwith on the areas set forth above, and the Plaintiff urges the court to enter such an order forthwith.

September 24, 2004

Respectfully submitted,

G. Flint Taylor
Joey L. Mogul
Michael E. Deutsch
1180 N. Milwaukee
Chicago, IL 60622

Standish E. Willis
407 S. Dearborn Street
Chicago, IL 60604

Demitrus Evans
621 Sheridan Road, Suite G
Evanston, IL 60202

18

- 65 -

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS
v.

No. 90-CR-11986,87,91

TONY ANDERSON

## ~~SUBPOENA~~ SUBPOENA DUCES TECUM

The People of the State of Illinois to all Peace Officers in the State - GREETING:

WE COMMAND THAT YOU SUMMON   CHICAGO POLICE DEPARTMENT
SUPERINTENDENT LEROY MARTIN
1121 SOUTH STATE STREET, CHICAGO, IL

to appear to testify before the Honorable   JUDGE KARNEZIS

on   DECEMBER 10,   19   in Room 208   Circuit Court, 26th Street and

California Avenue, Chicago, Illinois, at   9:30 a. m.

YOU ARE COMMANDED ALSO to bring the following:

ANY AND ALL POLICE REPORTS, ETC. IN THE CHICAGO POLICE DEPT. ("STREET FILES"
ALSO KNOWN AS "OFFICE UNIT OR WORKING FILE OR RUNNING FILE") ON
RD. #N-123118, R.D. #N-131198 R.D. #N-151925.

COPIES WILL SUFFICE IN LIEU OF COURT APPEARANCE.
In your possession or control

YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISH-
MENT FOR CONTEMPT OF THIS COURT.

DIRECT ALL INQUIRIES TO:   WITNESS   November 26, 1990 19

Clerk of Court

Att. No.   30285
Name   WILLIAM J. HEENAN
Attorney for   DEFENDANT
Address   2650 SOUTH CALIFORNIA, 8TH FLOOR
City   CHICAGO, IL   60608
Telephone   890-6989 OR 890-3098

DIRECT INQUIRIES TO:   AURELIA PUCINSKI
Clerk of the Circuit Court
Criminal Division
2650 South California, Chicago, Illinois 60608

NON-APPLICABLE - Strike out Title which does not apply - Subpoena or Subpoena Duces Tecum.

NOT VALID FOR SERVICE ON NEWS MEDIA WITHOUT ORDER OF COURT

(OVER)

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

COURT BRANCH          COURT DATE                                    SHEET          LINE

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS          Case No.      96247563

                                         BFW [    ]

Leo Hicks

### ARREST WARRANT

THE PEOPLE OF THE STATE OF ILLINOIS TO ALL PEACE OFFICERS IN THE STATE — GREETING:

We command you to arrest          Leo Hicks
                                                    (Defendant)

for the crime of    38      18-2      Armed Robbery
          (Chapter)    (Section)            (Description)

state in which charge you respond to before this court and that you bring him instanter before The Circuit Court of Cook County at

5100 S Wentworth Chicago Cook County Illinois
                         (Location)

or if I am absent or unable to act, the nearest or most accessible court in Cook County or, if this warrant is executed in T county
other than in Cook, before the nearest or most accessible judge in the county where the arrest is made.

Issued in Cook County      4-30-          90
                                                    19

Bail Fixed at $    No Bail

                                    Oliver of Story
                                                    Judge

WITNESS MORGAN M. FINLEY, CLERK OF THE COURT and the Seal thereof,      1-5-          19

                                         By
Clerk of The Circuit Court                              Deputy Clerk

### INFORMATION AND DESCRIPTION OF DEFENDANT

Name    Leo Hicks                     Alias    Tommy willis/ Tracy hicks

Residence    901 E 40th st          Chicago      Illinois
                                    City/ Town                    Zip

| Sex | Race | Weight | Height | D.O.B. | Age | Complexion | Build | |
|-----|------|--------|--------|--------|-----|------------|-------|--|
| M | B | 170 | 602 | 5 Mar 57 | 33 | Dark | thin | Forfeited Bond No. |

| R | 413390 | | CB | | | IBI | |

Complainant's Name    Anajon Beauty Salon          Address    1855 E 87th st

Arresting Officer    Det. J. Boylan      16650      Unit    622
                     Det. McDermott  Star No.    13525

MORGAN M. FINLEY, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

- 67 -

Detective Division
Area 2 Violent Crimes

Armed Robbery  031A
Victim: Amazon Beauty Salon

RD# N-151-925

VICTIMS CONT'D:

BOTA, Mary A.   F/B   6 Mar 40

McKINNES, Donna M.   F/B   5 Nov 60

HENDERSON, Cleo G  F/B  20 Jul 68

CARTER, Stephanie A  F/B   8 Feb 62

WHITMAN-EASTON, Deborah  F/B  2 Aug 51

IN CUSTODY:

ANDERSON, Tony  M/B 15 Jan 66 aka WILLIAMS, Joseph
5936 So. Talman  IR#682980

WANTED:

HICKS, Raymond  M/B  5 May  aka WILLIES, Tommy
aka HICKS, Tracy, HICKS, Michael
901 E 100th St apt 301  IR# 413390

CHARGES, COURT &
DATE:

Chap 38-18-2  (Armed Robbery)  Branch 66
3 May 90

ARRESTING OFFICERS:

Det. M. McDermott #13525
Det. J. Boylan  #16650   , Area 2 Violent Crimes

DATE, TIME, LOCATION
OF ARREST:

27 April 90, 1300hrs at 727 E 111th st

Continued page three...........................

- 68 -

Detective Division
Area 2 Violent Crimes

Armed Robbery -031A
Victim: Anajon Beauty Salon

RD# N-151-925

DATE, TIME, LOCATION
OF INCIDENT:

4 April 90, 1905hrs at 1855 E 87th st

WEAPON:

25 cal b/s handgun Sterlin automatic
serial # 064959 -recovered on 18 Apr 90
from Tony Anderson and Robert Allen

PROPERTY TAKEN:

Store Loss- 200.00usc

Payton-Smiley- 200.00usc, gold chain with medallion

Wash- 6.00usc and gold ring

Ford-Gilliam- 350.00usc, diamond ring & gold ring

Bota- 10.00usc, burgundy leather purse, gold ring
(1) set of keys

McKinnes-350.00usc, black suede jacket, emerald ring
(4) braclets, (3) gold chains with diamond
and sapphire and diamond ring with sapphire

Henderson: gold chain, (3) gold rings

Carter- (4) gold rings

Whitman-Easton- 225.00usc, 150.00 money order
brown purse, wedding band (2)
gold braclets

MANNER/MOTIVE:

Offenders enter small businesses, display b/s
handgun and force all employees and customers to the
rear of the store/ monetary gain

EVIDENCE:

Use of above described weapon

REFERENCES:

Crime Pattern 90-P-162
RD# N-156-206 (Armed Robbery)

STATEMENTS:

Tony Anderson: (oral)

NOTIFICATIONS:

Asa Cernius Felony Review

continued page four............................

69

Detective Division
Area 2 Violent Crimes

RD# N-151-925

Armed Robbery 031A
Victim: Anajon Beauty Salon

INVESTIGATION:　　　　　　　　　　The reporting detective was assigned the
　　　　　　　　　　　　　　　　　investigation of the above armed robbery.
Reporting interviewed the victims and they related in summary that on 4 Apr 90
at approx. 1900hrs two male subjects entered the beauty salon/boutique.
These two subjects walked around the store looking at the merchandise.
At this time one of the subjects displayed a small b/s handgun and announced
a robbery. The offenders ordered all the employees and customers to the rear
of the store and told them to lie on the floor. Money and jewelry was
taken from each of the victims. (see proprty loss section this report)
The offenders then fled the scene and the police were notified.

　　　　　　　　　　　　　　　　　The reporting detectives noted that the
description of the offenders and the M.O. matched that of the offenders
in crime pattern 90-P-162. Reporting then developed information that the
offenders in this crime pattern were driving a stolen 1985 Olds Cutlass.
RD# 155-906 On 18 Apr 90 two subjects were apprehended inside this car
along with a .25cal handgun. Both these subjects were transported into Area 2
for further investigation.

　　　　　　　　　　　　　　　　　At Area 2, Tony Anderson was advised of his
rights which he stated he understood. Present for this interview was Det.
Mc Carthy and McDermott. Anderson at first denied any knowledge of these
robberies but was then confronted with the evidence against him. Anderson
then admitted committing numerous armed robberies while armed with the
above blue steel handgun.

　　　　　　　　　　　　　　　　　In regards to this robbery Anderson stated
that he drove to a beauty shop on 87th st near Jeffery. Anderson stated that
he was with Leo Hicks and that he (Anderson) was armed with a .25cal handgun
and Hicks was armed. That after they were allowed entry, they walked around the store
pretending to be customers. Anderson stated that he then displayed a handgun
and forced all the women to the rear of the shop. Both Anderson and
Hicks took money and jewelry and other misc articles from the victims and they
then fled the scene. Anderson stated that they drove to the "Ranch Motel"
on Stony Island and there they split the proceeds in a room previously
rented by Hicks. Anderson stated that he just took the money but Hicks took
control of the jewelry, usc and checks. Hicks then furnished reporting with
an address and description of Hicks.

　　　　　　　　　　　　　　　　　On 19 Apr 90, the reporting detectives
attempted to contact all the victims of this robbery but learned that many
were unable to view a line-up. Anderson was subsequently charged with murder
and other unrelated armed robberies and was confined to the Cook County jail.

　　　　　　　　　　　　　　　　　On 27 Apr 90, the reporting detectives obtained
a writ for Tony Anderson. Anderson was taken from the Cook County jail and
transported into Area 2 for line-ups.

continued page five.........................

-70-

page five

Detective Division
Area 2 Violent Crimes

Armed Robbery 081A
Victim: Amazon Beauty Salon

RD# N-151-925

INVESTIGATION CONT'D:                On 27 Apr 90 at approx. 1915hrs all
                                      the victims on this case viewed a line-up
a Area 2. Each victim viewed the line-up seperatly and each was then secluded
from the rest of the witnesses. Tony Anderson was positivly identified
by seven of the eight victims. Anita Ford-Gilliam made a tenative identification
of suspect.

                                      A photo display was then shown to the victims
who then made a positive identification of Leo Hicks as the second offender
in this case.

                                      Asa Cernius of the felony review section
responded to Area 2 and interviewed the victims in this case. After being
appraised of all the known facts, Cernius approved armed robbery charges
for Tony Anderson.

                                      Reporting made several attempts to
locate Leo Hicks but this met with negative results. A stop order was
placed and a warrant was obtained on 30 Apr 90. Warrant# CN013622, charge
armed robbery with No Bond.

                                      Due to the above facts reporting requests that
this case be CLEARED OPEN with the arrest and charging of one of the two
offenders.

Det. M. McDermott 13525
Det. L. Boylan  16650

Case 1:06-cv-00079    Document 1    Filed 07/14/2006    Page 79 of 83

V-15/4.2

VICTIM #1 stated / relayed / AMAZON Age 30,

IN SUMMARY VICTIMS RELATED TO P/O THAT SAID OFFENDER ENTER SALON UNDER THE PRETENSE

OF BUYING SOME APPARELS + CLOTHING, WHO BEING ADMITTED (DOORS KEPT LOCKED) OFFENDERS BEGAN

WALK AROUND STORE LOOKING AT MERCHANDISE AND WATCHING VICTIMS, SHORTLY AFTERWARD

OFF #1 DISPLAYED SMALL CAL. AUTO AND PUT SAME INTO THE SIDE OF VIC #1 AND ANNOUNCED A

STICK-UP OFFENDERS TOLD ALL THE VICTIMS TO GIVE THEM ALL OF THEIR MONEY AND VALUABLES (ETC)

OFFENDERS TAKING SAME ORDERED VICT #9 PROPRIETOR OF BUS. TO OPEN SAFE AND TAKE.

OFFENDERS ORDERED ALL VICTIMS INTO REAR ROOM of BLDG AND FLED.

DURING DIRECTION OF ARREST PROPERTY TAKEN V-1 USE BY #71-2 CHAINS RINGS + BRACELETS

BILL + BOO PURSES BY #71-4 BLU SUEDE COAT BY #71-5 US POSTAL M.O., CURRENCY ETC. M.O.

VARIOUS SETTINGS + SAPPHIRE BY #71-4 BLU SUEDE COAT BY #71-5 US POSTAL M.O., CURRENCY ETC. M.O.

THIS I.D.'S AND NUMEROUS CREDIT CARDS MASTERY VISA, JEWELS DOMINIC CUB FOOD, AMER-EXP.

SETTINGS BLK CATOP-2-CHK BK, DU HERETAGE BOK, 1 UNCASHED CHK (NIL Trim) FED MCE FEST.

P/O DET 01/14 2ed    410-044-2ed    DU Arrest

Case 1:98-cv-03979   Document...   Filed 07/14/...   Page 80 of ...

OFFENSE/INCIDENT - PRIMARY CLASSIFICATION

ROBBERY

ARMED - HANDGUN

LA CITY SALON / BOUTIQUE

11. NAME

GILLIAM, ANITA A.

IDENTITY VERIFIED

12. HOME ADDRESS

12. BUSINESS PHONE

TEACHER

SUPPLEMENTARY REPORT
CHICAGO POLICE — FOR USE BY R.I.S. PERSONNEL ONLY

| OFFENSE CLASSIFICATION | UCR OFF CODE | ADDRESS OF ORIG. INCIDENT/OFFENSE | 4 Apr 90 | 1905 |
|---|---|---|---|---|

Armed Robbery - Handgun    031A    855 E 87th St    412

VICTIM'S NAME AS SHOWN ON CASE REPORT

Anaton Beauty Salon    5222

TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED    LOCATION CODE    NO. OF VICTIMS    NO OF OFFENDERS

Beauty Salon    330    9    2

OFFENDER'S NAME / DESCRIBE CLOTHING, ETC.    HOME ADDRESS    SEX-RACE-AGE / HEIGHT / WEIGHT / EYES / HAIR / COMPL

ANDERSON    5936 So. Talman    M 24 507 150 Brn Blk Med

HICKS    90... MICHIGAN    M 33 602 170 Brn Blk Drk

682-980    24    622

dna    dna    622

ARREST OF OFFENDER / CO-OFFENDER IDENTIFIED -
WARRANT OBTAINED

FORD-GILLIAM, Anita F/B 27 Jun 39

PAYTON-SMILEY, Amazon F/B 12 Jan 50

WASH, Serenna F/B 29 Dec 59

N-131-925

May 90    1700

REPORTING OFFICER (PRINT NAME)    STAR NO.    REPORTING OFFICER (PRINT NAME)    STAR NO.    SIGNATURE

Det. N. McPherson    13525    Det. J. Boylan    16650

DATE APPROVED (DAY-MO.-YR.)    TIME
7 MAY 90 1815

- 74 -

| LOCATION OF INCIDENT | TYPE LOCATION (HOUSE, STREET, ETC.) FLAT | | DAY OF WEEK | TIME OCCUR. |
|---|---|---|---|---|
| 1855 East 87th St. | Beauty Shop | | | 1905 |

| DESCRIPTION OF VICTIM | WEATHER/LIGHTING |
|---|---|
| Good | Clear-cool   Indoor lights |

| VICTIM'S NAME (LAST—FIRST—M.I.) | | SEX—RACE | AGE—DATE OF BIRTH | MARITAL STATUS |
|---|---|---|---|---|
| | APT./FLOOR | | NUMERICAL IDENTIFIERS (TYPE & NO.) | |

| PLACE OF EMPLOYMENT—ADDRESS—TELEPHONE | SECONDARY ADDRESS/TELEPHONE USED BY VICTIM |
|---|---|

| INJURIES | HOSPITAL TAKEN TO | TREATED OR PRONOUNCED BY—TIME |
|---|---|---|

| MEDICAL EXAMINER'S INV. | VICTIM IDENTIFIED BY: NAME—ADDRESS—TELEPHONE—RELATIONSHIP |
|---|---|

| OFFENDER'S NAME (LAST—FIRST—M.I.) | | SEX—RACE | AGE—DATE OF BIRTH | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| Unknown | | M  1 | 2025 | 5'7 | 150 |
| HOME ADDRESS | APT./FLOOR | TELEPHONE | CLOTHING DESCRIPTION Red cap with snake skin bill, black leather jkt | | |
| VEH. DESCRIPTION—LICENSE NO.—V.I.N. | | WEAPON  ☐USED ☒ DISPLAYED Handgun | Brown print shirt (& pants) leopard | | |
| I.R. NO. | C.B. NO. | WORDS USED BY OFFENDER | | | |

| OFFENDER'S NAME (LAST—FIRST—M.I.) | | SEX—RACE | AGE—DATE OF BIRTH | HEIGHT | WEIGHT |
|---|---|---|---|---|---|
| Unknown | | M  1 | 20-25 | 5'11 | 170 |
| HOME ADDRESS | APT./FLOOR | TELEPHONE | CLOTHING DESCRIPTION Navy blue shirt dk. pants. | | |
| VEH. DESCRIPTION—LICENSE NO.—V.I.N. | | WEAPON  ☐USED ☒ DISPLAYED Handgun | | | |
| I.R. NO. | C.B. NO. | WORDS USED BY OFFENDER | | | |

| $$ | | | |
|---|---|---|---|
| $5,000 USC | $5,000.00 Jewelry | purses  misc.  ID | |

| CRIMINAL CHARGE(S) | ☐OVERRULED (EXPLAIN) ☐APPROVED | CT. BR. | DATE | ASA |
|---|---|---|---|---|

| NAME (LAST—FIRST—M.I.) 1. | | SEX—RACE | AGE—DATE OF BIRTH | ☐EYE  ☐OUTCRY ☐CIRCUMSTANTIAL |
|---|---|---|---|---|
| HOME ADDRESS | APT./FLOOR | HOME TELEPHONE | NUMERICAL IDENTIFIERS (TYPE & NO.) | |
| PLACE OF EMPLOYMENT—ADDRESS—TELEPHONE | | RELATIVE/FRIEND NOT LIVING WITH WITNESS: NAME-ADDRESS-PHON | | |

| NAME (LAST—FIRST—M.I.) 2. | | SEX—RACE | AGE—DATE OF BIRTH | ☐EYE  ☐OUTCRY ☐CIRCUMSTANTIA |
|---|---|---|---|---|
| HOME ADDRESS | APT./FLOOR | HOME TELEPHONE | NUMERICAL IDENTIFIERS (TYPE & NO.) | |
| PLACE OF EMPLOYMENT—ADDRESS—TELEPHONE | | RELATIVE/FRIEND NOT LIVING WITH WITNESS: NAME-ADDRESS-PHON | | |

| TYPE NO. | PROP. INVENTORY NO. | DESCRIPTION |
|---|---|---|

| YEAR & NO. | ☐MAIN  ☐INSIDE TELLER  ☐THREAT NOTE  ☐OTHER (DESCRIBE) ☐BRANCH  ☐OUTSIDE WINDOW TELLER  ☐BAIT MONEY |
|---|---|
| TYPE OF ALARM SYSTEM | GUARD PRESENT  CAMERAS ACTIVATED — LOCATION: ☐YES  ☐NO   ☐YES  ☐NO |
| TELLER INFORMATION & LENGTH OF SERVICE | GUARD INFORMATION & LENGTH OF SERVICE |
| PATROL BEACON/ASSIGNED—OFFICERS' NAMES, STAR NOS. Bt. 415 Off. Brown #3691 | ASSISTING UNITS (E.T., MOBILE CRIME LAB.) |
| | UNITS NOTIFIED |
| DETECTIVE ASSIGNED (NAME — UNIT NO.) Gallagher | |

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,          )

                    Respondent,          )

                            )

VS.          )          Case No. 90 CR 11984 OV

                            )          The Honorable James B. Linn

TONY ANDERSON,          )          Judge Presiding

                Petitioner.          )

**RECEIVED**

## NOTICE OF MOTION

MAR 1 5 2005

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

TO:  The Honorable State's Attorney
     Office of the Cook County State's Attorney
     2650 S. California
     Chicago IL 60608

         PLEASE TAKE NOTICE that on _MARCH 8, 2005_, I shall file
with the above Court the Petitioner's Motion For Reconsideration, and a copy of
which is enclosed herewith and is hereby served upon you.

                                          _Tony Anderson_
                                          Tony Anderson

### PROOF OF SERVICE

        I, Tony Anderson, swear that I caused true and correct copies of this
Notice of Motion and the documents referred to herein by placing the same in the
U.S. Mail at the Stateville Correction Center, in Joliet, Illinois with the
appropriate request to the prison officials to place proper postage thereon, on
this day of _MARCH 8, 2005_ .

                                      _Tony Anderson_
                                      Tony Anderson

Subscribed and sworn to before me
this ___8th___ day of ___March___ , 2005

___Crystal L. Mason___
NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,        )

                Respondent,        )

vs.        )

                         )

TONY ANDERSON,        )

                Petitioner.        )

**RECEIVED**

MAR 1 5 2005

Case No. 90 CR 14984

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

The Honorable James B. Linn
Judge Presiding

## MOTION FOR RECONSIDERATION

NOW COMES, Tony Anderson, Petitioner, pro se, in pursuant to 725 ILCS 5/122-1 et. seq., and respectfully requests that this Honorable Court grant this motion for reconsideration of the Order dismissing the Petitioner's petition for leave to file a successive petition for post-conviction relief. In support thereof, the petitioner states as follows:

1. On January 24, 2005, the petitioner mailed a pro se petition for leave to file a successive petition for post-conviction relief (Hereafter, the "Successive Petition") and an attached motion for appointment of counsel, both of which were stamped filed by the Clerk of the Court on February 09, 2005.

2. On Feb 16, 2005 _____, this Honorable Court entered an order, in pursuant to Illinois Supreme Court Rule 651, ruling that the successive petition was "Denied."

3. The petition was dismissed at the first stage without the appointment of counsel, and presumably, without any input from the State's Attorney's Office.

4. The petitioner respectfully requests that this Honorable Court reconsider its order dismissing his petition for the following reasons.

5. The petitioner believes that his pro se petition was wrongfully dismissed at the first stage without the appoinment of counsel to amend his petition, because petitioner presented claims of Actual Innocence, and because he presented the gist of many Constitutional violations which led to his wrongful convictions.

6. In the petition, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓ but were the result of coercion and the ineffective assistance of counsel; that the State's failure to provide all relevant Brady material, denied the petitioner his Right to evidence tending to negate his guilt; Newly Discovered Evidence demonstrates that the petitioner was coerced into confessing and the confession was the result of police torture and abuse; and that his Appellate

Counsel were ineffective for not investigating, developing and raising the issues raised on appeal.

7. Moveover, the pro se petitioner, who is currently incarcerated, did his best to present the above mentioned claims without the benefit of subpoena power or counsel. And had he had the benefit of subpoena power or if counsel were appointed, the petitioner makes the proffer / offer of proof that the evidence would prove that:

 a. the petitioner is actually innocence ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 ▮▮▮▮▮▮▮▮

 b. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 ▮▮▮▮▮▮▮▮▮▮▮▮▮

 c. the State failed to provide all relevant Brady material which denied the petitioner his Right to evidence tending to negate his guilt;

 d. Newly Discovered Evidence demonstrates that the petitioner was coerced into confessing by officers who had tortured and abused other detainees into falsely confessing - before and after the petitioner's interrogation in which he was tortured and abused. And that these same officers were apart of a systematic pattern and practice of torture and abuse at Area 2 and Area 3 Police Headquarters under the command of fired Commander Jon Burge;

 e. in a January 5, 2005, Opinion, Seventh Circuit Judge Diane Wood stated about the officers at Area 2 and Area 3 under the command of Jon Burge:

> "[T]he claim [petitioner in that case] has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched... [A] mountain of evidence indictes that torture was an ordinary occurrence at the Area Two station [and later at Area Three] of the Chicago Police Department during the exact period pertinent to [that petitioner's] case...." (emphasis added) (See: Patterson v. Burge, Memorandum Opinion of January 5, 2005, p. 5; Hinton v. Uchtman _____ F.3d _____ (7th Cir. 2005), (Slip Opinion, pp. 19-22), Wood, J., concurring).

the petitioner believes that not only does Judge Wood statement addresses the issue torture and abuse at Area 2 and Area 3 under Burge (which includes the officers the petitioner claims tortured and abused him), but the statement also addresses the fact that "everything that the bad actors [the officers in question] touche[s]" should be called into question or viewed as unreliable. And the petitioner believes

-78-

this same "cloud hangs" over everything the officers in his case "touched,"
including the acts and testimony of Officer Robert Dwyer -- where Officer Dwyer
has been accused of failing to report to a supervisor the use of excessive force
during an in interrogation in conjunction with a murder investigation (where
officers had tortured a confession from a detainee), and where Dwyer gave false
information and made a false report to cover-up the bad acts and to obtain a
conviction.  Specifically, the petitioner obtain information after the filing of
his successive petition that the Police Department's Office Of Professional
Standards had "sustained" charges against Officer Dwyer for the violation mentioned
above, which is basically the same charges the petitioner made against Dwyer during
his hearing on the motion to suppress his confession and the motion to suppress
the identification obtained by Officer Dwyer.  (See: Exhibit #1 OPS Report)

    8.  The petitioner believes that he meets the cause and prejuduice standard
required for granting leave to file his successive petition.

    9.  Cause: The petitioner asserts that the objective factors that impeded the
constitutional violations complainted of in his successive petition from being
raised in his initial petition for post-conviction relief because the issue of torture
and abuse was new to the petitioner and not discovered fully until after his initial
petition was dismissed, and because the petitioner filed his initial petition without
the benefit of subpoena power to obtain the information hidden by the State
concerning the officers in question, and because the State violated and failed to
provide all relevant Brady material which tended to neagte the petitioner's guilt.

    10.  Not only did the State violated its discovery obligation, as more fully
explained in the successive petition, but it also violated its continuance obligation
to disclose the aforementioned exculpatory Brady material to the Direct Appeal
counsel and to the petitioner during the proceeding of his initial petition.

    11.  Had the State disclosed this pertinent exculpatory material to the
defense, it would have given the defense reasons to properly investigate, develop
and present this highly relevant evidence in his initial petition.

    12.  Prejudice:  The petitioner asserts that had he been able to properly
investigate, develop and present the claims raised in the successive petition, he
would had been able to present to the Court in his initial petition that the
officers involved in the petitioner's case has a long history of torturing and
abusing suspects into allegedly "confessing" to crimes they did not commit, and a

long history of falsifying police reports and documents and commiting perjury to cover-up their misconduct.

13. Moreover, had the State not violated it continuance Discovery obligation by not disclosing the above mentioned pertinent and revevant material, it would have established that the petitioner stands convicted of a crime he did not commit, in violation of his rights to a fair trial and to due process, because his conviction is based on highly suspect and highly contradicted evidence.

14. Had the evidence in the successive petition been presented at the petitioner's suppression hearing and/or trial, it would have created reasonable doubt as to petitioner's guilt, and would have given the fact-finder reasons not to find the petitioner guilt of a crime he did not commit, "[because] a cloud hangs over everything that the bad actors touched."

15. The petitioner is not an attorney and doesn't have the education or skills to articulate and properly present his claims (especially without the benefit of subpoena power) to this Honorable Court.

WHEREFORE, Tony Anderson, petitioner, pro se, prays that this Honorable Court will reconsider its Order dismissing his petition, because petitioner presented claims of actual innocence, and presented the gist of many non-frivolous claims of constitutional violations, and grant the petitioner the appointment of counsel so counsel can investigate, develop and articulately present the petitioner's claims within the successive petition.

Dated: _MARCH 8, 2005_

_Tony Anderson_
Tony Anderson

### VERIFICATION

I swear under penalties provided by law pursuant to Section 1-109 of the Code of Civil procedure, that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief as aforesaid, that I verily believes the same to be true.

_Tony Anderson_
Tony Anderson

Subscribed and sworn to before me this ___8th___ day of __March__ , 2005

_Crystal L. Mason_
NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

— 80 —

SUMMARY REPORT ·
SUBJECT: COMPLAINT REGISTER INVESTIGATION NO.:
CHICAGO POLICE DEPARTMENT

SUSTAINED

188617

DATE OF REPORT (DAY/MO/YEAR)
04 June 1993
20 March 1995T

INSTRUCTIONS: SUBMIT ORIGINAL ~~AND 3 COPIES IF ASSIGNED TO SAME UNIT AS ACCUSED.~~
SUBMIT ORIGINAL AND 4 COPIES IF NOT ASSIGNED TO SAME UNIT AS ACCUSED.

TO:       SUPERINTENDENT OF POLICE

ATTENTION   ☒ ADMINISTRATOR IN CHARGE, OFFICE OF PROFESSIONAL STANDARDS
            ☐ ASSISTANT DEPUTY SUPERINTENDENT, INTERNAL AFFAIRS DIVISION

| FROM · INVESTIGATOR'S NAME | RANK | STAR NO. | SOCIAL SEC. NO. | EMPLOYEE NO. | UNIT ASSIGN. |
|---|---|---|---|---|---|
| Robert Cosey | Inv | 27 | | 300170 | 113 |

REFERENCE NOS. (LIST ALL RELATED C.R., C.B., I.R., INVENTORY NOS, ETC., PERTINENT TO THIS INVESTIGATION)

C.R. #134947, CB #6973302, 6973303, Inv. #037799, 037798C1, RD #E-406-011 IR # 591438, 672905

| ADDRESS OF INCIDENT | DATE OF INCIDENT · TIME | BEAT OF INCIDENT | LOCATION CODE* |
|---|---|---|---|
| 727 E. 111th St. Area 2 Headquarters | 29 Oct 83 | 0230 | 514 | 04 |

| NAME | RANK | STAR NO. | SOCIAL SEC. NO. | EMPLOYEE NO. | UNIT ASSIGN. |
|---|---|---|---|---|---|
| 1.   Peter Dignan | Sgt | 1267 | | | 189-A |
| 2.   Robert Dwyer | Det | 21068 | | | 622 |
| 3.   John Byrne | Sgt | 1453 | | | 007 |

| SEX/RACE | D.O.B. | DATE OF APPOINTMENT | DUTY STATUS (TIME OF INCIDENT) | | PHYS. COND. CODE* |
|---|---|---|---|---|---|
| 1. M/W | 29 Nov 46 | 31 Mar 69 | ☒ ON DUTY  ☐ OFF DUTY | ☒ SWORN  ☐ CIVILIAN | 01 |
| 2. M/W | 25 Oct 48 | 15 Jun 70 | ☒ ON DUTY  ☐ OFF DUTY | ☒ SWORN  ☐ CIVILIAN | 01 |
| 3. M/W | 01 Jul 46 | 22 Jan 68 | ☒ ON DUTY  ☐ OFF DUTY | ☒ SWORN  ☐ CIVILIAN | |

| IF APPLICABLE · DATE ARRESTED/INDICTED | CHARGES | COURT BRANCH | DISPOSITION & DATE |
|---|---|---|---|
| 1. | | | |
| 2. | | CONFIDENTIAL DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER | |
| 3. | | 97 C 2715 | |

| NAME | ADDRESS** | CITY | STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE* |
|---|---|---|---|---|---|---|---|
| Atty. Jeffrey Haas | 1180 N. Milwaukee | Chgo | IL | 235-0070 | | | |

| NAME | ADDRESS** | CITY | STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE* |
|---|---|---|---|---|---|---|---|
| Gregory Banks | | | | | M/B | 26 Sep 63 | 03 |
| David Bates | | | | | M/B | 15 Sep 65 | 03 |

| NAME | ADDRESS** | CITY | STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE* |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

SEE REVERSE SIDE FOR CODES, INSTRUCTIONS FOR STATING ALLEGATIONS, AND COMPLETING THE REMAINDER OF THE SUMMARY REPORT.
SEE ATTACHED SHEET FOR ADDITIONAL ACCUSED, COMPLAINANTS, VICTIMS, WITNESSES.
* CPD MEMBER, LIST RANK, STAR, SOCIAL SECURITY, EMPLOYEE NOS. IN ADDRESS, PAX/BELL IN TELEPHONE BOX..

On 07 November 1991 at 1009 hours Police Officer J. Handley, Star #14980/Unit 121 telephoned the Office of Professional Standards and registered a complaint with Investigator Lucia De La Pava, Star #66 on behalf of Attorney Jeffrey Haas regarding Civil Suit 91-C-6470. It is alleged in the Civil Suit Complaint At Law 91C6470 that on 29 October 1983 at approximately 0230 hours, while in an interview room inside of Area 2 headquarters located at 727 E. 111th St., Sergeant John Byrne 1) placed the barrel of a .45 caliber automatic into Gregory Banks' mouth, 2) threatened to "blow his head off" and 3) struck Banks several times in the chest and stomach with his flashlight. It is alleged that as Mr. Banks fell out of the chair, Detective Grunhard 1) kicked Mr. Banks several times in the side, stomach and ankle. It is

C.R. NO.
CR 188617
1214

4.112 (Rev. 3/84)

Office of Professional Standards
Complaint Register Number 158547
Page 5

handcuffed to a ring on the wall of one of the interview rooms.
He stated that he remained in that particular room until
approximately 0230 hours of 29 October 1983 when Detective Dignan
came in unhandcuffed him, cuffed him behind his back and walked
him to an adjacent interview room. Mr. Banks stated that a short
time later Detective Dignan was joined by Sergeant Byrne and
Detective Grundhard who then began to interrogate him regarding
his knowledge and role in a murder the day before. Mr. Banks
stated that as he persisted in his denial of any knowledge or
role in the crime, Sergeant Byrne took out a silver .45 automatic
weapon, placed its barrel in his mouth and stated, "I should blow
your head off because you know what we're talking about." Mr.
Banks stated that when he further denied his involvement,
Sergeant Byrne struck him three to four times across his chest
and stomach with a black flashlight while still handcuffed behind
his back. He stated that he fell out of the chair while being
struck and as he lay on the floor, Detective Grundhard kicked him
in his stomach and ankle as he was being told by them all that he
will tell them what happened. Mr. Banks stated that he again
told them that he didn't know what they were talking about. He
went on to state that Detective Dignan, at that point, stated,
"We have something for niggers," and proceeded to bring out a
plastic garbage bag, placed it over his head (Mr. Banks) and
pulled it tightly around his neck. Mr. Banks stated this
occurred as Detective Grunhard kicked him in the stomach and
side. He stated that Detective Dignan kept the bag over his head
several minutes which did restrict his ability to breathe and
when he removed the bag, he and the other detectives left the
room with a promise that they would return. Mr. Banks stated
that approximately fifteen later, all three detectives returned
and asked him what he had decided to do and when he told them
that he didn't know they were talking about, Detective Dignan
again placed a plastic bag over his head and pulling it tight to
cut off his air passages. Mr. Banks stated that when the bag was
finally removed, he told them that he committed the crime. He
stated that he then told them where the gun used in the crime was
hidden and took them to that location several hours later. Mr.
Banks stated that while at the scene where the gun was recovered,
he was never unhandcuffed nor did he attempt to escape or became
involved in a physical altercation with Detective Dignan where he
was tackled and traded several punches. Mr. Banks stated that
after the gun was recovered, he was brought back to Area 2
Headquarters and placed in an interview room where he sat until
early the next morning when he was told that he would be giving a
statement to a State's Attorney. Mr. Banks alleged that in the
time he was in custody he was not given any food prior to being
interviewed by the State's Attorney. He also alleged that he was
verbally intimidated by Detective Dwyer and threatened with

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER
PRINTED IN 97 C 2775

212         8-2-         CR 1218

Office of Professional Standards
Complaint Register Number 134947
Page 6

additional physical harm if he didn't give a statement to the
State's Attorney.    Mr. Banks stated that he never told the
State's Attorney that he suffered any mistreatment at the hands
of the investigating detectives for fear of additional harm.    He
did state that once he was received at Cook County Jail and
examined by a doctor he at that time revealed what occurred.
(Atts. #3,#25,#29,#50,#57,#61)

On 18 November 1983, CR #134947 was registered on behalf of
Gregory Banks after Dr. John M. Raba, Medical Director, Cermak
Health Services made contact with the Office of Professional
Standards via written correspondence.    The correspondence related
that on 31 October 1983, Gregory Banks was admitted to the Cook
County    Department    of    Corrections    and    during    a    physical
examination conducted by Dr. Ross Romine, Gregory Banks alleged
that while in police custody he was beaten and a plastic bag was
placed over his head for the purpose of soliciting a confession.
The examination revealed multiple bruises and evidence of trauma
on    the    chest,    abdomen    and    legs.    There    were    also    scabbed
abrasions    on    Mr.    Banks'    wrist,    compatible    with    compression
injuries secondary to handcuffs. (Att. #29)

On 13 June 1985, Dr. Ross Romine gave testimony before Judege
Robert  Sklodowski  of  the  Circuit  Court  of  Cook  County.    Dr.
Romine testified that on 03 November 1983, he examined Gregory
Banks, pursuant to his duties at Cermak Hospital.    He stated that
during  the  examination,  Gregroy  Banks  revealed  that  while  in
police custody, he was deliberately beaten and a bag placed over
his head to extract a confession.    Dr. Romine testified that Mr.
Banks had lacerations with scabs on both wrists, consistent with
handcuff injuries.    He had multiple scrapes and scratches over
his chest and abdomen along with a bruised, swollen muscle on his
left side and some kind of a lump under his skin in the lower
left rib cage.    Dr. Romine further testified that the entire area
was  swollen,  discolored  and  tender  and  he  further  observed  a
large area of swelling, tenderness and discoloration below each
buttock;  somewhat  lateral.    He  stated  that  there  were  scratches
or  scrapes  around  one  of  his  ankles  in  addition  to  bruises  on
both legs in the upper posterior section of the upper thigh below
the buttocks.    Dr. Romine testified that Mr. Banks' injuries were
consistent with his account of how he received such injuries.
Dr.    Romine    testified    that    the    bruises    to    Mr.    Banks'    chest
appeared to be caused by some blunt object.    Dr. Romine testified
that  Mr.  Banks'  injuries  appeared  to  be  two  to  seven  days  old
which  was  consistent  with  Mr.  Banks'  statement  of  when  he
received his injuries.    While under cross-examination, Dr. Romine
was  asked  if  Mr.  Banks'  injuries  were  consistent  with  falling
down stairs and he answered, "No."    Dr. Romine testified that the

CONFIDENTIAL DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

213

CR    1219

Office of Professional Standards
Complaint Register Number 188617
Page 7

injuries were not consistent with a fall down the stairs because there were no injuries to bony prominent areas, such as, the pelvis, knees, top of the head or spine. Dr. Romine testified that the injuries noted were consistent with Mr. Banks' statement of how he received them and he therefore, reported the alleged police abuse to the hospital's medical director, Dr. Raba. (Atts. #3,#23,#29)

The victim David Bates who was a co-defendant of Gregory Banks also gave court testimony on his behalf. Mr. Bates testified that on 29 October 1983 at approximately 8:00 AM several Area 2 Violent Crimes Detectives came to his home as he slept and placed him into custody at which point he was transported to Area 2 Headquarters and placed in a small interview room. Mr. Bates testified that over the period of that day he was interviewed four to five times by Sergeant Byrne and Detective Grundhard. He stated that as he continued to deny knowledge and involvement in a murder/armed robbery offense the day before, Sergeant Byrne and Detective Grundhard would punch him in the stomach and chest with clenched fists and slap him in the face and would stop only after he would yell out or pretend to have passed out. Mr. Bates stated that during one of the interviews, Sergeant Byrne told him that they had 'something for those who don't like to talk' and before he could look around to see what he was talking about, a plastic bag was placed over his head and pulled tightly around his neck so that he couldn't breath while the other punched him in the stomach. Mr. Bates stated that again the detectives would stop only after he yelled out. He was then told by the detectives that they would take care of him on the graveyard shift when they took him to the forest. He stated that when they removed the bag, the same two detectives would slap him in the face several more times. He stated that on one occasion, Sergeant Byrne kicked him in his testicles. Mr. Bates testified that he was told by Sergeant Byrne and Detective Grundhard that a State's Attorney was on his way and when he got there, he (David Bates) would give a statement and in that statement he would tell the State's Attorney that he was involved in the murder. He was told that if he didn't confess, he would be taken to the forest and the beatings would start all over again. Mr. Bates testified that this threat of additional physical harm if he didn't confess came from Detective Dwyer. Mr. Bates did not give any testimony as to the extent of any injuries he may have sustained nor did he report any alleged injuries once he was taken to the County Jail. (Att. #3)

The accused, Detective Charles Grunhard was unavailable for an Office of Professional Standards interview pursuant to Civil Suit 91-C-6470 because he is deceased. Detective Grunhard did however

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

214

ENTERED IN 97 C 2775

- 84 -

CR  1220

Office of Professional Standards
Complaint Register Number 4
Page 8

give testimony on 17 May 1985 in court regarding his role and
involvement in the assigned murder investigation.   Also during
that testimony, Detective Grunhard stated that upon reporting to
work at 12:30 AM on 29 October 1983 he learned that he was
assigned to the investigation of the murder of Leon Barkan that
occurred the day before.   Detective Grunhard stated that while on
duty, he did see Gregory Banks on occasion and at one point was
present during a conversation with Mr. Banks at the request of
Detective Dignan.   According to Detective Grunhard, his presence
in the interview was to witness Mr. Banks' statement relative of
his involvement in the murder.   Detective Grunhard stated that
during the time he was present, neither he, Sergeant Byrne nor
Detective Dignan ever struck, punched or kicked Mr. Banks.
Detective Grunhard further denied ever personally kicking Mr.
Banks in his stomach or chest and denied ever striking David
Bates.   Detective Grunhard stated that at no time while Mr. Banks
was in his presence did he observe any visible injuries nor did
Mr. Banks complain of any injuries.   (Att. #3,#29)

The accused, Detective Sergeant John Byrne was unavailable for an
Office of Professional Standards interview pursuant to Civil Suit
91-C-6470 because he had resigned his position as detective with
the Chicago Police Department.   However, Sergeant Byrne also gave
testimony in court on 03 June 1985 as to his role and involvement
in the murder investigation.   Sergeant Byrne was the supervising
sergeant throughout the murder investigation and he assigned
various personnel to various tasks.   Throughout his testimony,
Sergeant Byrne denied that he played an integral role in the
interrogation and the extraction of a confession from Gregory
Banks.   He denied ever placing the barrel of a gun in Mr. Banks'
mouth and threatening to blow his head off.   He denied ever
striking Mr. Banks across the chest and stomach with a flashlight
and further denied that any detective in his presence made any
physical contact of an abusive nature with Mr. Banks.   Sergeant
Byrne testified that when Mr. Banks agreed to take his detectives
to where the murder weapon was hidden, he also went along,
accompanying Detectives Dignan and Grunhard.   Sergeant Byrne
testified that they took Mr. Banks to the scene where the murder
weapon along with a portion of the robbery proceeds, were
recovered.   He stated that Mr. Banks was unhandcuffed for a
period of time while at the scene and at one point attempted to
flee.   Sergeant Byrne stated that Detective Dignan tackled Mr.
Banks as they both rolled down several stairs and even traded
punches with each other before Mr. Banks was brought under
control and handcuffed.   Sergeant Byrne stated that during that
altercation, Detective Dignan sustained an injury to one of his
legs.   He stated that Gregory Banks never complained in his
presence of sustaining any injuries nor did he observe any injury

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

215

CR   1221

ENTERED IN 97 C 2775.    -85-

Office of Professional Standards
Complaint Register Number 188617
Page 9

to his person.  (Att. #3)

The accused, Detective Peter Dignan also gave court testimony and
he did give a statement pursuant to Civil Suit 91-C-6470.
Detective Dignan stated that he was one of the investigating
officers assigned to investigate the murder of Leon Barkan and
the shooting of Jeltro Givens and he received that assignment
from Sergeant John Byrne.  Detective Dignan testified that he had
several conversations with Mr. Banks during the early morning
hours of 29 October 1983 and during the initial interview, Mr.
Banks denied involvement in the crime.  Detective Dignan stated
that after Mr. Banks was confronted with the facts of the
investigation, what witnesses had said and the information that
had been given against him, he eventually made an admission to
the crime.  Detective Dignan denied during court testimony and in
a statement pursuant to Civil Suit 91-C-6470 that Gregory Banks
was ever physically abused to extract a confession.  He stated
that Sergeant Byrne never placed the barrel of a gun in Banks'
mouth and threatened to blow his head off.  He stated that Banks
was never struck with any flashlights, punched or kicked nor did
he personally place a plastic bag over his head to restrict his
breathing.  Detective Dignan stated that after Mr. Banks made an
admission to the murder, he also offered to show them where the
murder weapon was hidden.  He stated that during that same
morning, he along with Sergeant Byrne and Detective Grunhard
transported Mr. Banks to an abandoned and dilapidated building
located at 56 W. 95th St. and it was there that the murder weapon
was recovered along with a gallon of syrup (liquid narcotics)
which was part of the robbery proceeds.  Detective Dignan
explained during a statement that because of the building's very
poor structural condition, for Mr. Banks protection and safety,
he was not handcuffed.  He stated that while at the scene, Mr.
Banks attempted to flee by running down some stairs, but before
he could get too far he (Detective Dignan) dived and tackled him
and they both fell head over heels down several stairs.
Detective Dignan stated that he recalled being elbowed in the
face by Banks and he in turn punched Banks several times, before
he, with the assistance of Sergeant Byrne, was able to place
handcuffs on him.  Detective Dignan did speculate that Mr. Banks
sustained some injuries as a result of the altercation even
though he never complained or requested medical attention while
in their custody.  Detective Dignan stated as a result of the
altercation he sustained an injury to his right leg which was
treated at Little Company of Mary Hospital the next day, 30
October 1983.  In his statement, Detective Dignan also denied
that he ever denied Mr. Banks food.  (Att. #3,#29,#59)

The accused, Detective Robert Dwyer gave court testimony as well

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

216                                                    CR  1222

ENTERED IN 97 C 2775   -86-

Office of Professional Standards
Complaint Register Number 188617
Page 10

and he also gave a statement pursuant to Civil Suit 91-C-6470.
Detective Dwyer stated that he was assigned to the investigation
on 28 October 1983 but didn't come in contact with Gregory Banks
and David Bates until the early hours of 30 October 1983.
Detective Dwyer stated that during an interview with Gregory
Banks, he did make an admission of guilt, but only after he had
made the same admission to Detective Dignan earlier. Detective
Dwyer stated when asked that, Gregory Banks never complained of
any discomfort, illness or injury. Mr. Banks never requested any
medical attention and never stated that he had been mistreated in
any way by any detective assigned to the case. Detective Dwyer
denied that he ever threatened Mr. Banks or David Bates with
additional physical harm from other detectives if they didn't
confess to the murder. Detective Dwyer denied that he ever
denied either Gregory Banks or David Bates food. Detective Dwyer
stated that in the time Mr. Banks was in his presence, he never
observed any visible injuries to his person. (Atts. #3,#67)

CONCLUSION:

The Illinois Appellate Court, in its decision to reverse Mr.
Banks' conviction, noted and considered a number of errors made
by the trial judge during the Motion to Suppress.

The Appellate Court stated that the trial judge erred when the
responsibility was not taken to suppress Gregory Banks'
confession when the evidence presented strongly suggested that
his statement was coerced.

Despite the accused officers' statements and sworn testimony that
Gregory Banks' confession and subsequent conviction were not
obtained through the use of physical abuse and intimidation the
medical evidence presented in the testimony of Dr. Walter Romine
during the motion to suppress strongly suggest that, that in fact
was the case. Contrary to the suggestion by Detective Peter
Dignan that Mr. Banks sustained injuries when he attempted to
flee from custody while at the evidence recovery scene and
subsequently became involved in an altercation with Detective
Dignan, Gregory Banks stated that when he repeatedly denied
involvement in any crime during several interrogations, he was
struck across the chest with a flashlight by Sergeant Byrne and
kicked about his body by Detective Grunhard while laying on the
floor and while Detective Dignan pulled a plastic bag tightly
over his head. The areas of his body where he stated he was
struck were, according to Dr. Romine consistent with the location
of his injuries. Dr. Romine further stated that while it was
conceivable that Mr. Banks could have sustained injuries in the
manner described by Detective Dignan, it wasn't likely due to the

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

Office of Professional Standards
Complaint Register Number 188617
   Page 11

CONCLUSION (Continued)

absence of injury to the more bony prominent areas of Banks'
body.  He stated that Mr. Banks sustained injuries that were
consistent with being struck with a blunt object and that his
injuries in total were from two to seven days old which was
consistent with Banks' statement as to how he was injured.  While
there is little evidence to support Banks' allegations that
Sergeant Byrne placed the barrel of a gun in his mouth or that
Detective Dignan restricted his ability to breathe by placing a
plastic bag over his head or that he was denied food by all the
accused, the medical evidence as presented, strongly suggest and
support the notion that the injuries he sustained were sustained
in the manner he described and not in the manner as described by
the accused detectives.  Therefore, the allegations that Gregory
Banks while in police custody was physically abused when he was
struck repeatedly with a blunt object, punched and kicked about
his body as he laid handcuffed on the floor, supports the finding
of SUSTAINED.

There is no corroborating evidence to support the allegation that
Detective Robert Dwyer threatened both Gregory Banks and David
Bates with additional physical harm by other detectives if they
did not confess to the crime in front of a State's Attorney,
therefore, those allegations will be NOT SUSTAINED.

There is no medical evidence or supporting witness accounts that
David Bates was physically abused, therefore, those allegations
will be NOT SUSTAINED, as well.

There is no evidence to support the allegations that Commander
Jon Burge arrested Mr. Banks or was present in Area 2
Headquarters during his interrogation nor is there any evidence
that Commander Burge had any knowledge or sanctioned any form of
physical abuse or intimidation with the sole purpose of
extracting a confession from Gregory Banks, therefore the
allegations against Commander Jon Burge will be NOT SUSTAINED.
It should however be noted that at this writing, Commander Burge
is no longer a member of the Chicago Police Department.

FINDINGS:

Relative to the allegations made against Sergeant John Byrne by
Gregory Banks

Allegation #1         NOT SUSTAINED

Allegation #2         NOT SUSTAINED

218

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

ENTERED IN 97 C 2775  _ 88-

CR  1224

Office of Professional Standards
Complaint Register Number 188617
Page 12


FINDINGS (Continued)

Allegation #3
SUSTAINED – Violation of Rule 8, "Disrespect to or maltreatment of any person while on or off duty," in that on 29 October 1983 at approximately 0230 hours while at Area 2 Headquarters, Sergeant John Byrne struck Gregory Banks about the chest and stomach with a flashlight during an interrogation.

OTHER VIOLATIONS:
SUSTAINED – Violation of Rule 6, "Disobedience of an order or directive, whether written or oral," in that on 29 October 1983 at approximately 0230 hours while at Area 2 Headquarters, Sergeant John E. Byrne failed to abide by the directives of General Order 93-3 in that he failed to report to the Office of Professional Standards the use of excessive force against Gregory Banks during an interrogation in conjunction with a murder investigation.

SUSTAINED – Violation of Rule 14, "Making a false report, written or oral," in that on 03 June 1985, while in front of Robert L. Sklodowski of the Circuit Court of Cook County, Sergeant John E. Byrne gave false testimony that Gregory Banks was not physically abused while in police custody.

Allegation #4
NOT SUSTAINED (relative to allegation made by David Bates)

Allegation #5
NOT SUSTAINED (relative to allegation made by David Bates)

Relative to the allegations made against Detective Charles Grunhard

Allegation #1
SUSTAINED – Violation of Rule 8, "Disrespect to or maltreatment of any person while on or off duty," in that on 29 October 1983, at approximately 0230 hours, while at Area 2 Headquarters, Detective Charles Grunhard kicked Gregory Banks about his body as he laid handcuffed on the floor during his interrogation.

CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT TO PROTECTIVE ORDER

219

ENTERED IN 97 C 2775 -89-　　CR 1225

Office of Professional Standards
Complaint Register Number 188617
Page 13

FINDINGS (Continued)

OTHER VIOLATIONS:    SUSTAINED - Violation of Rule 6,
                     "Disobedience of an order or directive,
                     whether written oral," in that on 29 October
                     1983, at approximately 0230 hours, while at
                     Area 2 Headquarters, Detective Charles
                     Grunhard failed to abide by the directives of
                     General Order 93-3 in that he failed to
                     report to a supervisor the use of excessive
                     force against Gregory Banks during an
                     interrogation in conjunction with a murder
                     investigation.

                     SUSTAINED - Violation of Rule 14, "Making a
                     false report, written or oral," in that on 11
                     October 1984, at 0600 hours, while giving a
                     statement at the Office of Professional
                     Standards, Detective Charles Grunhard gave
                     false information that Gregory Banks was not
                     physically abused while in police custody.

Allegation #2        NOT SUSTAINED (relative to allegation made by
                     David Bates)

Relative to the allegations made against Detective Peter Dignan

Allegation #1        NOT SUSTAINED

Allegation #2        NOT SUSTAINED

OTHER VIOLATIONS:    SUSTAINED - Violation of Rule 6,
                     "Disobedience of an order or directive,
                     whether written or oral," in that on 29
                     October 1983, at approximately 0230 hours,
                     while at Area 2 Headquarters, Detective Peter
                     Dignan failed to abide by the directives of
                     General Order 93-3 in that he failed to
                     report to a supervisor the use of excessive
                     force against Gregory Banks during an
                     interrogation in conjunction with a murder
                     investigation.

                     SUSTAINED - Violation of Rule 14, "Making a
                     false report, written or oral," in that on 26
                     May 1993 at 1507 hours, Detective Peter
                     Dignan gave false information while providing
                     a statement at the Office of Professional

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

220                                              CR    1226

ENTERED IN 97 C 2775        -90-

Office of Professional Standards
Complaint Register Number 188617
Page 14


FINDINGS (Continued)

Standards regarding the use of excessive force during the interrogation of Gregory Banks in conjunction with a murder investigation.

Relative to the allegation made against Commander Jon Burge

Allegation #1          NOT SUSTAINED

Relative to the allegations made against Detective Robert Dwyer

Allegation #1          NOT SUSTAINED

OTHER VIOLATIONS:      SUSTAINED - Violation of Rule 6, "Disobedience of an order or directive, whether written or oral," in that on 30 October 1983 between 0000 hours and 0300 hours, while at Area 2 Headquarters, Detective Robert Dwyer failed to abide by the directives of General Order 93-3 in that he failed to report to a supervisor the use of excessive force against Gregory Banks during interrogations in conjunction with a murder investigation.

SUSTAINED - Violation of Rule 14, "Making a false report, written or oral," in that on 03 June 1993, at 1012 hours, Detective Robert Dwyer gave false information while providing a statement at the Office of Professional Standards regarding the use of excessive force during the interrogation of Gregory Banks in conjunction with a murder investigation.

The reporting investigator recommends a finding of NOT SUSTAINED relative to the allegation that Gregory Banks and David Bates were denied food during the time they were in custody in Area 2.

DATE INITIATED:       07 November 1991
DATE CLOSED:          04 June 1993
ELAPSED TIME:         574 Days
SUSPENSE TIME:        34 Days
NET ELAPSED TIME:     540 Days

CONFIDENTIAL: DOCUMENT PRODUCED
PURSUANT TO PROTECTIVE ORDER

221

ENTERED IN 97 C 2775          — 9( —          CR 1227

File Date: _July 14, 2008_

Case No: _08cv3979_

ATTACHMENT # _1_

EXHIBIT _Pages 92 - 174_

## TAB (DESCRIPTION)

1          DETECTIVE MASLANKA

2    a witness called on behalf of the Respondent, the

3    People of the State of Illinois, on the motion, being

4    first duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7                         BY

8                    MR. OWEN:

9         Q       Detective, would you please state your name

10   for the record and spell your last name and give your

11   star number for the benefit of the court reporter

12   please?

13        A       Detective Tony Maslanka, M-a-s-l-a-n-k-a.

14        Q       Could you please give your star number?

15        A       My star number is 16161.

16        Q       Where are you assigned, detective?

17        A       Assigned Area 3, Violent Crimes, Chicago

18   Police Department.

19        Q       Calling your attention, specifically to

20   April 19th, 1990, were you working on that day,

21   detective?

22        A       Yes.

23        Q       And were you working alone or with a

24   partner.

174

1       A     My partner.

2       Q     And that morning, sometime around noon, did

3   you have an occasion to proceed to Area 2 Violent

4   Crimes located at 111th Street down here in Chicago,

5   Illinois?

6       A     Yes.

7   THE COURT:  Excuse me the date again?

8   MR. OWEN:  April 19th, 1990.

9   THE COURT:  Okay.

10   MR. OWEN:

11       Q     And what was your purpose for proceeding

12   down to Area 2 on April 19th, 1990?

13       A     The purpose was to conduct lineups and

14   several investigations pertaining to Area 3 Violent

15   Crimes.

16       Q     And did any of those investigations

17   involve, from your perspective, sir, or your

18   participation that day, to a robbery which occurred on

19   11601 S. Halsted at a Trak Auto Store here in Chicago,

20   Cook County, Illinois?

21       A     No, sir.

22       Q     Did you have an occasion on that date to

23   meet an individual by the name you now know to be Tony

24   Anderson, also known as Joseph McKenzie?

1       A       That's correct.

2       Q       And where was it that you met that

3  individual, sir, that day?

4       A       At Area 2, Violent Crimes interview room.

5       Q       And at the time that you met this

6  Defendant, were you alone or with another person?

7       A       I was with my partner and later with a

8  State's Attorney.

9       Q       And what was your partner's name, sir?

10      A       John Paladino.

11      Q       And at anytime in the presence of this

12 Defendant, did either you or your partner or any other

13 person ever put a gun to the Defendant's head and

14 threaten him in any manner whatsoever?

15      A       No.

16      Q       Did you at anytime, you or your partner or

17 any person in your presence or one of your fellow

18 officers, take a police stick or a billyclub and

19 strike the Defendant and put it in the Defendant's

20 ribs or in his thigh at all?

21      A       No.

22      Q       At anytime did either you or one of your

23 brother officers or any person in your presence use

24 any psychological, physical or mental coercion against

1     this Defendant at anytime?

2          A     No.

3          Q     Do you recall when you spoke with the

4     Defendant, Tony Anderson, was he advised of his

5     rights, sir?

6          A     Yes, he was.

7          Q     And who advised him of his rights?

8          A     When my partner and I interviewed him, I

9     advised him of his rights.

10         Q     How did you do that, sir?

11         A     From a F.O.P. Handbook.

12         Q     Did you read them or recite them from

13    memory from the F.O.P. Book, sir?

14         A     I read them.

15    MR. HERNAN:    Judge, I would stipulate that the

16    officer do not actually recall the rights and read

17    them as they're written in the F.O.P. Book.

18         THE COURT:    Thank you.

19         MR. OWEN:    So stipulated, Your Honor.

20         Q     At anytime in your presence did this

21    Defendant -- strike that.

22                    At anytime, detective, did you ever

23    inquire of this Defendant anything regarding the Trak

24    Auto robbery or shooting which occurred at 11601 S.

177

PT55

1    Halsted on April 15th, 1990?

2          A      No, sir.

3          Q      Anybody in your presence conduct any

4    interviews of this Defendant regarding that, sir?

5          A      No, sir.

6          Q      I have nothing further, Judge.

7                        CROSS EXAMINATION

8                        BY

9                        MR. HEENAN:

10         Q      Detective, good afternoon.  You first met

11   Mr. Anderson at what time on the 19th?

12         A      On the 19th, I believe it was approximately

13   four o'clock in the afternoon we conducted lineups.

14         Q      And that was your first contact with Mr.

15   Tony Anderson that day?

16         A      Excuse me, that was two o'clock, I believe

17   it was, yes.

18         Q      And you first saw him, what room was he in

19   in Area 2?

20         MR. OWEN:  Objection, Judge, beyond the scope,

21   Judge, Your Honor, if I maybe heard.

22         THE COURT:  Go ahead.

23         MR. OWEN:  Judge, this detective, according to

24   this motion again, this motion is filed specifically

                        178

1    to this particular case, this a detective has had no

2    contact with this Defendant concerning this case, and

3    I believe that particularly to the motion in terms of

4    what it alleges, this detective indicates that at no

5    time did he do any of those things or his partner, and

6    I believe, Judge, that this detective's contact would

7    have been after any statements given regarding this

8    case, the only reason I call this detective, as well

9    as his partner Paladino, who would be next simply for

10   the material witness rules, as far as having contact

11   with the Defendant, I don't believe these questions

12   are relevant and proper.

13        MR. HEENAN:  Well, Judge, I gather what the

14   State's Attorney is arguing is that he is specifically

15   going into the one alleged statement, but I am asking

16   the Court, and I think the Court should be in this

17   motion as in all motions, looking at the totality of

18   the circumstances of an individual in custody, the

19   motion alleges both mental and the surroundings, the

20   atmosphere that he is in and how long he is with these

21   officers, and I'm just merely going into foundation as

22   to when this particular officer was with Mr. Anderson,

23   not for --

24        THE COURT:  I'm going to give counsel a little

1    leeway.

2        MR. HEENAN:

3        Q    What room was it that you first met him in?

4        MR. OWEN:   Objection, Judge.

11

5        MR. HEENAN:   I'm sorry, I thought that was the

6    question.

7        THE COURT:   You may answer that?

8        THE WITNESS:   It was an interview room at Area 2,

9    Violent Crimes.

10        MR. HEENAN:

11        Q    And Mr. Anderson was handcuffed in that

12    room?

13        MR. OWEN:   Objection, Judge.

14        THE COURT:   He may answer.

15        THE WITNESS:   I don't believe he was, he was with

16    other prisoners and, in one room that was separated by

17    a one-way mirror.

18        MR. HEENAN:

19        Q    And this did, during the conducting of

20    lineups, correct, that you first saw him?

21        A    That's correct.

22        MR. HEENAN:

23        Q    Now, when is it that you advised him of his

24    rights?

180

1      A      When my partner Paladino and I interviewed

2    him.

3          Q      What time was that?

4      A      That was approximately ten minutes after

5    four.

6          Q      And where was that?

7      A      In an interview room at Area 2, Violent

8    Crimes.

9          Q      Was Mr. Anderson handcuffed at that time?

10     A      No, he was not.

11         Q      Was he alone in that room?

12    MR. OWEN:   Objection, Judge.

13    THE COURT:   You may answer.

14    THE WITNESS:   Besides my partner and myself, he

15   was alone.

16    MR. HEENAN:

17         Q      Now, you indicated that you advised him of

18   his rights, at anytime did Mr. Anderson indicate to

19   you that he wished to exercise his right to remain

20   silent?

21     A      No, sir.

22         Q      Were you informed by other detectives at

23   that time that Mr. Anderson had already indicated that

24   he wished to remain silent?

1        MR. OWEN:  Objection, Judge.

2        THE COURT:  You may answer.

3        THE WITNESS:  No.

4        MR. HEENAN:

5        Q    Were you aware of who transported Mr.

6    Anderson to the Area 2 offices?

7        MR. OWEN:  Objection, Judge.

8        THE COURT:  You may answer.

9        THE WITNESS:  I can't recall at this time.

10       MR. HEENAN:

11       Q    You indicated that you advised Mr. Anderson

12   of his rights, did you advise him of his right to have

13   a lawyer present at the time of either questioning or

14   lineups?

15       MR. OWEN:  Objection, Judge.

16       THE COURT:  Sustained.

17       MR. HEENAN:

18       Q    At the time of questioning, did you advise

19   him that you had, that he had a right to have a lawyer

20   present?

21       A    That was one of his miranda rights, yes.

22       Q    Did Mr. Anderson indicate to you at anytime

23   while you were with him, that he wished to contact a

24   lawyer?

                              482

1          A      Can you repeat the question?

2          Q      Did Mr. Anderson at anytime indicate to you

3     that he wished to contact a lawyer?

4          A      No.

5          Q      Did he wish, did he indicate to you his, a

6     request to call his home?

7          MR. OWEN:  Objection, Judge.

8          THE COURT:  I'll let him answer?

9          THE WITNESS:  No.

10         MR. HEENAN:

11         Q      Call family members?

12         MR. OWEN:  Objection, Judge.

13         MR. HEENAN:

14         Q      To make any type of phone calls to make a

15    request to make a phone call?

16         A      No.

17         Q      Was he given an opportunity to make a phone

18    call while with you, detective?

19         MR. OWEN:  Objection, Judge, given an

20    opportunity, the Defendant never asked, Judge.

21         THE COURT:  Well, I don't know, I guess it's kind

22    of semantics, he can answer that?

23         THE WITNESS:  No.

24                              183

1          MR. HEENAN:

2          Q      You indicate, detective, that on this

3     particular day your partner was Detective Paladino?

4          A      Yes.

5          Q      Was Detective Paladino present at the time

6     of the reading of the rights to Mr. Anderson?

7          A      Yes, he was.

8          Q      You questioned Mr. Anderson or conversed

9     with him for how long a period of time that particular

10    day?

11         MR. OWEN:  Objection, Judge, goes beyond the

12    scope of this particular motion.

13         THE COURT:  Yes, this subsequent to -- well.

14         MR. HEENAN:  I'm not all that sure it is or not,

15    the totality.

16         THE COURT:  Yeah, I understand, I understand, you

17    know, and I might get this out of the way, you know, I

18    understand that this motion, I assume to this case,

19    but I kind of thought that it was a motion going to

20    all of them.  Is it?

21         MR. HEENAN:  Well, previous date, Judge, actually

22    when setting this matter --

23         THE COURT:  I'm sorry some --

24         MR. HEENAN:  When setting this matter that

184

1    question came up.

2         THE COURT:  And what did I say?

3         MR. HEENAN:  And I think we specifically said as

4    to --

5         THE COURT:  This one only?

6         MR. HEENAN:  That we're doing the motion

7    separately, I will indicate that, but now, even so,

8    you can not limit Mr. Anderson being in custody, only

9    to the --

10        THE COURT:  I understand what your saying, let's

11   find out when we're talking about here.

12        MR. HEENAN:  That's all I'm trying to do

13   timewise.

14        THE COURT:  Pose your question.

15        MR. OWEN:  Judge, I believe that's been asked and

16   answered, he indicated that he first asked him, he

17   said 4:10 p.m., the question has already been asked

18   and answered.

19        THE COURT:  4:10, right.

20        MR. HEENAN:

21        Q    I'm asking the total amount of time,

22   officer, that you conversed --

23        MR. OWEN:  I'm going to object.

24        THE COURT:  You may answer.

195

--103--

C201

1        THE WITNESS:  At what particular time, sir?

2        MR. HEENAN:

3        Q        You've indicated, let me, strike, ask

4   another question, Judge.

5                        You indicated that you never asked

6   him specifically about this incident about Trak Auto,

7   you never conversed with him at that time about that

8   incident?

9        A        I never spoke to him about that.

10       Q        But you actually spoke to Mr. Anderson on

11  April 19th for how long a period of time?

12       MR. OWEN:  Objection, Judge.

13       THE COURT:  You may answer.

14       THE WITNESS:  The first conversation was short,

15  it was approximately five minutes, the second

16  conversation with the State's Attorney took a little

17  longer, it must have been, it was at the same time

18  taken, interview, it might have been an hour, all

19  total.

20       Q        And that would have been the total amount

21  of time that you spent with Mr. Anderson that day?

22       MR. OWEN:  Objection, Judge.

23       THE COURT:  I'll overrule.

24       THE WITNESS:  There was also a lineup conducted

186

1   and that might have taken fifteen minutes; so, all

2   total, maybe an hour and a half.

3        MR. HEENAN:

4        Q     Now, detective, do you have a police stick

5   or billyclub, as I refer to?

6        A     No, sir.

7        Q     Is there one at the area office where Mr.

8   Anderson was?

9        MR. OWEN:  Objection, Judge.

10       THE COURT:  Sustained.

11       MR. HEENAN:

12       Q     Well, at anytime did you strike Mr.

13   Anderson with a stick of any sort?

14       A     No, sir.

15       Q     Did you hit Mr. Anderson in the rib area

16   with a billyclub or stick?

17       A     No, sir.

18       Q     Or in a vise?

19       A     No, sir.

20       Q     Was Detective Paladino with you at all

21   times when you were with Mr. Anderson?

22       A     No, sir.

23       Q     How long was Detective Paladino with you

24   while you were in Mr. Anderson's presence?

PT65

1          MR. OWEN:  Objection, Judge.

2          THE COURT:  Sustained.

3          MR. HEENAN:

4          Q    Mr. Anderson given any food while you were

5     with him that day?

6          MR. OWEN:  Objection, Judge.

7          THE COURT:  I thought he asked that already.

8          MR. HEENAN:  I asked the other officer.

9          MR. OWEN:  I'm going to object on the grounds if

10    there was no testimony that food was given, the proper

11    question is did he ever ask for food, whether it was

12    given, I mean, if he asked for food and denied food,

13    that would be something to say, whether or not he was

14    given food, and the officers says no, we don't know if

15    he was ever asked for any food; so, I object.

16         THE COURT:  You can answer that?

17         THE WITNESS:  I can't recall at this time.

18         MR. HEENAN:

19         Q    Was he given anything to drink?

20         A    I can't recall.

21         Q    Was he allowed to use the washroom?

22         A    He was given the opportunity to use the

23    washroom.

24         Q    Do you recall when that was?

                         188

1        A        That afternoon.

2        Q        Can you be more specific than that?

3        A        The present time that I was there, he was

4    allowed to use the bathroom the whole time that I was

5    there.

6        Q        Did he?

7        A        I can't recall.

8        Q        Now, officer, when you were with Mr.

9    Anderson, were you armed with any weapon?

10       MR. OWEN:  Objection, Judge.

11       THE COURT:  He may answer.

12       THE WITNESS:  Yes.

13       MR. HEENAN:

14       Q        What type of weapon?

15       MR. OWEN:  Objection, Judge.

16       THE COURT:  Overruled.

17       THE WITNESS:  I was armed with a Smith and Wesson

18    .9 millimeter, semiautomatic.

19       MR. HEENAN:

20       Q        And Detective Paladino, as far as you can

21    recall, armed with a weapon at the time that you were

22    with Mr. Anderson?

23       MR. OWEN:  Objection, Judge.

24       THE COURT:  He can answer that?

189

1          THE WITNESS:  Yes, he was.

2          MR. HEENAN:

3          Q    Do you know what type of weapon that it

4    was?

5          MR. OWEN:  Objection, Judge.

6          THE COURT:  Overruled.

7          THE WITNESS:  A revolver, I don't know the make.

8          MR. HEENAN:

9          Q    Now, where was Detective Paladino's weapon

10   during the time that you and Paladino were with

11   Anderson?

12         MR. OWEN:  Objection, Judge.

13         THE COURT:  Overruled.

14         THE WITNESS:  Where was whose weapon?

15         MR. HEENAN:

16         Q    Paladino's?

17         A    Holster.

18         Q    At anytime did Paladino remove that weapon

19   and put it to Mr. Anderson's head?

20         A    No.

21         Q    Did at anytime did you remove your weapon,

22   detective, and put it to Mr. Anderson's head?

23         A    No.

24         Q    Do you recall, the way, that particular day

190

1   you wore the weapon, was it a holster attached to your

2   pants area?

3        MR. OWEN:  Objection, Judge.

4        THE COURT:  Sustained.

5        MR. HEENAN:

6        Q    The weapon was not covered by any type of

7   jacket or coat of any sort, is that correct?

8        MR. OWEN:  Objection, Judge.

9        THE COURT:  Sustained.

10        MR. HEENAN:

11        Q    The weapon would have been visible to Mr.

12  Anderson, correct, the way you were wearing it when

13  you were in Mr. Anderson's presence?

14        MR. OWEN:  Objection, Judge.

15        THE COURT:  I'll let him answer the question.

16        THE WITNESS:  I'm wearing a sport coat as I am

17  wearing today.

18        THE COURT:  So, it's yes or no, would it have

19  been visible?

20        THE WITNESS:  I don't know if he can see through

21  my sport coat.

22        THE COURT:  You don't know.

23        MR. HEENAN:  Your indicating that you were

24  wearing a sport coat all the time that you were with

13

1    Mr. Anderson that day, correct?

2          MR. OWEN:  Judge, I'm going to object.

3          THE COURT:  Sustained.

4          MR. HEENAN:

5          Q     While in that interview room, were you

6    wearing a gun?

7          MR. OWEN:  Objection.

8          THE COURT:  Sustained.

9          MR. HEENAN:

10         Q     Was Paladino wearing a suit?

11         MR. OWEN:  Objection, Judge.

12         THE COURT:  Sustained.

13         MR. OWEN:  I have no further questions.

14         MR. HEENAN:  I have no further questions?

15                              (Witness excused.)

16               DETECTIVE PALADINO

17   a witness on the motion on behalf of the Respondent,

18   the People of the State of Illinois, being first duly

19   sworn, was examined and testified as follows:

20               DIRECT EXAMINATION

21               BY

22               MR. OWEN:

23         Q     Detective, would you please state your name

24   for the record and spell your last name for the

1    benefit of the court reporter and give your star

2    number?

3         A       John Paladino, P-a-l-a-d-i-n-o, star number

4    9938.

5         Q       Detective, where are you assigned, sir?

6         A       Area 3, Violent Crimes.

7         Q       You are a member of the Chicago Police

8    Department, is that correct?

9         A       Yes.

10        Q       Detective, were you working as a violent

11   crimes detective at Area 3 Violent Crimes unit on

12   April 19th, 1990?

13        A       Yes.

14        Q       And do you recall, did you have occasion on

15   that day, Detective Paladino, to be at Area 2 Violent

16   Crimes located at 11th Street?

17        A       Yes, I did.

18        Q       What was your purpose of going to Area 2

19   Violent Crimes, sir?

20        A       We had received a phone call earlier from

21   Area 2 Violent Crimes detective stating they had some

22   subjects in custody, and one of them had some

23   knowledge of a homicide that occurred at Area 3.

24        Q       Did you in fact then go to Area 2 Violent

                            193

                           —///—                        C209

PT71

1    Crimes, sir, and talk with an individual that you now

2    know to be Tony Anderson?

3         A     Yes, I did.

4         Q     And at anytime during your conversations

5    with Tony Anderson, at anytime did you ever inquire or

6    speak with him or any other person regarding a robbery

7    and shooting which took place at 11601 S. Halsted, a

8    Trak Auto Store on April 15th, 1990, sir?

9         A     No, I did not.

10        Q     Detective, when you spoke with the

11   Defendant, Tony Anderson, down at Area 2, who was with

12   you at that time, sir?

13        A     My partner, Tony Maslanka.

14        Q     Was anybody else present during your

15   interview with the Defendant, Tony Anderson?

16        A     No.

17        Q     Was the Defendant, Tony Anderson, advised

18   of his rights?

19        A     Yes, he was.

20        Q     Who was he advised of his rights by?

21        A     Detective Maslanka from the F.O.P.

22   Handbook.

23        Q     And do you recall whether or not he read

24   those rights from the handbook, sir?

1        A       He read it.

2        Q       Did the Defendant indicate whether he

3    understood those rights, sir?

4        A       After each right he indicated that he did

5    understand.

6        Q       Now, at anytime during the conversations

7    with the Defendant, Tony Anderson, or at anytime that

8    he was in your presence, anytime whatsoever, on that

9    date, April 19th, 1990, either you or your partner or

10   any other person in your presence put a gun to the

11   head of this Defendant, Tony Anderson, sir?

12       A       No.

13       Q       At anytime on that day or any other time in

14   your presence, either you or your partner or any other

15   police officer at anytime strike this Defendant, Tony

16   Anderson, with any kind of a stick, billyclub,

17   nightstick, or any instrument whatsoever in the ribs

18   or in the thigh area or anywhere around the thighs,

19   sir?

20       A       No.

21       Q       At anytime did either you or your fellow

22   officers or any persons in your presence use a

23   physical, psychological or mental coercion against

24   this Defendant?

185

1      A      No.

2      Q      At anytime during your conversations with

3  this Defendant, did he ever tell you that he wanted to

4  speak with an attorney?

5      A      No, he did not.

6      Q      At anytime during your conversations with

7  this Defendant, did he indicate that he wanted to

8  remain silent?

9      A      No.

10     MR. OWEN:  I have nothing further.

11                 CROSS EXAMINATION

12                 BY

13                 MR. HEENAN:

14     Q      Detective, when you were with Mr. Anderson,

15  where was it that you were with him on this particular

16  date of April 19th?

17     A      It was interview room at Area 2.

18     Q      And you were with your partner, Detective

19  Paladino at that time?

20     A      No, I'm Detective Paladino.

21     Q      Detective Maslanka, excuse me?

22     A      Yes, sir.

23     Q      And how was Maslanka dressed at that time,

24  do you recall?

196

1   MR. OWEN:  Objection, Judge, beyond the scope of

2 the motion.

3   THE COURT:  Rephrase.

4   MR. HEENAN:

5   Q Was Detective Maslanka, was he wearing a

6 suit coat?

7   MR. OWEN:  Objection, Judge, beyond the scope.

8   THE COURT:  I'll let him answer the question.

9   THE WITNESS:  I don't recall if he was.

10   MR. HEENAN:

11   Q You were armed, correct?

12   A Yes, sir.

13   Q At the time that you were with Mr.

14 Anderson?

15   A Yes, sir.

16   Q Detective Maslanka was armed?

17   MR. OWEN:  Objection, Judge.

18   THE COURT:  He may answer.

19   THE WITNESS:  Yes, he was.

20   MR. HEENAN:

21   Q Do you recall, did Detective Maslanka put a

22 gun to Mr. Anderson's head at anytime that you were

23 with him?

24   A No, he did not.

14

1      Q      Now, you weren't with -- strike that

2   amount.

3                      At some point you left that room,

4   Maslanka and Anderson in the room, correct?

5      MR. OWEN:  Objection, Judge, goes beyond the

6   scope of the motion, again we're talking specific acts

7   done by a police officer, if the Defendant's present,

8   fine, if not, it's beyond the scope of the motion.

9      THE COURT:  I think it would be best served

10  within reason to give them, we're going to give Mr.

11  Heenan a little leeway.

12     MR. HEENAN:

13     Q      Do you understand the question?

14     A      No, I don't.

15     Q      An anytime did you leave Paladino alone

16  with Mr. Anderson?

17     THE COURT:  No, Maslanka.

18     MR. HEENAN:  I'm stuck on this, I don't know.

19     Q      At anytime did you leave Detective Maslanka

20  alone with Mr. Anderson?

21     A      Later on he spoke to Anderson with the

22  State's Attorney.

23     Q      Were you ever informed by any police

24  officer or anyone that Mr. Anderson had requested,

1    indicated that he wished to exercise his right to

2    remain silent?

3          A      No, sir.

4          Q      You were present for the reading of the

5    rights?

6          A      Yes, sir, I was.

7          Q      Maslanka read the rights?

8          A      Yes, sir.

9          Q      How did Mr. Anderson respond to those

10   readings of those rights?

11         A      Yes.

12         Q      Yes, the word yes to each one?

13         A      Either shook his head yes or indicated yes.

14         Q      And now how many rights was it that he

15   merely shook his head and did not respond orally?

16         MR. OWEN:    Objection, Judge.

17         THE COURT:   Sustained.

18         MR. HEENAN:

19         Q      How long total amount of time were you with

20   Mr. Anderson that particular day?

21         MR. OWEN:    Objection, Judge.

22         THE COURT:   You may answer.

23         THE WITNESS:   Myself and Maslanka?

24

1    MR. HEENAN:

2        Q    No, yourself?

3        A    Approximately thirty or forty minutes.

4        Q    Mr. Anderson ask to make a phone call while

5    you were with him?

6    MR. OWEN:  Objection, Judge.

7    THE COURT:  You may answer that?

8    THE WITNESS:  No, he did not.

9    MR. HEENAN:

10       Q    Was Mr. Anderson handcuffed at the time of

11   the reading of the rights?

12       A    No, he wasn't.

13       Q    Was there a billyclub of any type in that

14   room?

15       A    I didn't see him, no.

16       Q    Do you recall if Detective Maslanka had a

17   billyclub or stick of any sort?

18       A    He did not.

19       Q    Did you offer at that time?

20       A    No, I didn't.

21       Q    Did you at anytime strike Mr. Anderson

22   while with him that day with a stick or billyclub?

23       A    No.

24       Q    Did Maslanka?

1          A        No,.

2          MR. HEENAN:   I have no further questions, thank

3     you, detective.

4          MR. OWEN:    I have nothing further, Judge.

5          THE COURT:   Thank you officer.

6                                         (Witness excused.)

7          MR. OWEN:   Judge, with that I have no further

8     officers today, even though I will have some tomorrow,

9     if I can make those phone calls.

10         THE COURT:  I would like to get going as soon as

11    you can get them in here.

12         MR. OWEN:   Judge, I understand I have to get them

13    here and talk, one, I have to get out of the academy,

14    that I will not be able to do until tomorrow morning

15    literally, it's a situation where it's literally not

16    at his normal place, he is in some kind of

17    instructional facility, he has been transferred and

18    given a new job.

19         THE COURT:  Well, okay, that's fine, let's hold

20    on until tomorrow, and that will be just as to 11984,

21    as to the remaining cases, I'm putting those over

22    until the 7th, no since having them printout all of

23    those, very good    Thanks very much, see everybody

24    then.

                            201

1                          (Which were all the

2                          proceedings had until

3                          April 23, 1991.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS )
                    )     SS.
2   COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION

4

  THE PEOPLE OF THE )
5   STATE OF ILLINOIS )
                   )   Case No. 90-11979-91
6      VS            )
                   )   Before JUDGE THEMIS N. KARNEZIS
7   TONY ANDERSON     )
                     April 29, 1991

8

9     Court convened pursuant to adjournment.

10     Present:

11         HONORABLE JACK O'MALLEY,
           State's Attorney of Cook County, by
12         MR. KIP OWEN,
           Assistant State's Attorney,
13            appeared for the People;

14         MR. RANDOLPH N. STONE,
           Public Defender of Cook County, by
15         MR. WILLIAM HEENAN,
           Assistant Public Defender,
16            appeared for the defendant.

17

18

19

20

21

22

23

24

—/2/—

1          THE CLERK:  Bring out Mr. Anderson.

2          THE SHERIFF:  Have a seat over there.

3          THE COURT:  Okay.  Mr. Anderson, good morning.

4    Have a seat.

5          MR. HEENAN:  Good morning, Judge.

6              Judge, this is Mr. Tony Anderson.  He's

7    represented by myself, William Heenan, an attorney

8    with the Public Defender's Office.  Judge, we are in

9    the middle of a motion to suppress statements.

10         THE COURT:  Right, motion to suppress statements

11   and identification.  State, call your next.

12         MR. OWEN:  Judge, we'll call Detective McDermott

13   to the stand.

14         THE COURT:  Okay.

15             Paul, just so -- this was last heard on --

16   I think the 22nd was the last time this case was up.

17   It was day to day thereafter, but no testimony was

18   heard.

19         MR. HEENAN:  Right.

20         THE COURT:  Please raise your right hand, sir.

21             (Witness is sworn.)

22

23

24

                        224

C220

1                    MICHAEL MC DERMOTT,

2    called as a witness on behalf of the Respondent-the

3    People of the State of Illinois, on the motion, being

4    first duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7                    BY MR. OWEN:

8         THE COURT:   Have a seat, please.

9         MR. OWEN:   Your Honor, just so the record is

10   clear, we are proceeding on the motion to suppress

11   statements.   There's also the motion to suppress

12   identification testimony, and I think as we did last

13   time, we'll probably get into both of those with the

14   officer.

15        THE COURT:   Sure, sure.

16        MR. OWEN:

17        Q.   Sir, would you, please, state your name,

18   for the record, and spell your last name for the

19   benefit of the court reporter?

20        A.   Michael McDermott, M-c-D-e-r-m-o-t-t.

21        Q.   What is your star number, sir?

22        A.   13525.

23        Q.   You are with the Chicago Police Department,

24   is that correct?

1    A.    Yes, sir.

2    Q.    And you are assigned to where, sir?

3    A.    Area 2, Violent Crimes.

4    Q.    I want to call your attention to the 18th

5    of April, 1990.  Were you assigned to Area 2, Violent

6    Crimes, on that day, sir?

7    A.    Yes, I was.

8    Q.    Would you have been working on the 18th?

9    A.    Yes.

10    Q.    Did you have occasion that evening to come

11    in contact with a person you now know as Tony

12    Anderson?

13    A.    Yes, I did.

14    Q.    Approximately, what time, if you recall,

15    Detective, was it that you came into contact with the

16    defendant, Tony Anderson, on April 18 of 1990?

17    A.    I would say, approximately, 9:00, 10:00 in

18    the evening.

19    Q.    And where was it that you saw Mr. Anderson,

20    at that time?

21    A.    At the Auto Theft Section at 1121 South

22    State.

23    Q.    I'm going to ask you to look around the

24    courtroom.  Do you see Tony Anderson in court today?

1    A.    Yes, I do.

2    Q.    Will you point to him and describe

3  something he is wearing today?

4    A.    The young man in that khaki top and white

5  shirt.

6    MR. OWEN:   Indicating the in-court

7  identification of the defendant, Tony Anderson.

8    THE COURT:   Yes.

9    MR. OWEN:

10    Q.    And when you saw him at 11th and State,

11  between 9:00 and 10:00 on April 18 of 1990, were you

12  working alone or with someone at that particular time?

13    A.    Actually, I was alone that night, but I

14  teamed up with Detective Gallagher to go down there.

15    Q.    And when you arrived there, did you, in

16  fact, meet with Tony Anderson at that location?

17    A.    I saw him there, yes.

18    Q.    Did you remain at 11th and State, or did

19  you go back towards Area 2?

20    A.    We eventually went back.

21    Q.    When you went back to Area 2, were you with

22  Detective Gallagher?

23    A.    Yes, sir.

24    Q.    Did you have anybody else with you, at that

1    time, sir?

2         A.    Joe Williams, Tony Anderson.

3         Q.    Indicating, the witness has pointed to the

4    defendant, Tony Anderson.

5         THE COURT:    Yes.

6         MR. OWEN:

7         Q.    Where was Mr. Anderson at the time that you

8    went back to Area 2, sir?

9         A.    He was in the back of our squad car.

10        Q.    Now, once you got back to Area 2, Violent

11   Crimes, where did you go?

12        A.    Second floor.    We went to an interview

13   room.    He was put in an interview room.    I believe

14   it's number two.

15        Q.    And was this defendant in that interview

16   room by himself, or was he with other persons inside

17   of the interview room?

18        A.    He was by himself.

19        Q.    And did you have occasion at,

20   approximately, 2:05 in the morning to have a

21   conversation with the defendant, Tony Anderson,

22   regarding a robbery which occurred at the Trak Auto

23   store at, approximately, 11613 South Halsted Street?

24        A.    I had conversations throughout the night,

208

6

0224

1    but, yeah, in particular this case, it was about 2:00.

2         Q.    That would be now on April 19, is that

3    correct?

4         A.    Yes, sir.

5         Q.    And when you spoke with Mr. Anderson, did

6    you advise him of anything, Detective?

7         A.    Previously, I did, yes, I did.

8         Q.    What did you advise him of?

9         A.    His Miranda warnings.

10        Q.    How did you do that?

11        A.    Initially through the FOP book.

12        Q.    And when you advised the defendant of his

13   rights per Miranda through the FOP book, who else was

14   present, at that time?

15        A.    Detective John Gallagher.

16        MR. HEENAN:   Judge, I would stipulate that if

17   the officer were asked to read page--

18        A.    79.

19        MR. OWEN:   79.

20        MR. HEENAN:   79 of the FOP book, he would read

21   that as it's written in the FOP book, being the

22   Miranda rights.

23        THE COURT:   Very good.  Thank you.

24        MR. OWEN:   So stipulated, Judge.

1     Q.    After you advised the defendant of his

2 Miranda rights from the FOP book, did he indicate

3 whether he understood each of those warnings?

4     A.    Yes, he did.  He responded he did.

5     Q.    Okay.

6     After advising him, is that when you had

7 the conversation of the robbery at Trak Auto which

8 involved the victim, Scott Volk (phonetic spelling)?

9     A.    Actually, I read them earlier when he told

10 us of numerous cases, specifically, at that time -- it

11 wasn't right prior to the 116th job.  We had a

12 previous conversation in which he recited numerous,

13 numerous robberies.

14     Q.    So, essentially, what you're telling the

15 Court is it was like an ongoing interview, is that

16 correct?

17     A.    Yes, that's correct.

18     Q.    But, in fact, the defendant was advised of

19 his rights prior to you having this interview with

20 him, is that correct?

21     A.    Yes, sir, yes.

22     Q.    And at the time -- at any time that you

23 were in the presence of this defendant, along with any

24 other officers, at any time, did you have any

1   knowledge of anyone putting a billy club or some kind

2   of a stick into the side of this defendant or striking

3   him on the thighs, or using a stick on this defendant

4   in any way, shape, or form, sir?

5       A.   No, sir.

6       Q.   At any time, in your presence, or did you

7   have any knowledge of anyone at any time placing a gun

8   to the defendant's head and pressing the gun at the

9   side of the defendant's head in order for him to make

10   any kind of statement, or did you ever see that happen

11   at all?

12       A.   No.

13       Q.   At any time, did this defendant ask for an

14   attorney to be present?

15       A.   No.

16       Q.   At any time, did you or any of your other

17   officers or any persons in your presence or to your

18   knowledge use any physical, psychological, or mental

19   coercion against this defendant at any time in order

20   for him to give a statement?

21       A.   No.

22       Q.   Detective, approximately April 18 of 1990

23   at, approximately, 11:20 in the morning, did you have

24   occasion to conduct a lineup in relation to this

1   particular case where Scott Volk was the defendant

2   (sic) at the Trak Auto store?

3          A.    Yes, I did.

4          Q.    And when that lineup was conducted, where

5   was that held?

6          A.    In Area 2, it's an adjoining interview

7   room.  It was around the corner from where he was

8   initially at.

9          Q.    And is the room set up where they have the

10  one-way mirror in one room, and you look through that

11  so the other people can't look towards you, is that

12  correct?

13         A.    Yes, sir.

14         Q.    And, approximately, how many people were

15  placed in that lineup, if you recall?

16         A.    Six.

17         Q.    Sir, I'm now going to show you what I've

18  marked for purposes of this as People's Exhibit Number

19  1 for identification.  I ask you to look at that,

20  sir.

21         A.    That's a photograph of the lineup that I

22  conducted.

23         Q.    That was concerning this particular case,

24  is that correct?

242

1        A.      Yes.

2        Q.      At any time -- strike that.

3                Were you in the room with the witness, or

4    were you in the room in which the defendant was

5    standing at the time the lineup was conducted?

6        A.      I was in with the witness.

7        Q.      And at any time, other than yourself being

8    present in that room, was anybody else present, other

9    than yourself and the witness at the time that the

10   lineup was conducted?

11       A.      With the participants?

12       Q.      Yes.

13       A.      Yes, Detective John Gallagher was in with

14   the participants, at that time.

15       Q.      And yourself, sir, other than you and the

16   witness looking at the lineup, was there anybody else

17   present in the room that you were in with the witness?

18       A.      No.

19       Q.      At any time, did you have to tell the

20   witness which person it was, sir?

21       A.      No.

22       Q.      How many persons were identified in that

23   lineup, sir?

24       A.      In this case, two.

                        213

11                      -/3/-                    C229

1      Q.    Was the defendant, Tony Anderson, one of

2  those two individuals?

3      A.    Yes.

4      Q.    And in this lineup, People's Exhibit Number

5  1, do you see what position Tony Anderson was standing

6  in in that lineup, sir?

7      A.    That's the number one position from left to

8  right.

9      MR. OWEN:   I have nothing further, Judge.

10     THE COURT:   Cross, Mr. Heenan.

11               CROSS-EXAMINATION

12               BY MR. HEENAN:

13  MR. HEENAN:

14     Q.    Detective, good morning.

15     A.    Good morning.

16     Q.    Detective, what time was it that you first

17  met Tony Anderson?

18     A.    9:00, 10:00 in the evening.

19     Q.    And that was at 11th and State?

20     A.    Yes, sir.

21     Q.    Where was Tony, at that time?

22     MR. OWEN:   Objection, Judge, relevancy.

23     THE COURT:   Oh, I'll let him answer.

24     A.    There was a large room.  He was separated

234

1    from the other offender, but I believe he was on a

2    bench.

3         MR. HEENAN:

4         Q.    How would you refer to that room?

5         MR. OWEN:   Objection, Judge.  Again, it goes

6    beyond the scope of the motion.

7         THE COURT:   Sustained.

8         MR. HEENAN:   Well, it goes to the time that he

9    was with Mr. Anderson, Judge.

10        THE COURT:   I'm going to sustain the objection.

11        MR. HEENAN:

12        Q.    Well, when you met Mr. Anderson, were you

13   aware of how long he had been at 11th and State?

14        MR. OWEN:   Objection, Judge.

15        THE COURT:   He may answer.

16        A.    I understood he was arrested at 5:00, 5:30

17   that evening.

18        MR. HEENAN:

19        Q.    And you went with Detective Gallagher to

20   11th and State to talk to Tony Anderson, is that

21   correct?

22        A.    Yes.

23        Q.    And you remained with Mr. Anderson for how

24   long at 11th and State?

13

1          A.     I wasn't with him.   I was waiting for the

2     auto theft detectives to finish with their end of it,

3     and we were going to transport him back to Area 2.

4          Q.     Did you have any discussions with Mr.

5     Anderson at 11th and State?

6          A.     No, sir.

7          Q.     When you transported him to Area 2, did you

8     transport Mr. Anderson in your police vehicle?

9          A.     Yes, sir.

10         Q.     And you and Detective Gallagher went with

11    Mr. Anderson to 111th Street, the Area 2 Office?

12         A.     Yes.

13         Q.     Did you have any conversations with Mr.

14    Anderson on the way to the Area 2 Offices?

15         A.     I believe I told him we're going to talk to

16    you, just wait until we get back to the area.   We

17    don't want to talk in the car, something to that

18    effect.

19         Q.     It's correct you did not advise Mr.

20    Anderson of his rights until you got to the Area 2

21    Office, is that correct?

22         A.     That's correct, myself, yes.

23         Q.     And Detective Gallagher did not advise Mr.

24    Anderson of any rights--

                              226

1        A.      That's correct.

2        Q.      -- prior to getting to the Area 2 Office,

3   is that correct?

4        A.      Yes.

5        Q.      Now, did you speak to other officers at

6   11th and State?

7        A.      Yes, I did.

8        Q.      Were you informed by those other officers

9   that Mr. Anderson had indicated that he wished to

10  remain silent, that he had indicated that to other

11  officers at 11th and State?

12       A.      Just the opposite.  As I recall, they said

13  he was eager to talk.

14       Q.      Okay.

15              Now, who was it that said to you that he --

16  that he, Mr. Anderson, was eager to talk?

17       MR. OWEN:     Objection, Judge.

18       THE COURT:    He may answer.

19       A.      There was several detectives.  I couldn't

20  tell you the name, but it would be the detectives who

21  arrested him said something along the lines that he

22  wants to talk.

23       MR. HEENAN:

24       Q.      What time was it, sir, that those officers

15

1   told that you Mr. Anderson was eager to talk?

2       A.    The time we were there.  I can't

3   specifically say, from 9:00, 10:00, that evening.

4       Q.    What time was it that you left 11th and

5   State, if you recall?

6       MR. OWEN:   Objection, Judge.

7       THE COURT:   I am sorry.  The question was, what

8   time did they leave 11th and State?

9       MR. HEENAN:   Yes.

10      THE COURT:   Overruled.

11      A.    I couldn't specifically say.  I know it was

12  in the vicinity -- in the area of 9:00, 10:00, that

13  night.

14      MR. HEENAN:

15      Q.    Now, you indicated at the Area 2 Offices at

16  111th Street, you had an ongoing or continuing

17  interview or conversations with Mr. Anderson?

18      A.    Yes, sir.

19      Q.    And it wasn't until -- strike that.

20            What time was it that you advised him of

21  his rights at Area 2, 111th Street station?

22      A.    Shortly after we arrived, and I would say,

23  approximately, 11:00.  It was before midnight.

24      Q.    And you were the officer that advised Mr.

                           248

1   Anderson?

2        A.    Yes, sir.

3        Q.    Was Detective Gallagher present at the time

4   of this?

5        A.    Yes, he was.

6        Q.    Those rights were given or spoken to Mr.

7   Anderson, correct?

8        A.    Yes.

9        Q.    They were not given to Mr. Anderson in any

10  type of written form, is that correct?

11       A.    Not then, no.

12       Q.    Now, did you have a conversation with Mr.

13  Anderson after giving him those rights?

14       A.    Yes, I did.

15       Q.    Now, this conversation, ongoing

16  conversation lasted for how long in total period of

17  time?

18       MR. OWEN:    I'm going to object.   I believe that

19  again their motion lies to this particular statement.

20       THE COURT:   We understand that; we understand

21  that.   Respectfully, we're going to overrule the

22  objection.   You may answer.

23       A.    I was there the entire night.   Initially,

24  when we talked to him, we spoke and then periodically

1　throughout the night, I would go back and forth to

2　clarify things that I found out or I learned.

3　　　　MR. HEENAN:

4　　　　Q.　　You indicate you were there all night.

5　　　　Actually, Mr. Anderson was there all night,

6　too, is that correct?

7　　　　A.　　Yes, sir, that's correct.

8　　　　Q.　　And these conversations, total number of

9　hours, if you could?

10　　　　A.　　Hours that I was actually in the room with

11　him or --

12　　　　Q.　　No, the ongoing conversations, the total

13　amount of time.

14　　　　A.　　I'd say four or five hours. Now, there was

15　things, maybe one or two facts that we've learned

16　later on in the early morning that I might have went

17　in there and talked to him about.

18　　　　Q.　　What -- what was the last -- what time was

19　it when you last had a conversation with Mr.

20　Anderson?

21　　　　MR. OWEN:　　Objection, Judge.

22　　　　THE COURT:　　He may answer.

23　　　　A.　　As far as any -- anything of any substance

24　in regards to any cases or --

220

1          MR. HEENAN:

2          Q.    A conversation with Mr. Anderson.

3          A.    A conversation, like taking him to use the

4    phone.

5          Q.    Would that be April 19?

6          A.    Yes, that's correct.

7          Q.    Would this be in the morning hours of April

8    19 or the afternoon of April 19--

9          MR. OWEN:    I would object.

10         MR. HEENAN:    -- when you last had your

11   conversation with Mr. Anderson?

12         MR. OWEN:    I object.  What conversation are we

13   talking about?

14         THE COURT:    Well, you're going to ask him that

15   question when you get your chance to come back.  Don't

16   worry.  Any conversation at all, any contact with

17   him.

18         A.    I had contact until 4:00 in the afternoon

19   where I would ask him, do you want to use the

20   washroom, do you want a cup of coffee.  If that's a

21   conversation, yes, I talked to him throughout the day.

22         MR. HEENAN:

23         Q.    So, the approximate time you last had

24   conversation with him would be 4:00 in the afternoon

                           224

1   of April 19?

2          A.    Sometime in the early afternoon, yes.

3          Q.    Now, do you know if Mr. Anderson was

4   allowed to sleep at any time during that period that

5   you were having these conversations with him?

6          A.    Yes, he was.

7          Q.    When was that?

8          A.    Any time he wanted to.

9          Q.    Did he?

10         A.    He laid down there.  At times I wasn't with

11  him, he was laying down.  If he fell asleep, I don't

12  know, counselor.

13         Q.    Now, where was he during this total amount

14  of time?

15         A.    In an interview room at Area 2.

16         Q.    Could you describe the interview room?

17         A.    Eight by ten foot, beige walls.  It has a

18  bench, a table, chairs.  It has a three-by-three foot

19  plague on the wall with his Miranda warnings in

20  English and in Spanish.  It has an acoustical ceiling

21  and tile on the floor.

22         Q.    What wall is the rights on?

23         A.    It would be facing -- it would be on the

24  west end.

222

1     Q.    How would you distinguish this interview

2  room from other interview rooms at Area 2?

3        MR. OWEN:   Objection.

4        MR. HEENAN:   Just so we know specifically which

5  interview room.

6        THE COURT:   He may answer.

7        A.    It's three feet away from the washroom.

8  It's right across the room from the photo room, room

9  number two.

10       MR. HEENAN:

11       Q.    Room number two.

12             Did Mr. Anderson have anything to eat

13  during that amount of time he was at Area 2?

14       A.    Yes, he did.

15       Q.    Do you recall what time it was that he ate?

16       A.    Besides snacks, he got food to eat later on

17  in the morning. He drank, and he was using the

18  washroom and got snacks the evening that I was there

19  and the early morning hours.

20       Q.    What time was it that you indicate that Mr.

21  Anderson was fed?

22       A.    I couldn't tell you.

23       Q.    Do you recall what it was that he was fed?

24       A.    I know that I got him snacks and coffee and

1  water at the time I was there in the early morning

2  hours.

3        Q.    When you indicate snacks, what do you mean?

4        A.    We have a cafeteria that has chips and

5  popcorn and candy and stuff like that.

6        Q.    Was Mr. Anderson handcuffed, at that time,

7  in that room?

8        A.    No, he wasn't.

9        Q.    He was not handcuffed during that period of

10 time from the 18th through the afternoon of the 19th

11 in that interview room, correct?

12       A.    That is correct.

13       Q.    Detective, you were armed at the time you

14 were having these conversations with Mr. Anderson,

15 correct?

16       A.    That's correct.

17       Q.    What type of weapon did you have?

18       MR. OWEN:    Objection, Judge, to the type of

19 weapon.

20       THE COURT:    He may answer.

21       A.    I usually have a 38 revolver.

22       MR. HEENAN:

23       Q.    During these conversations, where was that

24 weapon?

1      A.     On my side.

2      Q.     You're indicating your--

3      A.     Under my coat.

4      Q.     Under your coat on your left side?

5      A.     Right side.

6      Q.     Right side.

7             And, Detective, was -- were you wearing a

8  coat or jacket of any sort covering that weapon at the

9  time of this conversations with Mr. Anderson.

10     MR. OWEN:    Objection, Judge.

11     THE COURT:    He may answer.

12     A.     I don't know if I took it off.  I usually

13  keep it on.  It would be a sport coat, similar to what

14  I'm wearing now.

15     MR. HEENAN:

16     Q.     Detective Gallagher was the other detective

17  that was with you during these conversations with Mr.

18  Anderson, correct?

19     A.     Initially, yes.

20     Q.     Were there other detectives or other

21  officers going in and out having conversations besides

22  yourself and Detective Gallagher?

23     A.     No, sir.

24     Q.     Detective Gallagher was also armed, is that

                    235

0241

23

1    correct?

2         A.    I believe he was.

3         Q.    And was -- where was his weapon, if you can

4    recall, at the time of these conversations with Mr.

5    Anderson?

6         A.    I have no idea.

7         Q.    At any time when you were with Mr.

8    Anderson, did you remove your weapon and put it to his

9    head?

10        A.    Never.

11        Q.    Did you ever -- did Detective -- did you

12   ever see Detective Gallagher remove a weapon from --

13   from--

14        A.    No.

15        Q.    -- anywhere on his body and put it to Tony

16   Anderson's head?

17        A.    No, sir.

18        Q.    Do you recall any officer doing anything

19   like that?

20        A.    No.

21        Q.    Do you recall seeing a -- strike that.

22              Was there a billy club or stick in that

23   room at any time when you were in there talking to Mr.

24   Anderson?

                        226

1       A.      No.

2       Q.      Did you see Detective Gallagher at any

3    time--

4       A.      No.

5       Q.      You know Detective Maslanka and Detective

6    Paladino?

7       A.      Yes, I do.

8       Q.      Were they also at Area 2?

9       A.      They are in Area 3.  They work out of Area

10   3.

11      Q.      This time that Tony Anderson was at Area 2,

12   was Detective Maslanka and Detective Paladino there at

13   any time?

14      A.      Yes.

15      Q.      Were they also having conversations with

16   Mr. Anderson?

17      A.      I believe they did.

18      Q.      Did you ever see either Detective Maslanka

19   or Paladino strike Mr. Anderson with a stick or billy

20   club?

21      A.      No.

22      Q.      Did you see any detective strike Mr.

23   Anderson, any police officer strike Mr. Anderson?

24      A.      No.

25                              -145-

1          Q.      The lineup as to the Volk case took place

2     at what time?

3          A.      11:00, 11:30 in the morning.

4          Q.      Would it be correct to say there were a

5     series of lineups also going on during the night of

6     April 18 and the morning hours of April 19--

7          MR. OWEN:    Objection.

8          MR. HEENAN:    -- at Area 2 concerning Mr.

9     Anderson.

10         MR. OWEN:    Objection.

11         THE COURT:    He can answer.

12         A.      Yes, sir.

13         MR. HEENAN:

14         Q.      And, in fact, how many lineups was Mr.

15    Anderson placed in?

16         MR. HEENAN:    Objection.

17         THE COURT:    Sustained.

18         MR. HEENAN:

19         Q.      Well, how many witnesses actually viewed

20    Mr. Anderson during that -- during that period of time

21    he was at Area 2?

22         MR. OWEN:    Objection, Judge.

23         THE COURT:    Sustained.

24         MR. HEENAN:

                         278

1      Q.     Well, which witness viewed the lineup at

2   Area 2 concerning the Volk case?

3      A.     Ethel LaFlore and, I believe, Ricky

4   Norwood.

5      Q.     Now, at the time of that viewing by Miss

6   LaFlore -- strike that.

7             Who brought Miss LaFlore to the police

8   station?

9      MR. OWEN:   Objection, Judge.

10     THE COURT:   Sustained.   Overruled.   You may

11  answer, if you know.

12     A.     I don't know.

13     MR. HEENAN:

14     Q.     Okay.

15            Where was Miss LaFlore placed at Area 2

16  before viewing the Anderson lineup?

17     MR. OWEN:    Objection, Judge.

18     THE COURT:   Overruled.

19     A.     I believe most of the witnesses were placed

20  in a cafeteria, and a Sergeant Tidmarsh would escort

21  them to view the lineup, and then segregate them from

22  the rest, and put them in a conference room.

23     MR. HEENAN:

24     Q.     All of the witnesses prior to the lineup

                        229

                    -147-

27

1    were seated together or placed together in one room

2    before the viewing of the lineups, is that correct?

3         MR. OWEN:    Objection, Judge.

4         THE COURT:    Overruled.

5         A.    I can make that assumption.  I was busy

6    with the -- with the prisoners and so forth.

7         THE COURT:    The answer will be stricken.  Pose

8    another question.

9         MR. HEENAN:  .

10        Q.    You were -- what were you doing during

11   that?

12        MR. OWEN:    Objection.

13        THE COURT:    No, no, the answer will be

14   stricken.  All he has to say is I assume or I don't

15   know or whatever.  We're not going to allow that.

16   That doesn't make sense.

17        MR. HEENAN:

18        Q.    Now, what part did you -- what did you have

19   to do as to the lineup -- this lineup, the Volk

20   lineup, what was your duty?

21        A.    I was in with the witnesses.

22        Q.    Pardon?

23        A.    I was in with the witnesses.

24        Q.    You were in with the witnesses.

1          Okay.  Now, Miss LaFlore was brought into

2   that room to view that lineup by who?

3          A.    I believe Sergeant Tidmarsh, at least,

4   walked her up to the room.  I walked in the room with

5   her.

6          Q.    And when you met Miss LaFlore, she was

7   outside of the room, is that correct?

8          A.    As I -- there was a lot of witnesses,

9   counselor.  I -- I believe she was outside of the

10  room, and I brought her in, right.

11         Q.    Okay.

12               And do you recall if she had been talking

13  to any police officers or any witnesses prior to going

14  into that room?

15         A.    That I don't know.

16  MR. OWEN:   Objection, Judge.

17  THE COURT:    I'll let him answer.

18         A.    I don't know.

19  MR. HEENAN:

20         Q.    What did you say to Miss LaFlore upon

21  meeting her outside of that room?

22         A.    I told her there was going to be six people

23  on the inside room, not to worry because it's a

24  one-way mirror, and they can't see you.  Take your

231

29                        —149—                    0247

1    time, see if you recognize anybody.

2        Q.    And then you entered the lineup room

3    itself?

4        A.    Yes.

5        Q.    You indicate the lineup room consisted of a

6    two-way mirror?

7        A.    Yes.

8        Q.    How long did Miss LaFlore view that lineup

9    before making any identification?

10        MR. OWEN:    Objection, Judge.

11        THE COURT:    He may answer.

12        A.    I believe I told her to wait until each

13    participant -- until we were done having each guy walk

14    up to the mirror, a couple of minutes.

15        MR. HEENAN:

16        Q.    Did she view all six individuals in that

17    lineup?

18        A.    Yes, she did.

19        Q.    You indicated that you had them walk up

20    individually out of the line that they were in?

21        A.    I knocked on the mirror.  Each one,

22    starting from the left to the right, stepped up to the

23    mirror, look sideways, back to the mirror, and they

24    would walk back in line.

1        Q.   Detective, I'll show you what's been

2    previously marked as People's Exhibit Number 1.   Do

3    you recognize that?

4        A.   Yes.

5        Q.   As being what?

6        A.   That's a photo of the lineup in the

7    position they were in.

8        Q.   Now, that photo, is that the actual room

9    that the lineup took place in?

10       A.   No, the actual room would be this room

11   right here, and then there's a mirror that divides it,

12   and that's where the witnesses go.

13       Q.   Now, you indicate that Mr. Anderson would

14   be the first individual in the -- in the lineup as you

15   view that photo to your--

16       A.   Left.

17       Q.   Is that correct?

18       A.   Yes.

19       Q.   It's correct, Detective, that the third

20   individual in this lineup is considerably taller than

21   the other six, is that correct?

22       MR. OWEN:   Objection, Judge, to the form of the

23   question.   The photo speaks for itself.

24       THE COURT:   Sustained.

                    233

1      MR. HEENAN:    Judge, I would then -- at least at

2   the end, I would ask to be allowed to argue the

3   composition of the lineup.

4      THE COURT:    Oh, certainly.  You can argue that.

5   That's no problem.

6      MR. HEENAN:    To put it in for the record.

7      Q.    After -- where was Miss LaFlore taken after

8   viewing that lineup?

9      MR. OWEN:    Objection, Judge.

10     THE COURT:    Overruled.

11     A.    I know she was separated from the witnesses

12  that did not view the lineup, and I believe that she

13  was put in a conference room.

14     MR. HEENAN:

15     Q.    And what manner were they separated, if you

16  know?

17     A.    The cafeteria is separate from the

18  conference room and the other interview rooms.   It's

19  not into the Area 2 section.   It's maybe about 50 feet

20  from Area 2.

21        Sergeant Tidmarsh would walk to where they

22  were, bring them to the room.   I would have them in

23  the room.   After they're done, they would be brought

24  into -- into another room about--

                         221

                    —152—

                                    C250

1          Q.      You indicate that there was another witness

2     that viewed this particular lineup before this

3     particular incident, the Volk incident?

4          A.      I believe that Ricky Norwood did.

5          Q.      Was that before or after Miss LaFlore?

6          A.      After.

7          Q.      Do you know if that individual, that

8     witness, had any conversations with Miss LaFlore after

9     Miss LaFlore viewed the lineup?

10         A.      I don't believe he did.

11         MR. HEENAN:     I have no further questions,

12    Detective.   Thank you.

13         THE COURT:   Redirect.

14               REDIRECT EXAMINATION

15               BY MR. OWEN:

16    MR. OWEN:

17         Q.      Detective McDermott, the conversation

18    involving this particular case was, approximately,

19    just after 2:00 in the morning, I believe you said, is

20    that correct?

21         A.      Approximately.

22         Q.      And how long did this particular

23    conversation last regarding this case, if you recall?

24         A.      The specific details about this case, maybe

225

33

1   10, 15 minutes.

2        Q.    And you indicated that detectives from Area

3   3 were present later that day, is that correct?

4        A.    Yes, they were.

5        Q.    That would have been after you had spoken

6   with the defendant about this case and other cases, is

7   that correct?

8        A.    That's correct.

9        Q.    That would have been their separate

10  investigation as to their particular case from Area 3,

11  is that correct?

12       A.    That's correct.

13       Q.    You weren't present during those

14  interviews, were you, sir?

15       A.    No, sir.

16  MR. OWEN:   I have nothing further.

17  THE COURT:   Excuse me.  What time did that

18  occur, the interview regarding this case?  I missed

19  that.

20       A.    Approximately, 1:00 or 2:00 in the morning.

21  THE COURT:   Thank you very much.

22       A.    On the 19th.

23  THE COURT:   Mr. Heenan?

24  MR. HEENAN:   No further questions.

236

—154—

C252

```
 1            THE COURT:    Thank you very much, Detective.
 2                       (Witness is excused.)
 3            THE COURT:    Okay.  I think that's it for right
 4    now, is that correct?
 5            MR. OWEN:    Fine, Judge.
 6            THE COURT:    Okay.  Why don't you converse with
 7    Mr. Heenan and decide when we're going to resume?
 8            MR. OWEN:    Judge, is there a time that the Court
 9    may anticipate, just in terms of the officers being
10    available, Judge?  Four?
11            THE COURT:    Maybe a little earlier, but around
12    there.
13            MR. OWEN:    Fine, Judge.
14            THE COURT:    That's a guess.
15                            (Whereupon, there was a recess
16                             had in the above-entitled
17                             cause, after which the
18                             following proceedings were had:)
19            THE COURT:    As to Mr. Anderson, that will be hold
20    on call until tomorrow.
21            MR. HEENAN:    Thank you.
22            THE COURT:    First thing, please.
23                            (A continuance
24                             was taken to 4-30-91.)
```

STATE OF ILLINOIS )
　　　　　　　　　　 ) ss.
COUNTY OF C O O K )

　　　　　IN THE CIRCUIT COURT OF COOK COUNTY
　　　　　COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE　)
STATE OF ILLINOIS　)　Indictment No. 90-11984
　　　　　　　　　　 )
　　　　VS　　　　　 )　Before JUDGE THEMIS N.
　　　　　　　　　　 )　KARNEZIS
　　　　　　　　　　 )
TONY ANDERSON　　　 )　Tuesday, April 30th, 1991

　　　　　　　　　　　　9:30 o'clock a.m.


　　　Court convened pursuant to continuance.


　　PRESENT:

　　　Hon. Jack O'Malley,
　　　　State's Attorney of Cook County, by
　　　Mr. Kip Owen,
　　　　Assistant State's Attorneys,
　　　　appeared for the People.

　　　Mr. Randolph N. Stone,
　　　　Public Defender of Cook County, by
　　　Mr. William Heenan,
　　　　Assistant Public Defender,
　　　　appeared for the Defendant.

　　　　　　　- - - - - - - -

1       THE CLERK:  Tony Anderson.

2       THE COURT:  Good morning, Mr. Anderson.

3       THE DEFENDANT:  Good morning.

4       THE COURT:  Have a seat, sir.

5         We ready to resume?

6         State.

7     MR. OWEN:  Yes.

8         We will call Detective Gallagher.

9       THE COURT:  Raise your righthand, sir.

10          JOHN GALLAGHER,

11  called as a witness on behalf of the People of the

12  State of Illinois, having been first duly sworn,

13  was examined and testified as follows:

14          DIRECT EXAMINATION

15          BY MR. OWEN:

16     THE COURT:  Be seated.

17        Give me one second.

18     THE COURT:  Sorry.  Go ahead, Mr. Owen.

19    MR. OWEN:  Q  Sir, would you please state your

20  name for the record, spell your last name for the

21  benefit of the court reporter?

22    A   Sure.

23       Detective John Gallagher.  My last name is

24  spelled G A L L A G H E R.

1      Q    What is your star number, sir?

2      A    Star number is 12632.

3      Q    And are you currently employed as a

4  detective with the Chicago Police Department?

5      A    Yes, I am.

6      Q    Where are you assigned, sir?

7      A    I'm assigned to Area 2 Violent Crimes.

8      Q    You were assigned to Area 2 Violent Crimes

9  back in April of 1990, sir?

10     A    Yes, I was.

11     Q    I want call your attention specifically to

12  April 18th, 1990.  Were you working on that

13  evening, sir?

14     A    Yes, I was.

15     Q    Did you have an occasion to go to 11th and

16  State Police Headquarters on that evening, April

17  18th?

18     A    Yes, I did.

19     Q    Who were you with when you went there,

20  detective?

21     A    I was with Detective Mike Mc Dermott.

22     Q    And what was your purpose for going to

23  11th and State, if you recall, on that evening?

24     A    Detective Mc Dermott and myself were

240

1    informed by one of our supervisors that the auto

2    theft section had two people in custody down there.

3        Q    And did you in fact meet an individual who

4    you now know to be Tony Anderson on that day, April

5    18th, 1990, sir?

6        A    Yes, I did.

7        Q    Why don't you look around the courtroom

8    now.  Do you see that person in court today?

9        A    Yes, I do.

10       Q    Would you point to him, describe something

11   he is wearing?

12       A    Sure.

13           Sitting at the table over there.  He has a

14   brown, I would say jacket on or coat with white

15   long sleeve.  Long underwear.

16       MR. OWEN:  Indicating --

17       THE COURT:  The one without the tie.

18       THE WITNESS:  Yes, sir.

19       MR. OWEN:  Indicating in court identification

20   of the defendant Tony Anderson.

21       Q    And where was it that you saw Mr. Anderson

22   on that evening, sir?

23       A    I saw him in the auto theft section down

24   at 11th and State.

1      Q    And after you -- approximately what time
2   was it, do you recall?

3      A    We got down there, I say about 10:00
4   o'clock.

5      Q    And while -- well, strike that.

6           Did you in fact leave 11th and State that
7   evening, April 18th, 1990?

8      A    Yes, I did.

9      Q    Who was with you when you left that area,
10  sir?

11     A    Detective Mc Dermott and Mr. Anderson.

12     Q    And how was it that -- was Mr. Anderson
13  handcuffed at that time when you left 11th and
14  State, sir?

15     A    Yes, sir.

16     Q    Where did you go after you left 11th and
17  State?

18     A    After we left 11th and State, we went back
19  to Area 2 Violent Crimes.

20     Q    And once you returned back there, where
21  did you go, specifically, sir?

22     A    We went to our office.

23     Q    And was the defendant with you at that
24  time?

C42
-160-

C258

1          A     Yes, sir.

2          Q     Where did you take him?

3          A     We took him to one of the interview rooms

4     in the office.

5          Q     And approximately what time, if you

6     recall, would it have been that you arrived back at

7     Area 2 Violent Crimes?

8          A     Roughly, we got there probably little bit

9     before midnight.

10         Q     And when you are with the defendant at

11    Area 2 Violent Crimes, did either you or did

12    Detective Mc Dermott have a conversation with the

13    defendant?

14         A     Yes, we did.

15         Q     Where would that conversation have taken

16    place, sir?

17         A     Taken place at Area 2 Violent Crimes in

18    one of the interview rooms.

19         Q     And was the defendant handcuffed at that

20    time?

21         A     No, sir.

22         Q     And was the defendant advised of anything

23    at that time by either you or Detective Mc Dermott?

24         A     Detective Mc Dermott advised him of his

1    constitutional rights from his FOP Book.

2        Q    And other than yourself, Detective Mc

3    Dermott and the defendant Tony Anderson, was

4    anybody else present at that time?

5        A    Not to my knowledge, no.

6        Q    After Detective Mc Dermott informed the

7    defendant of his constitutional rights from the FOP

8    Book, did the defendant indicate whether or not he

9    understood those rights?

10       A    Yes, he did.

11       Q    How did he do that, if you recall,

12   detective?

13       A    When Mike Mc Dermott asked him in other

14   words "do you understand you have the right to

15   remain silent," he answered yes.

16       Q    Did he answer a yes to all the rights as

17   given by Detective Mc Dermott?

18       A    To my knowledge, yeah.

19       Q    And at that time did either you or any one

20   in your presence at any time ever strike this

21   defendant either with physical or any kind of a

22   billy-stick or any kind of a club of any sort?

23       A    No, sir.

24       Q    At any time did any one poke the defendant

234

−162−

C260

1    with any kind of a stick or billy-club or any type

2    of object like that?

3        A    No, sir.

4        Q    At any time did either you or Detective Mc

5    Dermott or any one else in your presence or to your

6    knowledge, did any one ever put a gun to this

7    defendant's head at any time, sir?

8        A    Not to my knowledge, no.

9        Q    At any time did the defendant Tony

10   Anderson ever ask to see his attorney?

11       A    Not to my knowledge, no.

12       MR. OWEN:  Nothing further, Judge.

13       THE COURT:  Cross.

14                   CROSS EXAMINATON

15                   BY MR. HEENAN:

16       MR. HEENAN:  Q  Detective, good morning?

17       A    Good morning.

18       Q    Detective, what time was it when you first

19   met Tony Anderson on the 18th of April, 1990?

20       A    I'd say it was probably little bit after

21   11.  Around 11, little bit after.

22       Q    That in the evening.  Eleven in the

23   evening?

24       A    Eleven p.m.

1          Q      That was at the police facility at 11th

2     and State, correct?

3          A      Yes, it was.

4          Q      And did you have any conversations with

5     any other police officers at that facility at 11th

6     and State when you went there around 11:00 o'clock

7     that evening?

8          MR. OWEN:   Objection, Judge.  Beyond the scope

9     of the motion.

10         MR. HEENAN:   Well, let me ask another question.

11         THE COURT:   Sure.

12         MR. HEENAN:   Q   Did any officers indicate to

13    you that Mr. Anderson had indicated that he wished

14    to remain silent, he wished to exercise his right

15    to remain silent?

16         A      No, sir.

17         Q      Did Mr. Anderson indicate that to you at

18    11th and State?

19         A      No, he did not.

20         Q      Did you have any conversations with Mr.

21    Anderson at 11th and State?

22         A      No, I did not.

23         Q      Did Detective Mc Dermott?

24         A      I do not know, sir.  He might have.

C4S

-164-

C262

9

1      Q   It's correct, neither you nor Detective Mc

2  Dermott advised Mr. Anderson of his rights at 11th

3  and State, correct?

4      A   No, we did not.

5          No.

6      Q   Now, you indicated you transported him in

7  a police vehicle, correct?

8      A   Yes.

9      Q   To the Area 2 Offices at 111th Street?

10     A   Yes, sir.

11     Q   Now, you and Detective Mc Dermott were in

12  that vehicle with Mr. Anderson during the

13  transporting of him to 111th Street, correct?

14     A   Yes, sir.

15     Q   Did you have conversatins with Mr.

16  Anderson at that time while transporting him?

17     A   We probably talked to him but we did not

18  talk to him about say, the armed robberies that we

19  had intended to talk to him.

20     Q   You indicate that the rights were given

21  to, the Miranda Rights were given to Mr. Anderson.

22        What time was that?

23     A   I'd say it was probably little bit after

24  midnight.

10

1    Q    And that conversation concerning the

2  rights took place in what room?

3    A    One of our interview rooms at Area 2.

4    Q    Which interview room?

5    A    Room Number 2.

6    Q    And could you just briefly describe that

7  room?

8    A    It's a room, it's got -- all it has is a

9  door.  There is no windows in it.  It's probably, I

10 don't know, roughly measurement wise, I don't know,

11 maybe it's 8 X 12.  It's got a bunch, it's got a

12 couple chairs.

13   Q    Now, Mr. Anderson to your knowledge was in

14 that room for how long a period of time, total

15 period of time?

16   A    He was in there from the time Detective Mc

17 Dermott and I put 'em in there say round midnight

18 until I left at 3 a.m.

19   Q    How did Mr. Anderson respond to the

20 Miranda Rights, do you recall?

21   A    As I answered previously when he was

22 informed of his rights he stated after each one

23 that he understood 'em.  He was asked "do you

24 understand this?"

1       Q    He indicated the words "I understand?"

2       A    No.

3            Detective Mc Dermott read him his rights.

4       Q    Yes?

5       A    The first right you have is "you have a

6    right to remain silent?  Do you understand that?"

7    He said "yes."  When he said the second one,

8    "anything you say can be used against you in court

9    of law.  Do you understand that?  Yes."

10      Q    He orally responded with speaking the word

11   "yes?"

12      A    Right.

13      Q    When you were interviewing Mr. Anderson,

14   were you armed?

15      A    Yes, I was.

16      Q    Where was your weapon?

17      A    In my holster.

18      Q    Was your weapon covered by any type of

19   jacket or any type of covering at the time you were

20   with Mr. Anderson?

21      A    Not that I recall, no.

22      Q    And Detective Mc Dermott.

23           Was he armed at the time you were

24   interviewing or having conversations with Mr.

C265

1    Anderson?

2        A    I do not recall specifically, but I would

3    have to say that he was.

4        Q    Recall if he had a jacket on or if he had

5    his jacket off at the time of the interview?

6        A    That I don't recall.

7        Q    You recall whether that weapon would have

8    been visible, Mc Dermott's weapon would have been

9    visible during the conversation with Mr. Anderson?

10       A    Well, if Detective Mc Dermott had his

11   outer coat and stuff off, the weapon would have

12   been visible, sure.

13       Q    Recall Detective Mc Dermott putting his

14   weapon up to the head of Mr. Anderson during these

15   conversations?

16       A    No, sir.

17       Q    Recall any threats being made to Mr.

18   Anderson by Detective Mc Dermott?

19       A    No, sir.

20       Q    Do you recall placing, removing your

21   weapon and placing it to the head of Mr. Anderson?

22       A    Sir, I have never done anything like that.

23       Q    Detective Paladino and Detective Maslanka

24   were also at Area 2, isn't that correct?

1        A      I do not recall if they were there or not,

2    sir.

3        Q      Do you recall if Detective Maslanka or

4    Paladino also had went into that interview room

5    where Mr. Anderson was?

6        A      Not at all.  No.

7        Q      Mr. Anderson have anything to eat during

8    that time he was at the Area 2 Offices?

9        A      He might have sir, but to my knowledge the

10   time that I was there with 'em he did not have

11   anything to eat.

12       Q      Did he have anything to drink to your

13   knowledge?

14       A      I don't know if he had anything to drink

15   or not.  He was free to ask or use the water

16   fountain.

17       Q      You do not recall whether he was given

18   anything to drink?

19       A      I do not recall he requested anything.  I

20   do not recall if he was given anything.

21       Q      Not that he requested.

22              Was he given anything to drink?

23       MR. OWEN:  Objection, Judge.

24       THE COURT:  I thought he said "not that I

1   recalled." But if you want to him to answer again,

2   you can answer again, officer.

3       THE WITNESS: Not that I recall.

4       MR. HEENAN: Q Detective, was he allowed to

5   use the washroom during that period of time that he

6   was at Area 2?

7       A    Sure.

8       Q    Did he?

9       A    I do not know.

10      Q    Do you recall if you took him to the

11  washroom?

12      A    I did not take him to the washroom. Not

13  that I remember.

14      Q    Your conversations concerning the volk

15  incident took place at what time. Your

16  conversation with Mr. Anderson concerning the Volk

17  incident?

18      A    Right.

19           It took place between midnight and one

20  a.m.

21      Q    And that conversation was with, in that

22  interview room correct, both you and Detective Mc

23  Dermott and Mr. Anderson?

24      A    That's right.

1       Q      You indicate Mr. Anderson was not

2    handcuffed at that time correct, during those

3    conversations?

4       A      To my knowledge he wasn't, no.

5       Q      To your knowledge Mr. Anderson was not

6    handcuffed all the time he was in that interview

7    room up until 3:00 o'clock in the morning of the

8    19th when you left, is that correct?

9       A      To my knowledge, that's right, yeah.

10      Q      Detective, you had, you did not

11   participate or have anything to do with any

12   line-ups as to the Volk matter, is that correct?

13      A      No, sir.

14   MR. HEENAN:  I have no further questions.

15            Thank you, detective.

16   THE COURT:  State.

17   MR. OWEN:  Very briefly.

18                RE-DIRECT EXAMINATION

19                BY MR. OWEN:

20   MR. OWEN:  Q  Detective Gallagher, there was

21   essentially at the time April 18th through the

22   19th, back in 1990.  This was essentially Detective

23   Mc Dermott's case, is that correct?

24      A      Oh, yes, it was his.

253

1      Q    He was handling the investigation.  At

2  that time you were assisting him, is that correct?

3      A    That's correct.

4      Q    And you were not present, as you say,

5  after approximately 3 a.m., I believe you said you

6  left Area 2, is that correct?

7      A    That's correct.

8      MR. OWEN:  I have nothing further, Judge.

9      MR. HEENAN:  I have nothing further.

10        Thank you, detective.

11     THE COURT:  Thank you very much detective.

12        Have a nice day.

13     THE WITNESS:  The same to you.

14                           (Witness excused)

15     MR. OWEN:  With that the People have no further

16  witnesses to present as to the motion to suppress

17  statement or as to 90-11984, also as to the

18  identification testimony.  I believe the State, I

19  believe has met it's burden under the material

20  witness rule.  I don't believe there is anybody

21  else who had contact with this defendant that I'm

22  aware of.  Unless counsel can offer some guidance

23  with that respect.  I believe I have called

24  everybody.

1      THE COURT:  Mr. Heenan.

2      MR. HEENAN:  Judge, if the --

3      MR. OWEN:  I would rest.

4      MR. HEENAN:  We would like to put Mr. Anderson

5   on if the court's schedule permits that now.

6      THE COURT:  Well, I think we will have to defer

7   that a little bit later in the day or when we take

8   a break.  Whatever you people can agree on is fine

9   with me.  My schedule is such that I'll probably be

10  pretty occupied til about five or so.

11     MR. OWEN:  Judge, would it help the court at

12  all if perhaps since Mr. Anderson is the only one

13  we would need, perhaps tomorrow morning.  If your

14  Honor wishes, we could start it --

15     THE COURT:  Doesn't make any difference to me.

16  Only if it is very early.

17     MR. HEENAN:  That would be actually better,

18  Judge.

19     THE COURT:  We will do it at 9:00 o'clock.

20     MR. OWEN:  I have no problem, Judge.

21     THE COURT:  Okay.  Very good.

22     MR. HEENAN:  Fine, Judge.

23     THE COURT:  Hold it on til 9:00 o'clock

24  tomorrow.

1                          (Cause continued to the

2                          following day, Wednesday,

3                          May 1st, 1991)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

—174—

File Date: <u>July 14, 2008</u>

Case No: <u>08cv3979</u>

ATTACHMENT # <u>2</u>

EXHIBIT <u>Pages 175-260</u>

TAB (DESCRIPTION)



STATE OF ILLINOIS )
                  ) ss.
COUNTY OF C O O K )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE   )
STATE OF ILLINOIS   )   Indictment No. 90-11984
                    )
        VS          )   Before JUDGE THEMIS N.
                    )   KARNEZIS
                    )
TONY ANDERSON       )   Wednesday, May 1st, 1991

                        9:30 o'clock a.m.


        Court convened pursuant to continuance.


    PRESENT:

        Hon. Jack O'Malley,
          State's Attorney of Cook County, by
        Mr. Kip Owen,
          Assistant State's Attorneys,
          appeared for the People.

        Mr. Mr. Randolph N. Stone,
          Public Defender of Cook County, by
        Mr. William Heenan,
          Assistant Public Defender,
          appeared for the Defendant.

                - - - - - - -

1          THE CLERK:  Tony Anderson.

2          MR. HEENAN:  Judge, we would call Mr. Anderson.

3          THE COURT:  Sure.

4              Step up here, Mr. Anderson.  Raise your

5      righthand.

6                        TONY ANDERSON,

7      the defendant herein, called as a witness on his

8      own behalf, on the motion, having been first duly

9      sworn, was examined and testified as follows:

10                       DIRECT EXAMINATION

11                       BY MR. HEENAN:

12         THE COURT:  Continuing hearing on motion to

13     suppress statements and identification, 90-11984.

14             Have a seat, Mr. Anderson.

15         MR. HEENAN:  Q  Tony, if you would state your

16     full name please, and spelling your last name?

17         A    Tony Anderson.  A N D E R S O N.

18         Q    Tony, calling your attention to the date

19     of April 18th, 1990.  Do you recall being taken

20     into custody by Chicago Police Officers at

21     approximately 1100 West 51st Street?

22         A    Yes.

23         Q    And that was at what time, do you recall?

24         A    I don't remember.

1      Q      Do you recall which officers took you in
2   custody?

3      A      It was two white officers and one black.

4      Q      Now, those officers took you somewhere,
5   correct?

6      A      Yes, they did.

7      Q      Where did they take you?

8      A      11th and State.

9      Q      And were you handcuffed at that time on
10  that trip to 11th and State?

11     A      Yes, I was.

12     Q      Were you at any time advised of your
13  rights to remain silent?

14     A      No, I wasn't.

15     Q      Were you ever informed that anything you
16  might say could be used against you in court?

17     A      Yes.

18     Q      Did they ever advise you of that right?

19     A      No.

20     Q      Were you advised that you had a right to
21  have and consult with a lawyer?

22     A      Yes.

23     Q      Were you ever advised of that right?

24     A      No.

1          Q     Were you ever advised of that you had a

2     right to have a lawyer present during questioning

3     by the police.

4                Were you ever advised of that right?

5          A     No.

6                Unh-unh.

7          Q     Were you ever advised that if you could

8     not afford a lawyer, that a lawyer would be

9     provided for you.

10               Were you ever advised of that right --

11         A     No.

12         Q     -- at any time on your way to 11th and

13    State?

14         A     No, I wasn't.

15         Q     Now, when you got to 11th and State, where

16    did they place you?

17         A     It was like interview room about three

18    desks.

19         Q     And how long did you remain in that

20    interview room?

21         A     For about three to four hours,

22    approximately.

23         Q     During that three or four hour period of

24    time, were you ever advised of those rights that I

23

1    just asked you about?

2        A    No.

3        Q    Now, while at 11th and State, were you

4    ever threatened or hit by any police officers at

5    any time?

6        A    Not 11th and State.

7        Q    From 11th and State, where were you taken?

8        A    To 111th.

9        Q    Recall who took you to 111th?

10       A    I don't remember.

11       Q    111th is another police facility, correct?

12       A    Yes, it is.

13       Q    You recall what time you got to 111th

14   Street?

15       A    I don't. I don't know.

16       Q    Where were you placed at 111th Street

17   Police Station?

18       A    Went on the second floor, small, very

19   small room.

20       Q    You recall, can you approximate the size

21   of that room?

22       A    Probably about 10 feet long, about seven

23   feet wide.

24       Q    Were there any windows in that room?

24

1        A      No.

2        Q      Tony, by the way, up to this point were

3   you given any food or drink of any sort?

4        A      No, I wasn't.

5        Q      You were allowed to use the washroom?

6        A      No, I wasn't.

7        Q      Did you at any time ask to make any phone

8   call?

9        A      Yes, I did.

10       Q      When was it that you asked to make a phone

11  call?

12       A      As soon as I got there.

13       Q      How many times while you were at 11th and

14  State did you ask to make a phone call, do you

15  recall?

16       A      About eight times.

17       Q      And who was it that you asked?

18       A      Officer Mc Dermott.

19       Q      Did you ask any one else if you could be

20  allowed to make a phone call?

21       A      Right.

22              On 11th and State I asked the officers

23  down there.  They wouldn't let me make a phone

24  call.

25

262

— 180 —                    0278

1        Q     You recall who those officers were?

2        A     I don't know they name.  But I know how

3    they look.

4        Q     Were they any of the officers who

5    testified here so far in these motions?

6        A     Yes, they were.

7        Q     Which ones, do you recall?

8        A     It was the black one and the other white

9    one, glasses.  His partner.

10       Q     You don't recall their names?

11       A     I don't know his name.

12       Q     And what was the purpose of asking for

13   that phone call?

14       A     So I could call my mother so she could

15   call the lawyer to come down there.

16       Q     Did you tell those officers at the time of

17   making that request for the phone call the purpose

18   you wanted to make the phone call?

19       A     Yes, I did.

20       Q     Now, back when you were at 111th Street

21   Police Station in that room, do you recall

22   Detective Mc Dermott speaking to you?

23       A     Yes, I did.

24       Q     And Detective Mc Dermott would be the same

1    detective that testified in this matter, correct?

2       A   Yes.

3       Q   Now, did Detective Mc Dermott do anything

4    to you while speaking to you?

5       A   Yes.

6       He kept asking me about armed robberies

7    and I didn't know anything about it.  Then he said

8    Robert Allen say that he sign a statement saying

9    that I done some arm robbery.  I told I'm ain't

10   know nothing about it.  I didn't say nothing else.

11      Q   After he said that to you, what happened,

12   if anything?

13      A   He put a gun to my head.

14      Q   And do you recall what time it was when

15   this happened?

16      A   It was 9:00 o'clock.

17      It was not a clock in there.

18      Q   Was any one else present besides yourself

19   and Detective Mc Dermott when Detective Mc Dermott

20   put this gun to your head?

21      A   No, it wasn't.

22      Q   Did Detective Mc Dermott say anything to

23   you when he did that?

24      A   Yes.  He say he will blow my damn brains

1   out.

2        Q    While you were at 111th Street, were you

3   at any time physically struck?

4        A    Yes.

5        Q    All right.

6             Do you recall when that was?

7        A    It was about an hour before they took us

8   back to 111th Street, by tall officer with blond

9   hair.  I don't know his name.

10       Q    When you were -- it was a tall officer,

11  you don't know his name?

12       A    I don't know his name.

13       Q    Was it an officer that has testified in

14  this hearing so far?

15       A    Yes, he was.

16       Q    Can you describe that officer in any way?

17       A    He is tall, blondish hair and his hair is

18  coming out just a little bit at the top.

19       Q    Would that be Detective Maslanka.

20            Do you remember that name?

21       A    Yes.  That's him.

22       Q    Now, that detective did what to you?

23       A    He jabbed me in my rib with the stick, in

24  my thighs and my back.

1       Q    How many times did he strike you in the

2  rib area?

3       A    About four or five times.

4       Q    And how did he strike you?

5       A    He press the stick into my back and my

6  chest like this here.

7       Q    Could you describe this stick?

8       A    It's a police stick.  The one that they

9  put.

10      Pull out black-jack.  It's about this

11  long, about like this.

12      Q    Would it be a wooden or metal stick?

13      A    Wooden.

14      MR. OWEN:  Judge, may the record reflect

15  the defendant has held his hands out

16  approximately --

17    MR. HEENAN:  Q  How long was this stick?

18      A    The ones they carry.

19      Q    Would this be a police stick?

20      A    Right.

21    MR. OWEN:  May the record --

22    THE COURT:  Billy club, right.

23    THE DEFENDANT:  Yes.

24    THE COURT:  Sure.

1        MR. HEENAN: Q  Now, when that detective, that

2    Detective Maslanka struck you with that billy club,

3    was there any one else present?

4        A    No, it wasn't.

5        Q    And was that in that same interview room?

6        A    It was the same side as that room, but in

7    another room.

8        Q    It was a different interview room?

9        A    A different room.

10       Q    Do you recall what time it was when he did

11   this?

12       A    I don't know.

13       Q    At the 111th Street Station, were you

14   advised of those rights I asked you earlier?

15       A    Never.

16       MR. HEENAN:  I have no further questions.

17       THE COURT:  Cross.

18                 CROSS EXAMINATION

19                 BY MR. OWEN:

20       MR. OWEN:  Q  Mr. Anderson, at the time you

21   were arrested you had been driving that car that

22   you were in, isn't that correct?

23       A    Yes.

24       Q    And the man that took you out of the squad

                      267

1   car was the black officer who testified here, isn't

2   that correct?

3       A   The black officer did not take me out of

4   the car.

5       Q   And after you were arrested, took you back

6   to the back of your car that you had been driving,

7   isn't that right?

8       A   It's not my car.

9       Q   Well, the car that you were driving, sir.

10  The officer took you to the back of that car and

11  put handcuffs on you, isn't that correct?

12      A   No, it wasn't.  Put me in his car.

13      Q   Put you in the car and then put the

14  handcuffs on you?

15      A   Yes.

16      Q   And at that time you were taken down to

17  11th and State, is that correct?

18      A   Right.

19      Q   And once you got down to 11th and State,

20  you were placed in an interview room, is that

21  correct?

22      A   Right.

23      Q   How big was that interview room.  Was that

24  bigger than the room that you were placed in at

269

C284

1    111th Street Police Station or smaller?

2         A    It was bigger.

3         Q    And did any of those officers at any time

4    strike you, sir?

5         A    No.  Not at 11th and State, they didn't.

6         Q    So 11th and State, the officers treated

7    you well, is that correct?

8         A    They didn't let me make a telephone call.

9         Q    Okay.

10        And how many times did you request this

11   telephone call from these police officers?

12        A    The ones at 11th and State --

13        Q    Yes, sir?

14        A    -- about four or five times.

15        Q    Four or five times you asked to make a

16   phone call, they would let you, is that correct?

17        Is that your testimony?

18        A    Right.

19        Q    And while you were there, did you ever ask

20   them to use the bathroom?

21        A    Yes, I did.

22        Q    And did they allow you to use the

23   bathroom?

24        A    No.

269

32

1        Q    And you were arrested approximately 5:00

2   p.m., is that correct?

3        A    I don't know what time I was arrested.

4        Q    Well, assuming you were arrested at 5:00

5   o'clock in the evening, that time when you were

6   taken from your car and placed in the squad car

7   with the handcuffs on.  Assuming that's 5:00

8   o'clock.

9             When when was it you would have asked to

10  use the bathroom shortly after that?

11       MR. HEENAN:  Objection to that question, Judge.

12  Asking for --

13       THE COURT:  Rephrase it.

14       MR. OWEN:  Sure.

15       Q    Assuming you were arrested at 5:00 o'clock

16  p.m. --

17       A    Huh-huh.

18       Q    -- on the 18th of April.

19            At what point then, when was the first

20  time you asked either of those officers to let you

21  use the bathroom?

22       MR. HEENAN:  Judge, once again I would be

23  objecting to the asking for the assumptions as to

24  time and frame.

1          THE COURT:  How about from the time you were

2     arrested, how long after.

3          MR. OWEN:   Q   How long after you were arrested

4     was it when you asked to use the bathroom?

5          A      Once I got 11th and State, about an hour.

6          Q      And how many times did you ask them to use

7     the bathroom?

8          A      Twice.

9          Q      Did they allow you ever to use a bathroom

10    there?

11         A      Never.

12         Q      And it's your testimony that neither of

13    the officers that originally arrested you out on

14    51st Street in that area by the liquor store, that

15    nobody had ever advised you of your rights, is that

16    correct, sir?

17         A     Never.

18         Q      And the officers that took you from 11th

19    and State Police Station down to 111th Street.  Did

20    those officers testify in this courtroom in this

21    matter?

22         A      It's been a year ago.  I really don't

23    remember.  It was so many detectives, I really

24    don't remember who took me.

34

1          Q     So your not sure who actually transported

2     you, is that correct?

3          A     Right.

4                I'm not sure.

5          Q     And when you were transported, you were

6     handcuffed, is that correct?

7          A     Correct.

8          Q     You were placed in the back of the squad

9     car, is that correct?

10         A     Correct.

11         Q     And you were alone with those two

12    detectives, is that correct?

13         A     No.

14         Q     Who was with you?

15         A     Robert Allen.

16         Q     so he was in the same car with you going

17    to 111th street?

18         A     Yes, he was.

19         MR. HEENAN:  Judge, just for clarification.

20    Are we talking about 11th and State or 111th

21    Street.

22         MR. OWEN:  Maybe I misspoke.

23         Q     When you went to 111th Street after --

24    originally when you were arrested you were taken to

                         272

1    11th and State is, correct?

2         A    Right.

3         Q    At some point later that night you were

4    taken to 111th Street, is that correct?

5         A    Right.

6         Q    When you went down to 111th Street, the

7    second police station you were at that evening, did

8    you go with two detectives in a squad car?

9         A    I don't remember because it was so many

10   detectives.

11        Q    Okay?

12        A    I don't remember.

13        Q    When you went to 111th Street that second

14   police station later that night.  Were you alone in

15   the back of that squad car or was Robert Allen with

16   you?

17        A    Robert Allen was with me.

18        Q    Now, when you arrived at 111th Street,

19   they placed you in an interview room, right?

20        A    Correct.

21        Q    It was in there -- at that time once you

22   got to 111th Street, at what point did you ask to

23   use the washroom there, sir?

24        A    First after I asked him to let me make a

273

1    telephone call to call my parents to call a lawyer,

2    he wouldn't.  He kept staying --

3         Q    Sir, my question to you is -- okay.

4              The question is sir, what was the first

5    point that you asked, at what time, how long after

6    you were at 111th Street, at what point did you ask

7    to use the bathroom.

8              That's my question, sir?

9         A    I say about three hours after I was down

10   there.

11        Q    Three hours after you were down there.

12             And is it your testimony sir, that from

13   the time you were arrested all the way up to this

14   point three hours after you arrived at 111th

15   Street, that at no time did they ever allow you to

16   use the bathroom, is that correct?

17        A    Correct.

18        Q    You never used the bathroom any time at

19   least up until that point, is that correct?

20        A    I never used it at all.

21        Q    So you never used it the entire time from

22   the time you were arrested.

23             At what point did you actually get to use

24   the bathroom, sir?

274

-192-

1    A    I didn't use it.

2    Q    Well, at some point you must have?

3    A    When I got down to the County.

4    Q    Down at County Jail?

5    A    Right.

6    Q    And you also indicated that you asked the

7    police officers to use the telephone when you were

8    at 111th Street, is that correct?

9    A    Correct.

10   Q    And how many times did you ask to make

11   phone calls when you were at 111th Street, sir?

12   A    About seven times.

13   Q    Seven times?

14   A    About seven times.

15   Q    And is it your testimony that the police

16   officers or the detectives at 111th Street, it's

17   your testimony that they never allowed you to make

18   any phone calls whatsoever?

19   A    Never.

20   Q    When was the first time you were allowed

21   to make a phone call?

22   A    When I got down to the County Jail.

23   Q    Now, when -- you indicated that Detective

24   Mc Dermott, and you recall which detective that is,

38

—193~

C291

1    is that correct?

2         A    (Witness nodding head up and down)

3         Q    You know who detective -- you have to

4    respond yes or no, sir?

5         A    Yes.

6         MR. HEENAN:  I object to the counsel directing

7    of to answer a certain way.

8         MR. OWEN:  Judge, he was nodding his head.

9         THE COURT:  What he means by that Mr. Anderson,

10   is he can't take it down if you nod your head.  You

11   have to answer verbally, you know, no matter what

12   you say.  Okay.

13        THE WITNESS:  Yes.

14        THE COURT:  Thank you.

15        MR. OWEN:  Q  Do you know who Detective Mc

16   Dermott is, sir?

17        A    Yes.  He was testifying.

18        Q    And that is the detective that you tell

19   this court that placed a gun to your head, is that

20   correct?

21        A    Can you tell me that question again.

22        Q    Sure.  Sure.

23             You indicated or you testified sir that

24   one of these detectives put a gun to your head, is

1   that correct?

2       A   Yes.

3       Q   And you testified that was in fact

4   Detective Mc Dermott who put the gun to your head,

5   is that correct, sir?

6       A   It was Mc Dermott.  Detective Mc Dermott.

7       Q   And when Detective Mc Dermott did this,

8   was anybody else present at that time?

9       A   No, it wasn't.

10      Q   And was this the only -- up to that point

11   in time when the gun was placed to your head was

12   that the only interview room you had been in down

13   at Area 2?

14      A   No.

15      Q   You had been in another interview room

16   down there before this?

17      A   Yes, I was.

18      Q   And you were taken out of one room and put

19   in a second room, is that correct?

20      A   Yes, I was.  Later the next day.

21      Q   Okay.

22       So in fact this threatening with the gun,

23   approximately what time would that have happened,

24   sir?

-195-

1    A    I don't know.

2    Q    Well, approximately how long after you

3  arrived at 111th Street was this gun placed to your

4  head, sir?

5    A    Probably, about -- I don't know.  I don't

6  know.  I really couldn't tell you.  I don't know.

7  Because I was so confused, I don't know.

8    Q    Well, you remember another officer.  You

9  remember Detective Gallagher who testified here and

10  said that he was also present when they spoke with

11  you initially at 11th and State.  111th Street,

12  excuse me?

13    A    Yes.

14         He was one of them.  It was a whole lot of

15  'em.

16    Q    He was one of the detectives who was in

17  that first interview room when they brought you to

18  111th, is that correct.  Him and Mc Dermott, is

19  that right?

20    A    I don't know because I don't remember who

21  brought me to 111th.

22    Q    Well, after you were brought to 111th

23  Street and you were placed in that first interview

24  room, you remember Detective Mc Dermott and

1      Detective Gallagher speak to you in that interview

2      room, is that correct?

3            A      Yeah.  I remember them speak to me in that

4      interview room.

5            Q      Okay.

6                   Now, when they spoke with you, isn't it

7      true that Detective Mc Dermott read you your

8      constitutional rights from that FOP Book?

9            A      No, he didn't.

10           Q      Do you recall seeing those rights on the

11     plaque that is on the wall in that interview room,

12     sir?

13           A      No.

14           Q      Was there such a plaque on that wall, sir?

15           A      No.  Nothing on the wall.

16           Q      So it's your testimony that those walls,

17     there is nothing on those walls at all, is that

18     correct?

19           A      Nothing.

20           Q      There is no rights, there is not a framed

21     or a card on the wall telling you the various

22     rights that you have, is that your testimony, sir?

23           A      No.  It's nothing on the wall.

24           Q      Nothing on the wall?

42

1     A    Nothing on the wall.

2     Q    Nobody ever advised you of your rights?

3     A    Never.

4     Q    And when the gun was placed to your head,

5  was that later on after Gallagher had left the

6  interview room where he was originally with Mc

7  Dermott talking to you?

8     A    Yes.  When he left.

9     Q    And that would have been sometime after at

10  least 3:00 o'clock in the morning, isn't that

11  correct?

12     A    I don't know.

13          I was in one room.

14     Q    Is it fair to say sir, or can you say

15  would it have been say more than five hours after

16  you arrived at 111th Street?

17     A    I don't know.  How can I say something if

18  I don't know?

19     Q    Okay.

20          Well, you also indicated that Detective

21  Maslanka, as you indicated the tall detective,

22  struck you or did something with what you call a

23  billy club or a police stick, is that correct?

24     A    A black-jack.  The ones the police carry.

```
1     Black-jack, billy club.

2          Q     That's the tall guy that testified, right?

3          A     Right.

4          Q     Detective Maslanka.

5                Now, did the gun to the head incident, did

6     that take place prior to this billy club being put

7     into your side and hitting your ribs, sir?

8          A     What do you mean?

9          Q     Well, which happened first.  The billy

10    club or the gun to the head?

11         A     The gun to the head first.

12         Q     And how much time went by after the gun

13    was placed to your head that the billy club

14    incident happened?

15         A     If I'm not mistaken, that was the next

16    day.  That was the next day.

17         Q     Well, sir, do you recall how many days

18    that you were at 111th Street?

19         MR. HEENAN:  Judge --

20         A     I don't remember.

21         MR. HEENAN:  Object to this question days,

22    whether or not we're talking full days, whether or

23    not --

24         THE COURT:  I'll let his answer stand.
```

1     MR. HEENAN: -- one evening.

2     THE COURT:  Pose another question.

3     MR. OWEN:  Q  Well, how much time, how many

4     hours between the gun to the head and the billy

5     club.

6             How many hours were between those

7     incidents?

8       A    I can't say.  I was so confused.  They had

9     me all strung out.  I don't know.

10      Q    So your confused, your so confused you

11    have no idea what time any of this stuff happened?

12      A    I was in one interview before they put me

13    in the other interview room.  I don't know. There

14    was so many of them.  I don't know.

15      Q    So many what?

16      A    Detectives.

17      Q    So many detectives.  Were so many

18    detectives hitting you that you don't know who did

19    it?

20      A    No.

21      Q    Just one guy hitting you and another guy

22    putting the gun to your head, is that correct?

23      A    That's correct.

24      Q    But you have no idea how far apart in time

292

200 -

C298

1      those two incidents happened.

2          MR. HEENAN:  Object, Judge.

3              He has already been asked that several

4      times.

5          THE COURT:  Sustained.

6          MR. OWEN:  Q  But your sure the gun incident

7      happened after Detective Gallagher had left that

8      first room and he and Mc Dermott had questioned you

9      initially, isn't that correct?

10         A    When him and Mc Dermott had questioned me

11     when Gallagher had left, then that's when it

12     happened.

13         Q    Now, you indicated that Detective Mc

14     Dermott placed a gun to your head, said he was

15     going to blow your brains out, is that correct?

16         A    Correct.

17         Q    And what type of gun was this, sir?

18         A    I don't know.

19         Q    Did you see the gun?

20         A    Yeah.  I seen it, but I don't know to much

21     about guns.

22         Q    You don't know to much about guns?

23         A    No.

24         Q    Do you know the difference between a

                              283

1      revolver and an automatic, sir?

2            A    I don't remember.

3                 Yeah.  I know the difference, but I don't

4      remember.  I don't remember.

5            Q    You know the difference, but you don't

6      remember what kind of gun he had?

7            A    I --

8            MR. HEENAN:  Objection.

9                 Asked and answered.

10           THE WITNESS:  I don't remember what kind it

11     was.

12           THE COURT:  Sustained.

13           MR. OWEN:  Q  Do you remember what color this

14     gun was?

15           A    No, I don't remember.

16           Q    Is it sir, that you just don't remember

17     them advising of your rights?

18           A    I know they didn't advise me of my rights.

19           Q    You remember that, right.  Is that right?

20           A    Yes, I did.

21           Q    And you remember that you asked for four

22     or five phone calls at 11th and State, isn't that

23     right?

24           MR. HEENAN:  Judge, once again this area has

47

1    already been asked.

2         THE COURT:  Sustained.

3         MR. OWEN:  Q  Well, sir, you remember certain

4    things that happened, specifically how many times

5    you asked for phone calls, isn't that right?

6         A    Because --

7         Q    You remember that, isn't that right?

8         A    Right.  Because I wanted to make a phone

9    call.

10        Q    You remember how many times you asked, is

11   that right?

12        MR. HEENAN:  Judge, at this point I object to

13   arguing with the witness.

14        THE COURT:  Overruled.

15        MR. OWEN:  Q  Is that right, sir.  You remember

16   how many times you requested phone calls, don't

17   you?

18        A    Yes.

19        Q    And you remember how many times you asked

20   to go to the bathroom, don't you?

21        A    Yes.

22        Q    But you don't know how much time passed

23   between the gun incident and the billy club

24   incident --

                        285

1       A    No.

2       Q    -- is that right?

3       A    Right.

4       MR. HEENAN:  Object, again.  Asked and

5   answered.

6       MR. OWEN:  Q  How many various rooms did they

7   take you to, sir?

8       MR. HEENAN:  Once again, asked and answered,

9   Judge.

10      THE COURT:  Sustained.

11          He has answered that.

12      MR. OWEN:  Q  Sir, did they take you to more

13  than two interview rooms?

14      MR. HEENAN:  Object again, Judge.

15      THE COURT:  I'll let him answer that.

16      THE WITNESS:  Yes, they did.

17      MR. OWEN:  Q  Approximately, how many interview

18  rooms did they take you to, sir?

19      A    Three.

20      Q    Three different interview rooms.

21          Would that include the room in which you

22  were placed in a line-up?

23      A    Yes, it was.

24      Q    And they kept you separate from Robert

1    Allen, didn't they?

2        A    Yes.

3        Q    By the way sir, could you show the court

4    again exactly how it was that the individual, I

5    believe it was Maslanka took this police billy club

6    and -- well, first perhaps you could tell us

7    exactly what it was he did with the billy club?

8        A    He was jabbing me in my back and my chest.

9        Q    Your back.

10        Could you stand up and show his Honor

11    exactly what part of your body sir, that he struck

12    with this billy club or jabbed with this billy

13    club?

14        A    He didn't struck, he jabbed me with it.

15        Q    Could you stand up sir, and show us.  Show

16    us what part of your body, sir?

17        A    Right.

18    MR. OWEN:  Q  Indicating Judge, the lower

19    middle back area.

20    THE COURT:  Yes.

21    MR. OWEN:  Q  You also indicated he jabbed you

22    in the chest, sir?

23    MR. HEENAN:  Judge, I object.  He did not

24    indicate his middle back area.

1    THE COURT:  I saw where it was.  And it was

2    roughly, I mean low middle.  It was more towards

3    the center line, the horizontal center than the

4    bottom of the back or the tailbone.

5    MR. OWEN:  Q  Now, sir, could you tell us where

6    on your chest?  What part of your chest area was it

7    that he jabbed you with the billy club?

8    A    Right here.

9    THE COURT:  Indicating essentially the center

10   of the chest.

11   MR. OWEN:  Q  And how many times did he jab

12   this billy club into your back, sir?

13   A    I don't know.  Because I was crying.

14   Q    At what point did you start crying?

15   A    Because it was hurting.

16   Q    Hurt bad, right?

17   A    Yeah, it hurt.

18   Q    He was jabbing you real hard, wasn't he?

19   A    Yes, he was.

20   Q    How many times did he jab you in the back

21   real hard with this billy club?

22   A    I don't know.

23   Q    Well, did he jab you in the back first or

24   the chest first with the billy club?

288

1        A    In my back first.

2        Q    And at what point did you start crying

3    because it hurt so bad, sir?

4        A    When he first started jabbing me in my

5    back.

6        Q    Okay.

7            Then you continued to cry as he continued

8    to jab in the back, is that correct, sir?

9        A    Yes.

10       Q    And did you continue to cry as he jabbed

11   it in your chest, sir?

12       A    Yes, I did.

13       Q    And approximately how many times, if you

14   know, did he jab you in the chest?

15       A    I don't.  It was about like over 12 times.

16   I don't.

17       Q    Over 12 times.

18            Now, didn't you also testify sir, that

19   then he jabbed you with this billy club in the

20   ribs.

21            Was that with a stick?

22       A    Stick, billy club.  It is wooden.

23       Q    Whatever that was.  Did he jab you in the

24   ribs too?

289

52

1      A     Right here.  Chest.

2      Q     Just in the chest.  Not in the ribs?

3      A     And the back.

4      Q     Chest and back.

5            But not in the ribs, is that correct?

6      A     Correct.

7      Q     And when he was jabbing you in the back,

8  did he jab you as many times in the back as he did

9  the chest?

10     A     I don't remember.

11     Q     Now, you recall, don't you sir, going over

12  to the -- well, when you went into the County Jail,

13  do you recall them giving you a physical

14  examination, sir?

15     A     Yes.  And I told 'em what had happened.

16     Q     You told the man then what happened?

17     A     Yes.

18           He said "I don't see no bruises or

19  anything."  I said "I feel the pain."  He says "no

20  bruises."  I said "I feel the pain, though."

21     Q     Did you see any bruises on you, sir?

22     A     No, I didn't.  No, I didn't.

23     Q     But you felt that pain, right?

24     A     Yes.

53

1          When he was doing it.

2     Q    How much time went by from the time that

3     you were jabbed with this stick or whatever it was

4     he did this to you with.  How much time went by

5     between that incident and the time you went to the

6     County Jail to have this examination?

7     A    It was the next morning when I went to the

8     County.

9     Q    The next morning.

10         And did he ever strike you with this item

11    in the thighs, sir?

12    A    No.

13    Q    Sir, now you remember when you were sworn

14    to this motion, don't you?

15    A    Huh-huh.

16    Q    You remember you swore all the things in

17    here were true.  Remember when the Judge did that

18    before we began?

19    A    Huh-huh.

20    Q    You remember reading the motion, sir.

21    Didn't you sir, where it says "the defendant was

22    struck in the ribs and the thighs by certain police

23    officers using a police stick or billy club."

24         You remember reading that that you swore

54

-209-

1    to, don't you, sir?

2         A    I didn't read the motion.

3         Q    You never read it?

4         A    No.

5         Q    So all this you don't even know was in

6    here is true.  Is that what your telling the court?

7         A    I didn't read it.

8         MR. OWEN:  I have nothing further, Judge.

9                    RE-DIRECT EXAMINATION

10                   BY MR. HEENAN:

11        MR. HEENAN:  Q  Tony, you were arrested on one

12   day, the 18th, April 18th, correct.  You were taken

13   into custody?

14        A    Yes.

15        Q    And you were held through that evening

16   into the following day, correct?

17        A    Correct.

18        Q    At the time Detective Mc Dermott was in

19   the room with the gun to your head, the other

20   detective the left the room, Detective Gallagher?

21        A    Yes.

22        Q    Now, other than the interview room you

23   indicated you had been during the course of that

24   evening and the following morning, you had been

- 210 -

1    taken by various police officers to other rooms, to

2    line up rooms and other rooms in that police

3    station, correct?

4          A    Yes, I was.

5          MR. HEENAN:  I have no further questions.

6              Thank you.

7          THE COURT:  State?

8          MR. OWEN:  Judge, if I could have just a brief

9    moment.

10          THE COURT:  Sure.

11          MR. OWEN:  Judge, I have nothing further.

12          MR. HEENAN:  Judge, actually we have nothing

13    further to present on the motion to suppress

14    statements.

15          THE COURT:  You may step down, Mr. Anderson.

16                              (Witness excused)

17          MR. HEENAN:  And we would then rest on the

18    motion to suppress statements.

19          THE COURT:  Okay.

20              As to the motion to suppress statements.

21              Argument.  Mr. Heenan.

22                      CLOSING ARGUMENT

23                      BY MR. HEENAN:

24          MR. HEENAN:  Judge, first of all, as to the

1    statement I would ask the court to consider that

2    Mr. Anderson from the time of his arrest has

3    indicated by testimony of the officers was on the

4    date of April 18th that he spent in custody many

5    hours on the day of the 18th with those police

6    officers either in transport to the station at 11th

7    and State and or being transported to the facility

8    at 111th Street.  There are various times being

9    presented as to when these actual events took

10   place.  I would ask the court to consider that Mr.

11   Anderson, during the course of April 18th and April

12   19th, was being shuffled from police station to

13   police station by these various police officers.

14        I would ask the court to consider the

15   totality of the circumstances of his custodial

16   situation that he is being shuffled, he is not

17   being allowed to make phone calls.  He has

18   indicated to you that he has asked to make a phone

19   call concerning obtaining a lawyer.  He asked to

20   have a phone call to call his family so his family

21   could contact a lawyer.  That was not -- that

22   request was not granted.  That request was made

23   several times.

24        He has indicated to you he was not advised

284

57

-212-

C310

1    of his Miranda Warnings.  The testimony of the

2    officers was varied as to when these rights were

3    given.  The officers were at least sure in their

4    testimony that they gave rights at least at the

5    111th Street Station.  There may not have been

6    testimony by other officers as to rights being

7    given at the time of the arrest.  Actually, I

8    believe the two officers that testified as to the

9    arrest varied in that testimony as to whether or

10   not rights were given.  The one officer saying that

11   he recalled rights being given, the other officer

12   at the time of the arrest saying he did not recall

13   the rights being given.

14           In either case Judge, Mr. Anderson is not

15   saying at any time at 11th and State or in the

16   transporting to 11th and State and to 111th Street

17   he was not physically abused as any time.  He was

18   not threatened, he was not, as counsel attempted to

19   elicit he was not, and I would ask the court not

20   consider that he was not treated well.  He was not

21   granted the Miranda Warnings, he was not granted an

22   opportunity to speak to his family, he was not

23   granted the opportunity to contact a lawyer.

24           At 111th Street, I would ask the court to

1    consider the testimony of Detective Gallagher was

2    that this case, this investigation was Detective Mc

3    Dermott's investigation.  It was not, as Detective

4    Gallagher indicated, his investigation.  That he

5    was, I believe may be without a partner that day

6    and then joined in this investigation.

7         I point that out to you as to Mr.

8    Anderson's allegation that Detective Mc Dermott was

9    the detective who actually put the gun, a gun, the

10   officers gun to the head of Tony Anderson,

11   threatened him with that gun, told him he had to

12   admit to these allegations that were being made by

13   the police officers as to his involvement in these

14   alleged crimes.

15        I would ask the court to consider though,

16   Mr. Anderson can't be certain as to the time frame.

17   I would ask the court to consider the totality, the

18   amount of time that he spent in custody.  There is

19   various times being presented as to when

20   specifically this statement as to this particular

21   incident was given.  I think the time was two or

22   three in the morning.  But if indication by the

23   officers was that Mr. Anderson was kept at that

24   station through the evening of the 18th, morning of

696

1    the 19th, and into 11:00 o'clock approximately even

2    later in the afternoon of the 19th.   That Mr.

3    Anderson was kept in the police rooms.

4              I would ask the court to consider the

5    condition of the rooms, the size of the rooms and

6    the lack of ability for Mr. Anderson to even

7    communicate with any one other than police

8    personnel, police personnel who were armed at the

9    time they were talking to him.   Not only armed,

10   that the weapons were visible at the time that the

11   officers were talking to him.

12             I would ask the court to consider also the

13   alleged striking of Mr. Anderson as Mr. Anderson

14   indicated in the, as he indicated now the chest and

15   he pointed to his back area and it is correct and I

16   expect the State to say that in the motion as

17   written it does indicate rib area and any area, but

18   Mr. Anderson was specific as to his testimony today

19   that it was the chest area and as he pointed the

20   court indicated, noted the, wherever on the back

21   that Mr. Anderson pointed to.   I don't believe it

22   was mid-back area.   He was pointing more to the

23   side area which would be medically, I suppose the

24   rib area or the back rib area.

1          But in either case he is certain that

2    these officers struck him.  They struck him with

3    the billy club.  It wasn't til much later that he

4    arrived at the County Jail and the court is

5    familiar with the situation where these in custody

6    persons such as Mr. Anderson are not immediately

7    transported to the County Jail.  It's clear that

8    those officers intended to and did keep Mr.

9    Anderson at this police station through at least

10   two days.  That which the time he got to the County

11   Jail Mr. Anderson indicates that he could not see

12   any bruising.  That the personnel at the County

13   Jail did not note any bruising, but as Mr. Anderson

14   said he still recalled the pain of being struck.

15        Judge, for all these reasons I would ask

16   the court to grant our motion to suppress the

17   statements.

18        THE COURT:  Thank you, sir.

19                   CLOSING ARGUMENT

20                   BY MR. OWEN:

21   MR. OWEN:  Very briefly, Judge.  I know that

22   the, all the officers who testified clearly

23   indicated the defendant was advised of all his

24   rights.  All the officers who testified indicated

1   the defendant acknowledged each and every right

2   saying that he understood.

3          The defendant admits there was no physical

4   abuse of him until he was at 111th Street.  As your

5   Honor recalls, Detective Gallagher testified that

6   he was present up til approximately 3 a.m.  It was

7   before that this defendant had communicated, gave

8   his statement regarding specifically this offense

9   and indicated that he had been talking about

10  various things he had done up until that point

11  Detective Gallagher left essentially all the

12  statements had been given up to that point.

13         Detective Maslanka has not arrived at the

14  police station until approximately, I believe it

15  was sometime noon or so.  This defendant indicates

16  that the gun to the head takes place sometime after

17  Gallagher left when Mc Dermott would have been

18  alone with him and by that time I submit to the

19  court, that the defendant would have already gave

20  the statement in question and had communicated to

21  both those detectives various things that he had

22  done along with other people.

23         As to the stick incident or billy club

24  incident.  The officers all again clearly testified

228

—217—

62

1   that no one was in possession of a billy club.

2   These detectives did not have one.  This was not

3   one in the room.  Nobody at any time struck this

4   defendant.

5          The defendant admits when he gets to the

6   County Jail he says in his testimony he is struck

7   so hard he was crying.  That he was struck at least

8   12 times in the chest, doesn't recall how many

9   times in the back.  But when he gets to the County

10  Jail the following morning there are no marks on

11  him to show any kind of physical abuse.

12         Judge, the officers were credible.

13  Clearly, this defendant had been advised of his

14  rights.  Nobody indicated that there was any kind

15  of threats, gun to the head or any kind of billy

16  club used on the defendant at any time.  They also

17  also indicated he was allowed to use the washroom.

18  All the amenities or conveniences the defendant

19  would have at the police station, I believe he was

20  allowed those things which he should be allowed.

21  There was no testimony by any officers that he was

22  not allowed to us the bathroom or call anybody or

23  any of those things.

24         We would ask that the motion to suppress

220

- 218 -

1    the statements be denied.

2         THE COURT:  Mr. Heenan.

3         MR. HEENAN:  I have nothing further.

4         THE COURT:  Okay.

5              The court has heard the testimony from all

6    of these officers and also from Mr. Anderson.  And

7    as to fact factually the defendant was arrested on

8    the street by officers well, at the very least I

9    think Officer Sellers was there and I think Brosnan

10   was also there.  And that was about, somewhere in

11   the neighborhood of, oh, I don't know, 4 or 5

12   o'clock in the afternoon on the 18th of April of

13   1990.  He was taken to 11th and State.

14              Both of those officers testified that Mr.

15   Anderson was advised of his rights.  They also

16   clearly testified that there was no discussion at

17   that time or at any time at 11th and State

18   regarding the incident which we are interested in

19   this case that being, I'm going to refer to it as

20   the Trak Auto Case.  Because that was apparently

21   where the alleged incident occurred.

22              At approximately, and I want to say it is

23   10 or 11:00 o'clock in the evening the Detective Mc

24   Dermott first has contact with Mr. Anderson and he

                    201

                   -219-

64                              C317

1    is then taken to 111th Street to Area 2.   They

2    arrive at Area 2 somewhere around 11:00 o'clock or

3    12 a.m  And Detective Gallagher was also with

4    Detective Mc Dermott.

5              Both of them testified that Mr. Anderson

6    was admonished and advised of his rights and at

7    approximately, I want to say somewhere around 2:00

8    o'clock in the morning he makes some statement

9    regarding the Trak Auto Case or the case we're

10   considering in this matter.

11             The officers, all of the officers who

12   testified, and I have not mentioned some other

13   officers who also came in contact with the

14   defendant, those being Paladino, Maslanka.  At the

15   very least, those officers.  They came in contact

16   with him much later in the day.  I want to say it

17   was 1 or 2:00 o'clock in the afternoon.  None of

18   them, number of the officers indicate that -- they

19   all deny, let's put that way, that Mr. Anderson was

20   at any time threatened, struck, beaten, hit or in

21   any way mistreated.

22             They also advised or indicated that he was

23   allowed to use the facilities and I believe he was

24   fed at least once that I can recall they testified

65

202

-220-

1    to.

2              Mr. Anderson has testified that he was

3    never advised of any rights and that he was struck

4    at various times.  Strike that.  He was threatened

5    by Officer Mc Dermott and he was struck by Officer

6    Maslanka, assuming arguendo and we do not choose to

7    accept the fact that he was struck by Officer

8    Maslanka that would be after the fact, after the

9    statement that we're concerned with in this case.

10             We must base our decision on the totality

11   of the evidence viewing all of it together and

12   viewing all of that evidence, we find number one,

13   that Mr. Anderson was advised of his rights

14   numerous times, at least two or three occasions.

15             We further find that he was not in anyway

16   threatened or abused at any time during the period

17   which is relevant to this motion at the very least

18   and respectfully, although it is not really

19   critical to the issues in this case we find that

20   the evidence we choose to accept the evidence, the

21   testimony of the police officers indicating that he

22   was at no time abused or physically threatened in

23   any way.

24             We find that his statement given at

1    approximately 2:00 o'clock I believe in the morning

2    on April 19th, 1990; was given freely and

3    voluntarily without coercion or threat or

4    compulsion of any kind.

5             The motion to suppress the statement will

6    be denied. And we are going to commence and

7    continue the motion to suppress the identification

8    to May 7th, am I correct?

9       MR. OWEN: Yes, Judge.

10      THE COURT: The next trial date. So we will do

11   that just prior to trial.

12            That will be the order.

13      MR. HEENAN: Thank you, Judge.

14            Judge, I would be asking all, Miss

15   Lenore --

16      THE COURT: Oh, absolutely. We have discussed

17   that. That was discussed off the record. There

18   are certain witnesses that the defense chooses to

19   call in their motion to suppress the identification

20   and the State will make those witnesses available

21   that morning.

22      MR. HEENAN: That's fine, Judge.

23            Thank you, Judge.

24      THE COURT: Motion to suppress statements is

1    denied.

2              By-agreement 5-7-'91, for trial.

3

4                        (Cause continued to

5                        Tuesday, May 7th, 1991)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

APPENDIX "B"

(FIRST JUDICIAL DISTRICT—APPELLATE COURT OPINION/ORDER)
Filed: DECEMBER 22, 2006

**NOTICE**
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

## corrected copy

SIXTH DIVISION
December 22, 2006

No. 1-05-1379

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 90 CR 11984 (02). |
| v. | ) | |
| | ) | |
| TONY ANDERSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

### ORDER

Defendant, Tony Anderson, appeals from the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 *et seq* (West 2002). He contends that the circuit court erred in summarily dismissing his petition where he set forth the gist of meritorious claims that (1) his due process rights were violated when he was coerced into giving a confession to offenses he did not commit by detectives at Area 2 violent crimes; (2) his trial counsel was ineffective when he failed to investigate defendant's claims of police torture;

No. 1-05-1379

(3) he was denied his constitutional right to counsel because he was questioned and tortured by police, even after he requested to remain silent until an attorney was provided to him and present; and (4) the State violated his due process right to a fair trial by failing to disclose exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

## BACKGROUND

Defendant was indicted on over 100 charges in thirteen different cases in Cook County, stemming from offenses he committed in March and April 1990. Case no. 90 CR 11984 was tried to a judge; case no. 90 CR 11985 was tried to a jury; and defendant pleaded guilty to charges in eleven remaining cases. Case nos. 90 CR 11984 and -85 arose from two separate robberies of Trak Auto stores both committed on April 15, 1990, the first at 116th Street and Halsted, the second at 73rd Street and Stony Island. In case no. 90 CR 11984, the subject of this appeal, defendant was convicted of attempted murder of Scott Volk (the manager of the Halsted Trak Auto Store), armed violence, and armed robbery, and sentenced to three concurrent 25 years' of imprisonment.

*Motion to Suppress Confession*

Prior to defendant's bench trial in this case, William Heenan, defendant's original trial counsel, moved to suppress defendant's statement and identification testimony. At a pre-trial hearing on that motion, the State called its own witnesses first. Detective Sellers testified that on April 18, 1990, together with his partner Patrick Brosnan, he arrested defendant for possession of a stolen automobile. Detective Sellers further testified that later that afternoon, around 6 p.m. he and his partner spoke with defendant at the Auto Theft Section of the Chicago Police Department

-2-

No. 1-05-1379

located at 1121 South State Street, in Chicago. Detective Sellers testified that prior to speaking

with defendant, he advised defendant of his <u>Miranda</u> rights from an F.O.P. book and that

defendant indicated that he understood each right. According to Detective Sellers, defendant did

not request an attorney and did not indicate that he wished to remain silent.

     Detective Sellers further testified that he then questioned defendant about the

circumstances of his arrest, but did not question him about the armed robbery or shooting at the

Halsted Street Trak Auto Store. According to Detective Sellers, during the interview, defendant

was seated and handcuffed to the wall together with another suspect, Robert Allen. Detective

Sellers denied having used a police stick to strike defendant in the ribs and thighs, or having

placed a gun in defendant's hand and putting it to the side of his head. He also stated that neither

he nor his partner used physical or psychological coercion to force defendant to speak.

     On cross-examination, Detective Sellers stated that the interview lasted for

approximately one hour and fifteen minutes. He also stated that upon request defendant was

given water, and was allowed to use the restroom.

     Detective Brosnan next testified that he was present at defendant's arrest early in the

afternoon of April 18, 1990, but stated that he did not advise defendant of his constitutional

rights at that point. Detective Brosnan stated that he next saw and then proceeded to question

defendant in an interview room of the Auto Theft Section of the Chicago Police Department at

1121 South State Street, in Chicago. Detective Brosnan acknowledged that before that

interview, he observed Detective Sellers read defendant his <u>Miranda</u> rights form an F.O.P. book,

and that defendant indicated that he understood those rights. Detective Brosnan also testified

-3-

_227_

No. 1-05-1379

that defendant did not request an attorney. Detective Brosnan denied having struck defendant

with a billy club, using a gun, or making any verbal threats against defendant. He further denied

having seen any other officers participate in any such coercion.

On cross-examination, Detective Brosnan conceded that when defendant was read his

individual rights from the F.O.P book, on many occasions, he merely nodded to show that he

understood. Detective Brosnan also testified that after responding to questions about the stolen

vehicle he had been driving when arrested, defendant indicated that he wished to remain silent.

Detective Brosnan indicated that he could not state with certainty when this occurred, but

believed it was while defendant was being read some of his constitutional rights, about twenty to

twenty-five minutes after Detective Brosnan arrived at the station to interview him. Detective

Brosnan also stated that he did not recall if defendant asked for a telephone call but upon further

questioning conceded that "he may have" done so.

Detective Brosnan next described the interview room as being about fourteen by nineteen

feet, and explained that during questioning, Allen and defendant were handcuffed to the wall in

the same handcuff ring. Detective Brosnan acknowledged that defendant was in the room for

about two to three hours, and that he was not given food. According to Detective Brosnan,

defendant was periodically un-handcuffed so that he could drink water from a water fountain

located next to the wall ring.

Detective Michael McDermott testified that about 9:00 p.m., on April 18, 1990, together

with Detective Gallagher, he picked up defendant from the Auto Theft Section at 1121 South

State Street and brought him to an interview room at Area 2 Violent Crimes located at 111th

-4-

No. 1-05-1379

Street in Chicago. Detective McDermott testified that officers at the State Street police station,
did not tell him that defendant had invoked his right to remain silent. Rather, they told him that
defendant was "eager to talk."

Detective McDermott stated that once at Area 2, at about midnight, he advised defendant
of his Miranda rights from an F.O.P. book, and defendant indicated that he understood.
Detective McDermott then proceeded to interview defendant in increments totaling about four to
five hours. The detective acknowledged that defendant was in the interview room the entire
night, and that the last conversation he had with him was on August 19, 1990, at 4 p.m. The
detective described the interview room as being "eight by ten foot, [with] beige walls *** [a]
bench, a table, chairs," and a "three by-three foot plaque on the wall with ... Miranda warnings in
English and in Spanish." According to Detective McDermott, during the interview, defendant
was not handcuffed, was given snacks, and water, and was allowed to use the washroom.
Detective McDermott also testified that Detective Gallagher from Area 2, and Detectives
Maslanka and Paladino from Area 3, participated in parts of the interview. Detective McDermott
finally stated that even though he was armed with a .38 revolver that night, he never threatened
defendant with the gun or used a police stick to jab him.

Detective John Gallagher next testified that around midnight on April 18, 1990, together
with Detective McDermott, he picked up defendant from the Auto Theft police station at 1121
South State Street and brought him to an interview room at Area 2 headquarters. Detective
Gallagher testified that he witnessed Detective McDermott advise defendant of his Miranda
rights from his F.O.P. book, and that defendant indicated that he understood those rights.

-5-

No. 1-05-1379

According to Detective Gallagher, defendant made a statement implicating himself in the Halsted

Trak Auto Store robbery and shooting around 2:00 a.m. on August 19, 1990. Detective

Gallagher also stated that during this interview no one struck defendant, poked him with a billy

club, put a gun to his head or threatened him in any way.

Detective Maslanka testified that on April 19, 1990, he was assigned to Area 3 Violent

Crimes and proceeded to Area 2 Violent Crimes headquarters in order to conduct lineups and

several investigations pertaining to a homicide relevant to Area 3. Detective Maslanka testified

that around 4:10 p.m., he met defendant in an interview room at Area 2 Violent Crimes with his

partner John Paladino. He advised defendant of his Miranda rights from an F.O.P. handbook,

and defendant indicated that he understood. According to Detective Maslanka, defendant did not

request an attorney, and did not ask to make a telephone call. Detective Maslanka also stated

that no one advised him that defendant had previously indicated that he did not wish to speak.

The detective then proceeded to question defendant, but averred that neither he, nor his partner

asked defendant about the Halsted Trak Auto Store robbery.

Detective Maslanka denied placing a gun to defendant's head, striking him with a police

stick, coercing him physically or psychologically, or seeing any other officer threaten defendant

in any manner. Detective Maslanka also stated that although he was armed with a Smith and

Wesson .9 millimeter gun and his partner had a revolver, during the interview, neither of them

removed the weapons from their holsters.

Detective Paladino testified that on August 19, 1990, he was assigned to Area 3 Violent

Crimes when he received a telephone call from Area 2 indicating that one of the subjects in

No. 1-05-1379

custody had "some knowledge of a homicide that occurred at Area 3." Detective Paladino stated

that he proceed to Area 2 with his partner Detective Maslanka. He averred that after Detective

Maslanka read defendant his Miranda rights, defendant indicated he understood them, did not

request an attorney and did not indicated he wished to remain silent. The officers then proceeded

to interview defendant but did not question him about the Halsted Trak Auto Store robbery.

According to Detective Paladino, during this interview, no one put a gun to defendant's head,

and no one struck him with a billy club.

    After the State presented its witnesses, defendant took the stand on his own behalf.

Defendant averred that while he was at the Auto Theft division, he was not threatened or hit by

any police officers, but testified that once at Area 2 headquarters at 111th Street, he was coerced

into making incriminatory statements relating to numerous crimes. Defendant stated that at Area

2, he was placed in a room that was about ten by seven feet, with no windows, and that he was

questioned by numerous police officers throughout the night. Defendant testified that after

Detective Gallagher left the room, Detective McDermott placed a gun to his head and threatened

that he would "blow [his] damn brains out" if he did not confess. Defendant also averred that

Detective Maslanka jabbed him in the chest, rib, and back with his night stick. Although he

could not say exactly how many times he was jabbed, defendant estimated it was "over 12

times," because he was crying in pain. Defendant acknowledged that he was given a physical

examination prior to his admission to the county jail, but that no bruises were present at that

time.

    Defendant further alleged that he was not permitted to use the bathroom at either the

-7-

— 231 —

No. 1-05-1379

State Street or 111ᵗʰ Street police stations, and that the first time he used a bathroom was when he

was transferred to the county jail. Defendant also stated that during the interview, he made seven

requests for permission to make a telephone call, but was denied each time. Defendant also

testified that no one ever advised him of his Miranda rights, and that there was no plaque on the

wall of the interview room indicating them.

At the close of the hearing, the court denied defendant's motion to suppress his

incriminating statements, finding that they were given "freely and voluntarily without coercion or

threat or compulsion of any kind." In doing so, the court found that based on the totality of

evidence, defendant "was advised of his rights numerous times," and was "not in anyway

threatened or abused." The court also noted that "the evidence we choose to accept *** [is] the

testimony of the police officers indicating that he was at no time abused or physically

threatened."

*Bench Trial*

On May 9, 1991, defendant proceeded with a bench trial for attempted murder, armed

violence and armed robbery stemming from the events that occurred at the Halsted Trak Auto

Store, on April 15, 1990. The evidence introduced at trial established that on that day, Scott

Volk was working as the manager at the Halsted Trak Auto Store, located at 116ᵗʰ Street and

Halsted in Chicago, together with Ricky Norwood and Ethel LeFlore.

Volk testified that at approximately 2:45 p.m., two men came into the store and asked

him for help with spark plugs. Volk pointed the two men to the parts counter, and asked what

kind of car they drove. At that point, the taller of the two men stepped behind Volk, and put a

-8-

No. 1-05-1379

gun to the back of his neck, and the shorter one announced that "this was a robbery." In court, Volk identified defendant as the shorter of the two men and Robert Allen as the taller one.

Volk further testified that after defendant announced the robbery, he pulled Volk to the front of the store while hitting him in the face and demanding that Volk "give [him] all the money." After Volk resisted, Allen shot him in the neck. Volk staggered and called to LeFlore to get help. According to Volk, defendant then took the store keys from Volk's belt and used the keys to unlock the change draw at LeFlore's register, totaling approximately $500. Volk further testified that shortly after the robbery he viewed six photographs and then a line-up and both times identified defendant as the shorter of the two men who robbed the store.

LeFlore next testified that at about 2:45 p.m. on April 15, 1990, she was working behind the front cash register at the Halsted Trak Auto Store, when she observed two men enter the store and ask Volk where the sparkplugs were located. According to LeFlore, soon thereafter, she heard "some scuffling," a shot going off, and Volk screaming at her to call the police. LeFlore then saw defendant and Allen approaching her with a gun. Defendant screamed at her to "give [Allen] the f–ing money." When LeFlore explained that she could not open the register because she did not have the keys, defendant went to Volk and returned with the keys. Defendant then took the money from the cash register, and the office. Both men warned LeFlore not to call the police, and then ran out of the store. LeFlore further testified that shortly after the incident she went to Area 2 and picked out defendant and Allen from a line-up. LeFlore also made an in-court identification of defendant.

Ricky Norwood next testified that about 2:45 p.m. on April 15, 1990, he was working as

-9-

No. 1-05-1379

a parts clerk at the Halsted Trak Auto Store, when defendant and Allen approached his counter. According to Norwood, he did not have an opportunity to wait on the two men, because they left while he was waiting on another customer. Shortly thereafter, Norwood heard a bang "like a gunshot," "a lot of screaming" and LeFlore saying "I can't do it Scott, give them the keys." Norwood walked to the front store, where he saw Allen standing behind LeFlore holding a gun, and defendant next to Volk, walking towards the register. Norwood ran back to the parts counter and called the police. Four days later, he picked defendant out of a line-up.

Detective Sellers next testified regarding the circumstances of defendant's arrest. He stated that about 5:00 p.m. on April 18, 1990, he was working with his partner, Detective Brosnan, when he noticed a late model Oldsmobile turn onto Aberdeen Avenue at a high rate of speed and stop at Aberdeen and 51st Street in front of a liquor store. Detective Sellers testified that after he obtained the vehicle's license plate number he discovered that the vehicle had been reported stolen. Detective Sellers then observed three men exiting the liquor store and entering the parked vehicle. The officers exited their squad car and identified themselves to the occupants of the Oldsmobile. Detective Sellers identified defendant as the driver of the vehicle, removed him from the vehicle and subsequently arrested him. Detective Sellers also observed Detective Brosnan remove a jacket from the vehicle and discover a loaded small caliber handgun in that jacket.

At trial, Detective McDermott testified to the substance of defendant's incriminating statements made with regard to these offenses. He testified that around 2:00 a.m. on April 19, 1990, he had a conversation with petitioner at Area 2 Violent Crimes. Detective McDermott

-10-

No. 1-05-1379

stated that around midnight, in Detective Gallagher's presence, he read defendant his Miranda

rights from the F.O.P. book and defendant indicated that he understood. According to Detective

McDermott defendant waived those rights and indicated that he wanted to speak with the

detective. Detective McDermott informed defendant that he had been identified in a line-up and

that the gun recovered from the car at the time of his arrest was going to be compared with the

bullet casings recovered from the scene at the Halsted Trak Auto Store. According to the officer,

at that time, defendant gave a statement. Defendant told Detective McDermott that Allen and he

drove to the Trak Auto Store in a beige 1985 Cutalss and that they were armed with the gun that

was later recovered by the police. He stated that once in the store, he and Allen approached the

white manager. Defendant then announced that "this was a robbery." Defendant further told

Detective McDermott that there was a scuffle between Allen and the manger, after which Allen

placed a gun to the back of the manager's head and fired once. After the manager was on the

ground, defendant and Allen took the keys to the cash register, took the money and fled the

scene. Defendant concluded that "it wasn't necessary for Allen to shoot the guy."

The ballistics evidence presented at trial further established that the bullet fired at Volk

was fired from the gun recovered at the time of the arrest "to the exclusion of all other firearms."

At trial, defendant presented an alibi defense. Defendant's wife, Ferniece Burkley,

testified that on April 15, 1990, defendant was at home and did not leave the apartment until at

least 5:00 p.m. Defendant's sister-in-law, Marlan Burkley, testified that on April 15, 1990, she

and her children went to defendant's apartment at 2:00 p.m., and that defendant, his wife and

three children were at home. Marlan Burkley stated that when she arrived at the apartment,

-11-

No. 1-05-1379

defendant was sleeping, and that around 3:00 p.m., she went into his bedroom to wake him up and borrow $20. Burkley testified that she, Ferniece and the six children remained at the apartment until 5:00 p.m., when they went to Red Lobster for Easter dinner.

At the close of the evidence, the court found defendant guilty of attempted first degree murder, armed robbery and armed violence and sentenced him to concurrent terms of 25 years' imprisonment. Defendant appealed his conviction and sentence contending (1) that the State did not prove beyond a reasonable doubt that he had the requisite mental state for attempted first degree murder, and (2) that his conviction for armed violence was improperly based on the same act as his conviction for armed robbery. We affirmed defendant's convictions for attempted murder and armed robbery, but vacated the armed violence conviction based on the one act, one crime rule. See People v. Anderson, No. 1-91-1867 (1994)(unpublished order pursuant to Supreme Court Rule 23).

On June 9, 2000, ten years after his bench trial, defendant filed a *pro se* post-conviction petition challenging his conviction. This petition is not attached as part of the record on appeal. Defendant's petition was summarily dismissed and he appealed. The public defender representing defendant on appeal filed a motion to withdraw as counsel pursuant to Pennsylvania v. Finley, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). We granted counsel's motion and affirmed the judgment of the circuit court. See People v. Anderson, No. 1-00-3453 (Feb. 16, 2002)(unpublished order pursuant to Supreme Court Rule 23).

On February 9, 2005, defendant filed what he named "Petition for Leave to File a Successive Petition for Post-Conviction Relief." In this petition, defendant claimed that he made

-12-

No. 1-05-1379

his incriminating statement at Area 2 Violent Crimes as a result of torture inflicted by Detectives McDermott and Maslanka. Defendant specifically asserted that Detective McDermott put a gun to his head and threatened to "blow his brains out," and that Detective Maslanka later jabbed him in the back and chest with his nightstick.

Defendant also asserted that his trial counsel was ineffective for failing to undertake any investigation into these allegations. Defendant further contended that at the time of his trial, the prosecution was aware of evidence supporting defendant's claims of police coercion and torture and failed to disclose this material to him in violation of Brady. In addition, defendant contended that although following his arrest, he asserted his right to remain silent and requested that counsel be appointed and present before the interview continued, he was not provided with such assistance.

In support of these allegations, defendant attached his own affidavit, and a copy of a party's response to a motion to bar the depositions of Mayor Richard M. Daley, and other officials in the separate and unrelated district court case of Aaron Patterson v. John Burge et al., (03-C-4433).

On February 16, 2005, the circuit court summarily dismissed defendant's petition. On March 15, 2005, defendant filed a motion to reconsider and on March 24, 2005, the court denied this motion. Defendant now appeals.

## ANALYSIS

### I. Motion For Leave to Cite Additional Authority

We first address the State's motion for leave to cite additional authority, pursuant to

-13-

No. 1-05-1379

Supreme Court Rule 361(c) (Official Reports Advance Sheet No. 22 (October 26, 2005), R. 361,

eff. January 1, 2006), which was ordered taken with the case. In that motion, the State seeks to

cite the Report of the Special State's Attorney as additional authority. We already granted

defendant's motion to cite to the Report of the Special State's Attorney on August 17, 2006.

That report examined, *inter alia*, the case of Alfonzo Pinex, and concluded that there existed

sufficient evidence to both indict and find Detecitves Maslanka and McDermott guilty beyond a

reasonable doubt for aggravated battery, perjury, and obstruction of justice in the interrogation of

Pinex at Area 2 on June 28, 1985. The State, now, alleges that it was not served with a copy of

defendant's motion to cite additional authority and became aware that defendant sought such

leave only upon receipt of this court's order granting defendant's motion. The State, however,

does not now attempt to raise an objection to that motion, but "for the sake of completeness"

seeks leave to cite a portion of the appendix to the Report of the Special State's Attorney, which

contains a three-page memorandum pertaining to the Special State's Attorney's investigation of

defendant's case.[1] In that report, the Assistant Special State's Attorney recommends that "the

---

[1] Attached to the Report of the Special State's Attorney on a digital compact disc are "all

of the reports for the cases [they] have investigated," with the exception of the Hobley, Patterson,

Howard and Orange cases. One of these is a three-page report pertaining to defendant in this

case.

-14-

No. 1-05-1379

matter of Tony Anderson" be closed because

> "[he] is an active litigator whose allegations cannot be supported due to a lack of
>
> physical and medical corroboration, lack of consistent and documented prior
>
> similar allegations to third parties, lack of consistency in numerous previous
>
> pleadings made by Anderson since the events in question, and finally, by lack of
>
> cooperation in the investigation herein [on] the advice of counsel that such may
>
> compromise his pending appeals."

As we have already granted defendant leave to cite the Report of the Special State's
Attorney, we find that for the sake of completeness we likewise allow the State to cite the
appendix in order to put the entire Report in proper context. See Connelly v. General Motors
Corp., 184 Ill. App. 3d 378, 387-88 (1989) (under the evidence "rule of completeness" if one
party introduces part of a writing, the opposing party may introduce the remainder, or so much
thereof, as is required to place that part originally offered in proper context so that a correct and
true meaning is conveyed"); Lawson v. G.D. Searle & Co., 64 Ill. 2d 543, 556 (1976) (holding
that under the "rule of completeness" the defense could introduce the entire committee report
into evidence, including portions detrimental to plaintiff, in order to put the committee report in
its proper context, because the plaintiff had repeatedly referred only to portions of that report
which were beneficial to her case). For these reasons, we grant the State's motion, and consider
the appendix in coming to our decision in this case.

## II. Violation of Due Process Because of Coerced Confession

Defendant first contends that the court erred in summarily dismissing his post-conviction

-15-

~239~

No. 1-05-1379

petition because "all [his] allegations taken as true" stated the gist of a meritorious claim that his

rights to due process were violated when the police used coercion to extract a confession from

him, which later served as a basis for his convictions for attempted murder, armed violence and

armed robbery. The State initially responds that defendant's claim is barred by the doctrines of

waiver and *res judicata*. We agree.

The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2004)) provides a

means by which a defendant may challenge his conviction for "substantial violations of federal

or state constitutional rights." People v. Tenner, 175 Ill. 2d 372, 377 (1997). At the first stage of

post-conviction proceedings, the circuit court must determine whether the petition is "frivolous

and patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2004); People v. Boclair, 202 Ill.

2d 89, 99 (2002). In order to avoid dismissal at this stage, defendant need only present the gist of

a meritorious constitutional claim. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). Defendant

need only present a limited amount of detail and all well-pleaded allegations in his petition must

be taken as true and liberally construed. People v. Edwards, 197 Ill. 2d 239, 244 (2001). We

review the circuit court's summary dismissal *de novo*. People v. Coleman, 183 Ill. 2d 366, 387-

88 (1998).

However, this is defendant's second post-conviction petition. Because an action seeking

post-conviction relief is a collateral proceeding, not an appeal from the underlying judgment, the

Act contemplates the filing of only one post-conviction petition. People v. Evans, 186 Ill. 2d 83,

89 (1999). Consequently, all issues actually decided on direct appeal are barred by the doctrine

of *res judicata*, and all issues that could have been raised in the original proceeding, or original

-16-

No. 1-05-1379

post-conviction petition, but were not, are waived. People v. Blair, 215 Ill. 2d 427, 442 (2005). Where *res judicata* and waiver preclude defendant from obtaining relief, such a claim will necessarily be frivolous and patently without merit. Blair, 215 Ill. 2d at 445.

In the present case, we find that defendant has forfeited his claim of coercion because this claim could have been raised either on direct appeal or in defendant's original post-conviction petition filed in 2000. Defendant's affidavit attached as part of his successive post-conviction petition states that Detectives McDermott and Maslanka coerced him into signing a confession. In that affidavit, defendant specifically avers that after he was arrested, he was never read his rights, that he requested an attorney, but was not provided one, and that instead the two police officers "beat and threatened [him] with a gun into making the coerced confession." We note that defendant made the exact same allegations in his testimony at a pre-trial hearing on his motion to suppress his statements in 1991, and the trial court found that his confession was not coerced. Defendant was thus aware of the coercion at the time that it allegedly took place in 1990, and at the time of his trial in 1991. However, after the denial of his motion to suppress, defendant chose to abandon these allegations, and did not address them on direct appeal, or in his original post-conviction petition, but instead, waited fourteen years, until February 2005, to raise them in a successive post-conviction petition. As we find that defendant could have brought this claim on direct appeal, his failure to raise this issue earlier results in the forfeiture of this claim. See Blair, 215 Ill. 2d at 445; 725 ILCS 5/122-3.[2]

---

[2]We note that even though in his successive petition, defendant alleges that "the issues raised in this successive post-conviction petition [have] not been previously raised or argued in

No. 1-05-1379

Defendant nevertheless argues that his petition is not procedurally barred because the sources relied on by him now constitute "newly discovered evidence," which corroborate his claim that his confession was coerced and involuntary. In support of his contention defendant relies on (1) a body of federal and state cases indicating a pattern of practice of torture at Area 2 and Area 3; (2) the report of the Chicago Police Department's Office of Professional Standards (OPS); (3) the Report of the Special State's Attorney's investigation into allegations of torture ordered by the Circuit Court of Cook County on April 24, 2002; (4) his own affidavit and (5) a copy of a party's response to a motion to bar the depositions of Mayor Richard M. Daley, and other officials in the case of Aaron Patterson v. John Burge et al., (03-C-4433).

For the reasons that follow, we find defendant's contention without merit. The doctrines of *res judicata* and waiver may be relaxed where "fundamental fairness so requires." People v. Morgan, 212 Ill. 2d 148, 153-54 (2004). In order to show that "fundamental fairness" requires that defendant be allowed to file a successive post-conviction petition, defendant must

_____

any proceedings below," defendant fails to provide us with a copy of his original post-conviction petition. We are thus unable to scrutinize that petition to determine if his claim is barred by the doctrine of *res judicata*. Because it is defendant's burden to preserve and present a sufficient record on appeal (People v. Stewart, 365 Ill. App. 3d 744, 747 (2006), citing People v. Smith, 106 Ill. 2d 327, 336 (1985)), where defendant fails to provide a record on appeal sufficient for reviewing the issues raised, we may presume that the trial court's decision was in conformity with the law and had a sufficient factual basis (See People v. Probst, 344 Ill. App. 3d 378, 385 (2003)).

-18-

No. 1-05-1379

demonstrate both cause and prejudice with respect to each claim. Morgan, 212 Ill. 2d at 153,

citing People v. Pitsonbarger, 205 Ill. 2d 444, 460 (2002). To establish cause, defendant must

identify an objective factor that impeded his ability to raise a specific claim during his initial

post-conviction proceedings. Morgan, 212 Ill. 2d at 153-54. To establish prejudice, defendant

must demonstrate that the error not raised in his initial post-conviction proceedings so infected

the trial that the resulting conviction violated due process. Morgan, 212 Ill. 2d at 154.

 We initially note that defendant does not attempt to demonstrate cause and prejudice with

regard to this particular claim. Instead, he relies upon People v. Cannon, 293 Ill. App. 3d 634,

640 (1997) for the proposition that "new evidence" and "special circumstances" warrant the

relaxation of the procedural bars of waiver and res judicata. We find defendant's reliance on

Cannon misplaced. In that case, a criminal defendant was allowed to relitigate the issue of a

coerced confession after 16 other arrestees filed complaints in the OPS alleging torture by police

detectives, and we set forth two exceptions to the general rule that bars relitigation of a decided

motion to suppress evidence: new evidence that would have been pertinent to the trial court's

rulings, and "special circumstances" that would warrant relitigation of the motion. Cannon, 293

Ill. App. 3d at 640. However, defendant here specifically states that "he does not request

relitigation of his initial motion to suppress as did the defendant in Cannon," but merely asks us

to apply the standard in Cannon to allow his successive post-conviction petition to proceed to the

second stage of review. We first note that in Pitsonbarger, our supreme court made it clear that

the sole "analytical tool" that is to be used to determine whether fundamental fairness requires an

exception to the statutory procedural bar of waiver to a successive post-conviction petition is the

No. 1-05-1379

cause-and-prejudice test. Pitsonbarger, 205 Ill. 2d at 459. We further note that while these two

tests may at least in part overlap, the Cannon test is reserved for relitigating motions to suppress,

which were denied during the pendency of an actual trial. However, because in the case at bar,

we are dealing with a successive post-conviction petition, the appropriate test is the cause-and-

prejudice test, and we will proceed with our analysis using that test, even though defendant does

not identify it as such.

    We next note that defendant has failed to satisfy the "cause" prong of the test because he

has failed to point to an objective factor that impeded him from raising a claim of coercion in an

earlier proceeding. Evidence of systematic torture was already widely available in 2000 when

defendant filed his original post-conviction petition. Most of the cases that defendant cites to

were decided between 1987 and 2000. See e.g. People v. Wilson, 116 Ill. 2d 29 (1987); People

v. Banks, 192 Ill. App. 3d 986 (1989); Wilson v. City of Chicago, 6 F. 3d 1233 (7th Cir. 1993);

U.S. ex rel. Maxwell v. Gilmore, 37 F. Supp. 2d 1078 (N. D. Ill. 1999). Similarly, the OPS

report[3] was completed on September 28, 1990, ten years before defendant filed his first post-

---

    [3]"The OPS investigation began in 1989, following internal investigation of police

misconduct at Area 2. The first section of the OPS report is known as th Goldston report. It

documents the allegations of 50 different suspects concerning misconduct by Area 2 personnel

from 1973 to 1986. The allegations included 27 incidents of beatings, 13 incidents where a

plastic bag or typewriter cover was placed over a suspect's head, 11 incidents where a firearm

was used to threaten or strike a suspect, 9 incidents of electroshock and 2 hanging incidents. The

report concluded that Area 2 police, headed by commanding officer Jon Burge, engaged in

No. 1-05-1379

conviction petition (See People v. Orange, 195 Ill. 2d 437, 445 (2001)), and defendant himself

concedes that it would have been "discoverable prior to filing of his previous petition."

Considering that the OPS report was available before the commencement of defendant's trial in

1991, and was in existence for ten years, at the time defendant filed his original post-conviction

petition, defendant's bald assertion that he exercised "due diligence in presenting the [OPS]

report at the earliest possible time" provides no plausible "cause" for his failure to obtain it

earlier. See People v. Mahaffey, 194 Ill. 2d 154, 185 (2000) citing People v. Franklin, 167 Ill. 2d

1, 15 (1995). Similarly, as already noted, defendant's affidavit, attached to his successive post-

conviction petition, does not provide any new evidence, as the allegations of coercion are exactly

the same as those he raised in his motion to suppress his statements in 1991. Thus, defendant

has not shown cause for not raising this issue in an earlier proceeding. See Orange, 195 Ill. 2d at

445.

      We recognize, however, that the last two documents on which defendant relies as newly

"systematic abuse of suspects during the 13 year period, which included planned torture." See

Orange, 195 Ill. 2d at 445-46. The second section of the OPS report is the Sanders report, which

is an analysis of the Andrew Wilson case. That report found that Burge himself actively

participated in the "mistreatment" of Wilson, burned Wilson with a radiator, repeatedly shocked

him, and "engaged [him] in several unjustified physical altercations during which Wilson was

handcuffed and incapable of providing any resistance." See Patterson, 192 Ill. 2d 93, 141 (2000).

No. 1-05-1379

discovered evidence became available only after he filed his original post-conviction petition in 2000. "Plaintiff's Response to Defendants City of Chicago's and Richard Devine's Motion to Bar the Consolidated Depositions of Richard M. Daley, Defendant Richard Devine, Mara Georges, *et. al.*, and Plaintiff's Cross Motion to Compel Said Depositions" is a pleading dated September 24, 2004, and presumably filed by Aaron Patterson in his section 1983 (42 U.S.C. § 1983) case against former Area 2 commander Jon Burge (Patterson pleading). The Report of the Special State's Attorney was completed pursuant to a court order of the Chief Justice of the Circuit Court Criminal Division entered on April 24, 2002, two years after defendant filed his original post-conviction petition. As such, we find defendant objectively could not have obtained these documents before filing his successive post-conviction petition.

However, even if defendant could establish cause for failing to raise his claim earlier, he cannot establish that he suffered any prejudice in connection with his claim of coercion because these two pieces of allegedly "newly discovered evidence" do not satisfy the standard for granting a new trial. See Orange, 195 Ill. 2d at 450. For new evidence to warrant a new trial, the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier. Orange, 195 Ill. 2d at 450-51 citing to People v. Molstad, 101 Ill. 2d 128, 134 (1984).

In light of the overwhelming evidence of defendant's guilt, there is no probability that the Patterson pleading or the Report of the Special State's Attorney would change the result of

No. 1-05-1379

defendant's proceeding on retrial. The evidence presented at defendant's trial, established that

three eyewitnesses identified defendant as the perpetrator of the armed robbery and shooting at

the Halsted Trak Auto Store. All three witnesses also picked defendant out of a line-up shortly

after the robbery. The victim, Volk, further identified defendant's photograph out of an array of

six photographs. All three witnesses testified in great detail regarding the robbery and the

shooting, and ballistics evidence confirmed that the bullet fired at Volk was fired from the gun

recovered upon defendant's arrest in the stolen Oldsmobile. In light of this evidence, there is no

reasonable probability that, had defendant's confession been excluded from the evidence at trial,

as a result of generalized evidence of a systematic pattern of abuse at Area 2, that the result of the

proceeding would have been different.

Moreover, because we have previously recognized that documents prepared in

anticipation of litigation "generally lack the earmarks of trustworthiness and reliability" (People

v. Smith, 141 Ill. 2d 40, 73 (1990)), we find that the Patterson answer is unreliable. This

document is merely a pleading that details allegations of the City of Chicago withholding

documents pertaining to 14 electric shock cases discovered by the OPS report in 1984.

In addition, a review of the Patterson pleading reveals that it contains no information that

would support defendant's allegations that Detectives Maslanka and McDermott jabbed him with

a billy club and threatened him with a gun. Neither officer is mentioned in that pleading, and the

allegations there involve the use of electric shock which differ from the coercive tactics which

defendant claims were deployed by Detectives Maslanka and McDermott to coerce his

confession. Generalized claims of misconduct, without any link to defendant's case, i.e. some

-23-

No. 1-05-1379

evidence corroborating defendant's allegations, or some similarity between the type of

misconduct alleged by defendant and that presented by the evidence of other cases of abuse, are

insufficient to support a claim of coercion. See People v. Maxwell, 173 Ill. 2d 102, 120-21

(1996) (holding that without some evidence that defendant was injured, evidence of the treatment

of other suspects, through reports of physical abuse and coercion of confessions at Area 2, could

not, by itself, be the basis for a post-conviction evidentiary hearing); People v. Hinton, 302 Ill.

App. 3d 614, 622 (1998) (rejecting defendant's contention that he was entitled to an evidentiary

hearing on his post-conviction petition because he had new evidence which showed "systematic

torture" at Area 2, specifically an affidavit from an Illinois attorney, OPS reports, findings from

the Chicago police board, and his own affidavit asserting that he was beaten, pistol-whipped,

shocked and suffocated, because defendant did not present sufficient evidence of *his own* injury);

People v. Hobley I, 159 Ill. 2d 272, 311-12 (1994) (holding it was not error for trial court to bar

testimony of three witnesses who claimed they had also been abused by the same officer who

abused defendant because there was no evidence that the defendant had sustained injuries

consistent with his claim of police brutality); People v. Hobley II, 182 Ill. 2d 404, 448-49 (1998)

(denying post-conviction petitioner's request to proceed to an evidentiary hearing, holding that

"new evidence" consisting of the OPS report and transcripts of testimony from other alleged

victims of abuse did not alter the court's determination that defendant did not suffer injuries

consistent with his claims of abuse); People v. Murray, 254 Ill. App. 3d 538, 553 (1993) (holding

that defendant's allegations of abuse of other suspects were properly excluded because they were

"general in nature"); Mahaffey v. Schomig, 294 F. 3d 907, 917 (7th Cir. 2002) (noting that

No. 1-05-1379

defendant's failure to produce any corroborating eyewitness testimony, medical records or

supporting evidence dealing with the injuries he alleges he sustained while in custody,

significantly undermined his involuntary confession claim).[4]

We similarly find that defendant is mistaken in relying on the Report of the Special

State's Attorney for evidence of coercion in his case. Although that report, unlike the Patterson

pleading, implicates Detectives Maslanka and McDermott in coercing a confession from Alfonzo

Pinex, it specifically separates itself from any of defendant's charges. A three-page

memorandum attached to the Report specifically discusses the State's Attorneys investigation of

defendant's allegations of coercion, and recommends that defendant's matter be closed at the

office of the Special State's Attorney because:

> "Tony Anderson is an active litigator whose allegations cannot be supported due
> to a lack of physical and medical corroboration, lack of consistent and
> documented prior similar allegations to third parties, a lack of consistency in
> numerous previous pleadings made by Anderson since the events in question, and
> finally, by a lack of cooperation in the investigation herein on the advice of
> counsel that such may compromise his pending appeals."

We therefore conclude that defendant's claim that his statement was coerced, is nothing

---

[4]We further note that even if we were to hold that the factual allegations in the Patterson

pleading constitute evidence of systematic misconduct at Area 2, the evidence is, at best,

cumulative of previous evidence of Area 2 tactics and therefore not "new." See Orange, 195 Ill.

2d 450-51.

No. 1-05-1379

more than a generalized allegation that is unsubstantiated by the tenuous evidence he offers with his petition. Accordingly, defendant has failed to present material, "new evidence" that would relax the procedural bar of waiver and allow him to proceed with his successive post-conviction petition.

Defendant nevertheless contends that his case is similar to People v. Patterson, 192 Ill. 2d 93 (2000) and People v. King, 192 Ill. 2d 189 (2000), cases holding that defendants were entitled to evidentiary hearings based on allegations of newly discovered evidence of police abuse at Area 2. We find these cases inapposite. In Patterson, the court specifically addressed whether the OPS report was "newly discovered evidence" entitling defendant to an evidentiary hearing to evaluate the credibility of defendant's allegations of police abuse, and found that the report was material to defendant's claim of coercion because it could change the outcome of defendant's proceedings on retrial. Patterson, 192 Ill. 2d at 145. However, in Patterson, the evidence used to convict defendant consisted solely of the testimony of the arresting officer and the State's Attorney regarding the substance of defendant's confession. See Patterson, 192 Ill. 2d at 104–106. Unlike in that case, defendant here was convicted on far more inculpatory evidence, specifically the testimony of three eyewitnesses, who all identified him as one of the robbers.

Moreover, unlike here, the Patterson court found that defendant's allegations that Jon Burge threatened him with a revolver were "strikingly similar" to allegations of systematic torture found in the Goldston report, which indicated that "a firearm was [often] used to threaten or strike the victim" and that Burge was identified as participating in "51% of the cases." See Patterson, 192 Ill. 2d at 117, 141, 145 (the question of relevancy "is a determination to be made

-26-

No. 1-05-1379

by the trial court, after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations.") In the present case, Detectives Maslanka and McDermott are at best identified with one single instance of misconduct in the Report of the Special State's Attorney, with regard to Alfonzo Pinex. However, even if we were to find this information otherwise relevant, without looking at the disparity in the number of instances charged against these detectives as opposed to Burge, it would not be outcome determinative in light of the overwhelming evidence of defendant's guilt.

Similarly, in King, the court followed the rationale in Patterson, and allowed defendant to proceed to an evidentiary hearing, where defendant alleged that Burge was present during his interrogation, and cited to the OPS report and the decision by the Chicago police board dismissing Burge from his employment as a Chicago police officer as newly discovered evidence. See King, 192 Ill. 2d at 198-99. Unlike King, where the defendant's inculpatory statements "supplied the primary evidence of his guilt" (See People v. King, 109 Ill. 2d 514, 521 (1986) (defendant's direct appeal)), however, as noted above, in the case at bar, defendant's confession was not essential to his conviction.

In his last attempt to circumvent the requirement of similarity between his own allegations of abuse and those to which he cites as "newly discovered evidence," defendant alleges that "several other cases have emerged" which show Detective Maslanka's and McDermott's involvement in allegations of abuse at Area 2.[5] However, defendant never cited to

_____

[5]See People v. Coleman, 206 Ill. 2d 261, 272-73, 278 (2002) (listing several torture complaints lodged against Detective Maslanka); People v. Brown, 169 Ill. 2d 132, 145-46 (1996)

-27-

No. 1-05-1379

these cases in his successive-post-conviction petition, and cannot introduce them as new evidence, for the first time on appeal. See 725 ILCS 5/122-2 (West 2002) ("a post-conviction petition *shall have* attached thereto affidavits, records, or other evidence, *supporting its allegations*); People v. Collins, 202 Ill. 2d 59, 68-9 (2002) (holding that post-conviction petitioner cannot be excused from the *pleadings* requirements of section 122-2); People v. Jefferson, 345 Ill. App. 3d 60, 71 (2003) (holding that because at the first stage of post-conviction proceedings, "[t]he circuit court is required to make an independent assessment *** as to whether *the allegations in the petition*, liberally construed and taken as true, set forth a constitutional claim for relief (emphasis in original), issues that are raised for the first time on appeal are by definition not "allegations in the petition.")

### III.  Ineffective Assistance of Counsel for Failure to Investigate Police Torture

On appeal, defendant next contends that the trial court erred when it summarily dismissed

_____

(although defendant alleged that Detectives Masianka and Paladino were among the Area 3 detectives who ignored his request to speak to an attorney and "struck him repeatedly on the chest, hands and legs, until he agreed to make a statement," court held that there was ample support for the trial court's finding that defendant's will was not overborne when he made his inculpatory statements"); People v. Clemon, 259 Ill. App. 3d 5, 6 (1994)(defendant alleged Detective Maslanka was one of the officers who coerced a confession from him in September 1991, and court held that "although a ten and a half hour detention generally is not considered unreasonable in itself, when, as here, the detention is combined with periodic screaming through the night, it supports defendant's theory of a coercive environment.")

-28-

No. 1-05-1379

his petition because he stated the gist of a claim of ineffective assistance of counsel in violation

of his sixth and fourteenth amendment rights (U.S. Const., amends. VI, XIV). Claims of

ineffective assistance of counsel are analyzed under the two-prong test established in Strickland

v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984);

People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17 (2004), which requires defendant to show

that (1) his attorney's performance fell below an objective standard of reasonableness and (2) that

the deficient performance so prejudiced the defense as to deny the defendant a fair trial. Failure

to make the requisite showing of either deficient performance or sufficient prejudice defeats an

ineffectiveness claim. People v. Palmer, 162 Ill. 2d 465, 475-76 (1994). We review the decision

of the circuit court, de novo. Coleman, 183 Ill. 2d at 387-88.

Defendant specifically alleges that counsel Heenan failed to investigate his allegations of

police torture at Area 2, by making no inquiry into "public records or information readily

available to him through the subpoena process." Defendant further asserts that "had counsel

done so, he would have discovered evidence that officers involved in the instant case, Detectives

McDermott and Gallagher (with Maslanka and Paladino) had used the same methods of torture

and abuse on other suspects to obtain coerced confessions." In support of this contention,

defendant cites to numerous reports and cases of abuse, already discussed above in context of

defendant's claim of coercion. Moreover, defendant attaches his own affidavit in which he avers

that he asked counsel on "numerous times" before his suppression hearing, if he had talked with

any of the witnesses, or if he had interviewed Officers Gregory Sellers or Patrick Brosnan about

his allegations of abuse and threats by Detectives McDermott and Maslanka, and about his

-29-

No. 1-05-1379

request to remain silent until provided with an attorney, but that counsel never investigated.

The State initially argues that this claim is waived because it could have been raised on direct appeal or in defendant's original post-conviction petition. We agree. Generally, the issue of trial counsel's competence is waived where defendant's appellate counsel fails to raise the issue on direct appeal (People v. Orange, 168 Ill. 2d 138, 149 (1995), citing People v. Owens, 129 Ill. 2d 303, 308 (1989)), and in the present case, appellate counsel did not raise this claim.

Moreover, as noted above, a claim of ineffective assistance of counsel is forfeited, if defendant fails to demonstrate cause and prejudice or actual innocence for not raising it in his initial post-conviction petition. Morgan, 212 Ill. 2d at 153. In the present case, defendant has not made a showing of either cause or prejudice. Defendant merely asserts that the objective reason for his failure to raise this claim on direct appeal is the "newly discovered nature of the evidence that he cites, attaches and relies upon in his petition." As noted above, we have already found that this information was not "newly discovered evidence" at the time defendant filed his original post-conviction petition in 2000. Moreover, defendant's mere bald assertion that "had the evidence in his petition been presented at ... trial it would have created reasonable doubt, as to his guilt," is insufficient to establish prejudice. See Mahaffey, 194 Ill. 2d at 184.

However, even if we were to relax the rule of waiver, and consider the merits of defendant's claim, we would find that he cannot state the gist of a meritorious claim of ineffective assistance of counsel, because counsel's failure to investigate defendant's claim of police misconduct did not fail to meet reasonable professional standards. Because effective assistance refers to competent and not perfect representation (People v. Odle, 151 Ill. 2d 168, 173

No. 1-05-1379

(1992)), mistakes in judgment will not, of themselves, render the representation incompetent (Palmer, 162 Ill. 2d at 476). We accord a heavy measure of deference to counsel's decision regarding whether to investigate allegations of abuse (See People v. Deloney, 341 Ill. App. 3d 621, 636 (2003) citing Orange, 168 Ill. 2d at 149), and counsel only has a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary. Orange, 168 Ill. 2d at 149, citing People v. Harris, 129 Ill. 2d 123, 158 (1989). Where the circumstances known to counsel at the time of investigation do not reveal a sound basis for inquiry into a certain issue, it is not ineffective for counsel to forgo further inquiry. Hinton, 302 Ill. App. 3d at 619-23, 624 (holding that defendant had not established there was a sound basis for further inquiry where there was no evidence of injury other than defendant's testimony and his allegation that counsel failed to introduce his bloody shirt); Orange, 168 Ill. 2d at 150 (not ineffective to forgo inquiry where the only evidence supporting defendant's allegation of abuse was his testimony and a questionable entry on a paramedic's report).

In the present case, at the time of defense counsel's investigation and the filing of the motion to suppress defendant's statement, the only evidence to support defendant's allegation of coercion were generalized claims of torture at Area 2. Defendant himself admitted at the hearing on that motion that he was given a physical examination after his interrogation, and that this exam revealed no bruises or physical injuries corroborating his allegations of abuse. Moreover, there was no witness to the alleged brutality. Because, as noted above, generalized allegations of coercive activity in Area 2, without other corroborative evidence would not establish that this defendant was coerced into confessing, we find that it was not unreasonable for counsel to curtail

-31-

No. 1-05-1379

his investigation. See People v. Titone, 151 Ill. 2d 19, 30 (1992) (our supreme court affirmed the

circuit court's dismissal of defendant's post-conviction petition alleging bribery between defense

counsel and the trial judge because an investigation into the judge's conduct in unrelated cases

was not germane to defendant's claim); People v. Zambrano, 266 Ill. App. 3d 856, 864 (1994) (in

affirming the dismissal of defendant's post-conviction petition alleging ineffective assistance of

counsel, this court found that the fact that defendant's attorney was being investigated for

improprieties in non-related cases was insufficient to taint other cases counsel had worked on);

Hinton, 302 Ill. App. 3d at 625 (court held that it was not reasonably probable that a motion to

suppress defendant's statement would have been granted had trial counsel investigated further,

because there were no medical reports to bolster defendant's claim of abuse, nor any photographs

of injuries or supporting witness testimony). Obviously, the competency of counsel cannot be

measured in hindsight by matters which may have come to light after he was called upon to act,

but must be viewed under the circumstances present at the time his action, or for that matter,

inaction, took place.

Finally, we concluded earlier in this opinion that it is not likely, that, had additional

evidence of brutality allegations come to light and prevented the introduction of defendant's

confession at trial, the jury would have concluded that defendant was innocent. Accordingly, we

cannot find here that the outcome of defendant's trial would have been different, but for

counsel's failure to obtain the same information, under the second prong of Strickland, 466 U.S.

at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.[6]

---

[6]For this same reason, we reject defendant's contention that his appellate counsel was

-32-

No. 1-05-1379

## IV. Denial of Right to Counsel

Defendant next contends that the trial court erred when it dismissed his petition because

he presented a gist of a meritorious claim that he was denied his right to counsel under the Fifth

and Fourteenth Amendments. Specifically defendant's petition alleges that after he was read his

Miranda rights, at 11th and State Street, defendant asserted his right to remain silent and informed

police that he wished to speak with an attorney. The petition further alleges that after defendant

was transported to Area 2 headquarters, he again informed the officers that he wished to remain

silent and requested an attorney. Despite these requests, the questioning of defendant continued

---

ineffective for, among other things, failing to challenge the ineffectiveness of trial counsel and to

further investigate defendant's allegations of coercion in order to challenge the trial court's

introduction of defendant's confession. Claims of ineffective assistance of appellate counsel are

measured by the same standard as claims of ineffective assistance of trial counsel (See People v.

Boyd, 347 Ill. App. 3d 321 (2004)) and to succeed on such a claim, defendant must prove that

appellate counsel's behavior was both objectively unreasonable and so prejudiced defendant as to

deprive him of a fair trial (Strickland, 466 U.S. at 687, 80 L. Ed.2d 693, 104 S. Ct. at 2064).

Appellate counsel is under no obligation to raise "every conceivable argument" on appeal

(People v. Coleman, 168 Ill 2d 509, 523 (1995) citing, People v. Collins 153 Ill 2d 130, 140

(1992)), and if the underlying issues have no merit, defendant suffers no prejudice as a result of

appellate counsel's failure to raise them. People v. Oliver, 367 Ill. App. 3d 826 (2006). As we

have already concluded here that the underlying issues are without merit, it follows that appellate

counsel was not ineffective for failing to raise them on appeal.

No. 1-05-1379

and an attorney was never provided to him. As a result, defendant made a confession that was

later testified to by one of the police officers at his trial. In support of these assertions, defendant

only attaches his own affidavit.

The State asserts that defendant's claim is barred under section 122-3 of the Act because

defendant knew of this violation of his right to counsel at the time it allegedly occurred in 1990.

725 ILCS 5/122-3 (West 2002). Therefore, his affidavit is not new evidence and there is no

reason why he could not have raised this claim on direct appeal or in his 2000 post-conviction

petition.

As defendant makes no argument as to cause and prejudice, or newly discovered

evidence, for not raising this claim on direct appeal, for the reasons already discussed above, we

agree with the State.

## V. **Brady** violations

Defendant next contends that his petitions states the gist of a meritorious claim under

Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), because the State

violated his due process right to a fair trial by failing to disclose exculpatory evidence of

voluminous claims of Area 2 police torture "echoing" defendant's claims of coercion. Defendant

specifically alleges that the State withheld evidence that Detective McDermott and Maslanka

committed misconduct at Area 2, and that Assistant State's Attorney Kip Owen, who litigated

defendant's trial and suppression hearing, had knowledge of this evidence at the time of

defendant's trial. Defendant specifically alleges that Owen "was intimately acquainted with Area

2 for the relevant time period, worked in felony review when many claims of Area 2 torture were

-34-

No. 1-05-1379

filed and even participated in the questioning of the petitioner in the Patterson case." We disagree.

Illinois courts have long recognized that a criminal defendant's right to due process and a fair trial is violated by the prosecution's failure to disclose material evidence favorable to the defense and that such claims are cognizable in post-conviction proceedings. People v. Harris, 206 Ill. 2d 1, 44 (2002); People v. Hobley, 182 Ill. 2d at 429-32. To establish a Brady violation, defendant must show that the suppressed evidence was both material and favorable to his defense. Evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the prosecution disclosed the evidence. People v. Thomas, 364 Ill. App. 3d 91, 101 (2006). A reasonable probability of a differing result is one sufficient to undermine confidence in the actual outcome. Thomas, 364 Ill. App. 3d at 101. Accordingly, to succeed on a claimed Brady violation, a defendant must demonstrate that (1) the undisclosed evidence is favorable to him because it is either exculpatory or impeaching, (2) the evidence was either willfully or inadvertently withheld by the State, and (3) withholding the evidence resulted in prejudice to him. People v. Rapp, 343 Ill. App. 3d 414, 418 (2003).

We first note that defendant has waived this claim by failing to raise it in his original post-conviction petition. As detailed, above, the exhibits submitted in support of defendant's claim were discoverable prior to his filing his original post-conviction petition in 2000. Moreover, even assuming that the State did possess such evidence of misconduct at Area 2 at the time of defendant's trial, and that defendant could not have discovered it at the time he filed his original post-conviction petition, defendant cannot meet the Brady materiality test because, as

No. 1-05-1379

discussed above, there is no reasonable probability that, had such evidence of systematic torture at Area 2 been disclosed to the defense, the result of the proceeding would have been different.

## CONCLUSION

For the foregoing reasons, we find that defendant's post-conviction petition was properly dismissed for failing to state any meritorious claims. Accordingly, we affirm the order of the circuit court of Cook County.

AFFIRMED.

JOSEPH GORDON, J., with FITZGERALD SMITH, P.J., and McNULTY, J., concurring.

File Date: _July 14, 2008_

Case No: _08cv3979_

ATTACHMENT # _3_

EXHIBIT _Pages 261 - 302_

**TAB (DESCRIPTION)**

_____

## APPENDIX "C"

**(CONFLICTING OPINION OF PEOPLE V. REYES)**
Decided: December 11th, 2006

Westlaw.

--- N.E.2d ----                                                      Page 1

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

**H**
People v. ReyesIll.App. 1 Dist.,2006.Only the
Westlaw citation is currently available.
NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.
　　　Appellate Court of Illinois,First District, First
　　　　　　　　　　　Division.
　　　The **PEOPLE** of the State of Illinois,
　　　　　　　　Plaintiff-Appellee,
　　　　　　　　　　　　v.
　　　Arturo **REYES**, Defendant-Appellant.
　　　The **People** of the State of Illinois,
　　　　　　　　Plaintiff-Appellee,
　　　　　　　　　　　　v.
　　　Gabriel Solache, Defendant-Appellant.
　　　　　**Nos. 1-04-1047, 1-04-1150.**

　　　　　　　　Dec. 11, 2006.

**Background:** Defendants convicted on two counts
of first degree murder, two counts of aggravated
kidnapping and home invasion filed petitions for
postconviction relief. The Circuit Court of Cook
County, Stanley J. Sacks, J., summarily dismissed
each petition, and defendants appealed.

**Holdings:** After consolidating the appeals, the
Appellate Court, Robert E. Gordon, J., held that:

(1) pro se defendant did not waive his claim that
newly discovered evidence showed that detective
who obtained his confession engaged in a pattern of
using improper techniques to coerce statements;

(2) defendants stated a claim that newly discovered
evidence, showing that detective systematically
used improper techniques to coerce false
statements, existed to relax doctrine of res judicata
and warrant a new trial; and

(3) defendants were entitled to a substitution of the
trial judge, as judge had prejudged a central issue in
defendants' postconviction case.

Reversed and remanded with directions.

**[1] Criminal Law 110 &#8734;1451**

110 Criminal Law
　　　110XXX Post-Conviction Relief
　　　　　110XXX(B) Grounds for Relief
　　　　　　　110k1451　k.　Constitutional　or
Fundamental Error. Most Cited Cases
The Post-Conviction Hearing Act provides a
remedy for defendants who have suffered a
substantial violation of their constitutional rights at
trial. S.H.A. 725 ILCS 5/122-1 et seq.

**[2] Criminal Law 110 &#8734;1407**

110 Criminal Law
　　　110XXX Post-Conviction Relief
　　　　　110XXX(A) In General
　　　　　　　110k1406 Nature of Remedy
　　　　　　　　　110k1407 k. In General. Most Cited
Cases
A proceeding under the Post-Conviction Hearing
Act is not an appeal of a defendant's underlying
judgment; rather, it is a collateral attack on the
judgment. S.H.A. 725 ILCS 5/122-1 et seq.

**[3] Criminal Law 110 &#8734;1427**

110 Criminal Law
　　　110XXX Post-Conviction Relief
　　　　　110XXX(A) In General
　　　　　　　110k1427 k. Matters Which Either Were
or Could Have Been Adjudicated Previously, in
General. Most Cited Cases
Because an proceeding under the Post-Conviction
Hearing Act is a collateral attack on a defendant's
judgment, any issues that were decided on direct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

appeal are res judicata, and any issues that could have been presented on direct appeal, but were not, are forfeited. S.H.A. 725 ILCS 5/122-1 et seq.

**[4] Criminal Law 110 ☞1575**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1574 Petition or Motion
              110k1575 k. In General. Most Cited
Cases

**Criminal Law 110 ☞1582**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1582 k. Answer or Return. Most
Cited Cases

**Criminal Law 110 ☞1592**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1591 Dismissal
              110k1592 k. In General. Most Cited
Cases
At the first stage in a proceeding under the Post-Conviction Hearing Act that does not involve the death penalty, the defendant files a petition and the circuit court determines whether it is frivolous or patently without merit; motions or responsive pleadings from the State are not permitted, and if the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. S.H.A. 725 ILCS 5/122-2.1(a)(2).

**[5] Criminal Law 110 ☞1575**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General

           110k1574 Petition or Motion
              110k1575 k. In General. Most Cited
Cases
A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim. S.H.A. 725 ILCS 5/122-2.1(a)(2).

**[6] Criminal Law 110 ☞1592**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1591 Dismissal
              110k1592 k. In General. Most Cited
Cases
The "gist" standard, applied when a postconviction relief petition is dismissed for failing to present the gist of a constitutional claim, is a low threshold, and a defendant need only present a limited amount of detail in the petition; the claim need not be set forth in its entirety, and the petition need not include legal arguments or citations to legal authority. S.H.A. 725 ILCS 5/122-2.1(a)(2).

**[7] Criminal Law 110 ☞1592**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1591 Dismissal
              110k1592 k. In General. Most Cited
Cases
The circuit court may summarily dismiss a postconviction petition if the defendant's allegations are contradicted by the record from the original trial proceedings. S.H.A. 725 ILCS 5/122-2.1(a)(2).

**[8] Criminal Law 110 ☞1582**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
           110k1582 k. Answer or Return. Most
Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

Page 3

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

**Criminal Law 110 ☞1602**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
            110k1600 Counsel
               110k1602 k. Right to Counsel. Most
Cited Cases
If a postconviction relief petition is not dismissed as
frivolous or patently without merit, it advances to
the second stage, at which counsel is appointed to
represent the defendant, if necessary, and the State
is allowed to file responsive pleadings. S.H.A. 725
ILCS 5/122-4, 122-5.

**[9] Criminal Law 110 ☞1575**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
            110k1574 Petition or Motion
               110k1575 k. In General. Most Cited
Cases
At the second stage in a postconviction relief
proceeding, which a petition advances to if it is not
dismissed as frivolous or patently without merit, the
circuit court must determine whether the petition
and any accompanying documentation make a
substantial showing of a constitutional violation.
S.H.A. 725 ILCS 5/122-2.1(a)(2), 122-4, 122-5.

**[10] Criminal Law 110 ☞1592**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
            110k1591 Dismissal
               110k1592 k. In General. Most Cited
Cases

**Criminal Law 110 ☞1652**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
          110XXX(C)3 Hearing and Determination

            110k1651 Necessity for Hearing
               110k1652 k. In General. Most Cited
Cases
At the second stage in a postconviction relief
proceeding, which a petition advances to if it is not
dismissed as frivolous or patently without merit, if
no substantial showing of a constitutional violation
is made, the petition is dismissed; if, however, a
substantial showing of a constitutional violation is
set forth, then the petition is advanced to the third
stage, where the circuit court conducts an
evidentiary hearing. S.H.A. 725 ILCS
5/122-2.1(a)(2), 122-4, 122-5.

**[11] Criminal Law 110 ☞1139**

110 Criminal Law
   110XXIV Review
      110XXIV(L) Scope of Review in General
         110k1139 k. Additional Proofs and Trial
De Novo. Most Cited Cases
Appellate Court's review of a circuit court's
dismissals of a postconviction petition is de novo.
S.H.A. 725 ILCS 5/122-1 et seq.

**[12] Criminal Law 110 ☞1042**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in
Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1042 k. Sentence or Judgment.
Most Cited Cases
In proceeding on pro se petition for postconviction
relief alleging his confession had been coerced,
defendant convicted on two counts of first degree
murder did not waive his right to raise on appeal of
order summarily dismissing petition claim that
newly discovered evidence showed that detective
systematically used improper techniques to coerce
false statements, though such defendant in his
petition only alleged that trial counsel was
ineffective for failing to investigate evidence of
detective's abuse, as proceeding on the petition was
only at the first phase, at such stage the petition
only needed to present a limited amount of detail
and was to be liberally construed, defendant did
allege that if his attorney had thoroughly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

Page 4

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

investigated claim of physical abuse such investigation would have shown that his confession was the result of physical coercion, and co-defendant in his own petition raised claim of newly discovered evidence. S.H.A. 725 ILCS 5/122-1 et seq.

**[13] Criminal Law 110 ⚌1575**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                    110k1575 k. In General. Most Cited Cases
At the first stage of the proceedings, a post-conviction petition need not set forth a claim in its entirety, and need only present a limited amount of detail. S.H.A. 725 ILCS 5/122-1 et seq.

**[14] Criminal Law 110 ⚌1577**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                    110k1577 k. Construction. Most Cited Cases
At the first state in a postconviction relief proceeding, the allegations in the petition are to be liberally construed. S.H.A. 725 ILCS 5/122-1 et seq.

**[15] Criminal Law 110 ⚌1578**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                    110k1578 k. Pro Se Petitions or Motions. Most Cited Cases
Principles, that in the first stage of a postconviction relief proceedings a petition need not set forth a claim in its entirety, need only present a limited amount of detail, and should be liberally construed, apply with special force where the petition is pro se and the petitioner is likely a person of limited

education. S.H.A. 725 ILCS 5/122-1 et seq.

**[16] Criminal Law 110 ⚌1536**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(B) Grounds for Relief
            110k1536 k. Newly Discovered Evidence. Most Cited Cases
In order for new evidence to be sufficient to warrant a new trial and avoid application of the doctrine of res judicata in a proceeding on a petition for postconviction relief: (1) it must be material and not merely cumulative; (2) it must be of such conclusive character that it will probably change the result on retrial; and (3) the evidence must not have been discovered or discoverable through the defense's due diligence prior to the original trial. S.H.A. 725 ILCS 5/122-1 et seq.

**[17] Criminal Law 110 ⚌1582**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1582 k. Answer or Return. Most Cited Cases

**Criminal Law 110 ⚌1592**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1591 Dismissal
                    110k1592 k. In General. Most Cited Cases

**Criminal Law 110 ⚌1602**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1600 Counsel
                    110k1602 k. Right to Counsel. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----                                                    Page 5

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

**Sentencing and Punishment 350H ☞1790**

350H Sentencing and Punishment
   350HVIII The Death Penalty
     350HVIII(G) Proceedings
       350HVIII(G)4    Determination    and
Disposition
        350Hk1790 k. Post-Conviction Relief.
Most Cited Cases
There is no provision in the Post-Conviction
Hearing Act authorizing a circuit court to dismiss a
capital defendant's petition if it is frivolous or
patently without merit; instead the circuit court must
first determine whether the petitioner, if indigent,
wants to be represented by counsel, once the
defendant makes that choice the matter is docketed
for further proceedings, and at that point the State
may either answer the petition or move to dismiss it.
S.H.A. 725 ILCS 5/122-1 et seq.

There is no provision in the Post-Conviction
Hearing Act authorizing a circuit court to dismiss a
capital defendant's petition if it is frivolous or
patently without merit; instead the circuit court must
first determine whether the petitioner, if indigent,
wants to be represented by counsel, once the
defendant makes that choice the matter is docketed
for further proceedings, and at that point the State
may either answer the petition or move to dismiss it.
S.H.A. 725 ILCS 5/122-1 et seq.

**[18] Criminal Law 110 ☞1575**

110 Criminal Law
   110XXX Post-Conviction Relief
     110XXX(C) Proceedings
       110XXX(C)1 In General
        110k1574 Petition or Motion
         110k1575 k. In General. Most Cited
Cases
A trial court is not to consider a first-stage
postconviction relief petition on the merits; rather,
the court is to determine whether the petition alleges
a constitutional infirmity which would necessitate
relief under the Post-Conviction Hearing Act.
S.H.A. 725 ILCS 5/122-1 et seq.

**[19] Criminal Law 110 ☞1575**

110 Criminal Law
   110XXX Post-Conviction Relief
     110XXX(C) Proceedings
       110XXX(C)1 In General
        110k1574 Petition or Motion
         110k1575 k. In General. Most Cited
Cases
The first stage of postconviction review presents
merely a pleading question; unless positively
rebutted by the record, all well-pled facts are taken
as true at this stage. S.H.A. 725 ILCS 5/122-1 et
seq.

**[20] Criminal Law 110 ☞1436**

110 Criminal Law
   110XXX Post-Conviction Relief
     110XXX(A) In General
       110k1435 Consideration Despite Waiver
or Other Bar
        110k1436 k. In General. Most Cited
Cases

**Criminal Law 110 ☞1536**

110 Criminal Law
   110XXX Post-Conviction Relief
     110XXX(B) Grounds for Relief
       110k1536 k. Newly Discovered Evidence.
Most Cited Cases
Defendants, convicted on two counts of first degree
murder, stated a claim in postconviction relief
petitions that newly discovered evidence, showing
that detective systematically used improper
techniques to coerce false statements, existed to
relax doctrine of res judicata and warrant a new
trial, such that petitions could not be dismissed as
frivolous and patently without merit in first-stage
postconviction proceeding, though defendants'
claims that their confessions were coerced were
litigated on direct appeal; detective's alleged
methods of abuse were similar in that he called
victims liars and hit them in the face, alleged
instances of abuse amounted to a pattern spanning
several years, new evidence would likely have
damaged detective's credibility and severely
weakened State's case as no physical evidence
linked defendants to the murders, and one of
defendant's trial attorneys was unable to discover

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

the evidence even though she conducted a reasonable investigation. S.H.A. 725 ILCS 5/122-1 et seq.

**[21] Criminal Law 110 ⊂⇒369.1**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k369 Other Offenses as Evidence of Offense Charged in General
                110k369.1 k. In General. Most Cited Cases

**Criminal Law 110 ⊂⇒369.2(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k369 Other Offenses as Evidence of Offense Charged in General
                110k369.2 Evidence Relevant to Offense, Also Relating to Other Offenses in General
                    110k369.2(1) k. In General. Most Cited Cases
While evidence of other bad acts is not admissible to prove a propensity to commit those acts, such evidence is admissible for any other relevant purpose.

**[22] Criminal Law 110 ⊂⇒369.2(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k369 Other Offenses as Evidence of Offense Charged in General
                110k369.2 Evidence Relevant to Offense, Also Relating to Other Offenses in General
                    110k369.2(1) k. In General. Most Cited Cases
Even incidents of prior bad acts that are remote in time can become relevant if the party presenting the evidence can present evidence of other incidents that occurred in the interim.

**[23] Criminal Law 110 ⊂⇒1650**

110 Criminal Law

110XXX Post-Conviction Relief
    110XXX(C) Proceedings
        110XXX(C)3 Hearing and Determination
            110k1650 k. In General. Most Cited Cases
There is no absolute right to a substitution of judge at a postconviction proceeding; rather, the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced. S.H.A. 725 ILCS 5/122-1 et seq.

**[24] Criminal Law 110 ⊂⇒1192**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1192 k. Mandate and Proceedings in Lower Court. Most Cited Cases
In order to obtain a remand to a new judge when an order dismissing a petition for postconviction relief is reversed, a defendant must show something more than simply that the judge presided over the defendant's earlier trial, such as animosity, hostility, ill will or distrust.

**[25] Criminal Law 110 ⊂⇒1192**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1192 k. Mandate and Proceedings in Lower Court. Most Cited Cases
To conclude that a judge is disqualified from presiding over a postconviction relief proceeding, when an order dismissing a petition is reversed, because of prejudice is not a decision to be lightly made.

**[26] Criminal Law 110 ⊂⇒1192**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1192 k. Mandate and Proceedings in Lower Court. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----                                                    Page 7

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

Defendants who were convicted on two counts of first degree murder and filed petitions for postconviction relief were entitled to a substitution of the trial judge, when trial judge's orders dismissing their petitions at the first stage in the proceedings were reversed on appeal, as trial judge prejudged a central issue in defendants' postconviction case, whether newly discovered evidence that detective who obtained defendants' confessions engaged in a pattern of using improper techniques to coerce statements; trial judge stated that the newly discovered evidence was not so conclusive as to change the result at retrial, and such conclusion was improper at the first stage in the postconviction relief proceedings as defendants merely had to present the gist of a constitutional claim. S.H.A. 725 ILCS 5/122-1 et seq.

Bluhm Legal Clinic, Northwestern University School of Law (Jane E. Raley, of counsel) and McGuire Woods LLP (Erin K. Smith, of counsel), Chicago, for Gabriel Solache.
Office of the State Appellate Defender, Chicago (Tiffany Green and Laura A. Weiler, of counsel), for Arturo Reyes.
State's Attorney, County of Cook, Chicago (James E. Fitzgerald, Samuel Shim and Sari London, of counsel), for Appellee.
Justice ROBERT E. GORDON delivered the opinion of the court:
*1 The central issue in these consolidated appeals is whether the confessions of defendants Arturo Reyes and Gabriel Solache were coerced. In June 2000, following simultaneous trials before separate juries, defendants were each found guilty of two counts of first degree murder, two counts of aggravated kidnaping, and home invasion. There was no physical evidence linking either defendant to the crimes. Solache received a sentence of death for the murder convictions, and Reyes was sentenced to natural life in prison without possibility of parole. On January 10, 2003, while Solache's direct appeal was pending before the Illinois Supreme Court, then-Governor George Ryan commuted Solache's death sentence to natural life imprisonment. The supreme court then transferred Solache's direct appeal to this court. On August 19, 2003, the appellate court affirmed Solache's convictions and

sentences. People v. Solache, No. 1-03-1149, 341 Ill.App.3d 1112, 304 Ill.Dec. 662, 853 N.E.2d 451 (2003) (unpublished order under Supreme Court Rule 23). A few weeks later, on September 30, the appellate court came to the same conclusion regarding Reyes' convictions and sentences. People v. Reyes, No. 1-01-2875, 343 Ill.App.3d 1292, 305 Ill.Dec. 886, 856 N.E.2d 691 (2003) (unpublished order under Supreme Court Rule 23).[FN1] In December 2003, each defendant filed a petition for postconviction relief pursuant to section 122-1 of the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2002)). In their petitions, defendants claimed, inter alia, that their confessions were the result of physical coercion by Detective Reynaldo Guevara of the Chicago police department. In March 2004, within the requisite 90 days, the trial court summarily dismissed each petition as frivolous and patently without merit. Defendants appealed the summary dismissal of their petitions, and their appeals (Reyes, No. 1-04-1047, and Solache, No. 1-04-1150) were consolidated. For the reasons set forth below, we reverse the judgments of the circuit court dismissing defendants' postconviction petitions.

BACKGROUND

Defendants were convicted of the murders of Mariano and Jacinta Soto, who were found stabbed to death in their apartment in Chicago on April 1, 1998. A third defendant, Adriana Mejia, pleaded guilty and was sentenced to natural life imprisonment.

According to testimony at trial, including defendants' inculpatory statements, which were read to the jury by the assistant State's Attorneys who took the statements, the murders took place as follows. In March 1998, defendants were living in an apartment with Adriana Mejia and her husband, Rosauro. Adriana had been feigning pregnancy, and she needed a baby to claim as her own. On Thursday, March 26, Adriana told Reyes she had found a friend with "a very pretty baby." Early in the morning of Saturday, March 28, Solache drove Reyes to the University of Illinois Hospital and picked up Adriana, who apparently had gone there

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

Page 8

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

under the pretext that she was about to give birth. Solache, Reyes and Adriana then drove to the Sotos' residence. While they were en route, Adriana told them that Reyes' assignment was to pick up the baby from the crib, and Solache's assignment was " to take care of Mr. Soto." Adriana said she would " take care of Mrs. Soto." When they arrived at the Sotos' apartment, Adriana knocked and, when Jacinta came to the door, Adriana asked Jacinta to let her in because she had no place else to go. Adriana, Reyes and Solache then entered the apartment. Reyes stabbed Jacinta and then ran to the bedroom and picked up the Sotos' two-month-old daughter, Maria. Reyes also took Santiago, the couple's three-year-old son, who was lying next to his father in the bed. Meanwhile, Solache picked up a knife from the kitchen table and ran to the bedroom, where he saw a man (Mariano Soto) lying face up, asleep on the bed. Solache stabbed the man in the stomach, then ran out of the bedroom and threw the knife down just outside the bedroom door. While Reyes was running out of the apartment with the children, he looked back and saw Adriana "on top of" Jacinta "stabbing her in the back like an animal." Reyes took the children to the car. Adriana and Solache then emerged from the apartment, and the three of them drove away. They dropped Adriana and the two children off at the hospital, and Solache and Reyes went back to their apartment and went to bed.

*2 Later in the morning of March 28, Rosauro, believing that Adriana had given birth, came to the hospital to pick her up. When Rosauro arrived at the hospital, he saw that she had not only a baby but a three-year-old boy as well. Adriana explained the presence of the boy by stating that another woman, Norma Salazar, had asked Adriana to care for the boy while she, Salazar, was giving birth at the hospital. Rosauro and Adriana then returned to their apartment with the two children.

On April 1, 1998, police found the bodies of the Sotos in their apartment. Officer David Valentin testified that, when he and his partner entered the apartment, they saw a "male Hispanic" lying face up by the doorway with multiple stab wounds. In the bedroom, they saw a blanket in the middle of the room. Under the blanket was a "female Hispanic

" with multiple stab wounds. The police also discovered that the Sotos' two children were missing. A police bulletin describing the children indicated that the baby had a wine-stain birthmark on her neck.

Late in the evening of the next day, April 2, Guadalupe Mejia, the sister-in-law of Adriana and Rosauro, saw a picture of the Sotos' three-year-old son on television, along with a news report about the murders. Guadalupe, who lived with her husband, Jorge, in the same apartment building as Adriana and Rosauro, recognized the boy as the same one that Adriana had brought home from the hospital on March 28. Fearing that the woman (Norma Salazar) who had given the boy to Adriana had murdered the child's parents, Guadalupe told Adriana what she had seen and urged her to call the police. Rosauro arrived home from work at 1:30 a.m. (April 3) and was told that the boy had been reported missing and his parents had been murdered. Rosauro then took the boy to the 8th district police station. Reyes and Solache went with him.

Officers at the 8th district station verified that the boy was Santiago Soto. Rosauro, Solache and Reyes were taken to the Area 5 station for further questioning. Detective William Kernan testified that he called the hospital and learned that neither Norma Salazar nor Adriana Mejia had ever been a patient there. Detectives were then sent to Adriana Mejia's apartment. When they saw the baby, they noticed that it was not a newborn (the child's umbilical cord had healed). They identified the baby as Maria Soto by the wine-stain birthmark on her neck. Adriana was then arrested. When authorities at Area 5 (where Rosauro, Solache and Reyes were being questioned) were notified of what occurred at the Mejia apartment, Rosauro, Solache and Reyes were also arrested.

Rosauro Mejia was held at Area 5 for two to three days and then released. He was never charged. In addition, Norma Salazar was never charged in this case. Adriana Mejia, Reyes and Solache were each charged with first degree murder, aggravated kidnaping and home invasion. As previously noted, Adriana subsequently pleaded guilty and was

--- N.E.2d ----                                                              Page 9

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

sentenced to life imprisonment.

*3 Prior to trial, defendants moved to suppress their statements on the ground, among others, that the statements had been coerced. In his motion, Solache alleged that he was a Mexican national and did not speak English and that he had difficulty understanding the Puerto Rican detective (Guevara) who interviewed him. Solache also alleged that the detective slapped him and chipped his tooth. Similar to Solache, Reyes alleged in his motion that he was a Mexican citizen and could not read, write or speak English. According to Reyes, his statements were obtained "as a result of physical, psychological and mental coercion." Specifically, Reyes alleged that a police officer (Guevara) interviewed him repeatedly and, on several occasions, struck him. In one instance, the officer allegedly asked Reyes why he had committed the crimes, and when Reyes denied any participation in the offenses, the officer allegedly hit him and told him he was lying. In another instance, Reyes allegedly was told that if he persisted in his denials and failed to say anything against Adriana or Solache, he would be allowing them to put the blame entirely on him, and he would get the electric chair.

The trial court conducted a series of hearings on the motions to suppress. Numerous witnesses testified, including Reyes, Solache and Guevara. According to the testimony of Guevara and other witnesses, Adriana, Reyes and Solache were held at Area 5 for at least two days and were questioned separately. Initially, all three denied any involvement in the murders. However, late in the evening of April 3, the same day the three were arrested, Adriana implicated Reyes in the crimes. This occurred at about 10:30 p.m. when Guevara, who was fluent in Spanish, confronted Adriana with her shoes and a baby's coat, both of which had blood on them. Adriana then stated that Reyes was the one who had kidnaped the children and killed their parents. At that point, she did not indicate that anyone else was involved. At 11:30 p.m., Guevara spoke to Reyes and told him that Adriana had implicated him. Reyes denied any involvement in the crimes. Shortly thereafter, at 12:15 a.m. on April 4, Guevara spoke to Solache, and he also denied any

involvement.

Guevara further testified that at 3 p.m. on April 4, he again spoke to Reyes and confronted him with Adriana's accusation. At that point, according to Guevara, Reyes said: "Well, now I'm going to tell you who was really there and what everybody did." Reyes told Guevara that he and Adriana and Solache all were present at the scene of the crimes and that Solache was the one who went into the bedroom and stabbed the husband. At 8 p.m. on April 4, Guevara again spoke with Adriana and confronted her with Reyes' statement that she and Solache also were involved in the murders. Adriana then conceded that Solache was involved as well. Shortly thereafter, at 9 p.m., Guevara spoke with Solache and told him that both Adriana and Reyes had implicated him in the murders. According to Guevara, Solache said: "Okay. I'll tell you. I'll tell you what happened. I was there and I'll tell you what happened."

*4 In the early morning hours of the next day, April 5, Adriana, Reyes and Solache each gave a written inculpatory statement. Reyes' statement was given to Assistant State's Attorney (ASA) Thomas O'Malley, with Officer Daniel Trevino interpreting. O'Malley testified that at no time in his presence did any police officer hit or strike Reyes or tell him he was lying. Photographs were taken of Reyes at the time of his statement. Solache's statement was taken by ASA Heather Brualdi, with Guevara interpreting. According to Brualdi, when she finished writing the statement in English, she gave it to Guevara, and he translated it to Solache. Brualdi testified further that she saw no marks on Solache's face. She observed that he had a chipped tooth and an "old scar" on his skull. Photographs also were taken of Solache. Adriana's statement was given to ASA David Navarro, who spoke Spanish.

At about 8:30 a.m. the same day, April 5, Officer Saul Basurto processed Solache and Reyes when they were brought to the lockup. Basurto testified that when he processed Reyes, he observed no obvious evidence of pain or injury. According to Basurto, who spoke Spanish, Reyes did not complain of being hit by a police officer while in custody, nor did he complain that he was screamed

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

at or interrogated in a loud fashion. Basurto gave essentially the same report regarding Solache. According to Basurto, Solache did not complain to him of any mistreatment or maltreatment. Photographs were taken of both Reyes and Solache at the time that they were processed. The next day, April 6, John Musa, a medical intake officer at the Cook County jail, processed Solache and Reyes. Musa, who spoke Spanish, testified that he observed no injuries or bruises on Reyes and that Reyes made no complaints of any injuries. With regard to Solache, Musa testified that he observed a scar on Solache's head which was "an old injury," but he saw no other injuries. Musa asked Solache if he had any recent head injuries, and Solache answered in the negative.

In his testimony, Reyes stated that he could neither read nor write English and that when he signed the written statement, which was in English, he had no idea what it said. Reyes denied telling Guevara that he was involved in the murders of the Sotos. Instead, Reyes told Guevara that he "wasn't involved " and that he "didn't know what had happened." Reyes also testified that Guevara physically abused him while Reyes was in custody. According to Reyes, when Guevara first interviewed him, he took a cap off Reyes' head and slapped him "very hard" in the face. Guevara then asked Reyes why he had " do[ne] it." Reyes told Guevara that he did not know what he was talking about. Reyes testified further that on another occasion, Guevara told Reyes that he was not helping himself and was "letting other people blame [him]," and that if he did not say something, "most likely [he would] get the electric chair." Subsequently, Guevara interviewed Reyes again and asked him a series of questions, in a loud voice, regarding whether Reyes had murdered Jacinta and Mariano Soto and whether he had kidnaped their children. According to Reyes, every time he answered "no," Guevara would tell him to stop lying and slap him in the face with an open hand. Reyes also testified that Guevara never advised him of his *Miranda* rights.

*5 Solache's testimony was similar to that of Reyes. Solache stated that he could neither read nor speak English and that he wrote his name on his statement, which was in English, because Guevara told him to

do it. Solache denied that Guevara read the statement to him. Solache also testified, as did Reyes, that Guevara physically abused him. According to Solache, when Guevara first spoke to him, Guevara told Solache what he had been accused of, and Solache told Guevara that he " wasn't involved." Solache testified that Guevara then started "beating" him. Solache explained that Guevara hit him "many times" with an open hand on the left side of his face. Solache testified that he was handcuffed to a ring in the wall on his right side, and this was the reason he was hit on the left side of his face. Solache testified further that Guevara left the interview room and returned with Adriana, who stated that Solache had "helped her" in committing the murders. Solache told Adriana that this "wasn't true," and he told Guevara that he " hadn't done anything." According to Solache, Guevara then hit him with an open hand in front of Adriana. Guevara and Adriana then left the room, and Guevara returned and allegedly began beating Solache in the stomach. Solache testified that he then "pled guilty because [he] couldn't * * * stand the beating anymore."

Solache also testified that, prior to April 3, 1998, when he was arrested in this case, he could hear in his left ear, but now he could hear in that ear only with a hearing aid. Without the hearing aid, Solache maintained, he could hear "nothing" with his left ear. On cross-examination, Solache acknowledged that the scar on his head was from an auto accident in 1997. Solache denied that there was any injury to his ear in the accident.

Adriana testified in support of defendants' claims of physical abuse. According to Adriana, Guevara physically abused her while she was being questioned in his office at Area 5. Adriana stated that Guevara told her he was tired of her lies, and he pulled her hair three times and hit her "very hard" on her back. Adriana also testified, as had Solache, that Guevara took her to the room where Solache was being held, and he slapped Solache in front of her.

The defense called Maria Rivera to testify in support of defendants' claims that their statements were coerced. Rivera testified that in August 1996

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

Page 11

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

she spoke to Guevara about a shooting that occurred near her house in which two young men were killed. Rivera testified further that she did not see the individuals who did the shooting. However, on October 18, 1996, she identified a person in a lineup as one of the individuals who had committed the shooting. According to Rivera, Guevara told her to identify this person. Rivera also testified that she subsequently told the assistant State's Attorney that Guevara had told her to identify the person but that she had not seen that person commit the shooting.

*6 In answer to a question from the trial court, defense counsel explained the relevance of Rivera's testimony to defendants' claims that their statements were coerced. According to counsel, Rivera's testimony showed that Guevara used the same technique in the past to coerce a witness in another murder case to make a false identification. Counsel added that, after Rivera told the state's attorney what had happened, the State nol-prossed the murder charges against the defendants in that case.

On cross-examination, Rivera conceded that Guevara did not hit her or give her money to persuade her to make the identification. However, she insisted that Guevara "forced" her to do it. She stated: "I know a lot of things about that detective."

The trial court denied defendants' motions to suppress based on "so-called physical abuse." The court stated:
"The police in my opinion * * * based on the * * * credible evidence did not do anything at all to mistreat either Arturo DeLeon [Reyes] or Gabriel Solache. Everybody [who] came into contact with them, the booking officers, the jailers, whoever came into contact with those two men indicated they never expressed anything about being mistreated by the police, about any injuries supposedly obtained as a result of police misconduct regarding them."

According to the trial court, the evidence clearly established that "neither m[a]n [was] abused in any fashion by Detective Guevara." The court noted that Reyes and Solache gave inculpatory statements only after "they were confronted with respect to the statements of other defendants."

The testimony at trial was essentially the same as the testimony at the suppression hearings, with a few notable additions. Barbara Wilson, a biochemist with the Illinois State Police, testified that she performed DNA analysis in this case on a number of items with bloodstains, including knives, shoes and other articles of clothing. Wilson found that DNA samples taken from bloodstains on Adriana's shoes and trousers matched the DNA profile of Mariano Soto, one of the murder victims. Wilson found, in addition, that DNA from a bloodstain on a knife taken from the Sotos' apartment matched Adriana's DNA profile. However, Wilson's tests uncovered no DNA matching the profile of either Reyes or Solache.

As previously indicated, the written inculpatory statements given by Reyes and Solache were read to their respective juries. Solache's statement was read to the jury by the ASA who took the statement, Heather Brualdi. Reyes' statement was read to the jury by the ASA who took his statement, Thomas O'Malley.

Adriana's husband, Rosauro [FN2], who was never charged in this case, testified in support of defendants' claims of physical abuse. Rosauro stated that Guevara questioned him while he, Rosauro, was being held at Area 5 along with Reyes and Solache shortly after their arrest. According to Rosauro, Guevara asked him how much he had paid for the little girl. When Rosauro answered that he did not pay anything for a girl, Guevara hit him. Rosauro stated: "He kept hitting me because he did not believe me." Rosauro testified that he was being held down by another person while Guevara hit him two or three times.

*7 In their testimony at trial, defendants repeated their allegations of abuse by Guevara. Each defendant also expressly denied any involvement in the murders. For his part, Guevara denied hitting, striking, or slapping either defendant. According to Guevara, he saw no injuries on Solache's or Reyes' face, and neither of them ever complained to Guevara that he had been struck by a police officer.

In his instructions to the jury, the trial court included the following instruction regarding

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

Page 12

defendants' statements:
"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

On June 20, 2000, each defendant was found guilty by his respective jury of two counts of first degree murder, two counts of aggravated kidnaping, and home invasion. In his motion for a new trial, Solache alleged, *inter alia,* that the trial court erred in denying his motion to suppress statements "based on the conduct of Detective Reynaldo Guevara." Reyes filed a similar posttrial motion alleging, *inter alia,* that the trial court erred in denying his motion to suppress statements based on coercion. Included as an attachment to each motion was a copy of the same article from The Chicago Reporter (R. Anderson, *Eyewitnesses Confuse, Convict in Humboldt Park Murder Cases,* The Chicago Reporter, June 2000, at 3). The article examined what it termed "questionable police practices" at Area 5 regarding several murder cases. Guevara was involved in each of these cases.

In August 2000, the trial court denied defendants' motions for a new trial. With regard to defendants' claims that their statements were coerced, the court concluded that "[t]here was no credible evidence whatever that Solach[e] and Reyes were injured in police custody at all." The court noted defendants' testimony that their statements were coerced, but stated: "I don't believe any of that testimony. I did not believe it then [during the pretrial suppression hearings] and nothing has happened to change my mind." The court added that defendants' inculpatory statements were given only after they were confronted with statements implicating them in the kidnaping and double murder.

Defendants waived a jury trial for sentencing. Following first- and second-stage capital sentencing hearings, the trial court found, with regard to Reyes, that there were sufficient mitigating factors to

preclude the sentence of death. With regard to Solache, the court found no such mitigating factors. The court sentenced Reyes to life imprisonment without possibility of parole for the murder convictions. Reyes was also sentenced to 30 years' imprisonment for his kidnaping and home invasion convictions, to run concurrently with the life sentences. Solache received death sentences for the murder convictions, and the same 30-year sentences as Reyes for the other convictions.

*8 Under Supreme Court Rule 603 (134 Ill.2d R. 603), because Solache was sentenced to death, his appeal lay directly to the Illinois Supreme Court. As previously noted, on January 10, 2003, while Solache's appeal was pending, then-Governor George Ryan commuted Solache's death sentence to natural life imprisonment. Because Solache was no longer sentenced to death, the supreme court transferred his direct appeal to the appellate court.

On August 10, 2003, the appellate court affirmed Solache's convictions and sentences. *People v. Solache,* No. 1-03-1149 (unpublished order under Supreme Court Rule 23). A few weeks later, on September 30, the appellate court reached the same conclusion with regard to Reyes' convictions and sentences. *People v. Reyes,* No. 1-01-2875 (unpublished order under Supreme Court Rule 23). The court expressly rejected defendants' claims that their inculpatory statements were coerced. In Reyes' case, the court stated:
"Ultimately, the instant case hinges almost entirely on credibility. As detailed above, this determination was for the trial court to make, which it did, against defendant. Specifically, the trial court did not find defendant's claim of abuse/beatings credible. * * * It is not for this court to second guess the trial court's decision, particularly given that it was specifically based on the demeanor of the witnesses during their testimony. Moreover, as noted above, the trial court was not required to give more credence to defendant's claim over that of Detective Guevara, who denied striking defendant." *People v. Reyes,* slip op. at 27-28.

In Solache's case, the court employed similar language with regard to this issue.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

Page 13

On December 17, 2003, Reyes filed a *pro se* petition for postconviction relief asserting, among other claims, that his trial counsel was ineffective for failing to investigate the abuse inflicted on Reyes by Guevara. According to Reyes, this physical coercion rendered his inculpatory statement involuntary. Reyes also claimed that he was the victim of prosecutorial misconduct, that he was subjected to an illegal search and seizure, and that he was not proven guilty beyond a reasonable doubt.

The next day, December 18, Solache filed a petition for postconviction relief. Solache's petition, which contained 14 claims, was filed with the assistance of counsel. Chief among Solache's claims was the allegation, similar to Reyes's, that Solache's confession was the product of a beating by Guevara. In support of this claim, Solache presented what he termed "substantial new evidence that Detective Guevara has systematically used improper techniques, including excessive physical force, to coerce false statements from suspects and civilians." This "new evidence" consisted of 23 allegations that, in Solache's view, "establish a clear pattern and practice of misconduct and abuse by Detective Reynaldo Guevara." Four of these allegations were not new. They included the complaints made against Guevara in this case by Maria Rivera, Adriana, and Reyes at the suppression hearings, and by Rosauro Mejia at trial. An additional item of allegedly new evidence attached to Solache's petition was an FBI report regarding an interview with Mohamed Omar, who was convicted in April 2001 on racketeering and drug conspiracy charges. In this interview, which took place on June 20 and 21, 2001, at the United State's Attorney's office in Chicago, Omar alleged that Guevara had a reputation for taking bribes to fix cases.

*9 Solache's petition also claimed, in the alternative, that if it were found that the allegedly new evidence was not newly discovered, then his trial counsel had a duty to investigate and present this evidence, and her failure to do so constituted ineffective assistance of counsel. The remainder of the claims in Solache's petition consisted of additional allegations of ineffective assistance of counsel and allegations of *Brady* violations for

failure to disclose materially favorable evidence.

On March 2, 2004, the trial court summarily dismissed Reyes' postconviction petition as frivolous and patently without merit. Ten days later, on March 12, the trial court reached the same conclusion regarding Solache's petition. Each defendant filed a notice of appeal, and their appeals were consolidated.

## DISCUSSION

[1][2][3][4][5][6][7] The Post-Conviction Hearing Act (Act) provides a remedy for defendants who have suffered a substantial violation of their constitutional rights at trial. A proceeding under the Act is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment. *People v. Evans*, 186 Ill.2d 83, 89, 237 Ill.Dec. 118, 708 N.E.2d 1158 (1999). Consequently, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are forfeited. *People v. Rogers*, 197 Ill.2d 216, 221, 258 Ill.Dec. 557, 756 N.E.2d 831 (2001). Under the Act, a postconviction proceeding not involving the death penalty contains three stages. *People v. Edwards*, 197 Ill.2d 239, 244, 258 Ill.Dec. 753, 757 N.E.2d 442 (2001). At the first stage, the defendant files a petition and the circuit court determines whether it is frivolous or patently without merit. *People v. Gaultney*, 174 Ill.2d 410, 418, 221 Ill.Dec. 195, 675 N.E.2d 102 (1996). At this stage, the Act does not permit any motions or responsive pleadings from the State. *Gaultney*, 174 Ill.2d at 418, 221 Ill.Dec. 195, 675 N.E.2d 102. If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. *Edwards*, 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442; 725 ILCS 5/122-2.1(a)(2) (West 2002). A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim. *Edwards*, 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442; *Gaultney*, 174 Ill.2d at 418, 221 Ill.Dec. 195, 675 N.E.2d 102. The "gist" standard is a low threshold,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

and a defendant need only present a limited amount of detail in the petition. *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442. The claim need not be set forth in its entirety. Further, the petition need not include legal arguments or citation to legal authority. *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442; *Gaultney,* 174 Ill.2d at 418, 221 Ill.Dec. 195, 675 N.E.2d 102. The circuit court may summarily dismiss a postconviction petition if the defendant's allegations are contradicted by the record from the original trial proceedings. *Rogers,* 197 Ill.2d at 222, 258 Ill.Dec. 557, 756 N.E.2d 831.

[8][9][10] If the petition is not dismissed as frivolous or patently without merit, it advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2002)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2002)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Edwards,* 197 Ill.2d at 246, 258 Ill.Dec. 753, 757 N.E.2d 442. "If no such showing is made, the petition is dismissed. If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing." *Edwards,* 197 Ill.2d at 246, 258 Ill.Dec. 753, 757 N.E.2d 442.

*10 [11] In the case at bar, defendants' petitions were dismissed as frivolous and patently without merit. Because this was a first-stage dismissal, the question before us is not whether defendants' petitions made a substantial showing of a constitutional violation. "[T]hat is a second-stage inquiry." *Edwards,* 197 Ill.2d at 246, 258 Ill.Dec. 753, 757 N.E.2d 442. Rather, the question we must address is whether defendants' petitions were frivolous or patently without merit, *i.e.,* whether they presented the gist of a constitutional claim. Our review of the circuit court's dismissals of defendants' postconviction petitions is *de novo.* *Edwards,* 197 Ill.2d at 247, 258 Ill.Dec. 753, 757 N.E.2d 442; *People v. Coleman,* 183 Ill.2d 366, 388-89, 233 Ill.Dec. 789, 701 N.E.2d 1063 (1998).

Solache argues before this court, as he did in his

postconviction petition, that his confession was coerced and that the "substantial new evidence" he presented in his petition demonstrated that "Detective Guevara has systematically used improper techniques, including excessive physical force, to coerce false statements from suspects and witnesses." In Solache's view, this evidence "would have had a dramatic effect on the credibility of those who testified at the suppression hearing." Solache argues that he has met his burden of alleging the gist of a constitutional claim, and his petition should have been advanced to the second stage.

In his brief to this court, Reyes makes essentially the same argument. He points to the allegedly newly discovered evidence included in Solache's petition, and argues that this evidence establishes a pattern of abuse and misconduct by Guevara "beginning in 1983 and continuing through the time of Reyes' arrest." According to Reyes, this evidence lends support to a similar claim in his *pro se* petition that other claims of abuse existed (Adriana and Solache) to substantiate his claims of abuse by Guevara.

However, in his *pro se* petition, Reyes did not raise newly discovered evidence. His claim in his petition was that his trial counsel was ineffective for failing to investigate "the abuse inflicted upon [him] at the hands of Det. Reynaldo Guevara." Reyes stated:
"[Counsel] should have asked and filed a complaint asking that Det. Reynaldo Guevara be investigated because the allegations that I put forth about being Slapped by Det. Reynaldo Guevara are true and factual. Not only did I bring this up but Gabriel Solache and Adriana Mejia also said they were abused in the same fashion and testified to this as well. * * * My Attorney * * * should have fought this issue harder. * * * This was a really big issue in My Defense and had this been investigated thoroughly it would have shown this Statement [Reyes' confession] was involuntary and was given because of physical coercion by Det. Reynaldo Guevara."

[12] The State argues that because Reyes' claim in his petition was for ineffective assistance of counsel, rather than newly discovered evidence, he has waived his right to raise the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

newly-discovered-evidence claim on appeal. The State contends that Reyes has simply adopted Solache's claims as his own, even though "none of it was before the trial judge when he ruled on Reyes' petition," and this issue (newly discovered allegations of abuse by Guevara) is being improperly raised for the first time on appeal. We disagree with the State.

*11 [13][14][15] At the first stage of the proceedings, a post-conviction petition need not set forth a claim in its entirety, and need only present a limited amount of detail. *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442. Moreover, the allegations in the petition are to be liberally construed. *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442. These principles apply with special force where the petition is *pro se* and the petitioner is likely a person of limited education. *People v. Dredge,* 148 Ill.App.3d 911, 913, 102 Ill.Dec. 552, 500 N.E.2d 445 (1986). In the case at bar, Reyes' petition, as did Solache's, alleged physical abuse by Guevara. Reyes mentioned that Solache and Adriana had complained of similar abuse, and Reyes further alleged that if the issue of physical abuse had been thoroughly investigated, such an investigation would have shown that Reyes' statement was, in fact, the result of physical coercion by Guevara. Interpreting Reyes' allegations liberally, we conclude that Reyes' petition sufficiently included a claim of newly discovered evidence, and Reyes therefore did not forfeit his right to raise this issue on appeal.

In reaching this conclusion, we reject the State's argument that none of the claims of newly discovered evidence that were included in Solache's petition were before the trial judge when he ruled on Reyes' petition. As previously indicated, Reyes' *pro se* petition was filed on December 17, 2003, and Solache's petition was filed one day later, on December 18. The trial judge ruled on Reyes' petition on March 2, 2004, and on Solache's petition 10 days later, on March 12. Solache's and Reyes' trials were before separate juries, but the trials were conducted simultaneously before the same trial judge. The two cases were intertwined. In our view, it would elevate form over substance to conclude, as the State contends, that Solache's claims of newly

discovered evidence were not before the judge when he ruled on Reyes' petition.

[16] We turn next to the issue of whether defendants' claims of coercion by Guevara are barred by the doctrine of *res judicata.* In the case at bar, the issue of the voluntariness of defendants' confessions was litigated and decided on direct appeal. Issues that were decided on direct appeal are barred by *res judicata. Rogers,* 197 Ill.2d at 221, 258 Ill.Dec. 557, 756 N.E.2d 831; *Evans,* 186 Ill.2d at 89, 237 Ill.Dec. 118, 708 N.E.2d 1158. However, our supreme court has recognized that, " in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence." *People v. Patterson,* 192 Ill.2d 93, 139, 249 Ill.Dec. 12, 735 N.E.2d 616 (2000). In order for new evidence to be sufficient to warrant a new trial, (1) it must be material and not merely cumulative, (2) it must be of such conclusive character that it will probably change the result on retrial, and (3) the evidence must not have been discovered or discoverable through the defense's due diligence prior to the original trial. *Patterson,* 192 Ill.2d at 139, 249 Ill.Dec. 12, 735 N.E.2d 616.

The question before us is whether the allegedly new evidence at issue qualifies as "substantial new evidence" and therefore warrants relaxation of the doctrine of *res judicata.* As previously noted, 4 of the 23 allegations included in Solache's petition are not new. At least one other allegation makes no mention of Guevara, and another is an allegation of physical abuse against Guevara's partner rather than Guevara. Of the remaining allegations, at least six allege the use of physical force against suspects and witnesses, and six others involve the improper influencing of witnesses to identify suspects.

*12 An example of the physical force allegations is that of Armando Serrano. Solache's petition included as an exhibit a copy of Serrano's petition for postconviction relief, dated August 6, 1999. In this petition, which indicated Serrano was sentenced in March 1995 for murder and armed robbery, Serrano alleged that Guevara and his partner took Serrano from his home on June 11, 1993, and transported him to the Area 5 police station for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

interrogation. During this interrogation, Guevara allegedly hit Serrano in the face, called him a liar, and struck Serrano on his body "in hopes of obtaining a confession." Another exhibit included in Solache's petition is a copy of the opinion in *People v. Pena*, 174 Ill.App.3d 281, 123 Ill.Dec. 780, 528 N.E.2d 325 (1988). Defendant Daniel Pena was convicted of murder, conspiracy to commit murder, and armed violence. On appeal, Pena argued, among other things, that his confession was involuntary. According to Pena, during his interrogation at Area 5 in January 1986, Guevara " repeatedly struck defendant in the face, ribs and on the legs from the groin to his knees with a flashlight. " *Pena*, 174 Ill.App.3d at 282, 123 Ill.Dec. 780, 528 N.E.2d 325. Guevara testified that Pena was not abused but there was a struggle when he was arrested. The appellate court concluded that Pena's confession was voluntary and affirmed his convictions and sentence. An additional exhibit attached to Solache's petition was a summary report of a complaint filed by Melvin Warren with the Chicago Police Department's Office of Professional Standards (OPS). Warren complained that, on April 16, 1986, Guevara (1) hit Warren with his fist on the right side of his face, (2) pushed Warren down in Warren's car, grabbed him around the neck, and choked him, (3) verbally abused him by calling him a "nigger dog" several times, and (4) verbally threatened Warren by stating that he (Guevara) would tear Warren's head off. According to the summary report (page 5 of which is missing from the record), the complaint arose from a traffic incident that took place while Guevara was off duty. Warren apparently cut Guevara off while Guevara was driving. Guevara then motioned for Warren to pull over. Warren alleged that, when he (Warren) emerged from his car, Guevara called him a "nigger dog" and threatened to tear his head off. Warren further alleged that when he (Warren) walked back to his car, Guevara hit him on the right side of his face with his fist, pushed Warren down in his car, grabbed him around the neck, and choked him. Warren stated that he then grabbed Guevara's wrist and bit Guevara until Guevara released Warren's neck. Two eyewitnesses confirmed that Guevara initiated this beating. The OPS report cited the arrest report in this case as indicating that Warren was arrested for simple battery, resisting arrest, and

negligent driving. The OPS conducted an investigation of Warren's complaint and sustained Warren's allegations that Guevara hit Warren in the face with his fist; pushed Warren in his car, grabbed him by the neck, and choked him; and verbally abused Warren by calling him a "nigger."

*13 An example of the improper-influencing allegations is that of David Velasquez. Solache's petition included as an exhibit Velasquez's testimony recanting an identification he made on May 10, 1991, in the murder case of Daniel Rodriguez. According to Velasquez, he falsely identified the accused after being questioned at Area 5 by Guevara and his partner, Detective Halvorsen. Velasquez testified that he was chained to a wall at Area 5, he was hit with a flashlight, and that Guevara told him what to say and threatened to "pin" the murder on him if he did not sign the false identification. Another exhibit attached to Solache's petition was the testimony of Luis Figueroa, who recanted his previous identification of Angel Diaz in a murder case. Figueroa, who was incarcerated at the time of his recantation testimony, stated that he viewed a lineup on February 6, 1995, and falsely identified Diaz as the shooter after Officer "Ray Cavera" "told [Figueroa] to pick him out." Figueroa further testified that "Cavera" told him Diaz "was the one that did it and he wants to take him down * * * when I got there he was asking me * * * what did you see, you know, I told him I could not see anything, and he told me [']I found out who did it and his name is Angel Diaz.[']" Also attached as an exhibit to Solache's petition was the testimony of Jose Melendez, who stated that on May 30, 1995, he falsely identified the accused in a murder case. According to Melendez, he was at Area 5 when Guevara showed him a photo array consisting of six photographs. Melendez testified that he indicated he had not seen the shooter, but Guevara separated out one of the photos from the rest and told Melendez he had reason to believe this was the killer. Melendez testified: "I think that day I was mad, I was angry. My friend got shot, and [Guevara] told me to point [the accused] out because he had reason to believe this was the guy."

[17] Before applying the *Patterson* test to determine if defendants' allegedly new evidence is sufficient to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

warrant relaxation of *res judicata,* we note the difference in procedural posture between *Patterson* and the case at bar. *Patterson* was a capital case, and such cases are handled differently under the Act than are noncapital cases. There is no provision authorizing the circuit court to dismiss a capital defendant's petition if it is frivolous or patently without merit. *People v. Thomas,* 195 Ill.2d 37, 40, 252 Ill.Dec. 684, 743 N.E.2d 552 (2001). Instead, where the petitioner is under sentence of death, the circuit court must first determine whether the petitioner, if indigent, wants to be represented by counsel. After the petitioner makes that choice, the matter is docketed for further proceedings. At that point, the State may either answer the petition or move to dismiss it. *Thomas,* 195 Ill.2d at 40, 252 Ill.Dec. 684, 743 N.E.2d 552. Accordingly, there is no "first stage" proceeding for a capital postconviction petition. Instead, such a petition moves automatically to the second stage, where counsel is appointed to represent the defendant, if necessary, and the State is allowed to file responsive pleadings (*Edwards,* 197 Ill.2d at 245-46, 258 Ill.Dec. 753, 757 N.E.2d 442). In *Patterson,* pursuant to this procedure, the defendant's petition was dismissed only *after* the State had moved to dismiss it. Because this dismissal came at the second stage, the defendant's burden was greater than in the first stage, where he is required only to present the gist of a constitutional claim. At the second stage, as noted, the question is whether the petition and any accompanying documentation make a substantial showing of a constitutional violation.

*14 [18][19] This greater, second-stage burden is apparent in the language used in *Patterson* to introduce the three-tier test for determining whether allegedly new evidence constitutes "substantial new evidence" such that *res judicata* may be relaxed. The court states: "For new evidence to be sufficient to warrant *a new trial * * *.*" (Emphasis added.) *Patterson,* 192 Ill.2d at 139, 249 Ill.Dec. 12, 735 N.E.2d 616. However, at the first stage, as in the case at bar, the petitioner is not seeking a new trial. Rather, he is seeking only to advance to the second stage of the proceeding, where he may have the assistance of counsel, if necessary, and the State may file responsive pleadings. Because the dismissal of the petition in the instant case came in the first stage rather than the second stage, the burden on defendants to establish that their allegedly new evidence was "substantial new evidence" is necessarily lighter than was the burden on the petitioner in *Patterson.* In order to set forth the gist of a constitutional claim, which our supreme court has described as " 'a low threshold' " ( *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442, quoting *Gaultney,* 174 Ill.2d at 418, 221 Ill.Dec. 195, 675 N.E.2d 102), a first-stage petition need only present a limited amount of detail and need not include legal arguments or citations to legal authority (*Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442, quoting *Gaultney,* 174 Ill.2d at 418, 221 Ill.Dec. 195, 675 N.E.2d 102). Moreover, in keeping with this lighter burden, the trial court is not to consider a first-stage petition on the merits. Rather, the court is to determine " whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *People v. Smith,* 326 Ill.App.3d 831, 839, 260 Ill.Dec. 462, 761 N.E.2d 306 (2001). The first stage of postconviction review presents merely a pleading question. "Unless positively rebutted by the record, all well-pled facts are taken as true at this stage." *Smith,* 326 Ill.App.3d at 839, 260 Ill.Dec. 462, 761 N.E.2d 306.

[20] With this lighter, first-stage burden in mind, we turn to the question of whether defendants' "new" evidence is sufficient to relax *res judicata.* The test articulated in *Patterson* focuses on three areas: the materiality of the evidence, the degree to which it is conclusive in character, and its newness. With regard to materiality, defendants argue that their new evidence is relevant and material because it establishes a course of conduct and pattern of abuse on the part of Guevara which would impeach Guevara's credibility and corroborate defendants' claims of abuse.

[21] While evidence of other bad acts is not admissible to prove a propensity to commit those acts, such evidence is admissible for any other relevant purpose. *People v. Cannon,* 293 Ill.App.3d 634, 640, 227 Ill.Dec. 1000, 688 N.E.2d 693 (1997) . For example, evidence of other acts of brutality could be used to prove a course of conduct on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----                                                    Page 18

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

part of the officers involved and could be used to impeach these officers' credibility. *Cannon*, 293 Ill.App.3d at 640, 227 Ill.Dec. 1000, 688 N.E.2d 693. Prior allegations of brutality have been found admissible where they involved the same officer or officers as in the defendant's case, where they involved similar methods of abuse, and where they occurred at or near the time of the defendant's allegations. *Patterson*, 192 Ill.2d at 115, 249 Ill.Dec. 12, 735 N.E.2d 616. With regard to proximity in time, *Patterson* added:

*15 "Even incidents that are remote in time can become relevant, however, if the party presenting the evidence can present evidence of other incidents that occurred in the interim. Thus, a single incident years removed has little relevance. However, a series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture." *Patterson*, 192 Ill.2d at 140, 249 Ill.Dec. 12, 735 N.E.2d 616.

In the case at bar, each of these three factors is present. Guevara, the officer who defendants allege abused them, is the same officer identified in the allegations set forth above (as well as others not listed here but included in Solache's petition). In addition, the methods of abuse are similar. Solache and Reyes both testified that Guevara hit them repeatedly in the face, and Reyes claimed that Guevara called him a liar. Similarly, Serrano, Pena and Warren all alleged that Guevara hit them in the face, and Serrano claimed that Guevara called him a liar. With regard to the time when the incidents alleged in Solache's petition occurred, those involving physical abuse took place in 1983, 1986 and 1993. While none of these alleged incidents occurred at or near the time of defendants' allegations of abuse, they nevertheless constitute "a series of events spanning several years" (*Patterson*, 192 Ill.2d at 140, 249 Ill.Dec. 12, 735 N.E.2d 616) and therefore may be relevant to establishing a claim of a pattern and practice of abuse.

The second requirement in the *Patterson* test is that the evidence be of such conclusive character that it will probably change the result on retrial. The "new" evidence cited in Solache's petition appears to meet this requirement. If even a fraction of the

allegations included in this evidence had been presented prior to trial, it appears likely that Guevara's credibility would have been damaged and defendants' confessions would have been suppressed. Without these confessions, the State's case against defendants would have been severely weakened. No DNA matching the profile of either defendant was found at the scene of the crimes. In addition, no other physical evidence was uncovered linking defendants to the offenses.

According to the third step in the *Patterson* test, the evidence must not have been discovered or discoverable through the defense's due diligence prior to the original trial. Defendants concede that most of the allegations included in their "new" evidence existed at the time of trial. However, they contend that this evidence was not discoverable through due diligence. Defendants note that, prior to trial, Solache's counsel filed subpoenas with the Chicago Police Department's Office of Professional Standards and Office of Internal Affairs seeking copies of all complaints, investigations and findings regarding Guevara. Seven files ultimately were turned over to the circuit court. After reviewing them *in camera,* the trial judge determined that the files were not relevant, and counsel for Solache was not able to view their contents. Defendants point to this incident as evidence that, even with reasonable due diligence efforts, counsel was unable to obtain these files prior to trial.

*16 The trial court rejected the argument that defendants' evidence could not have been discovered earlier. In its order dismissing Solache's petition, the court stated: "Once petitioner alleged to his attorneys that he was beaten, it seems reasonable to expect that counsel would conduct an investigation to determine if the police officers involved had any other complaints made against them." We disagree with the trial court. As noted, counsel for Solache did conduct an investigation regarding other complaints against Guevara, but her efforts were unsuccessful. In our view, the various allegations against Guevara could have been discovered prior to trial only if defense counsel had interviewed every person ever detained by Guevara. See *Patterson*, 192 Ill.2d at 109, 249 Ill.Dec. 12, 735 N.E.2d 616 (noting that, "beyond interviewing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

Page 19

anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information"). This is an unreasonable obligation, particularly in light of the lower, "gist of a constitutional claim" burden that is borne by a defendant at the first stage of a postconviction proceeding. Defendants' allegations against Guevara in the case at bar are sufficiently "newly discovered" to meet the requirements of *Patterson* as applied to a first-stage proceeding.

[22] The trial court also rejected the argument that the new evidence against Guevara was material. In its order dismissing Solache's petition, the court concluded that the allegations of physical abuse were "too attenuated and remote to be relevant." With regard to allegations such as those by Melvin Warren, who was allegedly beaten by Guevara following a traffic incident, the court stated that, while Warren's allegations referred to physical abuse during an arrest, there was no claim "that the abuse was used to obtain statements." The court took a similar view of the allegations that Guevara had improperly influenced witnesses to identify suspects. According to the court, such allegations were not relevant "as to whether Guevara physically abused Solache to get him to confess." We disagree. With regard to the remoteness of the physical abuse allegations, we note that this is not a case where there were a number of such allegations in 1983, and none since then. Instead, these allegations ranged from 1983 to 1993 (and to 1998, if the allegations of defendants, Adriana and Rosauro are included). "Even incidents that are remote in time can become relevant * * * if the party presenting the evidence can present evidence of other incidents that occurred in the interim." *Patterson,* 192 Ill.2d at 140, 249 Ill.Dec. 12, 735 N.E.2d 616. The trial court also challenged the relevance of physical abuse allegations that did not claim the abuse was employed to obtain statements. In our view, this is a fairly technical distinction that does not appear useful in determining whether the allegations in question are relevant to establishing a pattern and practice of physical abuse. Moreover, it is a distinction that is inappropriate at the first stage of a postconviction proceeding, where the court is not to consider the petition on the merits but, rather, is to

determine merely "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *Smith,* 326 Ill.App.3d at 839, 260 Ill.Dec. 462, 761 N.E.2d 306. We make a similar observation regarding the trial court's assertion that allegations of Guevara's improperly influencing witnesses' identifications of suspects are not relevant to whether defendants' confessions in the case at bar were physically coerced. In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced. This point was made by Reyes' counsel when he explained to the trial court the relevance of Maria Rivera's testimony. During a pretrial hearing on defendants' motions to suppress, Rivera testified that Guevara "forced" her to identify an individual as the shooter in a murder investigation, even though Rivera had not seen the person who did the shooting. The trial court asked Reyes' counsel to explain "the relevance of any of this."

*17 "MR. VERDUN [Reyes' counsel]: Judge, it's our contention that * * * Detective Guevara has used coercion in obtaining the statements from-not only from Mr. Reyes but * * * also [from] Mr. Solache. Judge, we think that this evidence is relevant because, in fact, he has used * * * that same technique in the past[,] this time with a witness but in fact in another homicide case."

Moreover, the trial court's assertion that allegations of improper influencing of witnesses are not relevant is inappropriate for the same reason that the trial court's challenging of the relevance of physical abuse allegations such as that of Melvin Warren was inappropriate. At the first stage of a postconviction proceeding, a petitioner need only present the gist of a constitutional claim. In keeping with this low threshold, the trial court at this stage is not to consider the petition on the merits, but rather is to determine "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *Smith,* 326 Ill.App.3d at 839, 260 Ill.Dec. 462, 761 N.E.2d 306. In this instance, for purposes of a *Patterson* analysis at the first stage of a postconviction proceeding, defendants' new allegations against Guevara are sufficiently relevant to be deemed material to their claim of a pattern and practice of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

abuse.

The trial court rejected, in addition, the argument that the new allegations against Guevara were of such conclusive character that they probably would change the result on retrial. In its order dismissing Solache's petition, the trial court stated: "As this court has earlier found, regardless of what other defendants may have claimed, *there is no evidence that petitioner was beaten in this case.*" (Emphasis in original.) The court added: "Upon[ ] medical examination, petitioner neither exhibited nor reported any signs of physical abuse." (Similar findings were made regarding Reyes when the trial court ruled on defendants' pretrial motions to suppress and on their posttrial motions.) The trial court stated, in addition: "While petitioner correctly notes that systematic patterns of torture have been held admissible in other cases [citations], this fact does not free him from the burden of establishing that the allegations constitute newly discovered evidence of abuse in his case." In sum, the court stated: "This court does not believe that a reasonable probability exists that had the court been aware of these twenty three (23) allegations that the result of the hearing on the motion to suppress Solache's statements would have been different." We disagree with the trial court. With regard to the court's assertions that neither defendant showed visible signs of physical abuse, we conclude that, while this is a relevant consideration, it is not dispositive. See *Patterson,* 192 Ill.2d at 116, 249 Ill.Dec. 12, 735 N.E.2d 616 ("Although we believe that [the defendants' failure to demonstrate that he suffered physical injuries] is a relevant consideration, we do not believe that the absence of physical injury, standing alone, precludes evidence of prior acts of brutality from being admissible"). We therefore reject the trial court's implication that this lack of visible evidence of physical abuse necessarily lessened the conclusiveness of the new allegations against Guevara. The trial court also erred in concluding that there was no reasonable probability that the new allegations would have altered the trial court's ruling denying defendants' motions to suppress their confessions. This sort of dispositive conclusion runs directly counter to the admonition that, at the first stage of postconviction proceedings, the trial court is not to address

substantive questions relating to the issues raised in the petition. *Smith,* 326 Ill.App.3d at 839-40, 260 Ill.Dec. 462, 761 N.E.2d 306. Instead, the question at the first stage is simply whether the petitioner has *alleged* a constitutional infirmity which would necessitate relief under the Act. In the case at bar, we conclude that the new allegations against Guevara are sufficiently conclusive to satisfy the *Patterson* test as applied to a first-stage proceeding.

*18 Notwithstanding the foregoing, the State argues that the trial court did not exceed the bounds of first-stage review in its consideration of defendants' petitions. The State notes that, "in determining whether a meritorious constitutional claim has been presented, the court may examine the court file and transcripts of the proceedings in which [the petitioner] was convicted and any action taken by an appellate court." The State adds that a postconviction petition may be summarily dismissed "if the allegations contained therein are contradicted by the record." Accordingly, the State further notes that, in order to determine whether the gist of a constitutional claim has been presented, the trial court must necessarily inquire into the relevance and merits of the petitioner's supporting documents. According to the State, this is what the trial court did in the case at bar. In the State's view, the court correctly found that "new evidence" claims "were contradicted by the record and [were] not substantially new evidence," and defendants' petitions therefore were barred from moving to the second stage of the proceedings.

In making this argument, the State relies on *People v. Deloney,* 341 Ill.App.3d 621, 275 Ill.Dec. 709, 793 N.E.2d 189 (2003). In *Deloney,* the defendant argued, on appeal from his murder conviction, that his custodial statement was coerced. The appellate court affirmed his conviction. The defendant filed a postconviction petition in which he asserted multiple grounds for relief, including police brutality and coercion. Because this issue had been decided on direct appeal, it was barred by *res judicata.* However, the defendant apparently included in his petition "new evidence" that allegedly revealed a pattern of abuse by the police. The trial court, in dismissing the petition as frivolous, applied the *Patterson* test and found the

--- N.E.2d ----

Page 21

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

defendant's evidence insufficient. *Deloney,* 341 Ill.App.3d at 627, 275 Ill.Dec. 709, 793 N.E.2d 189. On appeal from this dismissal, the defendant argued, among other things, that the trial court, in applying the *Patterson* test, "exceeded its scope of review in the first stage by assessing the merits of the evidence and * * * applied 'an outcome determinative test' rather than merely determining whether the petition stated the 'gist of a constitutional claim.'" *Deloney,* 341 Ill.App.3d at 627, 275 Ill.Dec. 709, 793 N.E.2d 189. The appellate court in *Deloney* disagreed, noting that, in order to survive summary dismissal, the defendant was required to present "'the gist of a claim for relief which is meritorious *when considered in view of the record of the trial court proceedings.'"* (Emphasis added.) *Deloney,* 341 Ill.App.3d at 627, 275 Ill.Dec. 709, 793 N.E.2d 189, quoting *People v. Dredge,* 148 Ill.App.3d 911, 913, 102 Ill.Dec. 552, 500 N.E.2d 445 (1986). The appellate court added that, in order to determine whether a gist of a constitutional claim had been presented, "the court must inquire into the relevance and merit of the defendant's supporting documents." *Deloney,* 341 Ill.App.3d at 627, 275 Ill.Dec. 709, 793 N.E.2d 189. In conducting its analysis, the appellate court in *Deloney* mentioned "over 900 pages of documents" attached to the defendant's petition. *Deloney,* 341 Ill.App.3d at 628, 275 Ill.Dec. 709, 793 N.E.2d 189. However, the court did not rely on these documents in making its decision. Instead, the court noted that the defendant's claim in his petition that certain named officers had abused him was directly contradicted by the defendant's own trial testimony that those same officers did not abuse him. *Deloney,* 341 Ill.App.3d at 629, 275 Ill.Dec. 709, 793 N.E.2d 189. The court concluded that the defendant's abuse claim could be dismissed "because such a claim would directly contradict the record at trial." *Deloney,* 341 Ill.App.3d at 629, 275 Ill.Dec. 709, 793 N.E.2d 189. The appellate court held that this claim remained barred by *res judicata.*

**\*19** The State's reliance on *Deloney* is misplaced. Setting aside any concern that the trial court and the appellate court in *Deloney* might have held the defendant to a higher burden than appropriate in a first-stage proceeding, we note that the appellate court's decision had nothing to do with the

defendant's allegedly newly discovered evidence. Quite simply, the court in *Deloney* held that the defendant's claims of police coercion were directly contradicted by the record at trial. In the case at bar, we have found no such contradiction of defendants' claims in the record at trial.

We conclude that defendants' new evidence is sufficiently material, conclusive and newly discovered to meet the *Patterson* test as applied to a first-stage postconviction proceeding. The doctrine of *res judicata* may be relaxed with regard to defendants' claims of abuse by Guevara.

We hold that defendants have alleged the gist of a constitutional claim, and the trial court erred in summarily dismissing their petitions as frivolous and patently without merit. The cause must therefore be remanded for advancement to the second stage of postconviction proceedings. However, before directing this remand, we address a final claim brought by defendants.

Defendants ask that any remand in the case at bar be assigned to a different judge.[FN3] Defendants argue that the trial judge in this case has already determined that defendants were not abused by Guevara. They point to comments by the trial judge that he did not believe any of the testimony that defendants were abused by the police. Defendants assert: "Given the trial court's stated unwavering certainty that Detective Guevara neither abused [defendants] nor fabricated any aspect of the so-called 'confession[s],' there can be little hope of persuading the court, even with the substantial evidence that post-conviction counsel has gathered thus far, that Detective Guevara acted with egregious dishonesty and brutality in handling [these] defendant[s]." Defendants also criticize what they describe as the judge's "willingness to improperly reach the merits of Solache's claims at the first stage of post-conviction review." According to defendants, this demonstrates that the trial judge has "already prejudged the issues." Defendants contend that the trial judge is prejudiced against their claims and, for this reason, any remand in the case at bar should be assigned to a different judge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.E.2d ----

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
(Cite as: --- N.E.2d ----)

Page 22

The State disagrees. According to the State, the trial judge "did not prejudge the merits of [defendants'] claims when dismissing [their] petition[s] but merely reviewed [the] petition[s] and determined that [they were] without merit and not worthy to proceed to the second stage." The State argues, in addition, that it would be "harmful to this case" to assign the remand to a different judge. They note the current trial judge's familiarity with "every aspect of this case," and contend that it would be difficult for another judge to step in and decide issues that, in the State's view, are "very fact[-] and legally specific to what has already occurred."

*20 [23][24][25] "There is no absolute right to a substitution of judge at a postconviction proceeding. [Citations.] Rather, the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced. [Citations.]" *People v. Hall,* 157 Ill.2d 324, 331, 193 Ill.Dec. 98, 626 N.E.2d 131 (1993). In order to obtain a remand to a new judge, a defendant must show "something more" than simply that the judge presided over the defendant's earlier trial. *People v. Vance,* 76 Ill.2d 171, 181, 28 Ill.Dec. 508, 390 N.E.2d 867 (1979). A defendant can show " something more" by demonstrating "animosity, hostility, ill will, or distrust" (*Vance,* 76 Ill.2d at 181, 28 Ill.Dec. 508, 390 N.E.2d 867), or " prejudice, predilections or arbitrariness" (*People v. McAndrew,* 96 Ill.App.2d 441, 452, 239 N.E.2d 314 (1968)). "To conclude that a judge is disqualified because of prejudice is not * * * a decision to be lightly made." *Vance,* 76 Ill.2d at 179, 28 Ill.Dec. 508, 390 N.E.2d 867.

[26] In the case at bar, we agree with defendants that the trial judge appears to have improperly prejudged a central issue in defendants' postconviction case: whether defendants' newly discovered evidence against Guevara is sufficient to warrant postconviction relief. In ruling on Solache's postconviction petition, the trial judge found, among other things, that the new allegations against Guevara were "not so conclusive as to change the result on retrial." The court explained: "This court does not believe that a reasonable probability exists that had the court been aware of these twenty three

(23) allegations that the result of the hearing on the motion to suppress would have been different." While this sort of conclusion is invited by one of the three parts of the *Patterson* test, we emphasize, as previously indicated, that *Patterson* itself dealt with a second-stage postconviction proceeding, where the trial court is to determine whether the petitioner has made a substantial showing of a constitutional violation. *Edwards,* 197 Ill.2d at 246, 258 Ill.Dec. 753, 757 N.E.2d 442. In the case at bar, which deals with a first-stage proceeding, the petitioner's burden is lower: the petitioner must merely present the gist of a constitutional claim. *Edwards,* 197 Ill.2d at 244, 258 Ill.Dec. 753, 757 N.E.2d 442. In our view, the trial court's finding in the case at bar that the new allegations against Guevara "are not so conclusive as to change the result on retrial" essentially decided this issue, and, in effect, the entire case. This sort of conclusion is more appropriate to a second-stage proceeding, or, possibly, a proceeding at the third stage, where an evidentiary hearing is held. It is not appropriate to a first-stage proceeding, where "[s]ubstantive questions relating to the issues raised in the petition are not to be addressed." *Smith,* 326 Ill.App.3d at 839-40, 260 Ill.Dec. 462, 761 N.E.2d 306.

The issue here is not whether defendants are guilty. Rather, it is simply whether defendants have, by virtue of their new evidence, presented the gist of a constitutional claim that their confessions were coerced. In this instance, the trial court gave the impression of being unwilling to consider whether defendants had met this burden.

*21 We conclude that defendants would be " substantially prejudiced" (*Hall,* 157 Ill.2d at 331, 193 Ill.Dec. 98, 626 N.E.2d 131) if this case were remanded to the same trial judge. Accordingly, we remand the cause to the presiding judge of the criminal court, with the direction that the case be assigned to a different trial judge. Because of our decision, we need not address the remaining arguments raised by defendants in these appeals. *Dredge,* 148 Ill.App.3d at 914, 102 Ill.Dec. 552, 500 N.E.2d 445.

CONCLUSION

--- N.E.2d ----                                                      Page 23

--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)
**(Cite as: --- N.E.2d ----)**

We reverse the trial court's judgment summarily
dismissing defendants' postconviction petitions. The
cause is remanded to the presiding judge of the
criminal court, with directions that it be assigned to
a different trial judge.

Reversed and remanded with directions.

McBRIDE, P.J., and GARCIA, J., concur.

> FN1. Defendants' petitions for leave to
> appeal these appellate court decisions to
> the Illinois Supreme Court were denied on
> October 6, 2004.
>
> FN2. On June 19, 2000, the date of
> Rosauro's testimony, he stated that he was
> no longer married to Adriana.
>
> FN3. The argument in favor of
> reassignment was made by Solache in his
> brief to this court. In Reyes' brief, Reyes
> adopted this issue "as raised by Gabriel
> Solache in his brief."

Ill.App. 1 Dist.,2006.
People v. Reyes
--- N.E.2d ----, 2006 WL 3594196 (Ill.App. 1 Dist.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

APPENDIX "D"

(ALFONZO PINEX "Torture Report" p.275-292)

## **ALFONZO PINEX**

Eddie McKeever was murdered on August 4, 1982, in a gang-related shooting. On May 29, 1985 Officers Anthony Maslanka and Michael McDermott arrested Samuel Hayes for armed robbery. He offered information about the murder of Eddie McKeever. He said that on the night that McKeever was shot Pinex had told him that he had shot McKeever. Hayes met with the officers at Detective Area 2 the next day and gave another statement in which Hayes described the circumstances under which McKeever had been killed.

Another witness, Roosevelt Strong, gave the police information that Pinex and Hayes were involved in the shooting of McKeever. According to Strong, the motive of the McKeever murder was the fact that McKeever was or had been a witness against Jeffrey Collins. McKeever alleged that Collins had attempted to murder him. At the time the police were interviewing Roosevelt Strong, Collins was serving time in the penitentiary for the previous attempted murder of McKeever.

The police re-interviewed Sammy Hayes, who told them that he, Pinex and others planned the killing of McKeever. They subsequently met Jeff Collins and Mark Pillette, who were riding in Collins' mother's car. Hayes said they saw Eddie McKeever riding a bicycle, and Pinex shot him.

Mark Pillette was arrested and told the police he was present when McKeever was shot. Jeff Collins, Pinex and Sammy Hayes were also present. Pillette said that Pinex and Hayes shot McKeever. Collins was the driver of the car. Pillette subsequently gave a court-reported statement to Assistant State's Attorney James Bigoness, who was assigned to the Felony Review unit.

275

−285−

Bigoness and the officers again interviewed Hayes at Cook County Hospital. He was informed of what Pillette had said. He admitted that he had fired one shot into McKeever's head as he was lying on the ground. Hayes also gave a court-reported statement to Bigoness.

Some of the officers accompanied Assistant State's Attorney Tom Roach to Logan Correctional Center in Lincoln, Illinois where Collins was imprisoned. Collins said he had not shot anyone, but he was the driver of the car when McKeever was killed. He said Hayes and Pinex did the shooting. A tape recording of his statement was reduced to writing; he read it and signed it.

Bigoness approved a murder warrant for Pinex. Pinex was arrested on June 28, 1985, and a statement was taken from him by Bigoness, who testified that he wrote out his summary of what Pinex was telling him. Pinex signed that summary in the presence of Bigoness and Maslanka.

Hayes, Collins and Pinex were indicted for the murder of McKeever. Hayes and Collins were convicted, but their convictions were reversed. They were retried, reconvicted and sentenced to 24 and 23 years respectively in the penitentiary.

Pinex made a motion to suppress his statement, which was allowed by Judge Michael Getty, who made a number of findings of fact which we will refer to in more detail later. One of the findings of fact was that during custodial interrogation Pinex told the officers that he had an attorney and wanted the attorney present during the questioning. But despite his request, Judge Getty found, Maslanka and McDermott "notwithstanding the defendant's assertion of his Miranda rights," questioned the defendant and this questioning was in violation of the defendant's constitutional rights.

276

Based on that finding, Judge Getty suppressed the statement. He advisedly declined to "reach the issue of whether or not the defendant was beaten." He said that it was not necessary for him to make that determination. Pillette recanted his previous statement, and Collins refused to testify for the State. The State then nolle prossed Pinex's indictment.

Shortly after the State dismissed his indictment, Pinex filed a suit against the City of Chicago in the Circuit Court of Cook County, alleging that McDermott and Maslanka had beaten him at Detective Area 2. The suit was settled on November 1, 1991, by payment of $5,000 by the City.

The principal witnesses for Pinex included his lawyer before and at the time of his arrest, Freddrenna Lyle. We have interviewed Pinex and Lyle and we have read their testimony at the motion to suppress. We also interviewed the mother and wife of Pinex.

According to the police reports, tactical officers from the 22nd District located at 111th & Monterey received information from a confidential informant that Alfonzo Pinex, who was wanted on a murder warrant, could be found in the vicinity of 66th & Hoyne Avenue. (The 22nd District is located in Detective Area 2 at 111th & Ellis.) The tactical officers met the informant at 66th & Seeley at approximately 10:20 p.m. on June 28, 1985. The informant told them that Pinex was staying with a girlfriend, Kim West, at 6614 South Hoyne. (6614 South Hoyne is located in the 7th Police District. The 7th Police District station is located at 61st & Racine.) An officer from the tactical unit of the 7th District joined the tactical officers from the 22nd District, and Pinex was arrested at 6614 South Hoyne. The Violent Crimes unit of Detective Area 2 was notified.

According to a report signed by Maslanka and McDermott, Pinex was transported to the 22nd District "for processing." Maslanka and McDermott advised the arresting officers that Pinex should be transported via squadrol to Area 2 for further investigation. Maslanka and McDermott were at the station at the 22nd District when Pinex was brought there. They saw him but did not question him.

Pinex testified at the motion to suppress that he was picked up by the police at the home of his girlfriend, Kimberly West, on June 28, 1985. He was first taken to the police station at 61st & Racine, then to the police station at 85th & Green and finally to the Detective Area at 111th & Michigan where he was taken upstairs to a room. (We believe that he was mistaken when he said he was taken to the station at 85th & Green. We believe that he was taken to the station at 111th & Monterey, District 22.) Maslanka and McDermott came into the room. When he was arrested Pinex had a lawyer, Freddrenna Lyle. Pinex had talked to Lyle before he was arrested on June 28. Lyle had called and talked to him about the case. She told Pinex that they were going to turn him in on Saturday, June 30. He was arrested near midnight on June 28, which was a Thursday.

Pinex said that Maslanka started to question him by saying Pinex knew what he was there for and Maslanka didn't want "no bullshit." He asked Pinex to tell him what he knew about the Eddie McKeever murder. Pinex said he would like to have his lawyer present before he said anything. Maslanka told him that he didn't have a lawyer. Pinex told him that he did have a lawyer, because he was supposed to be turning himself in the next day. Maslanka told him that Pinex was lying, and he was tired of Pinex lying to him. He told Pinex that the police had "papers" of Sammy Hayes and Mark Pillette. (The "papers" were the statements made by Hayes and Pillette to Bigoness.) Maslanka

278

then read them, and Pinex said that he didn't care what the papers said. Maslanka told him to shut up and listen, and he played the tape of Jeffrey Collins which implicated Pinex. After playing the tape, Pinex told the officers that he didn't care what they were saying, they were all lying.

Maslanka struck Pinex in his eye. McDermott jumped over and started helping Maslanka. McDermott started to hit Pinex in his ribs and grabbed his leg so that Pinex could not move. Pinex was just trying to cover up to stop from being hurt too bad in the face. The beating caused him to defecate in his pants. He was wearing underwear which he was able to dispose of. To make them stop the beating, Pinex had hollered, "Okay, I'll do what [you] want me to do."

Pinex testified that the beating occurred immediately after he heard the tape and after he said "he did not care what they were saying, they are all lying." Maslanka started the beating with his first blow to the corner of Pinex's right eye. After Pinex leaned over, Maslanka grabbed his hair, and McDermott was beating Pinex in the ribs. He kneed Pinex at the same time. He was struck maybe three, maybe more times in the right eye. Maslanka first struck him in the eye. At one point he was kneed in the eye.

He was also beaten in his ribs more than once. He was struck on the side of his ribs; the lower part in the ribcage. McDermott beat him in the ribs with his fists. Maslanka also kneed him in the left eye. He was struck in his right eye, left eye and right portion of his head.

About ten minutes after the beating, Pinex saw Assistant State's Attorney James Bigoness. Maslanka was in the room. Pinex said he told Bigoness that he had been beaten by Maslanka. He was crying. Bigoness told him to pull himself together.

279

Bigoness read the statement to him and asked if he had said that. When he heard the part of the statement about Pinex being treated well by the police, he told Bigoness, "I told you they have bruised me." Bigoness said that he didn't look like he had been bruised. Bigoness never mentioned a court-reported statement, and Pinex never told him he wanted to give a court-reported statement. He never saw Bigoness write down what is contained in the statement that was offered by the State. (A copy of that statement is attached to this report as Pinex Exhibit 1.)

He had seen McDermott and Maslanka earlier at what Pinex said was 84th & Gresham. (The station at 85th & Green is called the Gresham police station.) Even though he was not given Miranda warnings, he knew he had a right to remain silent. On cross-examination, he said that he had never given a statement to any police officers at any time. He saw Bigoness after he told police he would make a statement. Bigoness introduced himself.

Freddrenna Lyle arrived, and Pinex told her that he had been beaten by the police. Some time later, Lyle and Bigoness came in to talk to Pinex. Pinex told Bigoness where and how he had been beaten. The police had come to the room and said to Pinex that he told his lawyer that he had been beaten. Pinex said, "Yeah, I told her that." Pinex pointed out the portions of his body where he had been beaten.

Pinex said that he had worn reading glasses before. There was nothing wrong with his right eye until it became blurred after he had been beaten. His eye injury was the only one serious enough to have treatment for.

Freddrenna Lyle testified that she had met Pinex in maybe '83 or '84 and that she had been called by his mother several days before June 28 and requested to represent

Pinex. She made arrangements with the police to turn him in that Saturday at the station at 51st & Wentworth (the 2nd District; also Detective Area 1) at 3:00 p.m. Those arrangements were made on Thursday; she could not get there before Saturday. Mrs. Pinex had given Lyle a card with the number and name of some officers she had been talking to; Lyle took the card and called the officers. (Mrs. Pinex had received the card from policemen who came to her home with a warrant seeking her son.) Lyle was aware that there was a warrant for Pinex's arrest outstanding; this was the reason she had arranged to surrender him. Pinex was aware of the fact that she had been retained to represent him because she had spoken to Pinex and made arrangements as to what time and where they were supposed to go to turn him in. She was unable to find the card with the officer's name and did not remember the name of the officer.

She received a call from Pinex's family about 11:00 or 11:30 p.m. on June 28. She got out of bed and went to 51st & Wentworth; where she had been advised he had been taken. She went to the desk and asked where Pinex was; they checked the records and said he wasn't there. Lyle had been told by an Officer Richardson that Pinex was in custody at 61st & Racine, so she went to that station. She got there about five or ten minutes later. She identified herself on the phone to Richardson, and asked whether Pinex was in custody there, and Richardson said yes, and she went right over.      When she had arrived at 61st & Racine Pinex was not in the lock-up. She became rather agitated and asked the desk sergeant to find out where Pinex was. The desk sergeant called the lock-up, and no one knew where Pinex had been taken. After about ten minutes one of the officers who had assisted in making the arrest informed the desk sergeant and Lyle that Pinex had been taken to Detective Area 2.

281

Lyle asked the desk sergeant at 61st & Racine to call Area 2 before she went all the way out there, and the desk sergeant did. She was told that Pinex was not in the lock-up there. The desk sergeant then asked for Violent Crimes detectives and, after speaking to someone there, learned that Pinex was with the detectives. The sergeant told the detectives that Lyle was Pinex's attorney, that she was looking for him and that she was on her way out to Area 2.

Lyle arrived at Area 2 about 12:05 or 12:10 a.m. She immediately went to the desk, showed her identification and told the police at the desk that she wanted to see her client immediately. She was told that he wasn't in the lock-up. She told the officer that Pinex was with the Violent Crime detectives, so the police officer called up to Violent Crimes and indicated that there was an attorney downstairs who wanted to see Pinex. She was then asked to have a seat. She was kept waiting for about ten to fifteen minutes; then she went back to the desk and complained about the delay.

About five minutes later McDermott came downstairs and escorted Lyle up to the second-floor where Pinex was being questioned. On the way up the stairs McDermott asked Lyle whether she knew what the arrest was about. She said that she did know.

When she arrived on the second-floor she saw Assistant State's Attorney Bigoness and Maslanka standing outside a room. There was a court reporter sitting at one of the desks. She knew it was a court reporter because her machine was there. (It was later established that a court reporter was called by Bigoness, and the court reporter arrived at Area 2. Bigoness excused the court reporter because, according to a police report, Pinex had made a statement.) Lyle asked Bigoness whether he was getting ready to have the court reporter take Pinex's statement, and he answered that he was. After she

282

talked to Bigoness about the court reporter, they took her into a room about three or four feet from where they had been standing. Lyle went into the interrogation room and saw Pinex by himself. As soon as she walked in the door, Pinex started crying. She said he was hysterical. Pinex just kept repeating that they had been beating him, and she kept asking him whether he had made a statement. Pinex kept saying that he had asked for his lawyer and that they had been beating him. She kept asking Pinex whether he had made a statement, and he told her that he had.

She left the room and spoke to Bigoness and told him that Pinex said he had beaten. Bigoness told her that that's what they all say after giving a confession. She told him she was not concerned about what they all say; that her client said he had been beaten and that he had told Bigoness that he had been beaten. Maslanka went back into the room where Pinex was and Lyle followed him. Maslanka said to Pinex, "So you told your lawyer we had been beating you." Pinex answered, "Yes, I told her you had been beating me." Maslanka then said to Pinex, "You don't look like you've been beaten to me and we're going to take pictures for our protection."

About fifteen minutes later someone came back with a camera and proceeded to take pictures of Pinex. Lyle told the police not to take the pictures for her satisfaction, because Pinex was too dark skinned and there would be no bruises. If they were to strike somebody as light as she was that person would bruise easily, but someone as dark as Pinex would not show bruises until the next day. Lyle said that the police said they were going to take the pictures for their protection anyway.

Lyle stood in the hallway, and the police asked Pinex where he had been beaten. They proceeded to take pictures of his face and his ribs and then had him pull up his shirt.

283

Pinex had already told Lyle that he had soiled his pants and that they had allowed him to remove his underclothes. When the police told Pinex to drop his pants, Lyle knew that he didn't have any underclothes on so she turned away. (We have examined the pictures. There are two pictures taken of Pinex without his pants on; he is not wearing any underwear. Some of the pictures also show bloodshot marks in his lower left eye.) In an interview with this office, Lyle said that she had instructed Pinex that he was not to answer any questions by the police after he surrendered.

Celestine West is the mother of Kimberly West, the estranged wife of Pinex. West stated that on the day of Pinex's arrest both her daughter and a neighbor telephoned her and told her that police officers had surrounded her house. By the time West arrived home the police officers were taking Pinex from the house and placing him in a police automobile. Pinex supposedly was to be taken to the station located at 61st & Racine. When West and her daughter went there they were told that Pinex had been taken to the station located at 51st & Wentworth. At that station they were told that Pinex had been taken to the station located on 111th Street (the 22nd District). When they arrived at the 111th Street station they were told that Pinex was not there.

She and her daughter returned home, and some time later received a phone call from Pinex. He told her that he was in custody at Area 2. (Area 2 is on 111th Street but farther east than the 22nd District.) Pinex requested them to bring him clean underclothes because he had soiled himself while in custody. West and her daughter went to Area 2 that evening with the requested clothing which they turned over to the desk officer. They saw and spoke to Pinex in the visiting room area separated from him by a glass partition. West retained an attorney, Walter La Von Pride, for Pinex's defense. (Pride is now

284

_294 _

deceased.) Pride represented Pinex after he had been indicted. His motion to suppress was granted.

In a statement to our office, Kimberly West Pinex corroborated the statement of her mother. She made numerous visits to Pinex while he was in the county jail. She recalled that on the occasion of the first visit his eyes were still bloodshot. She was sure that at the time of his arrest Pinex had no damage to his eyes and was in excellent physical condition. Following the dismissal of the charges against Pinex in 1986, she and Pinex were married. They are still married, although they do not live with each other.

Frances Pinex is the mother of Alfonzo Pinex. She was not able to go to the Area 2 station because she was sick at the time, but she did notify Freddrenna Lyle of Alfonzo's arrest. She retained Walter La Von Pride to defend her son in connection with the murder charges. She first saw her son after the arrest when he was an inmate at Cook County Jail. His eyes were swollen and red.

Daniel Olsen was a Cermak Hospital physician assistant who did the history and physical examination at the Cook County Jail intake. His signature appears on the Pinex History and Physical Exam Sheet dated June 30, 1985. Olsen is now a physician living in Grand Rapids, Michigan. He says he does not want to be involved and fears being sued, but he did identify a document appearing to be one that was used in 1985. From the bottom part of the form Olsen identified his own handwriting, which indicated that Pinex complained of red eyes and blurred vision secondary to blows. He also determined that there were bilateral subconjunctive hemorrhages. He said that he had probably been requested to examine Pinex because of Pinex's complaint of blurred vision and the redness in his eyes.

285

Dr. Scott Cooper worked at Cermak Hospital. Cooper now practices internal medicine in Johnson City, Tennessee. On January 23, 2006 he was interviewed by a representative from this office.

He examined Pinex on November 14, 1985, relative to a complaint by Pinex that he had a pain in his right eye. Pinex said he had blurring of vision and burning of his eyes for two to three months. He told Cooper he had been hit in the eyes five months before. A vision test revealed that in his left eye Pinex was 20/200 and 20/100 in his right eye. In Dr. Cooper's opinion the finding made by Olsen of a subconjunctive hemorrhaging in both eyes would be consistent with a blow or beating to the head or the area of the eyes endured by the patient.

Maslanka and McDermott both testified at the motion to suppress, but they have refused to give any statement to this office. Bigoness also testified on the motion to suppress and has been interviewed by this office. In the motion to suppress both officers denied any abuse of Pinex. They also denied any knowledge that Pinex had a lawyer. Bigoness also denied that Pinex told him that he had been beaten. It was stipulated by the State and the defense that Bigoness was not present at any time while Pinex was abused.

Judge Getty made findings that Lyle did have an agreement with the police to surrender Pinex on Saturday, the 30th; that Pinex did tell the police that he had an attorney and wanted the attorney present before questioning. He concluded by singling out McDermott and Maslanka as the persons who, by their persistence in questioning Pinex, violated his constitutional rights. The only specific reference he made to Bigoness occurred when he said the following:

> "The court further notes that it's very unusual that thereafter
> the Assistant State's Attorney in a homicide case proceeded to take

286

> a summary statement, rather than a court-reported statement, lending itself to make an indication that there was a great deal of hurry, possibly, to get the whole thing done before somebody like Ms. Lyle arrived.

> It's curious, also, that Ms. Lyle was held for 15 to 20 minutes at Area 2 in a downstairs office, just enough time to get that statement and the signing of the statement.

> It is curious further -- not that there's corroboration -- the defendant's contention that he soiled himself, as he put it, and he had no underpants on when they sought to take his picture."

As noted, we have interviewed Lyle, Pinex and James Bigoness. The police officers have refused to talk to us, but we have come to a conclusion without considering their refusal to speak to us. Our conclusion is first that we agree with all the findings of fact by Judge Getty:

1. Lyle did have an agreement with the police to surrender Pinex.

2. Pinex did tell the police that he had an attorney and wanted her present before any questioning. It defies common sense to say that Pinex did not follow the instructions given to him by Lyle.

3. It was unusual for Bigoness to take a summary statement rather than a court-reported statement. Judge Getty's inference that the police and Bigoness were in a hurry was reasonable.

4. It was also reasonable for Judge Getty to infer that Lyle was stalled.

Although Judge Getty alluded to the fact that Pinex had said that he soiled himself, the judge expressed no inference. But we will: As factfinders we conclude that Pinex did soil himself and that he did so because of physical mistreatment.

In order for Judge Getty to come to the conclusion that he did, he would have had to come to the conclusion that the police, at least, were not telling the truth about whether

they knew that Pinex had a lawyer, he wanted his lawyer present and that his lawyer was deliberately given the run-around. We agree; we do not believe they were telling the truth. That being so, the question becomes what effect does that conclusion have on the question of the credibility of the officers in their denial of physical mistreatment. In our judgement, as factfinders we may believe that we may consider the police officers' willfully false testimony that Pinex did not tell them he had a lawyer and wanted his lawyer present in determining the truth of their denial of mistreatment. Moreover, Pinex's testimony is corroborated by the fact that he had to change pants; but the strongest corroboration of all is the medical testimony of Dr. Olsen and Dr. Cooper. Pinex did suffer an injury to his eye.

In addition, the testimony of the police and Bigoness contains its own improbabilities.

Consider these facts: According to the police Pinex arrived at Detective Area 2 at 11:45 p.m. and was placed in an interview room. At that time Maslanka and McDermott spoke to Bigoness, "who was already at Area 2 on a separate assignment." They informed Bigoness that Pinex was in custody at Area 2 headquarters. They then began the questioning of Pinex. According to Bigoness' Felony Review Report he was first contacted by McDermott and Maslanka at about 12:30 a.m., but about 15 minutes later (12:45 a.m.) according to the report, the officers were telling Bigoness that Pinex had confessed. That means that all that the officers had testified to - the accusations they made to Pinex, the denial, the reading of the statement of Hayes and Pillette, the playing of the tape of Collins' report and the oral confession Pinex allegedly made to the police all took place in 15 minutes.

288

- 298 -

Consider also these facts: The warrant was issued for Pinex's arrest on June 8, 1985. Twenty days later (June 28) his attorney made arrangements to surrender him on June 30. The very day that his attorney made arrangements to surrender Pinex, a "confidential informant," who apparently had been silent for almost three weeks now told the tactical officers from the 22nd District, not the 7th District where Pinex was allegedly staying, and where Pinex could be found.

Detective Area 2 officers, McDermott and Maslanka, who had been in on the investigation since May 29, when they interviewed Sammy Hayes, were notified of the upcoming arrest. They went first to District 22 and told the tactical officers to take Pinex to Detective Area 2, where they would be waiting to interrogate him. And when the officers got to Detective Area 2, who should be there to assist them in case Pinex wanted to make a statement, but the very assistant who had taken the statements from Hayes and Pillette and approved a warrant for Pinex's arrest on June 8, 1985, an assistant state's attorney who just happened to be at Area 2 on another assignment. Bigoness does not recall what that other assignment was.

It is undisputed that Bigoness was not present when Pinex was mistreated by the police; and there is no direct evidence that he was aware before he began his questioning that an arrangement had been made by Pinex's lawyer to surrender him. (Bigoness testified that Pinex told him, after his oral statement but before his written statement, that he had an arrangement to surrender.)

Pinex testified that he did tell Bigoness that he had been beaten; and Bigoness denied that he had done so. A factfinder could reasonably determine that Pinex was telling the truth.

We do not have proof beyond a reasonable doubt that Bigoness aided and abetted any mistreatment of Pinex; but, in our judgment, we have sufficient evidence to present to a grand jury and seek the indictment of Maslanka and McDermott for aggravated battery, perjury and obstruction of justice.

Edward J. Egan

Thomas J. Reed

## ALFONZO PINEX EXHIBIT NO. 1

STATEMENT OF

_Alphonso Pinex_

Taken _June 29, 1995_ At _1:15 a.m._

At _Area 2 Headquarters_

Present _ASA James Brewer_

_Det. J. A. McVlenke_

This statement taken regarding the _death_
of _Willie McKiever_ which occurred on _Aug. 4, 1972_
at _1557 W. 96 rn St._ at _12:40 a.m._

I understand I have the right to remain silent and that
anything I say can be used against me in a court of law.
I understand that I have the right to talk to a lawyer
and have him present with me during questioning, and if
I cannot afford to hire a lawyer one will be appointed
by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

x _Alfonzo Pinex_

After being advised of his rights, Alphonso
Pinex, in summary, stated as follows:
that on August 3, 1982 he was known
as "Chief Lee" because he was the
head of the Division street gang. On
that date he called a meeting of his
gang in the basement. About 15 members
appeared, including Jeffrey Collins, Mark
Pillette, and Danny Hayes. The purpose
of the meeting was to talk about ways
to raise some more money. The meeting
lasted from around 6:00 p.m. until
about 8:00 or 9:00 p.m. At about 10:00
p.m. Pinex was still home when Collins
and Pillette picked him up in Collins'

ASA ~~Brewer~~               _Alfonzo Pinex_

291

car. They then picked up Sammy Hayes around 91st and Marshfield. They rode around "looking to get high" for a couple of hours. They then stopped at a liquor store at 91st and Marshfield. Collins went inside to buy some liquor. Sammy then yelled out "there is a rock," meaning that he had seen a Blackstone. The Blackstones and Disciples were feuding. Sammy had his handgun with him and Pincx had a loaded .22 handgun. After Sammy yelled, Pincx, Pillette and Sammy Hayes ran towards a young man who was riding his bike near 90th and Ashland. Sammy Hayes ran up to within 5 feet of the young man, yelled "Disciples," and fired once. Pincx said he then aimed his gun at the victim and fired once. Sammy then fired his gun at the victim several more times. The victim fell back. Pincx and Pillette ran with Hayes right behind. They got back in the car and drove to Brandon Park where Pincx threw the gun in some bushes.

Pincx said that he had been treated well by the police and that no threats or promises had been made in return for this statement. ⸱ Alfonso Pincx
⸱ ASA [signature]
⸱ Det. Sgt. [signature]

292

−302−