IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG 2 1 2008
AUG 21 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES ex rel.
TONY ANDERSON (B-16044),          )
                                  )
        Petitioner,               )
                                  )
-Vs-                              )   No. 08 C 3979
                                  )
TERRY McCANN, WARDEN              )   Honorable Elaine E. Bucklo,
STATEVILLE CORRECTIONAL           )   Judge Presiding.
CENTER,                           )
                                  )
        Respondent.               )

## PETITIONER'S RESPONSE TO COURT ORDER OF 7/30/08

COMES NOW Petitioner <u>Tony Anderson</u>, Pro-se, and hereby respectfully
files his "Response to this Court's ORDER of 7/30/08", and hereby asserts
the following:

1.    Prior to filing the instant Petition for Writ of Habeas
Corpus pursuant to 28 U.S.C. § 2254 to challenge his 1991 conviction
counts of attempt first-degree murder, armed robbery, and armed
violence <u>Based</u> on "Newly Discovered Evidence" that was deliberately
withheld by State Officials.

2.    Petitioner was informed by the Law Office of Standish E.
Willis, Ltd., 407 S. Dearborn, Suite 1395, Chicago 60605 (312)-554-0005
that they would be filing this Petition for Writ of Habeas Corpus on
Petitioner's behalf.

3.    Petitioner did not hear from the Law Office of Standish E.
Willis, and feared missing (Defaulting) on the filing deadline and
therefore prepared a Pro-se Petition and filed it with the District
Court.

4.    The Law Office's of Standish E. Willis likewise <u>filed</u> a
Petition for Writ of Habeas Corpus on petitioner's behalf (See: Attached

-1-

"Petition for Writ of Habeas Corpus By a Person in State Custody"--
Authored By: The Law Office of Standish T. Willis), which was
apparently simotaniously filed on petitioner's behalf in this Court.

    5.    It is respectfully requested that this Honorable Court
find that Petitioner is being represented by Standish E. Willis Ltd,
and the Court further would view the Petition prepared by the Law
Office of Standish E. Willis, Ltd as an Amended Petition or incorporate
the pro-se and counsel's Petition for Writ of Habeas Corpus pursuant
to 28 U.S.C. § 2254 which can better be represented by counsel.

    6.    Petitioner is unaware if another case number was assigned
to the Petition for Writ of Habeas Corpus filed by the Law Office of
Standish E. Willis, or whether they reflect the same case number in
this Honorable Court.

    7.    Petitioner further is under the understanding that the $5.00
Filing Fee has been paid by the Law Office of Standish E. Willis upon
the filing of the Petition of Writ of Habeas Corpus with the Clerk of
this Honorable Court.

    8.    As noted in the Petition for Writ of Habeas Corpus filed by
The Law Office of Standish E. Willis Ltd This Petition is properly
before this Court and is clearly based on "New Evidence", which was
not made available to Petitioner initally filed a Petition for Writ
of Habeas Corpus in(Anderson v. Briley, No. 03-1927) which was dismissed
as untimely (Order dated June 3, 2003).

    9.    The Issues in this instant Petition have been presented to
and Exhausted through the State's highest Court, and therefore
Jurisdiction is properly invoked to this Honorable Court.

WHEREFORE, for the reasons beforementioned, It is respectfully prayed that this Honorable Court Find that Petitioner is being represented by counsel (The Law Office of Standish E. Willis, Ltd.), Further, that Petitioner's Pro-se Petition for Writ of Habeas Corpus and counsel's Petition for Writ of Habeas Corpus that was filed in this Court be filed under the same Case Number, and further incorporate the two petitions, and/or consider Counsel's Petition an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Further, Find that the Filing fee has been paid by the Law Office of Standish E. Willis, Ltd. and allow the Petitioner to proceed with his just cause of action.

Dated: On this _11_ day
      of _August_, 2008.

Respectfully submitted,

TONY ANDERSON B-16044 (Petitioner Pro-se)
Stateville Correctional Center
P.O. Box 112
Joliet, Illinois 60434-0112

cc: Law Office of Standish E. Willis, Ltd.
    407 S. Dearborn, Suite 1395
    Chicago, Illinois 60605
    (312)-554-0005

Court Name: Northe:      :trict of Illinois
Division: 1
Receipt Number: 1624006604
Cashier ID: lisufi
Transaction Date: 07/31/2008
Payer Name: STATEVILLE CC INMATE TRUST FUN
--------------------------------------
WRIT OF HABEAS CORPUS
 For: TONY ANDERSON # B16044
 Case/Party: D-ILN-1-08-CV-003979-001
 Amount:     $5.00
--------------------------------------
CHECK
 Check/Money Order Num: 141557
 Amt Tendered: $5.00
--------------------------------------
Total Due:      $5.00
Total Tendered: $5.00
Change Amt:     $0.00

NEW HABEAS CASE 08CV3979 FILING FEE


206807  7/29/08


Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $45 fee will
be charged for a returned check

**Stateville Correctional Center   Trust Fund**
Post Office Box 112
Joliet, Illinois  60434

**141557**

Check Date
07/23/2008

| Vendor:  10431 Clerk Of The United States District Cour | | STAF 0405 | | |
|---|---|---|---|---|
| Description | Invoice # | Inv Date | Inmate | Net Payable |
| fee federal hapeaus corpus #90CR11984 | C0722016 | 07/22/2008 | B16044 Anderson, Tony | 5.00 |
| | | | Total: | 5.00 |

08CV3979

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel<br>TONY ANDERSON,<br>                Petitioner | )<br>)<br>)<br>) | |
| v. | )<br>) | No. |
| TERRY L. McCAN, WARDEN<br>STATEVILLE CORRECTIONAL<br>CENTER, | )<br>)<br>)<br>) | |

## Petition For Writ of Habeas Corpus
### By a Person in State Custody

TONY ANDERSON #B-16044, petitioner, herein, by and through his attorneys, Standish E. Willis and Angela Lockett, of the Law Office of Standish E. Willis, respectfully petitions for a writ of habeas corpus under 28 U.S.C. § 2254, and in support alleges and states as follows:

### Procedural History

1.    The name and location of the court that entered the judgment of conviction and sentence under attack are:

      a) Circuit Court of Cook County, Illinois, County Department, Criminal Division.

      b) Chicago, Illinois.

2.    The date of judgment of convictions is August 9, 1991.

3.    Mr. Anderson was sentenced to 50 years imprisonment for first degree murder, 30 years for each count of attempt First Degree Murder and Armed Robbery, and 5 years for Attempt Escape all to run concurrent.

4.    On August 9, 1991, Mr. Anderson pleaded guilty to first degree murder (in case no. 90 CR 11979), two counts of attempted first degree ( in case no. 90 CR 11983, 90 CR 11986), seven counts of armed robbery ( in cases 90 CR 11780, 90 CR 11990, 90 CR 11987, 90 CR 11988, 90CR 11989, 90 CR 11990, 90 CR 11991, and 90 CR 660648) and one count of attempted escape (90 CR 11982).

5.    Mr. Anderson pled guilty.

6.    Mr. Anderson pled guilty and, therefore, he did not have a trial.

7.    On November 1, 1991, Mr. Anderson moved pro se to vacate his guilty pleas, in each of the foregoing cases, arguing that he did not understand the plea agreement, the nature of the charges, or that the potential sentences could run consecutively to his other convictions in case nos. 90 CR 11984 and 90 CR 11985. He also argued that his attorney had "coerced" him into pleading guilty by telling him that if he did not do so, he would likely get the death penalty.

8.    On December 17, 1991, the Circuit Court *sua sponte* indicated that it would treat Mr. Anderson's motion to vacate as a post-conviction petition because it was untimely as it was filed 30 days after he had entered his pleas of guilty.

9.    The court then went on to dismiss Mr. Anderson's post-conviction petition.

10.    Mr. Anderson appealed the circuit court's dismissal of his petition arguing that it was improperly dismissed without an evidentiary hearing more that 30 days after its filing.

11.    On May 4, 1992, the Appeals Court remanded the cause solely for appointment of counsel and a hearing to determine whether the allegations in Mr.

2

Anderson's Petition were frivolous. On remand, the circuit court ruled that the claims raised in Mr. Anderson's petition could have been raised on direct appeal and were thus frivolous and patently without permit. Mr. Anderson filed a motion to reconsider this ruling, and the court denied it.

12.    On April 28, 2000, Mr. Anderson filed a single *pro se* post-conviction petition encompassing case nos. 90 CR 11979, 80, 82, 83, 86, 87, 88, 90, 91, and 90 CR 60648, in which he alleged that he was deprived of effective assistance of counsel when counsel "coerced" him to plead guilty through repeated threats that if he proceeded to trial, he would received the death penalty. He also argued that counsel was ineffective for failing to file any motions, and for appearing drunk in court on the day of his guilty pleas.

13.    On May 16, 2000, the circuit court dismissed Mr. Anderson's second petition as untimely and frivolous.

14.    On March 19, 2002, the Appeals Court upheld the dismissal of Mr. Anderson's petition.

15.    On December 9, 2004, Mr. Anderson filed a "Petition for Leave to File a Successive Petition for Post-Conviction Relief". In this petition, he alleged that his plea was made as a result of police coercion, and that he made his incriminating statement at Area 2 Violent Crimes as a result of torture inflicted by Area 2 and Area 3 detectives. Mr. Anderson also contended that counsel "coerced" him into pleading guilty to the crimes to which he confessed. He further argued that in violation of Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the State failed to disclose to him that Detectives Maslanka and McDermott had been accused of torture by other defendants.

3

and that there were numerous instances of similar police abuse at Area 2 and Area 3 under the command of Jon Burge.

16.     On January 4, 2005, the circuit court dismissed the above petition without a written order.

17.     On February 16, 2005, the circuit court denied Mr. Anderson's motion to reconsider the denial of his motion for leave to file a successive post-conviction petition.

18.     On July 20, 2007, the Illinois Appeals Court affirmed the order of the Circuit Court of Cook County.

### Statement of Facts Relating to Tony Anderson's Plea

#### Events leading to Tony Anderson's indictment

20.     Petitioner was arrested on April 18, 1990 for the alleged offense of auto theft. Mr. Anderson was in an automobile with his wife, Ferniece Burkley and friend, Robert Allen. He was transported to the police station at 11th and State Streets in Chicago, Illinois. Later, the arresting officers verified through the vehicle's owner that the automobile was not stolen. The officers then alleged that a gun was found in the vehicle that had been used in an alleged homicide.

21.     After being detained at 11th and State for over three hours, and after being denied the use of the telephone and the use of the wash-room, the Petitioner was transported to the Area Two police station for questioning by detectives Michael McDermott and John Gallagher. The detectives informed Petitioner that they wanted to question him about the gun found in the vehicle earlier and potential homicides in which the gun had been used. Mr. Anderson denied knowledge of the gun or knowledge of any homicides involving the weapon. Petitioner informed the detectives that he wanted to use

4

the telephone and that he wanted an attorney; both requests were denied. Mr. Anderson was transported to Area Two by detectives McDermott and Gallagher.

22. Upon arrival at Area Two, Petitioner was placed in an interrogation room where he was questioned by detectives McDermott, Gallagher, John Paladino, Anthony Maslanka, Robert Dwyer, and Dennis McClaire. The detectives were playing "good cop, bad cop" with the Petitioner attempting to get him to confess to a murder and a multitude of other unsolved crimes. The Petitioner, however, continued to request an attorney.

23. The detectives continued to refuse to allow the Petitioner to use the telephone to call a lawyer or to allow him to call his family. Finally, the detectives realized that the "good cop, bad cop" strategy was not working. Detective McDermott then asked the other detectives to step out of the room, at which time McDermott stuck a gun to Petitioner's head and told him the he would "blow your brains out" if Petitioner did not confess to the robberies and other crimes.

24. A short time later, the other detectives returned to the interrogation room, and the interrogation continued. Some time later, detective Maslanka took Petitioner into another room where Maslanka insisted that Mr. Anderson wasn't going anywhere until he confessed to the crimes of which he had been accused.

25. Mr. Anderson again told the detective that he did not know anything about the crimes, and that all he wanted to do was to call his family so they could get him a lawyer. At this point, detective Maslanka started jabbing the Petitioner in the ribs, thighs and back with a "night-stick" repeatedly until the Petitioner began to cry from the pain, and eventually screamed out in pain, "okay, I'll say what you want me to say" so that the Maslanka would stop the beating with the night-stick.

26.    At that moment, Maslanka stepped out of the room and almost immediately returned with an Assistant State's Attorney with an already typed confession for Petitioner to sign. The Petitioner who had very little education, who was practically illiterate, and who had endured several hours of torture, signed the typed written confession.

27.    The typed written confession implicated Mr. Anderson for 13 separate crimes within a two month time period.

### The Motion to Quash Arrest, Suppress Evidence and Suppress Confession

#### Anderson's Proofs

28.    Anderson testified at his motion to suppress that on April 18, 1990 he was taken into custody by Chicago police officers near 1100 West 51st Street. He further stated that he was never advised of his Miranda Rights. He was taken to the 11th and State police station, and placed in an interview room where he remained for three or four hours. After being at the 11th and State police station for several hours, he was taken to the Area Two police station at 111th Street by detectives McDermott and Gallagher, and placed in a small, windowless room on the second-floor. While in custody, he was not given food or allowed to use the washroom.

29.    His requests to make a telephone call were repeatedly refused by the detectives at Area Two. His requests to make a telephone call had also been repeatedly refused while at the 11th and State police station. Mr. Anderson wanted to use the telephone to call his mother so she could call a lawyer.

30.    During his detention at Area Two, detective McDermott kept asking Petitioner about armed robberies and Mr. Anderson continuously denied any knowledge of any robberies.

31.    McDermott told Anderson that Robert Allen had signed a statement admitting involvement in some armed robberies. Anderson continued to deny any involvement in any such robberies. In response to Anderson's continued denials, McDermott put a gun to Anderson's head and threatened to "blow his brains out."

32.    Anderson further testified that detective Maslanka pressed a "night-stick" into his ribs, back and chest, and repeatedly jabbed him.

33.    After several hours of undergoing coercion and torture, Mr. Anderson signed a typed statement in which he confessed to thirteen different crimes.

34.    On May 1, 1991, the court denied Mr. Anderson's motion to quash arrest and suppress evidence and identification. The court choose to believe the testifying detectives, including Dwyer, Maslanka, Paladino, Gallagher and McDermott, finding that Mr. Anderson "was not in anyway threatened or abused at any time during the period which is relevant to this motion". P.66.

### Anderson's Involuntary Guilty Plea

35.    In August 1991, Mr. Anderson's newly retained counsel, Thomas Hoffa, failed to appear in court for three consecutive days, despite the fact that the case was set for jury trial and a jury pool was waiting. The trial judge was forced to issue a bench warrant for Mr. Hoffa's arrest. On August 7, 1991, the Assistant State's Attorney informed the trial court the she had spoken to an investigator who visited attorney Hoffa's apartment, and that he reported that Hoffa had "a gash in the side of his head,

7

bruises and swelling to his face. that he was intoxicated. that he was disoriented and that he was unable to move or walk." This information was relayed to Mr. Anderson and the court advised him that "It would be this Court's opinion…, and it is just my opinion, that Mr. Hoffa is not now nor will he be in the near future in a position to represent you in this case." Opinion in State v. Anderson, Illinois Appeals Court, 1-05-1577, p.8-9.

36.     On August 9, 1991, Hoffa finally appeared in court, and represented Mr. Anderson as he pleaded guilty to first degree murder (case no. 90 CR 11979), two counts of attempted first degree murder in case nos. 90 CR 11983, 90 CR 11986), seven counts of armed robbery ( case nos. 90 CR 11780, 90 CR 11987, 90 CR 11988, 90 CR 11989, 90 CR 11990. 90 CR 11991. and 90 CR 660648), and one count of attempted escape ( case no. 90 CR 11982).The factual basis for the plea included the Petitioner's coerced statement confessing involvement in the above incidents.

### Evidence of Systematic Abuse at Area Two

37.     Many of the facts recited in paragraphs 38-72; infra., were developed for the first time by Anderson's post-conviction counsels.

38.     In *Wilson* v. *City of Chicago*, 86-C-2360, the City of Chicago, who was a Defendant in that case. admitted in its Amended Answer, dated July 13, 1995, that Andrew Wilson was tortured by Jon Burge on February 14, 1982.

39.     On May 15, 1995, the City of Chicago admitted that Melvin Jones had been electrically shocked by Jon Burge on his genitals and thigh with a device in a wooden box and threatened with a gun, while he was handcuffed to a ring in the wall in an Area 2 interview room in an attempt to coerce a confession from him. Local Rule 12 N Statement of the City, ¶ 26. (Exhibit A; see also Melvin Jones, Exhibit B).

8

40.     On January 28, 1991, Amnesty International issued a Report calling for "a

full inquiry into allegations that Chicago police systematically tortured criminal suspects

from 1972 to 1984." *Chicago Sun Times,* 1/28/91. "Police Torture Probe Sought Here."

41.     On November 2, 1990 OPS Director Gayle Shines approved as

"compelling" and forwarded to Superintendent Martin the 25 page Report and findings

made by OPS investigator Michael Goldston concerning allegations of torture and abuse

at Area 2. This Report included the following findings:

> As to the matter of alleged physical abuse, the preponderance of the evidence is
> that abuse did occur and that it was systematic. The time span involved covers
> more than ten years. The type of abuse described was not limited to the usual
> beating, but went into such esoteric areas as psychological techniques and planned
> torture. The evidence presented by some individuals convinced juries and
> appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

> The number of incidents in which an Area 2 command member is identified as an
> accused can lead to only one conclusion. Particular command members were
> aware of the systematic abuse and participated in it either by actively participating
> in same or failing to take any action to bring it to an end. This conclusion is also
> supported by the number of incidents in which Area 2 offices are named as the
> location of the abuse.

OPS Special Project Conclusion Reports and Findings, and Cover Letter, Shines to
Martin, dated November 2, 1990 (Goldston Report, Exhibit C).

42.     On or about November 2, 1990, OPS Director Gayle Shines also approved

as compelling" and forwarded to Superintendent Martin the 66 page report and

conclusions of OPS investigator Francine Sanders which found that based on "the

overwhelming body of evidence which supports the allegations" that administrative

charges of excessive force should be sustained against Jon Burge and John Yucaitis

including that they "repeatedly administered electrical stimulation to Mr. [Andrew]

Wilson's body in order to create pain" and that Burge "held Mr. Wilson, while

handcuffed, against a hot radiator causing burns to Mr. Wilson's face, chest and thigh."

Chicago Police Office of Professional Standards (OPS) Special Investigative Report and

Findings, October 26, 1990 (Sanders Report, Exhibit D. pp.62-66).

43.    In their Memorandum In Opposition To Motion To Bar Testimony

Concerning Other Alleged Victims of Police Misconduct, filed on January 27, 1992

before the Police Board in the *Matter of Charges Filed against Respondents Jon Burge,*

*John Yucaitis and Patrick O'Hara,* Cases # 1856-58, specially appointed City of Chicago

lawyers, on behalf of Chicago Police Superintendent Leroy Martin and the City of

Chicago, made the following judicial admission concerning the testimony of "seven

additional victims of torture tactics at Area II headquarters:"

> The testimony regarding similar acts sets forth detailed accounts of tortuous
> treatment that are almost identical to the torture suffered by Andrew Wilson. The
> testimony reveals an astounding pattern or plan on the part of respondents [Burge,
> Yucaitis and O'Hara] to torture certain suspects, often with substantial criminal
> records, into confessing to crimes or to condone such activity.

Memorandum In Opposition To Motion To Bar Testimony Concerning Other Alleged

Victims of Police Misconduct, p. 1.

44.    In *Wilson* v. *City of Chicago,* 120 F.3d 681, 683-85 (7th Cir. 1997), the

Seventh Circuit Court of Appeals held that Defendant Burge acted within the scope of his

employment with the City "when he tortured Wilson," stating:

> Burge was not pursuing a frolic of his own. He was enforcing the criminal law of
> Illinois overzealously by extracting confessions from criminal suspects by
> improper means. He was, as it were, too loyal an employee. He was acting
> squarely within the scope of his employment.

45.    In January of 1994, OPS Investigator [Tillman] Messenger entered

sustained findings, which were subsequently approved by her supervisor, on the following allegations made by Darrell Cannon in CR #134723:

a)  Area 2 Sergeant John Byrne struck Cannon with a cattle prod on his testicles and penis and in his mouth;

b)  Sergeant Byrne repeatedly called Cannon a "nigger;"

c)  Sergeant Byrne held a 9 mm handgun to Cannon's head;

e)  Sergeant Byrne attempted to lift Cannon by the handcuffs;

d)  Area 2 Detective Peter Dignan played Russian roulette with a shotgun with Cannon;

e)  Detective Dignan attempted to lift Cannon by his handcuffs;

f)  Detective Dignan put a shotgun to Cannon's head;

h)  Area 2 Detective Charles Grunhard lifted Cannon up while Byrne held onto the cuffs.

46.  On December 16, 1993 Office of Professional Standards investigator Leutie Lawrence made the following sustained findings against Area 2 Detectives Boffo, Lotito and Dignan on allegations made by Philip Adkins in CR # 142201:

a)  Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly striking Adkins about the body and groin area with a flashlight on June 7, 1984;

b)  Detective Lotito violated Rule 8, by striking Adkins repeatedly about the body with a flashlight on June 7, 1984;

c)  Detective Lotito violated Rule 14, making a false report, by stating to OPS that he had seen injuries to Adkins prior to arresting Adkins while Adkins was in his house the morning of June 7, 1984 and for falsely stating that Det. Boffo had not been in the car while he was transporting Adkins;

d)  Sergeant Dignan violated Rule 14, making a false report, for writing in a police reportdatedJune15, 1984, and for stating to OPS on November 18, 1993, that he had observed injuries to Adkins' chest and torso while inside Adkins' house prior to his arrest on June 7, 1984.

47.  In June of 1993 OPS investigator Robert Cosey made the following sustained findings against four accused Area 2 officers on allegations made by Gregory Banks in CR # 188617:

a)  Sergeant Byrne violated Rule 6 by failing to report to OPS the use of excessive force against Gregory Banks;

b)  Sergeant Byrne violated Rule 14 by making a false report by testifying falsely before Judge Robert Sklodowski on June 3. 1985.that Gregory Banks was not physically abused in police custody;

c)  Sergeant Byrne violated Rule 8 by kicking Gregory Banks on October 29, 1983;

d)  Sergeant Byrne violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

e)  Sergeant Byrne violated Rule 14by making a false report by giving a false statement to OPS that Banks was not injured while in police custody;

f)  Detective Peter Dignan violated Rule 6 by failed to report to a supervisor the use of excessive force against Banks;

g)  Detective Peter Dignan violated Rule 14 by giving false information while providing a statement to OPS about Banks;

h)  Detective Robert Dwyer violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

i)  Detective Robert Dwyer violated Rule 14 by giving false information while providing a statement to OPS about Banks.

j)  Detective Charles Grunhard violated Rule 8 by kicking Gregory Banks about the body while he lay handcuffed on the floor during his interrogation;

k)  Detective Charles Grunhard violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

l)  Detective Charles Grunhard violated Rule 14 by giving false information while providing a statement to OPS about Banks

CR 188617, Cosey Summary Report.

48.    On January 11, 1994, OPS investigator Leutie Lawence entered the following sustained findings against Area 2 detectives and supervisors on allegations made by Stanley Howard in CR # 142017:

a)  Sergeant Byrne violated Rule 8, maltreatment of any person, by repeatedly striking Howard about the body with his fists inside interview room # 4 at Area on November 3, 1984;

b) Sergeant Byrne violated Rule 8, maltreatment of any person, by repeatedly kicking Howard's left leg inside interview room 4 at Area 2 on November 3, 1984;

c) Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly kicking Howard about the body inside interview room #4 at Area on November 3, 1984;

d) Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly striking Howard about the body inside interview room # 4 at Area on November 3, 1984;

e) Detective Lotito, violated Rule 8, maltreatment of any person, by repeatedly striking Howard about the body with his fists inside interview room # 4 at Area on November 3, 1984;

f) Detective Lotito, violated Rule 8, maltreatment of any person, by jerking Howard's body in the air causing the handcuffs to cut into Howard's wrists inside interview room # 4 at Area on November 3, 1984.

Summary Report, CR 142017. (See Howard, Exhibit E).

49.    OPS investigator [Tillman] Messenger testified in *People* v. *Cannon* that she recommended that OPS allegations be sustained against Peter Dignan for using excessive force during interrogation against Lee Holmes. An OPS memorandum indicates that she also found violations of Rule 8 against Dignan and Area 2 detective Dioguardi for hitting Holmes with a rubber hose and placing a plastic bag over Holmes' head. *People* v. *Cannon*, 11/2/99, p. 46; Shines Memo, 12/21/94).

50.    In September of 1992 Judge Earl Strayhorn granted a motion to suppress an alleged Area 3 torture victim's confession which was extracted under the supervision of then Area 3 Commander John Burge and Area 3 Sergeant John Byrne, finding that:

Given the atmosphere that existed in that District with eleven people under suspicion in custody in the same location the atmosphere must have been horrendously oppressive and I am going to suppress the statements *People* v. *Clemon*, 259 Ill. App.3d 5,8 (1994). The Illinois Appellate Court subsequently affirmed Judge Strayhorn's granting of the motion to suppress. *People* v. *Clemon*, 259 Ill. App.3d 5, (1994).

51.    On February 11, 1993, the Chicago Police Board ordered that Jon Burge

13

be separated from the Chicago Police Department and John Yucaitis be suspended for 15months for torturing and physically abusing Andrew Wilson. *In The Matter of the Charges Filed Against Jon Burge*–No. 91-1856 (Chicago Police Board. February 11, 1993).

52.    On February 10, 1994, Cook County Circuit Court Judge Thomas O'Brien affirmed the Police Board's order separating Burge and suspending Yucaitis, and on December 15, 1995, the Illinois Appellate Court affirmed Judge O'Brien's ruling. *Burge v. Police Board of the City of Chicago*, No. 93 CH 2265, (Circuit Court of Cook County, February 10. 1994); *Burge, O'Hara and Yucaitis v. Police Board of the City of Chicago*, No. 1-94-999, 1-94-2462. 1-942475 (consolidated) (Ill. App. Ct., December 15, 1995,unpublished)

53.    On May 9, 1997, Federal Judge Ruben Castillo, while ordering the public release of numerous police disciplinary files which contained allegations and findings of Area 2 torture and abuse, found:

> As Martin Luther King, Jr. stated in his now famous letter from the Birmingham County Jail in April of 1963: Like a boil that can never be cured as long as it is covered up but must be opened with all its pus-flowing ugliness to the natural medicines of air and light, injustice just likewise be exposed, with all of the tension its exposing creates, to the light of human conscience and the air of national opinion before it can be cured. Similarly, this Court concludes that the allegations of police misconduct contained in the disputed files must be exposed to the light of human conscience and the air of natural opinion.

*Wiggins v. Burge*, 173 F.R.D. 226, 230 (N.D. Ill 1997).

54.    On January 10, 2003, Illinois Governor George Ryan granted four Burge death row torture victims, Plaintiffs Aaron Patterson, Madison Hobley, Leroy Orange and Stanley Howard, pardons on the basis of innocence, finding:

The category of horrors was hard to believe. If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system.

Statement of Governor George Ryan, Depaul University School of Law, January 10, 2003. (Exhibit F).

55.    In *U.S. ex. rei. Maxwell* v. *Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D.Ill.

1999), Judge Shadur found the following in his decision:

It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.

56.    In her concurring opinion in *Hinton* v. *Uchtman*, 395 F 3d 810,822-23 (7th

Cir 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

[T]he claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched ... [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge -the officer in charge of Hinton's case-had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area Two on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See People v. Wilson, 506 N.E.2d 571 (Ill. 1987). Burge eventually lost his job with the police, though not until 1992. See In the Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, February 11, 1993). To this day,

Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick. "Burge repeatedly takes 5th;Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2, 2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972 and September 1991). . . .Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession. . .," thereby violating the fundamental human rights principles that the United States is committed to uphold. . . .

57.    The following criminal defendants who have alleged torture and abuse by

Area 2 or 3 detectives have received new hearings or trial, or had their confessions

suppressed, on the basis of evidence of Area 2 or 3 torture and abuse in the following

cases:

     a.  Andrew Wilson: *People* v. *Wilson,* 116 Ill.2d29 (1987);

     b.  Darrell Cannon: *People* v. *Cannon,* 293 Ill.App. 3d 634 (1997);

     c.  Aaron Patterson: *People* v. *Patterson,* 192 Ill. 2d 93, (2000);

     d.  Gregory Banks: *People* v. *Banks,* 192 Ill. App. 3d 986 (1989);

     e.  David Bates: *People* v. *Bates,* 267 Ill. App. 3d 503,505 (1994);

     f.  Derrick King: *People* v. *King,* 192 Il.2d 189 (2000);

     g.  Stanley Howard: *People* v. *Howard,* 84 C 13134. (Ill. Sup. Ct. Order of 6/18/99);

     h.  Jesse Clemon: *People* v. *Clemon,* 259 Ill. App.3d 5, (1994).

58.    On April 24, 2002, Judge Paul Biebel, Chief Judge of the Cook County

Criminal Division, finding the State's Attorney Richard Devine had a conflict of interest,

appointed Special Prosecutors Edward Egan and Robert Boyle to investigate allegations

of police torture and abuse at Area 2 and Area 3. (See Exhibit G).

59.     In an affidavit executed in August of 2004. Richard Brzeczek averred that

he was the Chicago Police Superintendent from January 11. 1980 until April 29. 1983,

and that he made the following true and accurate statements to *Chicago Tribune* reporter

Steve Mills which appeared in an April 29, 2002 *Chicago Tribune* article:

> Twenty years later, Brzeczek, now a defense attorney, said that there is 'no doubt
> in my mind' that Burge and his detectives tortured some suspects. The whole
> situation at Area 2 [was] a disgrace and an embarrassment. It's time something is
> done about it," Brzeczek said, referring to the former Burnside station on the
> southside where most of the torture allegedly occurred. (See Tribune, Exhibit H).

60.     On October 19, 2005, the Inter-American Commission for Human Rights

of the Organization of American States held a hearing on the question of Area 2 torture

and is presently considering whether to hold a highly unusual on-site visit to question,

*inter alia,* Mayor Richard Daley, Cook County State's Attorney Richard Devine. and

victims of torture concerning the police torture scandal.

61.     On May 19, 2006, the ten person United Nations Committee Against

Torture made the following findings:

> The Committee is concerned with allegations of impunity of some of the State
> party's [U.S. Government's] law enforcement personnel in respect to acts of
> torture or cruel, inhuman or degrading treatment or punishment. The Committee
> notes the limited investigation and lack of prosecution in respect of the allegations
> of torture perpetrated in Areas 2 and 3 of the Chicago Police Department (article
> 12). The State party should promptly, thoroughly and impartially investigate all
> allegations of acts of torture or cruel, inhuman or degrading treatment or
> punishment by law enforcement personnel and bring perpetrators to justice, in
> order to fulfill its obligations under article 12 of the Convention. The State should
> also provide the Committee with information on the ongoing investigations and
> prosecution relating to the above-mentioned case. 5/19/06 Conclusions and
> Recommendations of the U. N. Committee Against Torture, paragraph 25, p.7

62.     On May 19, 2006, Chief Cook County Criminal Court Judge Paul Biebel,

after finding that "over the past 30 years, the public has demanded to know why no

complete investigation was ever conducted into the [torture] allegations," and that there

17

have been "allegations of a cover-up by high ranking police and government officials."

ordered that the Report of the Special Prosecutor in the Burge torture investigation be

made public, finding that:

> [T]he [Special Prosecutor's investigation] was ordered because of an "open sore" on the civic body of the City of Chicago which has festered for many years. The Court finds the interests of justice require full publishing of the Special Prosecutor's Report, including certain materials relating to the Grand Jury.

Memorandum Opinion and order of 5/19/06, pp. 9, 17-18.

63.    On July 19, 2006, the Special Prosecutors issued their Report. Among

their findings were the following:

a.    The evidence established beyond a reasonable doubt that "Jon Burge and at least one other officer [John Yucaitis] committed armed violence, intimidation, official misconduct and aggravated battery when they abused Andrew Wilson at Detective Area 2 on February 14, 1982, and committed perjury when they testified at Wilson's first trial on November 9, 1982;" (Report, p. 16)

b.    The evidence established beyond a reasonable doubt that Area 2 detectives Anthony Maslanka and Michael McDermott abused Alphonso Pinex, and committed aggravated battery, perjury, and obstruction of justice; Id.

c.    The evidence established beyond a reasonable doubt that Area 2 Detectives James Lotito and Ronald Boffo abused Philip Adkins and committed aggravated battery against him; Id.

d.    There were "many other cases" in which the Special Prosecutor "believed" that the victims were abused, including Melvin Jones, Shaded Mumin, and Michael Johnson, but "proof beyond a reasonable doubt is "absent; "Id.

e.    That "the commander of the Violent Crimes Section of Detective Areas 2 and 3, Jon Burge," was "guilty" of "abus[ing] persons with impunity," and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they;" Id.

f.    That Police Superintendent Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson," that he "believed at the time that officers at Area 2 had tortured Andrew Wilson," that "Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson," and that he "kept Burge in command at Area 2, and issued a letter of commendation to all of the detectives at Area 2;"

g.    That the Chief of Felony Review of the States Attorneys' Office,

18

Lawrence Hyman, gave "false testimony" when "he denied that Andrew Wilson told him he had been tortured by detectives under the command of Jon Burge;"

h.  That "the Superintendent of Police Department [Brzeczek] received and believed evidence that a prisoner [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and he had to believe, they testified perjuriously, that the prisoner had been sentenced to death, and that for 20 years the Superintendent still remained silent. . ." (emphasis in original); (Id.,. pp. 86:-87)

i.  That the Court of Appeals for the Seventh Circuit in its 1993 consideration of the City's liability in the Wilson civil case was misled concerning the superintendent's contemporaneous knowledge that Burge and his subordinates tortured Wilson because he concealed those views until after the case was concluded; (Id. pp. 87-88)

j.  That no meaningful police investigation was conducted, nor any police witness questioned in either the Wilson case, or in the Michael Johnson electric-shock case, which occurred a few months after Wilson, and had "glaring similarities" to the Wilson allegations; (Id. pp. 71-73; 88)

k.  That "something should have been done about the disgrace and embarrassment [at Area 2] 24 years ago" by the Chicago Police Superintendent; (Id. p. 89)

l.  If action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly thereafter, the appointment of the Special Prosecutor would not have been necessary; (Id. p. 88)

m.  That this action, should have included, "at the very least," the Superintendent's remov[al] of Burge from any investigative command and a "complete shake-up at detective Area 2." (Id., p. 88)

64.     In a press statement made by the Mayor of the City of Chicago on July 21, 2006, he made the following admissions binding on himself, his office, the City of Chicago, its City Council and its police department:

a.  That the City "strongly supported the release" of the "Special Prosecutor's Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District" [Area 2] because "the public has the right to know about this shameful episode in our history." (Daley Statement, p. 1);

b.  "no suspect should be subjected to the abuses detailed in [the Special Prosecutor's] Report, and no suspect should ever be coerced into confessing to crimes he did not commit." This "fundamentally undermines

our system of justice and destroys public confidence. It should never happen." (Daley Statement, p. 1);

   c.    That Burge and his Unit participated in a "pattern of misconduct" (Id. p. 2)

   d.    That he accepted his "share of the responsibility" and would "apologize to anyone"

65.    On November 3, 2006, the City of Chicago agreed to settle the torture cases of *Madison Hobley* v. *Burge*, *Leroy Orange* v. *Burge*, and *Stanley Howard* v. *City of Chicago* for a total of $14.8 million dollars. (See Affidavit Orange, Exhibit I).

### Evidence of Other Allegations Of Torture and Abuse Committed By Detectives Maslanka, McDermott, Paladino, McGuire, Dwyer and Gallagher

66.    On October 21, 1985, Franklin Burchette testified that McDermott, and other Area 2 detectives, "threatened him with electric shock on testicles, sleep deprivation.

67.    In an OPS statement on May 29, 1986, Terry Harris stated that Maslanka, McGuire and others, "choked, arm twisted, held in underwear overnight, repeatedly threatened, made sexually derogatory comments".

68.    In June of 1985 Alphonso Pinex  suffered a severe beating at the hands of Maslanka, McDermott and others. (See Pinex, Exhibit J).

69.    On May 13, 1987, Shaded Mumin testified the Maslanka, Paladino, McDermott and others "pushed him into wall, threatened with .44 magnum silver revolver to head, Russian roulette, suffocated with typewriter cover until unconscious, threatened with worst treatment, repeatedly called 'nigger'.

70.    On July 23, 1987 Andrew Maxwell testified that he "was beaten to the body and face, kicked during interrogation" by Paladino, McDermott, and others.

71.    In August of 1987 Madison Hobley testified that Detectives Dwyer, Paladino and others, "hit in chest, thumbs to neck, recial epithets, including 'nigger'. kicked in

groin, beaten to the body while bagged, held nose while bagged, passed out, threatened to kill him during interrogation.

72.  Robert Smith stated that he was "beaten during questioning" by Dwyer, and Keith Eric Johnson testified that he was "repeatedly slapped, beaten, kicked from chair, kicked, called 'lying nigger' during 48 hours of interrogation". (See Torture Chart Compiled by People's Law Office, Exhibit K).

### Grounds for Relief

*4. Tony Anderson was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Prosecutors Suppressed Evidence that Physical Abuse of Detainees and Coercion of Confessions at Area Two Violent Crimes was Widespread and Systematic in Violation of* Brady v. Maryland *and its progeny.*

73.  The Goldston Report and the Sanders Report of the Office of Professional Standards of the City of Chicago demonstrated that an officially sanctioned pattern and practice of physical abuse of prisoners and coercion of confessions prevailed at Area 2 Violent Crimes during the time that Tony Anderson was interrogated about a murder and other crimes.

73.  This evidence, which rebutted the mere denials of police at the Motion to Suppress hearing that they subjected Anderson to physical abuse and psychological torture and refused to allow him to call his mother or a lawyer, is the type of evidence which must be disclosed under Brady.

74.  Moreover, the timely disclosure of this evidence would have served as the basis of admitting specific evidence from other victims of police abuse by officers under Jon Burge's command.

75.    Had this favorable and potentially exculpatory evidence been disclosed to

Anderson in a timely manner, there is a reasonable probability that his statement would

have been suppressed.

76.    The State's Attorney was aware of this length investigation by the OPS

and aware of the Goldston and Sanders Reports, and had a duty to disclose this evidence

pursuant to Brady.

*B. Tony Anderson was Denied Effective Assistance of Counsel, in Violation of his Rights*
*under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States*
*Constitution when Counsel Failed to Investigate The Issue of Anderson's Allegations of*
*Physical Abuse and Psychological Torture.[1]*

77.    Defense counsel Thomas Hoffa failed to investigate claims of physical

abuse and torture made by Tony Anderson.

*C. Tony Anderson was Denied Effective Assistance of Counsel, in Violation of his Rights*
*under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States*
*Constitution when Counsel Failed to Challenge the Unduly Suggestive Identifications*
*Made By State Witnesses.*

78.    Defense counsel Thomas Hoffa failed to file motions to challenge the

unduly suggestive identification of Petitioner.

*D. Tony Anderson was Denied Effective Assistance of Counsel, in Violation of his Rights*
*under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States*
*Constitution when Counsel Failed to Challenge the Coerced Statement Made By*
*Petitioner.*

79.    Defense counsel Thomas Hoffa failed to file motions to suppress coerced

statements made by petitioner after a reasonable investigation would have revealed that

the Goldston Report and Findings and the Sanders Report and Findings demonstrated that

---

[1] A Thomas Edward Hoffa was listed in the Attorney Registration & Disciplinary Commission "ARDC"
as "Voluntarily inactive and not authorized to practice law-Last registered Year: 1994. Hoffa had been
admitted to practice in Illinois on May 16, 1972.

an officially sanctioned pattern and practice of physical abuse of prisoners and coercion of confessions prevailed at Area 2 Violent Crimes during the time that Anderson was interrogated about murder and other crimes.

*E. Tony Anderson was Denied Effective Assistance of Counsel, in Violation of his Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when Counsel Coerced Petitioner Into Pleading Guilty and That Counsel's Representation Fell Below an Objective Standard of Reasonableness.*

80.    Defense counsel Hoffa "coerced" the Petitioner into pleading guilty by telling him that if he did not do so, he would likely get the death penalty. Further, counsel failed to inform Petitioner of the applicable law in his case, namely, that he was not death penalty eligible, and said failure by counsel resulted in his pleading guilty.

*F. Tony Anderson Asserts the Actual Innocence Exception to The Procedural Default Doctrine.*

81.    In April, 1990, Detectives McDermott, Maslanka, Paladino, Gallagher and McGuire, under the direct supervision of Lieutenant Jon Burge, physically abused and emotionally tortured Mr. Anderson until he "confessed" to crimes that he did not commit.

82.    In May, 1991, during a hearing on his Motion to Suppress his "confessions," Mr. Anderson testified under oath that he had been abused and tortured by the Area Two Detectives.

83.    At the same hearing, Detectives Michael McDermott, John Gallagher, John Paladino and Robert Maslanka testified that they neither struck Mr. Anderson, nor coerced Mr. Anderson into making a statement.

84.    Based upon the evidence available in early 1990-91, the trial court discredited the testimony provided by Mr. Anderson and credited the testimony provided by the Detectives.

85.    Now, 18 years later, the slow accrual of new evidence has revealed that the trial court made the wrong decision.. It is now common knowledge the Area Two Detectives, including Detectives Burge, McDermott, Maslanka, Paladino, McGuire and Gallagher, routinely engaged in the same type of abuse and torture described by Tony Anderson in 1990.

86.    Based upon this new evidence, Mr. Anderson's prior sworn testimony now bears strong indicia of reliability; whereas, the testimony of Detectives McDermott, Maslanka, Paladino, McGuire and Gallagher is, at best, suspect.

87.    The new evidence and the reliability of his prior sworn testimony-coupled with the fact that Mr. Anderson was denied effective assistance of counsel when he failed to investigate the allegations of torture, failed to challenge the unduly suggestive identifications made by State witnesses, failed to challenge the coerced statements, and when he threaten Mr. Anderson with the likelihood of being sentenced to death, in light of all of the above, it is more likely than not that no reasonable jury would have convicted him.

s://Standish E. Willis
Standish E. Willis

The Law Office of Standish E. Wills, Ltd.
407 S, Dearborn, Suite 1395
Chicago, IL 60605
312.554.0005